UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PATRICIA PEROTTI-CYRUS,
      Plaintiff,                      CIVIL ACTION
                                     NO. 05-10116-DPW

      v.

ROBERT JENSON, Chairman
of The Board of Appeals For
The Town of Sandwich, et al.,
      Defendants.

PLAINTIFF'S MEMORANDUM IN SUPPORT OF
HER MOTION FOR SUMMARY JUDGMENT

NOW COMES the plaintiff, Patricia Perotti-Cyrus [hereinafter "Ms. Perotti-Cyrus"], and moves this Court, pursuant to Fed.R.Civ.Proc. Rule 56, and Local Rule 56.1 of the U.S. District Court for the District of Massachusetts, for entry of summary judgment in her favor, as there is no genuine dispute as to the material facts, in this matter, hence, summary judgment is appropriate. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Celotex Corporation v. Myrtle Nell Catrett, Administratrix, ____ U.S. ____, 106 S.Ct. 2548, 2553 (1986).

    I.      By Virtue of the 1994 ANR Plan, Plaintiff's Cottage Is Exempt From
             The Cottage Colony Conversion By-law, Section 4710 of the Sandwich
             Zoning By-laws.

By virtue of the 1994 ANR Plan, plaintiff's cottage at 9 Ploughed Neck Road, as well as the other cottages shown on that plan, nos. 11, 13, 15, 17, and 19 Ploughed Neck Road, is exempt from the Cottage Colony Conversion By-law contained in the Sandwich Zoning by-laws, Section 4710, because, being located on it's own lot, the cottage no longer meets the definition of the term "cottage

colony," as contained in the zoning by-laws.  <u>See</u> Plaintiff's Statement of Undisputed Facts ["Facts"], ¶¶24 – 32.  Instead, plaintiff's cottage, after division of the lot such that each cottage is located on its own lot, falls within the definition of "dwelling, single-family," as defined in the Sandwich zoning by-laws. <u>See</u> Facts, ¶¶30-32.  <u>Marinelli v. Board of Appeals of Stoughton</u>, 440 Mass. 255, 259, 797 N.E.2d 893 (2003) ("primary source of insight into the intent of the [law-making body] is the language of the [by-law]," interpreted in accordance with its plain language); <u>Mass. Broken Stone Co. v. Weston</u>, 430 Mass. 637, 640, 723 N.E.2d 7 (2000)("Where the language of a [by-law] is clear, courts must give effect to its plain and ordinary meaning...").

Single-family dwellings are a by-right use in the R-2 zoning district in which plaintiff's cottage is located, for which no special permits or other zoning relief or permission is required.  <u>See</u> Facts, ¶¶31, 39, 40, 52.  Moreover, there is no distinction under the State Building Code between a cottage or a single-family dwelling, such that no "change of use" must be obtained under the State Building Code.  <u>See</u> Facts, ¶40.  Indeed, the definition of the term "cottage colony," as contained in the Sandwich zoning by-laws, suggests that the cottages are in fact single-family dwellings, when compared to the definition of "dwelling, single-family," as contained in the same by-laws.  <u>See</u> Facts, ¶¶24, 25 and 30.

As such, plaintiff was entitled to the issuance of a building permit by the Building Inspector to repair her cottage at Ploughed Neck Road, and the Building Inspector wrongfully denied her application for the same, and the Board of Appeals wrongfully denied her appeal of the Building Inspector's denial of her application for a building permit.  <u>See</u> Facts, ¶¶46, 53, 54.  Plaintiff requests that

this Court order the defendants to issue her a building permit so she may repair her cottage forthwith.

II.  Defendants' Denial of Plaintiff's Requests for a Building Permit, Special
    Permit and/or Variance Relief Was Wrongful, as it Rests on an
    Untenable Interpretation of the Zoning By-Laws, Which Impermissibly
    Violates the Home Rule Act, and Limitations Placed Upon
    Municipalities Thereunder.

Defendants' wrongful denial of plaintiff's requests for a building permit, special permit and variance relief rests upon an untenable interpretation and twisting of the zoning by-laws, in violation of the limits placed upon municipalities under the Home Rule Act, G.L. c. 43B, s. 13. See Facts, ¶¶56-59. Essentially, it is the defendants' position, in reliance upon Town Counsel's opinions, that the division of land through the endorsement of an "approval under the subdivision control law not required," commonly known as an "ANR plan," pursuant to G.L. c. 41, s. 81L, by virtue of the provision that a parcel of land upon which two or more structures have existed since before the municipality adopted the Subdivision Control Law (G.L. c. 81K et seq.), such that each structure is located on its own lot -- as was done in this case – is unlawful, unless, at the time of endorsement of such an ANR plan, the resulting lots, each containing their own structure, met the zoning dimensional requirements in effect as of the date of endorsement of the ANR plan, as required under Sections 2550 and 4710 of the Sandwich zoning by-laws. See Facts, ¶54.

This position, however, violates the limits placed upon municipalities in adopting ordinances and by-laws, including zoning by-laws, under the Home Rule Act, which states:

> Nothing in this section shall be construed to permit any city or town, by ordinance or by-law, to exercise any power or function which is inconsistent with any general law enacted by the general court before November eighth, nineteen hundred and sixty-six which applies alike to all cities, or to all towns, or to all cities and towns, or to a class of not fewer than two.

> G.L. c. 43B, s. 13.

The Legislature has "supreme zoning power." Mass. Const. Amend. Art. 89; Board of Appeals v. Housing Appeals Committee, 363 Mass. 339, 294 N.E.2d 393 (1973). The Legislature first enacted a "zoning act" in 1920s, and the current act was adopted in 1975, allowing municipalities to adopt zoning by-laws. Opinion of the Justices to the House of Representatives, 234 Mass. 597, 127 N.E. 525 (1920) (zoning act rightfully does not interfere with "rights already acquired by existing use or construction of buildings in general . . .".) Thereafter, in 1953, it enacted the Subdivision Control Law. G. L. c. 41, ss. 81K, et seq.

The provision in the Subdivision Control Law exempting from the definition of the terms "subdivision" "the division of a tract of land upon which two or more buildings were located when the Town adopted the Subdivision Control Law, into separate lots on each of which one of such buildings remains standing. . . ," first appeared in the 1953 version of the law, without explanation. G.L. c. 41, s. 81L; Citgo Petroleum Corp. v. Planning Board of Braintree, 24 Mass. App. Ct. 425, 427, 509 N.E.2d 284 (1987)("The legislative history of the 1953 statute shows that the drafters were quite aware of what they were doing, although it does not explain their reasons."); Smalley v. Planning Board of Harwich, 10 Mass. App. Ct. 599, at 604, 410 N.E.2d 1219 (1980).

As both the Citgo and Smalley cases (and the many cases in their wake) make clear, a municipality's planning board may not refuse to endorse an ANR plan, where two or more structures have existed since before the municipality adopted the Subdivision Control Law, and the ANR plan divides the property such that each structure is located on its own lot, *despite* the fact that the resultant lots do not meet then-current dimensional requirements. Citgo Petroleum Corp. v. Planning Board of Braintree, 24 Mass. App. Ct. at 427, 509 N.E.2d 284; Smalley v. Planning Board of Harwich, 10 Mass. App. Ct. at 604, 410 N.E.2d 1219. The Legislature, which must be regarded as cognizant of these cases, has amended both the Subdivision Control Law and the Zoning Act on numerous occasions since that time, but has not seen fit to place any dimensional limitations on the division of land where the structures thereon pre-date the adoption of the Subdivision Control Law.

A municipality may adopt and/or enforce zoning by-laws only insofar as they are not inconsistent with the Massachusetts Constitution or laws enacted by the General Court. Mass. Const. Amend. Art. 89, s.6; G.L. c. 43B, s. 13; Bloom v. Worcester, 363 Mass. 136, 293 N.E.2d 268 (1973) (municipalities may not exercise powers or functions which are inconsistent with the general laws). Furthermore, the Zoning Act itself places limits upon municipalities' adoption of zoning by-laws. G.L. c. 40A, s. 6. Section 6 of the Zoning Act contains nine paragraphs, or clauses, each setting forth the limits upon which zoning by-laws or ordinances shall apply in various circumstances,[1] the most important of which, in

---

[1] The first paragraph protects lawfully developed and existing properties, providing different levels of protection for different uses. G.L. c. 40A, s.6 (1st ¶). The second paragraph protects

5

considering the issues in this case, is the first paragraph, which states:

> Except as hereinafter provided, a zoning ordinance or by-law shall not apply to *structures* . . . *lawfully in existence* . . .
>
> G.L. c. 40A, s. 6 (first paragraph, in pertinent part) (*emphasis added*).

There is no legitimate reason why structures so divided on this type of an ANR plan should not be considered a "structure lawfully in existence" under the first paragraph of Section 6 -- certainly the division of properties containing structures pre-dating the adoption of Subdivision Control, such that each structure is situated on its own lot, is lawfully done pursuant to G.L. c. 41, ss. 81L and 81P.   Particularly where, as is the case here, the structures predate not only the adoption by the Town of Subdivision Control Law on August 20, 1954, but also the adoption of zoning in the Town of Sandwich in 1960, derogate in any way from the purposes of the Town's zoning by-laws.   See Facts, ¶35.   As acknowledged by Mr. Jensen, chair of the Zoning Board of Appeals, and Ms. Boardman, The Building Inspector and Zoning Enforcement Officer under the Zoning By-laws, the purpose of dimensional zoning is to regulate the structural density of an area, and where, as here, the structures predate both zoning and

---

properties lawfully under development, provided development continues to completion within a reasonable time.  G.L. c. 40A, s.6 (2nd¶).  The third paragraph provides that where a use has been abandoned for two years, it may be deemed abandoned.  G.L. c. 40A, s. 6 (3rd¶).  Paragraph 4 provides that vacant lots held in separate ownership, meeting certain dimensional requirements, are always protected from increases in certain dimensional zoning requirements, and that up to three vacant lots held in common ownership are protected for a period of five years.  G.L. c. 40A, s. 6(4th¶).  The fifth paragraph provides protection for lots on approved definite plans of subdivisions for eight years.  G.L. c. 40A, s.6 (5th¶).  The sixth paragraph provides protection for land shown on an ANR plan from changes in permitted uses for a period of three years.  G.L. c. 40A, s.6 (6th¶).  Paragraphs 7 and 8 toll the running of time under paragraphs 5 and 6 until appeals of decisions involving subdivision and ANR plans.  G.L. c. 40A, s.6 (7th and 8th ¶¶).  Finally, the ninth paragraph provides that an owner may waive the protections afforded him under Section 6, by the recording a plan to that affect.  G.L. c. 40A, s.6 (9th¶).

subdivision control, the division of one large lot containing six (6) structures, into six lots each containing one structure, does not in any way change the structural density of the area.  See Facts, ¶¶43, 44.

Yet, both the Town's Cottage Colony By-law, Section 4710, and its Non-Conforming Lots By-law, Section 2550, and the Town's interpretation of these by-laws in fact are impermissibly inconsistent with the Subdivision Control Law, rendering the lawful division of land containing two or more structures since before the adoption of Subdivision Control, unlawful under zoning, _unless_ the resultant lots meet dimensional requirements in effect when such an ANR plan is endorsed.   As such, these two zoning by-laws are unlawful due to their inconsistency with the Subdivision Control Law, pursuant to the Home Rule Act, G.L. c. 43B, s. 13.[2]  County Commissioners of Bristol v. Conservation Comm. Of Dartmouth, 380 Mass. 706, 715, 405 N.E.2d 637 (1980).

> Under the terms of §6 [of Art. 2 of the Home Rule Amendment], a municipal by-law is valid in so far as it is not inconsistent with the laws enacted by the Legislature in conformity with its reserved powers.  "In determining whether a local ordinance or by-law is 'not inconsistent' with any general law within the meaning of those words in § 6 of the Home Rule Amendment . . . the same process of ascertaining legislative intent must be performed as has been performed in the Federal preemption cases and in our own cases involving 'inconsistent' . . . local ordinances or by-laws. . . . If the Legislature has made no explicit indication of its intention in this respect, a legislative intention to bar local ordinances and by-laws purporting to exercise a power or function on the same subject as State legislation may nevertheless be inferred in all the circumstances. . . . ."

---

[2] Plaintiff does indeed have standing to challenge the validity of these by-laws under the Home Rule Act, in an action for declaratory judgment, which this is, where an actual controversy has arisen, which it has, pursuant to G.L. c. 43B, s. 14 and G.L. c. 231A, ss.1 and 2.  Mastriani v. Building Inspector of Monson, 19 Mass. App. Ct. 989, 990, 475 N.E.2d 408 (1985) (The other method that may be used to challenge the validity of a zoning ordinance or by-law is by bringing an action pursuant to G. L. c. 231A, provided an actual controversy exists).

While requiring conformity with dimensional requirements for ANR plans pertaining to _vacant_ land serves a legitimate zoning purpose of controlling structural density of an area, it makes no sense, and serves no legitimate zoning purpose where the structures such as these, and thus the structural density of the area, pre-date both the adoption of Subdivision Control and zoning by the Town of Sandwich, and thus have long been established.[3]  See Facts, ¶¶43, 44.  Pierce v. Wellesley, 336 Mass. 517, 521, 146 N.E.2d 666 (1957) (zoning by-laws are invalid where there "'is no substantial relation between it and the furtherance of any of the general objects' stated in the enabling legislation.'");  Rogers v. Town of Norfolk, 432 Mass. 374, 380, 734 N.E.2d 1143 (2000) (legitimate purpose of zoning is to preserve the character of a neighborhood).

The character of the neighborhood is not changed by the division of one large lot containing six cottages into six resulting lots, each containing one cottage or single-family dwelling; nor does such a division result in a change of use – all of the single-family homes continue to use the land in the same manner as they did prior to division.  See Facts, ¶45;  Willard v. Board of Appeals of Orleans, 25 Mass. App. Ct. 15, 21, 514 N.E.2d 369 (use does not change by virtue of change in structure's relation to dimensional requirements); see also Goldhirsh v. McNear, 32 Mass. App. Ct. 455, 460, 590 N.E.2d 709 (1992);  Bannerman v. Fall River, 391 Mass. 328, 461 N.E.2d 793 (1984);  CHR General, Inc. v. City of Newton, 387 Mass. 351, 439 N.E.2d 788(1982).  Indeed, several Land Court cases

---

[3] Moreover, as noted by the Citgo Court, "a building, to qualify under this provision, must have been in existence when the Subdivision Control Law went into effect in the town.  It is too late for speculators to buy tracts of back land, cover them with shacks, and divide them into lots accordingly."  Citgo Petroleum Corp. v. Planning Board of Braintree, 24 Mass. App. Ct. at 427, 509 N.E.2d 284.

have held the properties such as these, divided because the structures pre-date the adoption of Subdivision Control by the particular city or town, are entitled to the protections set forth in the first paragraph of G.L. c. 40A, s.6.  Most recently, in the case of Norwell-Arch, L.L.C. v. Norwell Zoning Board of Appeals, Misc. Case No. 285113, Mass. Land Court (Hon. J. Trombley) (decided May 24, 2004); 12 LCR 208; 2004 MASS. LCR LEXIS 44 (copy attached as Exhibit 3-15, the Land Court recognized the interaction between the Subdivision Control Law, in particular with regard to residential structures pre-dating the adoption of that law by a municipality, and the Zoning Act, holding that such residential structures are entitled to the protections afforded by G.L. c. 40A, s. 1st ¶, stating:

> Clearly, the General Court intended to provide special protection for residential structures in existence before the adoption of the subdivision control law in each locality when it added the two building exception to G. L. c. 41, 81L, in 1953. Citgo Petroleum Corp. v. Planning Bd. of Braintree, 24 Mass. App. Ct. 425, 427 (1987); G. L. c. 41, §81L (excepting from the subdivision control law the "division of a tract of land on which two or more buildings were standing when the subdivision control law went into effect in the city or town in which land lies into separate lots on each of which one of such buildings remains standing").  Similarly, single and two-family residential structures enjoy preferential zoning treatment under the second "except" clause of G. L. c. 40A, §6. The second "except" clause of G. L. c. 40A, §6, provides residential structures preferential zoning treatment when the proposed changes to a nonconforming residential structure will not increase its nonconforming nature.  Goldhirsh, 32 Mass. App. Ct. at 458-461 (discussing board of appeal's review of nonconforming structures under G. L. c. 40A, §6).  To fully protect single and two-family residential structures, G. L. c. 41, §81L, and c. 40A, §6, must be read together.

> Norwell-Arch, L.L.C. v. Norwell Zoning Board of Appeals, Misc. Case No. 285113, Mass. Land Court (Hon. J. Trombley) (decided May 24, 2004); 12 LCR 208; 2004 MASS. LCR LEXIS 44; see also Shkliew et al. v. Board of Appeals of Salisbury, Land Court, Misc. Case No. 174671 (July 6, 1992; Hon. Robert V. Cauchon) (Exhibit 3-16); and see Liston v. Board of Appeals of Dartmouth, Land Court, Misc. Case No. 180789

(December 10, 1996; Hon. Robert V. Cauchon) (Exhibit 3-17).

Accordingly, plaintiff requests that this Court enter a declaratory judgment, and enter orders as follows:

(a)     as applied to properties, containing structures pre-dating the adoption of the Subdivision Control Law, and lawfully divided pursuant to G.L. c. 41, s. 81L and s. 81P, the Town's Cottage Colony Conversion By-law, Section 4710, and Non-Conforming Lots By-law, Section 2550, are unlawful and violate the Home Rule Act, G.L. c. 43B, s. 13, as they are inconsistent with a General Law, the Subdivision Control Law, G.L. c. 41, ss. 81K et seq., which allows division of these properties, without regard to dimensional requirements in effect as of date of endorsement of such an ANR plan;

(b)     enjoin the defendants from deeming these particular and peculiar types of properties "unlawful under zoning" unless the resultant lots meet dimensional requirements in effect as of the date of endorsement or recording of this type of ANR plan, and instead affirmatively mandate that the defendants treat such properties as "lawfully in existence," regardless of non-compliance with dimensional requirements, as set forth in G.L. c. 40A, s. 6, 1st¶;

(c)     order the defendants to issue a building permit to the plaintiff so that she may repair her cottage;

(d)     award plaintiff damages, in the amount of $700 per month for lost rent resulting from defendants' failure and refusal to issue a building permit (through December 2005, the sum of $18,200), together with an award of damages in the amount of $50,000, the loan plaintiff was forced to obtain to keep herself afloat;

(e)     find that the defendants' conduct amounts to gross negligence, bad faith, and/or malice, and award plaintiff her costs and attorney's fees, and such other amounts as this Court deems just and reasonable.

III.   **Defendants' Interpretation of Zoning By-laws, and the Zoning By-laws Themselves, Constitute Unlawful Spot Zoning, Albeit Reverse Spot Zoning, Depriving the Plaintiff of Her Rights to Equal Protection and Substantive Due Process under the Massachusetts and Federal Constitutions.**

Reverse spot zoning occurs when zoning bylaws ". . . impose more

> restrictive treatment on given parcels than is imposed on other parcels in the same zoning district are often characterized as "reverse spot zoning."   [Bobrowski, Massachusetts Land Use and Planning Law §  3.4.3 (1993)]   However, the legality of a given zoning amendment turns not on what parcel has been singled out, or even on the effect on the parcel, but rather on whether the change can fairly be said to be in furtherance of the purposes of the Zoning Act. . . .  [citations omitted] . . .
>
> . . .
> "The vice is the singling out of a particular parcel for different treatment from that of the surrounding area, producing, without rational planning objectives, zoning classifications that fail to treat like properties in a uniform manner." [National Amusements, Inc. v. Boston, 29 Mass. App. Ct. 305, 308, 312-313, 560 N.E.2d 138 (1990)].
>
> W.R. Grace & Co. v. Cambridge City Council, 56 Mass.App.Ct. 559, 569-570, 779 N.E.2d 141 (2002).

Here, plaintiff's property, dimensionally nonconforming as a result of the endorsement and recording of 1994 ANR Plan, is being "singled out for different treatment from the surrounding area, producing, without rational planning objectives, zoning classifications that fail to treat like properties in a uniform manner." Ibid.  See Facts ¶¶43 - 52, and 64 - 69.  Specifically, as materials submitted to the Board of Appeals in considering this matter clearly reveal, a survey of 262 neighboring properties, located in the very same R-2 zoning district, shows that only eleven (11%) percent of these single family residences comply with current zoning dimensional requirements.  See Facts ¶47.  Nor is plaintiff's property at 9 Ploughed Neck Road the most non-conforming

dimensionally – instead, it ranks 59th on the list of nonconforming properties.[4]
See Facts ¶48.

There is no legitimate nor rational reason for treating the plaintiff's
dimensionally nonconforming property – lawfully created by virtue of the 1994
ANR Plan, pursuant to G.L.c. 41, ss. 81L and 81P – any differently than properties
that have become nonconforming through increases in dimensional zoning
requirements.  Yet, the Town does so in two ways: First, by interpreting the first
paragraph of Section 6 of the Zoning Act, Chapter 40A, so as to add language not
found in the statute, in essence adding the language contained in Section 2550 of
the Town's zoning by-laws, which requires that a lot, when created, whether
vacant or developed, comply with dimensional requirements; and Second,
through the application of Section 2550 to these types of properties.

A.    <u>Plain Language Of G.L. c. 40A, s. 6 1st ¶ Does Not Provide
      Limitations Inferred By Town.</u>

There is nothing in the plain language of first paragraph of Section 6 of the
Zoning Act[5] which gives any grounds to conclude that the term "structure . . .
lawfully in existence" is tied in any way to the "date of endorsement of a plan"
creating lots such as this, one of the bases upon which the defendants assert that
plaintiff's property is unlawful under zoning.[6]  <u>Marinelli v. Board of Appeals of</u>

_____

[4] With no. 1 being the most nonconforming property, and no. 262 being the most dimensionally
conforming property.

[5] Which states "[e]xcept as hereinafter provided, a zoning ordinance or by-law shall not apply to
*structures . . . lawfully in existence* . . .."  G.L. c. 40A, s. 6 (first paragraph, in pertinent part)
(*emphasis added*).

[6] Plaintiff notes that she asserts this position only with regard to the division of properties on
which structures have existed since before the municipality adopted the Subdivision Control Law,
and not otherwise.  Having been developed prior to the adoption of either zoning or Subdivision
Control, the question is not, as it is in the case of vacant lots created through the ANR process,
whether the lots are "buildable," because, as is patently obvious, properties such as plaintiff's have
already been built upon and developed before the adoption of Subdivision Control.

Stoughton, 440 Mass. 255, 259, 797 N.E.2d 893 (2003) ("primary source of insight into the intent of the Legislature is the language of the statute," interpreted in accordance with its plain language); Mass. Broken Stone Co. v. Weston, 430 Mass. 637, 640, 723 N.E.2d 7 (2000)("Where the language of a statute is clear, courts must give effect to its plain and ordinary meaning..."). Certainly the division of such properties is lawful – G.L. c. 41, ss. 81L and 81P expressly provide for it. By limiting the words "lawfully in existence," as contained in the first paragraph of Section 6, to mean *only* those properties meeting minimum dimensional requirements in effect when a plan is endorsed, and thus the lots created, impermissibly adds language not found in the plain language of the statute. Lord v. Board of Appeals of Somerset, 30 Mass. App. Ct. 226, 228, 567 N.E.2d 954 (1991)(courts will not add language where statute is clear and unambiguous); Marinelli v. Board of Appeals of Stoughton, 440 Mass. at 259, 797 N.E.2d 893; Mass. Broken Stone Co. v. Weston, 430 Mass. at 640, 723 N.E.2d 7.

Such an interpretation impermissibly interferes with both Section 6 (1st ¶) of the Zoning Act and Subdivision Control Law regarding these types of ANR plans. If structures on these types of ANR plans are lawful under zoning only when the resulting lots contain the dimensional requirements in effect as of the date the plan is endorsed, municipalities may effectively prohibit the creation of such lots through zoning, rendering the language in Section 81L of Chapter 41

mere "surplusage."[7]  <u>Citgo Petroleum Corp. v. Planning Board of Braintree</u>, 24 Mass. App. Ct. at 427, 509 N.E.2d 284.

The fact that the Legislature did not so limit the term "lawfully in existence" is evidenced not only by the lack of such language in paragraph one of Section 6, but also by the fact that it <u>*did*</u> use such express language in paragraph four of Section 6 (which applies solely to vacant land[8]).  G.L. c. 40A, s. 6 (compare paras. 1 and 4); <u>Lord v. Board of Appeals of Somerset</u>, 30 Mass. App. Ct. at 228, 567 N.E.2d 954; <u>Murray v. Board of Appeals of Barnstable</u>, 22 Mass. App. Ct. 473, 478-9, 494 N.E.2d 1364 (1986)(absence of language indicates that it was not intended).  The lack of any such language in paragraph one argues against the Town's interpretation.  <u>Marinelli v. Board of Appeals of Stoughton</u>, 440 Mass. at 259, 797 N.E.2d 893.

B.  <u>Section 2550 of the Town's Zoning By-laws Is Invalid and Unconstitutional as Applied to Properties Such as Plaintiff's, and Conflicts with the Protections Set Forth in G.L. c. 40A, s. 6 1st ¶, and Section 2420 of the Town's Zoning By-laws.</u>

Section 2550 of the Town's Zoning By-laws incorporates the protections set forth in paragraph 4 of Section 6 of the Zoning Act.  <u>See</u> Facts, ¶¶55, 73 and

---

[7] Indeed, the Town has indicated that in considering zoning relief for these types of properties, relief would not be appropriate if the owner of a larger parcel sought it because that person could "cure" the zoning defect by recombining the lots.  However, if an "innocent buyer" unwittingly purchased one of these properties, he might be entitled to relief.  The Town's position suggest a "conferral of a roving and virtually unlimited power to discriminate as to uses between landowners similar situated."  <u>SCIT, Inc. v. Planning Board of Braintree</u>, 19 Mass. App. Ct. at 108, 472 N.E.2d 269.

[8] <u>Dial Away Co., Inc. v. Zoning Board of Appeals of Auburn</u>, 41 Mass. App. Ct. 165, 168, 669 N.E.2d 446 (1996) (paragraph 4 of Section 6 applies only to vacant land, while paragraph 1 of Section 6 applies to lots upon which structures have already been constructed); <u>Willard v. Board of Appeals of Orleans</u>, 25 Mass. App. Ct. 15, 18, 514 N.E.2d 369 (1987) ("There is nothing to suggest on the face of the fourth paragraph to suggest that it was intended to apply to anything but vacant land").  Most assuredly, properties of this type are not vacant land.  The <u>Dial Away</u> case indicates that paragraph 1 of Section 6 applies to properties such as plaintiff's.

74.  However, the Town extends the protections from increases in zoning not only to vacant land, as provided for in paragraph 4 of Section 6 of the Zoning Act,[9] but also to developed properties.  See Facts, ¶55.  However, it also impermissibly limits this protection only to *certain* developed properties – those which, when developed, complied with existing zoning dimensional requirements.  Ibid.  In doing so, Section 2550 conflicts with both the Town's zoning by-law regarding pre-existing nonconforming structures and uses, Section 2420, but also with the first paragraph of Section 6 of the Zoning Act.  See Facts, ¶¶66, 73-75.

The Zoning Act sets forth "the limits on the exercise of zoning power by [a] municipality."  SCIT, Inc. v. Planning Board of Braintree, 19 Mass. App. Ct. 101, 107, 472 N.E.2d 269 (1984).  Section 6 of the Zoning Act fully deals with the integration of nonconforming structures and uses, providing varying levels of protection and limiting a municipality's ability to enforce zoning in connection with the same.[10]  Yet, Section 2550 attempts to limit the protections afforded by G.L. c. 40A, s. 6,1st¶ for lawfully existing structures, to only those structures located on lots that complied with zoning dimensional requirements when created.

This poses an inherent problem in and of itself, as it limits protections from increases in zoning only to those properties developed *after* zoning was adopted by the Town, which occurred in 1960, some six years after the Town adopted Subdivision Control in Sandwich, and is thus inherently unconstitutional as it constitutes "spot zoning," or singling out of those properties lawfully

---

[9] See footnote 8, *supra.*
[10] See footnote 1, *supra.*

developed after zoning was adopted for protection from increases in zoning, thereby providing an economic benefit to those properties, while depriving those properties lawfully developed *before* zoning was adopted from those protections. Van Renselaar v. City of Springfield, 58 Mass. App. Ct. 104, 787 N.E.2d 148 (2003)("... challenger must prove by a preponderance of the evidence that the zoning regulation is arbitrary and unreasonable, or substantially unrelated to the public health, safety, morals, or general welfare."); Leahy v. Inspector of Buildings of New Bedford, 308 Mass. 128, 31 N.E.2d 436 (1941) (singling out lot for preferential treatment without valid relation to "purpose of promoting the health, safety, convenience, morals or welfare of its inhabitants" constitutes unlawful spot zoning.)

Given that the Town of Sandwich was established in 1639, there are innumerable properties that had been developed before zoning was adopted in 1960. See Facts, ¶76. There are some forty-two (42) properties that were developed in Sandwich before the adoption of Subdivision Control, and which contain less than 5,000 square feet of lot area. See Facts, ¶77. Section 2550, which limits any change, alteration, or movement of a structure on a property containing less than 5,000 square feet deprives these properties of the lawful protections set forth in G.L. c. 40A, s. 6, 1st¶, and without any valid relation to the "purpose of promoting health, safety, convenience, morals or welfare" of Sandwich's inhabitants, and instead is an arbitrary exercise of the Town's police power. LaMarre v. Commissioner of Public Works, 324 Mass. 542, 87 N.E.2d 211 (1949)("ordinance will be set aside only where the court is convinced that the

ordinance involves a mere arbitrary exercise of power having no substantial relation to the[ purposes of zoning].")

Additionally, there are at least twenty-eight properties which had been developed before Sandwich adopted Subdivision Control, which have been divided pursuant to an ANR plan because they pre-date Subdivision Control, by an ANR plan endorsed _after_ zoning was enacted by the Town in 1960. See Facts, ¶¶ 23, 24. In each instance, at least one of the resulting lots was dimensionally nonconforming in some fashion, usually with respect to lot area, yet, with the exceptions noted in Facts ¶24, the Town has never sought to bring any zoning enforcement action against these properties. See Facts, ¶24. Indeed, in many instances, the Town has granted special permits and variances to these properties.[11] Ibid. Both these properties and those containing less than 5,000 square feet of lot area are entitled to the protections set forth in G.L. c. 40A, s. 6, 1st¶, as they were all "lawfully created." Yet, Section 2550 effectively deprives them of these protections, in violation of the limitations placed on municipalities regarding zoning. SCIT, Inc. v. Planning Board of Braintree, 19 Mass. App. Ct. at 107, 472 N.E.2d 269.

---

[11] In two instances, properties divided by virtue of this particular type of an ANR plan (by virtue of the fact that the structures located on the property pre-dated the adoption of Subdivision Control), located at 6 and 8 Jarves Street and 133 and 135 Route 6A, have been granted numerous special permits, despite the fact that in each case one of the resultant lots was dimensionally nonconforming at the time of endorsement of the ANR Plan. See Facts ¶¶68. In the case of the properties located at 6 and 8 Jarves Street, an amendment to a special permit was granted in early 2004, to 8 Jarves Street, despite the fact that, according to Town Counsel's opinion, it should not have been eligible for the same, due to the "doctrine of infectious invalidity," and the then-Director of Planning & Development, who had endorsed the Jarves Street ANR plan as chair of the Planning Board, failed in 2004, in her capacity as Director of Planning & Development to bring the fact that 6 Jarves Street failed to meet dimensional requirements when the ANR plan was endorsed. See Facts, ¶¶69-70.

Not only has the Town failed to bring any zoning enforcement action against any of the other five resulting properties created by the 1994 ANR plan, it in fact granted a building permit to at least one other property owner, Marjorie Collis, the owner of 15 Ploughed Neck Road, which was one of the properties created by the 1994 ANR Plan.  See Facts ¶¶ 42, 64.  The legitimate objectives of the Town of Sandwich zoning by-law are set forth in Section 1100 of the Zoning By-laws.  See Exhibit 3-2.  The division of land upon which structures have existed since before Sandwich adopted Subdivision Control in now way derogates from these objectives.  The land, having been developed before Subdivision Control was adopted, and populated with cottages, which constitute single-family dwellings, by virtue of their very definition, has already been developed for usage. Moreover, by locating each cottage on its own lot, each cottage falls squarely within the definition of "dwelling, single-family" as contained in the Sandwich zoning by-laws, a by-right use in the R-2 zoning district in which plaintiff's cottage is located (see Facts, ¶31), and, rather than derogating from the purposes of the zoning by-laws, the use of the cottages as single-family residences instead complies with the goal of "encouraging the most appropriate use of land, as set forth in Section 1100(a).

The cottages, including the plaintiff's, by virtue of the fact that they pre-date both the adoption of Subdivision Control and zoning in Sandwich, do not derogate from the goal of "preventing the overcrowding of land," as set forth in Section 1100(b), since the structures already existed, nor from any of the remaining provisions of Section 1100(c)-(j).  Opinion of the Justices to the House of Representatives, 234 Mass. 597, 127 N.E. 525 (1920) (zoning act rightfully does

not interfere with "rights already acquired by existing use or construction of buildings in general . . .".)

Accordingly, by refusing the plaintiff a building permit to repair her cottage, in light of the fact that there are numerous other single-family residences located within the same zoning district and in the area surrounding plaintiff's property that are also dimensionally nonconforming, granting a building permit to one of the other cottages located on the 1994 ANR plan, plus the fact that the Town has treated other properties similarly divided via this type of an ANR plan, where one or more of the resulting lots did not comply with zoning when these ANR plans were endorsed, the Town is unlawfully and unconstitutionally singling the plaintiff out for treatment different from other similarly situated properties, "without rational planning objectives, [and producing] zoning classifications that fail to treat like properties in a uniform manner." W.R. Grace & Co. v. Cambridge City Council, 56 Mass.App.Ct. 559, 569-570, 779 N.E.2d 141.

As a consequence of the Town's unlawful and unconstitutional treatment of plaintiff in refusing to grant her a building permit, the value of plaintiff's property is diminished from $168,000 to nothing, essentially resulting in an unconstitutional taking of her property, and she has lost the rental income she would otherwise have received through rental of the property, in the amount of $700 per month, from October 2003 and continuing through the present, and suffered damages in the form of being required to borrow $50,000 in order to stay afloat during these proceedings. See Facts, ¶¶60-63.

Plaintiff requests that this Court enter judgment in her favor, together with an award of damages, including attorney's fees and costs incurred in this

action, and to enter orders determining that the Town's position and actions are unlawful and unconstitutional, essentially amounting to "reverse spot zoning," and have deprived her of equal protection and substantive due process under the state and federal constitutions, and further order the Town to cease and desist from so interpreting its by-laws in this fashion, and, finally, order the issuance of a building permit to the plaintiff forthwith.

> Plaintiff,
>
> PATRICIA PEROTTI-CYRUS,
>
> By her attorney,
>
>
> ___/s/ Julie C. Molloy_____
> Julie C. Molloy        BBO#555176
> 379 Route 6A
> East Sandwich MA 02537
> (508) 833-3707

Dated:  December 27, 2005

CERTIFICATE OF SERVICE

I, Julie C. Molloy, Esq., hereby certify that a copy of the foregoing was served via U.S. Mail, first class, postage pre-paid, on December 27, 2005, upon the defendants, as follows:

Leonard H. Kesten, Esq.
Deborah Ecker, Esq.
Brody, Hardoon, Perkins & Kesten
One Exeter Plaza, 12th floor
Boston MA 02116

> ___/s/ Julie C. Molloy_____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PATRICIA PEROTTI-CYRUS,
      Plaintiff,                        CIVIL ACTION
                                     NO. 05-10116-DPW

      v.

ROBERT JENSON, Chairman
of The Board of Appeals For
The Town of Sandwich, et al.,
      Defendants.

AFFIDAVIT OF JULIE C. MOLLOY, ESQ.

      I, Julie C. Molloy, under oath hereby depose and state as follows:

1.      I am an attorney admitted to the bar of the Commonwealth in good standing, and have been since 1989, and am authorized and admitted to practice before this Honorable Court, and represent the plaintiff in this action;

2.      Attached hereto, as Exhibit 3-1, is a true and accurate copy of the Town of Sandwich Zoning By-laws in effect in 1994, including the zoning map;

3.      Attached hereto, as Exhibit 3-2, is a true and accurate copy of the Town of Sandwich Zoning By-laws in effect in 2004, including the zoning map;

4.      Attached hereto, as Exhibit 3-3, is a true and accurate copy of G.L. c. 41, s. 81L, without annotations;

5.      Attached hereto, as Exhibit 3-4, is a true and accurate copy of the case of Citgo Petroleum Corp. v. Planning Board of Braintree, 24 Mass. App. Ct. 425, 509 N.E.2d 284 (1987);

6.      Attached hereto, as Exhibit 3-5, is a true and accurate copy of the case of Smalley v. Planning Board of Harwich, 10 Mass. App. Ct. 599, 410 N.E.2d 1219 (1980);

7.      Attached hereto, as Exhibit 3-6, is a true and accurate copy of the Town of Sandwich Notice of adoption of Subdivision Control Law, recorded with the Barnstable Registry of Deeds, at Book 883, Pages 194-202, pursuant to G.L. c. 41, s. 81N, which requires notice of adoption of the

Subdivision Control Law be recorded with the Registry of Deeds before law could become effective;

8.  Attached hereto, as Exhibit 3-7, is a true and accurate copy of G.L. c. 40A, s.16, without annotations;

9.  Attached hereto, as Exhibit 3-8, are true and accurate copies of the Town of Sandwich Assessor's records regarding 262 Single-family properties in the neighborhood surrounding 9 Ploughed Neck Road, depicting that most of the single family residences in that area do not comply with current dimensional zoning requirements;

10. Attached hereto, as Exhibit 3-9, is a true and accurate copy of the case of <u>Willard v. Board of Appeals of Orleans</u>, 25 Mass. App. Ct. 15 (1987) ;

11. Attached hereto, as Exhibit 3-10, is a true and accurate copy of G.L. c. 43B, s. 13, without annotations;

12. Attached hereto, as Exhibit 3-11, is a true and accurate copy of G.L. c. 43B. s. 14, without annotations;

13. Attached hereto, as Exhibit 3-12, is a true and accurate copy of G.L. c. 231A, s. 2, without annotations;

14. Attached hereto, as Exhibit 3-13, is a true and accurate copy of G.L. c. 40A, s. 6, without annotations;

15. Attached hereto, as Exhibit 3-14, are true and accurate copies of Town of Sandwich Assessor's Field Cards, indicating that the cottages at 9, 11, 13, 15, 17, and 19 Ploughed Neck Road were all constructed in 1948, before the adoption of the Subdivision Control Law by the Town of Sandwich in 1954.

16. Attached hereto as Exhibit 3-15, is a true and accurate copy of the case of <u>Norwell-Arch, L.L.C. v. Norwell Zoning Board of Appeals</u>, Misc. Case No. 285113, Mass. Land Court (Hon. J. Trombley) (decided May 24, 2004); 12 LCR 208; 2004 MASS. LCR LEXIS 44.

17. Attached hereto, as Exhibit 3-16, is a true and accurate copy of the case of <u>Shkliew et al. v. Board of Appeals of Salisbury</u>, Land Court, Misc. Case No. 174671 (July 6, 1992; Hon. Robert V. Cauchon).  Attached hereto, as Exhibit 3-17, is a true and accurate copy of the case of <u>Liston v. Board of Appeals of Dartmouth</u>, Land Court, Misc. Case No. 180789 (December 10, 1996; Hon. Robert V. Cauchon).

18. Attached hereto, as Exhibit 3-18, is a true and accurate Summary of Town of Sandwich dimensional zoning by-laws, from 1960 through present, obtained from the Office of Planning & Development.

19. Attached hereto, as Exhibit 3-19, is a true and accurate copy of the case of <u>Dial Away Co., Inc. v. Zoning Board of Appeals of Auburn</u>, 41 Mass. App. Ct. 165, 669 N.E.2d 446 (1996).

20. Attached hereto, as Exhibit 3-20, is a true and accurate copy of the case of <u>Willard v. Board of Appeals of Orleans</u>, 25 Mass. App. Ct. 15, 514 N.E.2d 369(1987).

21. The Town of Sandwich was established in 1639, and is touted as "the oldest town on Cape Cod."

22. My review of the Town of Sandwich's Assessing Department records reveals that, as of 1954, there were some 42 properties in Sandwich that had already been developed before that date, and which each contained less than 5,000 square feet (or less than 0.11 acres) of lot area, per the List attached hereto as Exhibit 3-21.

23. My review of the records of the Town of Sandwich Planning & Development Office, specifically ANR plans endorsed by the Planning Board, starting with roads beginning with "A" and ending with the road "Jarves Street," revealed some twenty-eight properties divided via endorsement of an ANR plan, because the structures located on these properties pre-dated the adoption of Subdivision Control by the Town of Sandwich in 1954, and in each instance one or more of the ANR plan creating the resulting lots with structures created new dimensional nonconformities, mostly pertaining to lot area, by virtue of the ANR plan.

24. With the exception of three (3) of these properties, including plaintiff's property at 9 Ploughed Neck Road, a property located at 372 Route 6A, owned by Donald Thibault (which is the subject of an action pending in the Barnstable Superior Court, <u>*Thibault v. Board of Appeals, et al.*</u>, C.A. No. 04-0588, and in which case the plaintiff Thibault's motion for summary judgment is currently under advisement), and a property located at 132 Main Street, owned by Hideyo Harada (who was denied a special permit to operate a bed & breakfast, despite the fact that there are no dimensional requirements for bed & breakfasts set forth in the use regulations of the Sandwich Zoning By-laws, Section 2310 and 2320 of Exhibits 3-1 and 3-2), my extensive review of records pertaining to these ANR properties, including a review of the records at the Barnstable Registry of Deeds, reveals that the Town of Sandwich has never taken any enforcement action against these dimensionally nonconforming properties, and instead, in many instances, has granted

special permits and/or variances to the same.  I do not feel it appropriate to reveal the identity of these properties, for fear that the Town will unreasonably decide that these properties are "unlawful," causing problems for the homeowners, however, if necessary, I will provide supporting documentation *in camera* for the Court.

25.    I have completed a thorough review and examination of the records maintained at the Barnstable Registry of Deeds, and state that at no time has the Town of Sandwich ever recorded any notice of any action brought against plaintiff or any of her predecessors-in-interest to enjoin and zoning violation, whether structural (as it relates to a structure's compliance with dimensional requirements) of use violations, at any time, specifically including any time from October 19, 1994, through the present, despite the requirements of doing so as set forth in G.L. c. 40A, s. 7.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 27th DAY OF DECEMBER, 2005.

_/s/ Julie C. Molloy_____
Julie C. Molloy      BBO#555176

COMMONWEALTH OF MASSACHUSETTS

BARNSTABLE, ss.

AFFIDAVIT OF HARRY B. MILLER, JR.

I, Harry B. Miller, Jr., under oath hereby depose and state as follows:

1. I am of legal age and sound mind, and I reside at 16 Hill Road, Winnesquam N.H. 03289. I have held a Construction Supervisor's License for over twenty (20) years, and am a real estate developer, with over thirty (30) years.

2. West Yarmouth Lodgings, Inc., owned the property purchased by Patricia Perotti Cyrus from June 1, 2001, through September 11, 2002.

3. At the time of the sale of the property to Ms. Cyrus, I was the Vice President of West Yarmouth Lodgings, Inc., and was authorized to convey the property to Ms. Cyrus.

4. Prior to June 1, 2001, the property in question was owned by Forestdale Realty, Inc., and I, as President of that corporation, signed the deed to West Yarmouth Lodgings, Inc. Forestdale Realty, Inc., purchased the property on October 28, 1994.

5. At no time from 1998 through the date of sale to Ms. Cyrus on September 11, 2002, were any notices of zoning violations received by either corporation identified above.

6. The property consists of a one-bedroom cottage, with a living room, kitchen with usual appliances, and bathroom, and has always has a heating system. When the property was purchased, the heating system was vintage late 1940's/early 1950's, which I recognize from my experience in the construction and real estate industry.

7. While the two corporations owned this property, it continued to be equipped with a heating system, and the corporations rented these properties out as dwelling units to individuals who resided in them for varying lengths of time.

8. The dwelling is located entirely on its own lot, due to the 1994 endorsement of an ANR Plan by the Town of Sandwich Planning Board, on October 19, 1994, which plan is recorded with the Barnstable County Registry of Deeds, Plan Book 506, Page 85.

9.      I have viewed and examined the property since the October 2, 2003, fire, and can attest to the fact that there is no structural damage, but instead the damage consists of scorching, smoke damage and water damage, and will require replacement of several windows, the front door and sheet rock.

Signed under the pains and penalties of perjury this 3rd day of September, 2004.

_____
Harry B. Miller, Jr.

# Town Of Sandwich
**THE OLDEST TOWN ON CAPE COD**





Sandwich Glass Works

# PROTECTIVE ZONING BY-LAW
# MAY 2004

1

## SANDWICH PROTECTIVE ZONING BY-LAWS
### Table of Contents

**ARTICLE I.  ADMINISTRATION AND PROCEDURE**
- **1100.** PURPOSE
- **1200.** ADMINISTRATION
  - 1220. Building Permits
  - 1230. Certificate of Use and Occupancy
  - 1240. Enforcement
  - 1250. Violations
    - 1251. Penalties
  - 1260. Performance Bond or Deposit
- **1300.** BOARD OF APPEALS
  - 1310. Membership
  - 1320. Powers of the Board of Appeals
    - 1321. Variance
    - 1322. Special Permit Granting Authority
  - 1330. Special Permits
    - 1331. Public Hearing
    - 1332. Referral
  - 1340. Application Requirements
    - 1341. Review by Planning Board and Town Engineer
    - 1342. Consideration of Recommendations
  - 1350. Repetitive Petitions
  - 1360. Plan Submission Requirements
  - 1370. Appeals Under the Subdivision Control Law
  - 1380. Special Permit for the Protection of Drinking Water Resources
    - 1381. Criteria
    - 1382. Submission Requirements
  - 1390. Design and Operations Guidelines
- **1400.** AMENDMENT
- **1500.** VALIDITY
- **1600.** APPLICABILITY
- **1700.** EFFECTIVE DATE

**ARTICLE II. USE AND INTENSITY REGULATIONS**
- **2100.** ESTABLISHMENT OF DISTRICTS
  - 2120. District boundary Line
  - 2130. Lots Divided by District Boundary Line
  - 2140. Districts
- **2200.** USE REGULATIONS
  - 2210. Applicability
  - 2220. Classification of Activity
- **2300.** USE REGULATIONS SCHEDULE
  - 2310 Principal Uses
  - 2320. Accessory Uses
  - 2321. Scientific Research, Development or Related Production.
- **2400.** NON-CONFORMING USES
  - 2410. Abandonment.
  - 2420. Change, Extension or Alteration
  - 2430. Restoration
- **2500.** INTENSITY OF USE REGULATIONS
  - 2510.Conformance with Section 2600
  - 2520. Change in Lot Shape
  - 2530. Street Line
  - 2540. Multiple Principle Buildings on the Same Lot

2

   2550. Non-Conforming Lots.
   2580. Condominium Dimensional Requirements
   2590. Water Resource Overlay District Lot Area
  **2600**. INTENSITY OF USE SCHEDULE

**ARTICLE III. GENERAL REGULATIONS**
  **3100**. PARKING REQUIREMENTS
   3110. Adequate Off Street parking.
   3111. Parking Overlay District
   3112. Parking Overlay District Requirements
   3120. Table of Requirements
   3130. Setback from Street Line
   3140. Driveway Separation
   3150. Parking for Six or More Cars.
  **3200**. STANDING AND LOADING REQUIREMENTS
   3120. Queues of Vehicles.
   3220. Adequate Off Street Loading
  **3300**. SIGN REGULATIONS
  **3400**. ENVIRONMENTAL CONTROLS
   3410. Applicability
   3420. Noise
   3430. Waste Disposal.
   3431. On-Site Waste Disposal.
   3440. Smoke Density
   3450. Airborne Particulate Matter.
   3460. Radio Activity and Electrical Disturbances
   3470. Lighting
   3480 Compliance with Environmental Controls
  **3500**. LANDSCAPING AND SCREENING
   3510. Requirements
   3520. Landscaping - Parking for Six or More Cars
   3530. Erosion Control.
   3540. Outdoor Sales Display Areas and Commercial Outdoor Recreation
   3550. Sight Obstruction at Corners.
   3560. Sight Obstructing Fence or Wall
  **3600**. POND SETBACK REQUIREMENTS
   3610. Pond Elevations
   3620. Plan Showing Setback
   3630. Setbacks from Pond Elevation
  **3700**. BUILDING SITING
   3710. Set Backs Relative to Elevation
   3720. Overflow Elevation
  **3800**. WIRELESS TELECOMMUNICATIONS SERVICES
  **3900**. ADULT ENTERTAINMENT

**ARTICLE IV. SPECIAL REGULATIONS**
  **4100**. ACCESSORY USES
  **4200**. EARTH MOVING REGULATIONS
  **4300**. FLOOD PLAIN DISTRICT
  **4400**. CLUSTER DEVELOPMENT
   4450. Affordable Housing
  **4500**. DELETED ATM 4/98
  **4600**. MULTI-FAMILY DWELLING
  **4700**. CONVERSION OF SEASONAL OR INTERMITTENT USE STRUCTURES
  **4800**. SWIMMING POOLS
  **4900**. DEVELOPMENT SCHEDULE

**ARTICLE V. WATER RESOURCE PROTECTION DISTRICTS**
    **5000.** PURPOSE
        **5010.** Creation
        **5020.** Definitions
        **5030.** Use Regulations
        **5040.** Performance Standards
        **5050.** Water Quality Review Committee
            **5052.** Certificate of Water Quality Compliance
        **5060.** Enforcement
    **5100. SURFACE WATER PROTECTION DISTRICT**
        **5110.** Special Permit Requirements

**ARTICLE VI. GROWTH CENTER TECHNOLOGY DISTRICT**
    **6000.** Purposes
    **6100.** Definitions
    **6200.** Objective
    **6300.** Regulations
    **6400.** Permitted uses
    **6500.** Site plan review

**ARTICLE VII. THREE PONDS DISTRICT**
    **7000.** PURPOSE AND OBJECTIVE
    **7100.** PERMITTED USES, CONDITIONAL USES, PROHIBITED USES
        **7130.** Chapter 40A, Section 6
        **7140.** Existing Single-Family Homes
        **7150.** change, Extension, Alteration
    **7200.** DIMENSIONAL REGULATIONS
    **7500.** POND SHORE BUFFER REQUIREMENTS.
    **7600.** SCENIC ROAD CORRIDOR
    **7700.** SPECIAL PERMIT CRITERIA FOR USES ACCESSORY TO AN
ALLOWED PRINCIPAL USE
    **7800.** OPEN SPACE RESIDENTIAL DEVELOPMENT
    **7900.** APPLICATION PROCEDURES.

**DEFINITIONS**

# ARTICLE I
## ADMINISTRATION AND PROCEDURE

**1100. PURPOSE.** The purpose of this by-law is to provide for the Town of Sandwich all of the protection authorized by the General Laws of the Commonwealth of Massachusetts, Chapter 40A and any amendments thereto - namely the promotion of the public health, safety, convenience and welfare by:

    a.  Encouraging the most appropriate use of land;

    b.  Preventing overcrowding of land;

    c.  Conserving the value of land and buildings, including the conserving of natural resources and the preventing of blight and pollution of the environment;

    d.  Lessening the congestion of traffic;

    e.  Preventing undue concentration of population;

    f.  Providing for adequate light and air;

    g.  Reducing hazards from fire and other dangers;

    h.  Assisting in the economical provisions of transportation, water, sewerage, schools, parks, and other public facilities;

    i.  Encouraging housing for persons of all income levels; and

    j.  Preserving and increasing the amenities of the Town.

## 1200. ADMINISTRATION

**1210**. This by-law shall be administered by the Building Inspector.

**1220**. No **building permits** shall be approved except in compliance with this by-law. Sufficient information shall be submitted to demonstrate compliance, including a plot plan showing, in addition to those items required under Section 113.6 of the Massachusetts Building Code, two-foot contours across the entire lot, and full width of the street across the lot frontage, and sufficient data to determine compliance with parking, standing and loading, landscaping and erosion control, and other applicable provisions of this by-law. Prior to proceeding with construction above the foundation, a Registered Land Surveyor shall certify that the structure has been located in compliance with all yard requirements.

**1230**. No **certificate of use and occupancy** as required in Section 19.1 of the Commonwealth of Massachusetts Building Code shall be issued in violation of any provisions of the By-Law, and no use of land not requiring such certificate under the building code shall be initiated or changed without certification of use compliance by the Building Inspector.

**1240**. **Enforcement**. The Building Inspector shall institute appropriate legal proceedings to enforce the provisions of this by-law or to restrain by injunction any violation thereof, or both; and shall institute and take any and all such action as may be necessary to enforce full compliance with any and all provisions of this by-law.

**1250**. **Violations**. Any person violating any of the provisions of this bylaw or any condition of a special permit issued under this bylaw shall be fined not more than $300.00 for each offense. Each violation and each day that such violation continues shall constitute a separate offense. (Amended STM 9/91). However, when enforcing bylaw offenses by the non-criminal disposition method (as described in Article 8, Section 3, of the Town of Sandwich By-Laws, the fine shall be as follows:

    a.  First offense within the preceding twelve month period ................ $ 50.00.

    b.  Second offense within the same twelve month period ..................$100.00.

    c.  Third offense and each subsequent offense  .............................. $300.00.

Sandwich Protective Zoning By-laws                                      May 2004

**1251.** The **imposition of the penalties** herein prescribed shall not preclude the Building Inspector from instituting appropriate action to prevent unlawful construction or to restrain, correct or abate a violation, or to prevent illegal occupancy of a building, structure or premises or to stop an illegal act, conduct, business, or use of a building or structure in or about any premises.

**1260.** A **performance bond or deposit** of not less than $12.00 per foot of lot frontage plus $0.05 per cubic foot of foundation volume shall be required prior to authorization of any new structure or addition if, in either case, involving more than 200 square feet of floor area, as security against possible costs due to erosion or damage within street rights - of-way, or failure to enclose and backfill the foundation within the time period covered by the building permit, or failure to carry out any or all conditions mandated in a special permit granted by the Board of Appeals. Such bonds may also be required by the Building Inspector for site alterations not involving new structures but potentially incurring damage within street rights-of-way. These bonds shall be held by the Town Treasurer until he is notified by the Building Inspector that all on-site work, as required under the building code and conditions of a special permit granted, and all movement of heavy equipment has been completed and any damage repaired.

## 1300. BOARD OF APPEALS

**1310.** The **Board of Appeals** shall consist of five members and four associate members, who shall be appointed by the Selectmen and act in all matters under this by-law in the manner prescribed by Chapter 40A of the General Laws as amended.

**1320.** The **Board of Appeals shall have the following powers**:
   a. To hear and decide appeals in accordance with Section 8, of Chapter 40A
   b. To hear and decide applications for Special Permits upon which the Board is empowered to act under this by-law.
   c. To hear and decide appeals from decisions of a zoning administrator, if any.

**1321.** The Board of Appeals shall have the power, after a public hearing upon petition, to grant **variances** from the terms of this by-law with respect to particular land or structures, but only where such permit granting authority finds all of the following: (amended 5/4/98)
   a. A literal enforcement of the provisions of this bylaw would involve a substantial hardship, financial or otherwise, to the petitioner or appellant.
   b. The hardship is owing to circumstances relating to the soil conditions, shape, or topography of such land or structures but not affecting generally the zoning district in which it is located.
   c. Desirable relief may be granted without either;
      1. Substantial detriment to the public good; or
      2. Nullifying or substantially derogating from the intent or purpose of this by-law.

Before a variance may be authorized, the Board of Appeals shall, as required by Chapter 40A, Section 10 of the General Laws, find that all of the conditions of this section have been met. The Board of Appeals shall impose such limitations on time and use or such other conditions as it may deem desirable to protect the public interest and ensure that the variance granted is not greater in degree or duration than is justified by the hardship to be relieved. The Board of Appeals shall not impose conditions, safeguards, or limitations based upon the continued ownership of the land or structures to which the variance pertains by the appellant, petitioner or any owner. The Board of Appeals shall record its findings in each case.

If the rights authorized by a variance are not exercised within one year of the date of grant of such variance, such rights shall lapse, provided however, that the permit granting authority in its discretion and upon written application by the grantee of such rights may

6

extend the time for exercise of such rights for a period not to exceed six months; and provided, further, that the application for such extension is filed with such permit granting authority prior to the expiration of such one year period. If the permit granting authority does not grant such extension within thirty (30) days of the date of the application therefore, and upon the expiration of the original one year period, such rights may be re-established only after notice and a new hearing pursuant to the provisions of this section. Variances granted prior to effective date of this ordinance but limited in time may be extended on the same terms and conditions that were in effect for such variance upon said effective date.

**1321.1.** Applications for **variances** shall include as part of the application to the Board of Appeals ten (10) copies of the following:

1. Completed application form
2. Written request for waiver of any submission requirements.
3. A site plan prepared to a scale of 1" = 40' minimum, by a Massachusetts Registered Architect, Landscape Architect, Civil Engineer or Land Surveyor, illustrating the shape and location of the proposed building(s) and proposed addition(s).
4. A written narrative describing the variance requested describing the circumstances relating to the soil conditions, shape or topography of such land or structures that do not generally affect the zoning district ion which it is located

The Board of Appeals is authorized, upon receipt of a written request, to waive specific submission requirements of Section 1321.1 if the Board of Appeals deems a particular requirement to be duplicative or unnecessary.  The granting of such waivers shall be deemed by the Board of Appeals to be in the public interest.  The Board of Appeals shall include a written description of the waivers granted within the decision on the application.

**1321.2.** **Referral**. The Board of Appeals shall refer variance applications to the Board of Health, Water Quality Review Committee, Conservation Commission, Planning Board, Department of Public Works, and Town Engineer for written comments and recommendations pertaining to the area of responsibility of that particular board or department, before taking final action on said variance application.

In addition to the above noted boards, the Board of Appeals may refer a variance application to any other Town agency/board/department for comments and recommendations if it so desires before taking final action on the variance application.

Any such board or agency to which applications are referred to for comments shall make its recommendations and send copies thereof to the Board of Appeals and the applicant within twenty (20) days of receipt of the referral request by said board or agency or there shall be deemed no opposition or desire to comment.

The Board of Appeals shall not act upon said variance until either comments from referred boards or agencies have been received, or twenty (20) days have elapsed, whichever is sooner.

**1322**. Unless otherwise specified in this by-law, **the Board of Appeals shall act as the Permit Granting Authority and the Special Permit Granting Authority**.

**1330**. **Special Permits** shall normally be granted unless, because of conditions peculiar to the particular case but not generally true for similar permitted uses on other sites in the same district, it appears that nuisance, hazard or congestion will be created, or for other reasons there will be substantial harm to the neighborhood or derogation from the intent of the by-law, so that the stated district objectives will not be satisfied. The Special Permit

Granting Authority shall place upon each special permit the condition that failure to comply with the conditions set forth in the special permit will result in termination thereof and that it shall expire upon transfer of ownership, prior to initiation of substantial construction on or occupancy of the site, unless such transfer is authorized in the permit, or if no substantial construction or occupancy takes place within the twelve (12) months of special permit approval, excluding such time required to pursue or await the determination of an appeal referred to in Section 17 of Chapter 40A. Extenuating circumstances may be a basis for a six (6) month extension to be granted by the Special Permit Granting Authority. Construction or operations under a building or special permit shall conform to any subsequent amendment of the ordinance or by-law unless the use or construction is commenced within a period of not less than six (6) months after the issuance of the permit and, in cases involving construction, unless such construction is continued through to completion as continuously and expeditiously as is reasonable.

**1331.** **Special permits** shall only be issued following **public hearings** held within sixty-five (65) days after filing of an application with the Special Permit Granting Authority. A copy of the application shall be given to the Town Clerk forthwith by the applicant.

**1332**. **Referral**. The Special Permit Granting Authority (SPGA) shall refer special permit applications to the Board of Health, Water Quality Review Committee, Conservation Commission, Housing Authority, Planning Board, Board of Appeals, Highway Department, and Town Engineer for written comments and recommendations pertaining to the area of responsibility of that particular board or department, before taking final action on said special permit application. In additions to the above noted boards, the SPGA may refer a special permit application to any other Town agency/board/department for comments and recommendations if it so desires before taking final action on said special permit application. A public hearing on said referral shall not be required. The SPGA need not send a referral to itself.

Any such board or agency to which applications are referred to for comments shall make its recommendations and send copies thereof to the SPGA and the applicant within thirty-five (35) days of receipt of the referral request by said board or agency or there shall be deemed no opposition or desire to comment. The SPGA shall not act upon said special permit until either comments from referred boards or agencies have been received, or said thirty-five (35) days have elapsed, whichever is sooner. Applications referred to more than one board or agency may be reviewed jointly by said boards or agencies.

**1340**. Applications for **special permits and amendments to special permits other than single family residential use**, shall include as part of the application to the Special Permit Granting Authority ten (10) copies of the following:
1. Completed application form;
2. Written request for waiver of any submission requirements;
3. Photographs of premises and all adjoining structures;
4. A site plan prepared to a scale of 1" = 40' minimum, by a Massachusetts Registered Architect, Landscape Architect, Civil Engineer or Land Surveyor, illustrating:
   a) The shape and location of the proposed building(s) and proposed addition(s).
   b) Vehicular and pedestrian circulation.
   c) Proposed parking including service vehicles.
   d) Entranceways, roadways, sidewalks and loading areas.
   e) The general extent and nature of proposed cutting of natural vegetation and proposed planting and landscaping of disturbed areas.
   f) The general intentions for proposed utilities, the location and size of septic tanks and leaching fields and the handling of surface drainage.
   g) The general location and types of outdoor signs.
   h) The general location and intent of outdoor lighting.
   i) The general location and type of outdoor storage, fencing and screening.

j)   Principal elevation at a scale of 1/16" = 1' minimum, showing:
1.   The general massing and height of the proposed facility, and
2.   Any special heating, ventilation and mechanical requirements impacting the exterior.

1341.   The SPGA is authorized, open receipt of a written request, to waive specific submission requirements of Sections 1330 through Sections 1370 if the SPGA deems a particular requirement to be duplicative or unnecessary.  The granting of such waivers shall be deemed by the SPGA to be in the public interest.  The SPGA shall include a written description of the waivers granted within the decision on the application. When an application is made to the Board of Appeals and information required under section 1340 is submitted, **the Board of Appeals shall forthwith transmit such information to the Planning Board and Town Engineer for review and recommendations**. Those two agencies shall make their reviews and such recommendations and shall send copies to the Board of Appeals and the applicant within thirty-five (35) days of receipt of the application by each of the aforementioned agencies, provided that failure to make recommendations shall be deemed to be a lack of opposition.

1342.   In acting on special permits and special permit amendments under this section, the **Board of Appeals shall give consideration to the recommendations, if any, of the Planning Board and the Town Engineer**. These recommendations shall be formulated considering the following criteria:
a)   Protection of adjacent area against detrimental or offensive uses on the site by provision of adequate surface water drainage, buffers against lighting, sight, sound, dust, vibration, odor and allowance of sunlight and air;
b)   Convenience and safety of vehicular and pedestrian movement within the site and in relation to adjacent areas;
c)   Adequacy of facilities for handling and disposal of refuse and other production by-products;
d)   Protection of environmental features on the site and in adjacent areas;
e)   Promotion of appropriate arrangement of structures within the site and in relation to existing structures within the district and neighborhood;
f)   Co-ordination with and improvement of systems of vehicular and pedestrian access, drainage, water supply, sewage disposal, lighting, landscaping, wetlands, water courses, buildings and others features that support the neighborhood;
g)   Compliance with all applicable sections of the Zoning By-Law.

1350.   **Repetitive petitions** for appeals and petitions for variances, and application to the Special Permit Granting Authority or Permit Granting Authority shall be limited as provided in Section 16, of Chapter 40A, M.G.L.

1360.   All applications or petitions to the Special Permit Granting Authority or Permit Granting Authority, if involving erection or **change in exterior dimensions of any structure or parking area**, shall be accompanied by a plot plan as specified in Section 1220 for building permit applications. Such plans shall also be submitted in other cases when deemed necessary by the Board for it determinations. All applicants or petitioners shall appear at or be represented by a spokesman at the public hearing upon their application or petition, or the Board may dismiss the application for lack of sufficient information.

1370.   **The Zoning Board of Appeals shall act as the Board of Appeals under the Subdivision Control Law,** with the authority to issue withheld building permits as provided in Section 81-Y, Chapter 41, and M.G.L.

1380. Special Permit Issued for Protection of Drinking Water Resources:
Where specified in Section 2300 by the letters "SA", the Board of Appeals shall act as the Special Permit Granting Authority in accordance with this section. Such special permits

shall be granted if the Board of Appeals determines that the intent of this by-law, as well as the specific criteria of Sections 1381 and 1390 are met. In making this determination, the Board of Appeals shall give consideration to the simplicity, reliability, and feasibility of the control measures proposed and the degree of threat to water quality, which would result if the control measures failed.

1381. **Special Permit Criteria.** The Board of Appeals shall issue special permits only if the Board determines that groundwater quality resulting from on-site waste disposal and other on-site operations will not fall below federal or state or town (added ATM 92) standards for drinking water or, if existing groundwater quality is already below these levels, on-site disposal will result in no further deterioration.

1382. **Submittals**. In applying for a special permit under section 1380, the information listed below shall be submitted by the applicant in accordance with Section 1331.

a)    A complete list of all chemicals, pesticides, fuels, and other potentially toxic or hazardous materials to be used or stored on the premises in quantities greater than those associated with normal household use, accompanied by a description of measures proposed to protect all storage containers/facilities from vandalism, corrosion, and leakage, and to provide for control of spills.

b)    A description of potentially toxic or hazardous wastes.

c)    Evidence of approval by the Massachusetts Department of Environmental Protection (DEP) of any industrial waste treatment or disposal system or any wastewater system over 15,000 gallons per day capacity.

d)    For underground storage of toxic or hazardous materials, evidence of qualified professional supervision of system design and installation.

e)    Analysis certifying compliance with Section 1381, such analysis to be done by a Massachusetts Registered Civil, Sanitary, Chemical or Industrial Engineer.

1390. **Design and Operations Guidelines.** Except for single-family dwellings not being used in connection with a home occupation, the following design and operations guidelines shall apply to special permits granted under Section 1380:

a)    **Safeguards**. Provisions shall be made to protect against toxic or hazardous materials discharge or loss resulting from corrosion, accidental damage, spillage, or vandalism through measures such as: spill control provisions in the vicinity of chemical or fuel delivery points; secured storage area for toxic or hazardous materials; and indoor storage area for toxic and hazardous materials; and indoor storage provisions for containers which are corrodible or dissolvable. For operations which allow the evaporation of toxic or hazardous materials into the interiors of any structures, a closed vapor recovery system shall be provided for each such structure to prevent discharge of contaminated condensate into the groundwater.

b)    **Disposal.** For any toxic or hazardous materials to be produced in quantities greater than those associated with normal household use, the applicant must demonstrate the availability and feasibility of disposal methods, which are in conformance with Chapter 21c, MGL.

c)    **Drainage.** All runoff from impervious surfaces shall be recharged on the site, diverted towards areas covered with vegetation for surface infiltration to the extent possible. Dry wells shall be used only where other methods are infeasible, and shall be preceded by oil, grease, and sediment traps to facilitate removal of contaminants.

1400. **AMENDMENT.** This By-Law may be changed by amendment, addition or repeal in the manner provided in Section 5, Ch. 40A, G.L.

1500. **VALIDITY.** The invalidity of any section or provision of this by-law shall not invalidate any other section or provision thereof.

**1600. APPLICABILITY.** Where the application of this by-law imposes greater restrictions than those imposed by any other regulations, permits, restrictions, easements, covenants or agreements, the provisions of this by-law shall control.

**1700. EFFECTIVE DATE** .The effective date of the adoption or amendment of any Zoning By-Law shall be the date on which such adoption or amendment was voted upon by Town Meeting.


# ARTICLE II
# USE AND INTENSITY REGULATIONS

**2100. ESTABLISHMENT OF DISTRICTS**

**2110.** For purposes of this By-law, the Town of Sandwich is hereby divided into the following types of districts:

| | |
|---|---|
| Residence Districts | R-1 & R-2 |
| Ridge District | RD |
| Shore District | S |
| Business Limited | BL-1 & BL-2 |
| Marine Limited | MAR |
| Industrial Limited | IND |
| Governmental District | GD |
| Growth Center Technology District | |
| Adult Entertainment District | |
| Flood Plain Districts | |
| Parking Overlay District | |
| Surface Water Protection District | |
| Three Ponds District | |
| Water Resource Overlay District | |
| Wireless Telecommunications Overlay District | |

The boundaries of these districts are defined and bounded on the map entitled **"Zoning Map, Sandwich, Massachusetts,"** dated revised April 24, 1978, as amended May 1 and 2, 1978 (Articles 12, 13, and 14), May 4, 1981 (Article 31), May 19, 1986 (Article 9), revised November, 14, 1988 (Article 33), revised May 24, 1989 (Article 26), revised May 1, 2000, (Article 31), revised March 19, 2001(Article 2) and as amended and revised through May 7, 2001and as further amended and revised through May 6,2002 (Article 31) on file with the Town Clerk. The map and all explanatory matter thereon is hereby made part of this by-law.

**Adult Entertainment Overlay District,** as described in Section 3920, is herein established as an overlay district and shall be superimposed on other districts established in this bylaw.

**Flood Plain District,** as described in Section 4310, shall be considered to be superimposed over any other district established by this by-law.  Land in a Flood Plain District shall be subject to the requirements of Section 4300.

**Parking Overlay District,** as described in Section 3111, shall be considered to be superimposed over any other district established by this by-law.   Land in the Parking Overlay District shall be subject to the requirements of Section 3112.

**Surface Water Protection District**, which comprise the area within 300 feet of any surface water pond as described in Sections 3610 and 5120, shall be considered superimposed over any other district established by this bylaw.  Land in a Surface Water Protection District shall be subject to the requirements of Section 5100. (Added STM 9/91).

**Water Resource Overlay District,** as described in Section 5010, shall be considered to be super-imposed over any other district established by this by-law.  Land in a Water Resource Overlay District shall be subject to the requirements of Section 5000.

**Wireless Telecommunications Overlay District,** as described in Section 3820 is herein

established as an overlay district and shall be superimposed on other districts established in this Zoning By-law. New telecommunications facilities that are constructed exclusively for the purpose of transmitting and receiving television, AM/FM radio, digital, microwave, cellular, telephone or similar forms of electromagnetic radiation must be located within the Wireless Telecommunications Overlay District.

**2120**.  Except when labeled to the contrary, **boundary or dimension lines** shown approximately following or terminating at street, railroad, or utility easement center of layout lines, boundary or lot lines, or the channel of a stream, shall be construed to be actually those lines; when shown approximately parallel, perpendicular, or radial to such lines, shall be construed to be actually parallel, perpendicular or radial thereto; when appearing to follow shoreline, shall coincide with the mean low-water line.  When not locatable in any other way, boundaries shall be determined by scale from the map.

**2130**.  Where a **district boundary** line divides any lot existing at the time such line is adopted, the regulations for the less restricted portion of such lot shall extend not more than thirty (30) feet into the more restricted portion, provided the lot has street frontage in the less restrictive district.

**2140.**  **District purposes are as follows:**
**RESIDENCE: R-2** - To provide for low-density residential environment in areas of good accessibility while protecting the quality of air, surface water and ground water of the area.
**RESIDENCE: R-1** - To provide higher-density residential environment in areas serviced with public utilities.
**RIDGE: RD** - To provide for flexible development of large scale tracts, allowing development for regional service and residence near expressway interchanges and to allow variety and choice in residential development; at the same time preserving or enhancing views of the bay from public ways; preserving or enhancing landscaping and tree cover; and minimizing visibility of parked autos, avoiding creation of hazards or congestion, and assuring compatibility with low density residential development.
**SHORE: S** - To provide for travel accommodations in areas already containing such uses.
**BUSINESS LIMITED: BL-1** - To provide for small scale business development for local and transient service, at the same time preserving or enhancing ocean views from highways, protecting the character of historic environs, preserving or enhancing landscaping, minimizing visibility of parked autos and avoiding creation of hazards or congestion.
**BUSINESS LIMITED: BL-2** - To provide for all scales of business development for local, regional, or transient service, with purposes otherwise the same as for BL-1.
**MARINE LIMITED: MAR** - To preserve oceanfront for ocean related uses consistent with ecological protection.
**INDUSTRIAL LIMITED: IND** - To preserve uniquely serviced areas for exclusive Industrial or commercial use, while providing a visually pleasing landscaped areas compatible with the Town's history.
**GOVERNMENTAL DISTRICT: GD** - To provide for necessary governmental functions, public recreation, and conservation on publicly owned lands.
**GROWTH CENTER TECHNOLOGY DISTRICT: GCTD** - To provide for small and medium scales of business or commercial developments related solely to research, development, manufacturing, assembly or transmission of goods or information related to computers, medicine, high-technology, finance, science, education and electronic transmission of information and other uses as specified in this Section of the Sandwich Protective Zoning Bylaws.  To provide for small and medium scales of office space for Medical Doctors and patient services.
**THREE PONDS DISTRICT -** The purpose and objective of the Three Ponds District (the district) is to establish zoning regulations that accomplish the following:

Sandwich Protective Zoning By-laws                                          May 2004

- Protect to the greatest extent possible surface and groundwater quality;
- Preserve rare and endangered species and habitat existing within fragile ecosystems;
- Preserve the scenic character of district roads as well as views of pond shores and woodlands;
- Provide for carefully planned land uses such as small scale densely clustered residential development with recreational amenities of an appropriate scale;
- Preserve of existing single family homes;
- Foster the existing open space and recreation land uses including summer camps a use that encompasses both recreation and education;
- Allow for additional recreational uses compatible with resource protection;
- Manage growth in a manner that will not adversely affect municipal infrastructure.

**2200.    USE REGULATIONS**

**2210.**   No lot shall be used and no building, structure or addition to a structure shall be erected except as set forth in the "Use Regulation Schedule," or as exempted by Section 2400 or by Statute. (Amended STM 9/91). Symbols employed shall mean the following:

Y          A permitted use.
N          An excluded or prohibited use.
S          Use authorized under Special Permit as provided for in Section 1320 herein.
SA         Use authorized under Special Permit as provided for in Section 1380 herein. (Amended 5/4/98)

**2220.**   Where an activity might be classified under more than one of the following uses, the more specific classification shall determine permissibility; if equally specific, the more restrictive shall govern.

**2300.    USE REGULATION SCHEDULE**

| | Zoning District | | | | | | |
|---|---|---|---|---|---|---|---|
| | R-1<br>R-2 | BL-1 (6)<br>BL-2 | IND | MAR | RD | S | GD |
| **2310.                     PRINCIPAL USES** | | | | | | | |
| **AGRICULTURAL USE** | | | | | | | |
| Farm with pigs, foxes, mink; more than 100 cattle or 1000 poultry **(1)(2)** | Y | Y | Y | Y | Y | Y | Y |
| Others **(2)** | Y | Y | Y | Y | Y | Y | Y |
| **COMMERCIAL USE** | | | | | | | |
| Animal kennel or hospital | N | S | S | N | N | N | N |
| Bank, funeral home | N | S | N | N | N | N | N |
| Boat and motor vehicle servicing and repair | N | SA | SA | SA | N | N | N |
| Boat and watercraft storage building | N | N | N | N | S | N | N |
| Car wash | N | SA | SA | SA | N | N | N |
| Commercial Marine Fishing Equipment Storage | N | N | Y | Y | N | N | N |
| Dry cleaning | N | SA | SA | N | N | N | N |
| Major commercial complex **(3)** | N | S | S | N | N | N | N |
| Marine Medical & Rehabilitation Facility | N | N | N | S | N | N | N |
| Medical Services and Technology | N | S | S | N | N | N | N |
| Office | N | S | S | N | N | N | N |
| Other retail business or service | N | S | S **(5)** | S | N | N | N |
| Restaurant | N | S | S | S | N | N | N |
| Tattoo/Body Art Establishment | N | N | N | S | N | N | N |

Sandwich Protective Zoning By-laws                                    May 2004

| | | Zoning District | | | | | |
|---|---|---|---|---|---|---|---|
| | R-1<br>R-2 | BL-1 (6)<br>BL-2 | IND | MAR | RD | S | GD |
| Technology Business or Service | N | N | S | N | N | N | N |
| Wholesale and Retail Warehouse (STM 92) | N | N | S (7) | N | N | N | N |
| **INDUSTRIAL/UTILITY USE** | | | | | | | |
| Manufacturing, processing, trucking terminal | N | N | S | N | N | N | N |
| Bulk storage, warehouse | N | N | S | N | N | N | N |
| Contractors yard | N | N | S | N | N | N | N |
| Research laboratory, Chemical, bacteriological lab | N | SA | SA | SA | SA | N | N |
| Heliport | N | S | S | N | N | N | N |
| Power generation (Amended 5/4/98) | N | N | S | S | N | N | N |
| Earth removal  (See Section 4200) | N | N | S | N | N | N | N |
| **Disposal Area:** | | | | | | | |
| Disposal – Public, Salvage yard | N | N | SA | N | N | N | N |
| Sanitary landfill | N | N | SA | N | SA | N | N |
| Private | N | N | N | N | N | N | N |
| Municipal sewage treatment with onsite disposal of secondary- treated effluent | N | N | SA | SA | N | N | N |
| Covered road salt stockpile on impervious surface | N | N | SA | N | SA | N | SA |
| Metal plating | N | N | SA | N | N | N | N |
| Use of toxic or hazardous materials in quantities greater than associated with normal household or agricultural use | N | SA | SA | SA | SA | N | N |
| Sale, storage or distribution of fuel oil or gasoline as principal activity | N | S (4) | N | N | N | N | N |
| **INSTITUTIONAL USE** | | | | | | | |
| School  - Public, sectarian, denominational, or by a non-profit educational corporation | Y | Y | Y | Y | Y | Y | Y |
| Museum | S | S | N | N | Y | S | N |
| Religious Use | Y | Y | Y | Y | Y | Y | Y |
| Cemetery | S | S | N | N | Y | S | N |
| Hospital, nursing home, convalescent home | S | S | N | N | S | S | N |
| Philanthropic institutions, clubs | S | S | N | N | Y | S | N |
| Municipal use not more specifically cited | Y | Y | Y | Y | Y | Y | Y |
| **RECREATIONAL USE** | | | | | | | |
| Cinema, theater, auditorium, indoor sports area, health club, bowling, game room (Amended 11/18/97) | N | S | S | N | N | N | N |
| Drive-in theater, race track, amusement park, cart  track, miniature golf, token or coin operated video arcade, pinball machines (Amended 11/18/97) | N | N | N | N | N | N | N |
| Golf course, standard or par-3 | S | S | S | N | S | S | N |
| Marina | S | S | N | S | N | S | N |
| Camping, supervised | N | N | N | S | S | N | N |
| Campground | N | N | N | N | N | N | N |
| Stables, riding school (8) | N | S | N | N | S | N | N |
| Sportsmen's club, game preserve | Y | Y | Y | Y | Y | Y | N |
| Commercial picnic area, bath house, beach | S | S | N | S | S | S | N |
| Bicycle club, bicycle club competition facilities | N | N | N | S | N | N | N |
| Spa (11) | S | N | N | N | S | N | N |
| **RESIDENTIAL USE** | | | | | | | |
| **Dwelling:** | | | | | | | |
| Single-family | Y | S | N | N | Y | Y | N |

Sandwich Protective Zoning By-laws                                    May 2004

|  | | Zoning District | | | | | |
|---|---|---|---|---|---|---|---|
|  | **R-1**<br>**R-2** | **BL-1 (6)**<br>**BL-2** | **IND** | **MAR** | **RD** | **S** | **GD** |
| Two-family | S | N | N | N | N | N | N |
| Multi-family (See Section 4600) | S | S | N | N | N | S | N |
| Lodging house | N | S | N | S | S | S | N |
| Cottage Colony | N | S | N | S | S | S | N |
| Motel or Motor Court | N | S | N | S | S | S | N |
| Mobile Home Park | N | N | N | N | N | N | N |
| Cluster Development (See Section 4400) | S | S | N | N | S | S | N |
| Bed & Breakfast (See Article VII Definitions) | S | S | N | N | S | S | N |
|  | | | | | | | |
| **2320.** **ACCESSORY USES** | | | | | | | |
|  | | | | | | | |
| Accessory Dwelling Unit (See Section 4130) | S | S | N | N | S | S | N |
| Camper storage (See Section 4120) | Y | Y | Y | Y | Y | Y | N |
| Commercial Marine Fishing Equipment Storage | Y | BL-1 Y<br>BL-2 N | Y | Y | Y | Y | Y |
| Common Driveway | Y | Y | Y | Y | Y | Y | Y |
| Home occupation **(12)** (See Section 4110) | Y | Y | Y | Y | Y | Y | N |
| Lodging for not more than six guests | Y | Y | Y | Y | Y | Y | N |
| Parking **(10)** | Y | S | S | S | S | S | N |
| Private garage, boat house | Y | Y | Y | Y | Y | Y | N |
| Sale of produce, 50% or more raised on premises | Y | Y | Y | Y | Y | Y | N |
| Stables **(9)** | Y | Y | Y | Y | Y | Y | Y |
| Temporary construction office | Y | Y | Y | Y | Y | Y | N |
| Wind generation or turbines | S | S | S | S | S | S | S |

**Use regulation schedule Notes:**

1. Only on premises of five (5) acres or more, otherwise "N". Structures containing such animals not to be located within 100 feet of a lot line or within 200 feet of a dwelling not on the same lot.
2. Not more than two cattle per acre or their equivalent in terms of waste products shall be allowed unless special waste handling procedures satisfactory to the Board of Health are provided.
3. See definition.
4. *Reserved for future use. (Amended 5/4/98)*
5. No more than 20% of the floor space to be used for retailing. Products to be retailed must be directly related to the primary industrial activity.
6. Lot #2, Assessor's Map 67, in Forestdale may only be used as a physician's office.
7. Only on lots of fifteen (15) acres or more, within a single building containing at least 10,000 square feet of floor area, of which no more than 75% is used for retailing. (Added STM 8/92)
8. Only on parcels of five (5) acres or larger
9. But not more than one horse on less than one acre.
10. For six (6) or more cars.
11. Not allowed on parcels less than 25 acres in area. Setback requirements of the district are doubled for spa lots. The spa lot must maintain a 50' undisturbed vegetated buffer around the lot perimeter.
12. Tattoo/Body Art Establishments shall be prohibited as home occupations.
13. In the R-1, R-2, Ridge, Shore and Bl-1 such storage shall be limited to one boat and one boat trailer per principal use.

**2321.** **Uses whether or not on the same parcel** as activities permitted as matter of right, accessory to activities permitted as a matter of right, which activities are necessary in

connection with **scientific research or scientific development or related production** may be permitted upon the issuance of a special permit provided the Special Permit Granting Authority (SPGA) finds that the proposed accessory use does not substantially derogate from the public good.

**2400.    Non-Conforming Uses.** The use of any structure or land lawfully existing at the time of the enactment or subsequent amendment of this bylaw may be continued although such structure or use does not conform with provisions of this by-law, subject to the following conditions and exceptions**:**

**2410.    Abandonment.** A non-conforming use of a building or land, which has been abandoned for a period of two (2) years, shall not thereafter be returned to such non-conforming use. A non-conforming use shall be considered abandoned when the premises has been vacant for two years, or when the characteristic equipment and/or furnishings of the non-conforming use have been removed from the premises and have not been replaced by similar equipment, whichever shall occur first.

**2420.    Change, Extension Or Alteration.** No change, extension or alteration of a pre-existing non-conforming use and no change, extension or alteration of a pre-existing non-conforming structure may be made except upon the issuance of a special permit from the Zoning Board of Appeals. Such a special permit may be granted only if the special permit granting authority finds that the proposed change, extension or alteration of a pre-existing non-conforming use, or change, extension or alteration of a pre-existing non-conforming structure is not substantially more detrimental to the neighborhood than the existing non-conforming use or non-conforming structure.

The following conditions shall apply to any special permit granted under this section:
a). When the permit applicant requests either a change, extension or alteration of a non-conforming use or change, extension or alteration of a non-conforming structure, any change, extension or alteration may occur only upon those parcels of land upon which the pre-existing non-conforming use or structure is located;
b). When the permit applicant requests either a change, extension or alteration of a non-conforming use, or a. change, extension or alteration of a non-conforming structure, the permit applicant shall substantially screen all new parking from abutters and from streets. (5/4/98)

**2430.    Restoration.** In case of destruction or damage by fire or other catastrophe, a legally non-conforming structure may be rebuilt in substantially the form it had at the time of the destruction or damage, or in any form if within applicable setback requirement and not larger than previously, provided that reconstruction is started within twelve (12) months and completed within twenty-four (24) months of the catastrophe.

**2500. INTENSITY OF USE REGULATIONS**

**2510**.    All buildings hereafter erected in any district shall be located on a lot such that all the requirements set forth in Section 2600 are conformed with, except where specifically exempted by this by-law or by General Law. Construction or operations under a building or special permit shall conform to any subsequent amendment of the ordinance or by-law unless the use or construction is commenced within a period of not less than six (6) months after issuance of the permit and, in cases involving construction, unless such construction is continued through to completion as continuously and expeditiously as is reasonable.

**2520**.    No lot shall be changed in size or shape so as to result in a violation of Section 2600, if such alteration increases the number of actual or potential building lots, with the exception of divisions of land upon which two-or-more structures have existed since

before Sandwich adopted Subdivision Control on August 20, 1954, where the division of the land as a plan not requiring approval [ANR plan] under the Subdivision Control Law, G.L. c. 41, s. 81L and s. 81P, shows a division of the land such that each lot created contains one or more structures.  Such properties shall be deemed to be lawful, pre-existing, nonconforming structures and properties, entitled to all of the protections set forth in G.L. c. 40A, Section 6, first paragraph, and Section 2420 of the Sandwich Protective Zoning By-laws, despite the fact that the resulting lots may not meet dimensional requirements in effect as of the date of endorsement of the ANR plan.

**2530**.  Where **no street line** has been established or can be readily determined, such line shall be assumed to be twenty-five feet (25') from the center of the traveled roadway for the purpose of applying these regulations.

**2540.**  **Multiple Principal Buildings on the Same Lot.**
    **a.**  **Residential Districts.**  Up to two principal dwellings may be allowed in R-1, R-2, and Ridge zoning districts on the same lot, but only upon issuance of a special permit by the Zoning Board of Appeals.  Such a special permit shall not be issued unless the subject lot has at least twice the minimum lot area required for one principal dwelling, at least the required frontage for one principal dwelling; and then only if both proposed dwellings satisfy all of the minimum yard, lot coverage and other dimensional requirements set forth under Section 2600.
    **b.**  **Commercial Districts.**  Multiple principal buildings may be allowed in the BL-1, BL-2, Industrial Limited, and Marine Limited Districts, but only upon issuance of a special permit by the Zoning Board of Appeals.  Such a special permit shall not be issued unless the subject lot satisfies the minimum requirements set forth in Section 2600 for one building and unless each building satisfies all of the minimum yard and lot requirements set forth in Section 2600.
    **c.**  **Affordable Housing.**  In the BL-1 and BL-2 Districts, one dwelling unit may be located within a structure which has a principal non-residential use, but only upon issuance of a special permit by the Zoning Board of Appeals.  Additional dwelling units may thereafter be authorized by special permit; however, to be eligible for a special permit for additional dwelling units, a 1:1 ratio of market rate units to affordable units shall be established and maintained.  The Board of Appeals shall condition any special permit allowing the affordable units according to the affordability criteria in Section 4138.  In addition, no special permit for more than one such unit shall be issued unless adequate parking is provided; appropriate site provisions have been made for both the residential and non-residential uses; and all of the criteria of Section 1330 have been shown to be satisfied.

**2550.**  **Non-Conforming Lots.** Application of amended Intensity of Use Regulations to previously created lots is limited by Section 6, Chapter 40A, MGL. In addition, any increase in lot area, width, depth, frontage, yard, or coverage requirements of this by-law shall not apply to erection, extension, alterations, or moving of a structure on a legally created lot not meeting current requirements, provided that either the lot is in an exempted subdivision (see Section 2560) or the applicant documents that:
    a.  At the time such increase requirement became applicable to it, the lot:
        1.  Had at least 5,000 square feet of lot area and 50 feet of frontage on a street; and
        2.  Conformed to the existing dimensions required at the time of creation,
    b.  The lot is to be used for a single dwelling unit or for non-residential use, provided that no side yard shall be less than 20 feet on a lot having frontage of more than 100 feet but less than 200 feet and that no side yard shall be less than the greater of ten (10) percent of the lot's frontage or six (6) feet on one side and eight (8) feet on the other on a lot having frontage of 100 feet or less,
    c.  And the lot was held in ownership separate from all abutting property on December 31, 1998. (Amended 5/4/98)

Such non-conforming lots may be changed in size or shape or their land area recombined without losing this exemption, so long as the change does not increase the actual or potential number of buildable lots.

**2555**. Any legally created lot with an area of at least 20,000 square feet, and frontage of at least 125 feet, which, while buildable for single family residential use, was held in separate ownership from all adjoining property and which has been held in such separate ownership at all times thereafter, shall be buildable for single family residential use notwithstanding lack of compliance with the dimensional requirements of Section 2600. Buildings constructed on such lot shall conform to the setbacks required for the lot when the lot was created. (Added ATM 5/6/96).

**2560.** *Reserved. (Deleted ATM 92)*

**2570.** *Reserved. (Deleted ATM 94)*

**2580**. Residential condominium shall comply with the regulations for multi-family dwellings. (See Section 4600).

**2590**. **Water Resource Overlay District**. Residential uses located within a Water Resource District shall be governed by the lot area requirements of the R-2 District if more restrictive than otherwise applicable requirements. This requirement shall not apply to lots created on plans recorded prior to January 1, 1985.

**2600.** **INTENSITY OF USE SCHEDULE**
(See Section 4640 for Multi-family dwelling requirements)

|  | R-1 | BL-1 (a) MAR S | BL-2 | IND | R-2 GD | RD |
|---|---|---|---|---|---|---|
| Minimum lot size in square feet **(b, h, l)** | 40,000 | 20,000 | 40,000 | 40,000 | 60,000 | 60,000 |
| Minimum lot frontage in feet | 150 | 125 | 150 | 150 | 200 | 200 |
| Minimum front yard in feet **(c)** | 30 | 30 | 30 **(f)** | 30 **(f)** | 50 | 40 |
| Minimum side rear yard in feet **(d, e, i)** | 25 | 0 | 0 | 30 **(m)** | 45 | 30 |
| Maximum lot coverage % | 25 | none | none | none | 25 | 25 |
| Maximum building height **(g)** in feet (Amended STM 4/1/96) | 35 | 35 | 35 | 45 | 35 | 35 |
| Maximum shape factor **(k)** | 22 | 22 | 22 | 22 | 22 | 22 |

**Intensity Of Use Schedule Notes:**
   a. Permitted residential uses must conform to the requirements at the nearest residential district.
   b. Hotels, motels, motor courts, lodging houses and cottage colonies must meet this requirement and must provide not less than 12,000 square feet per dwelling or guest unit.
   c. On special permit from the Board of Appeals, may be reduced to the lesser of thirty percent (30%) of lot depth or the average of the setbacks of the buildings on the lot next thereto on either side, a vacant lot or a lot occupied by a building set back more than the minimum requirement being counted as though occupied by a building set back by the minimum.
   d. One-story accessory buildings may be located within a required yard, but not less than ten (10) feet from lot lines other than street lines; except an accessory building of one hundred (100) square feet or less may be located no closer than six (6) feet to the line.
   e. No building or any part thereof, except steps, shall be built within twelve (12) feet of any other building.
   f. If abutting an arterial street, sixty (60) feet front yard setback is required and to be

maintained with vegetation.

g. A special permit may be granted by the Board of Appeals for a greater height from the required maximum for wind turbines or generators only if proven the requested greater height is required for efficient power output.

h. For two family dwellings on lots shown on a plan recorded at the Barnstable County Registry of Deeds prior to March 1, 1982, increase the lot area by fifty (50) percent of present requirements; for all others increase lot area by one hundred (100) percent of present requirements, except as authorized under Section 4130.

i. Any business abutting a residential district, or an existing residence in a business district will, in the Business Limited-I, Shore, and Marine Districts be required to have a minimum side and rear yard setback of twenty (20) feet. In the Business Limited-2 District, the minimum side and rear setback will be thirty (30) feet. The minimum side and rear yard setback will only apply to those yards directly abutting a residence.

j. A special permit may be granted by the Board of Appeals to construct an addition to a structure with an existing nonconforming setback, provided, however, that this non-conformity is not increased.

k. The lot shape factor shall be obtained by dividing the square of the perimeter enclosing the lot area necessary for zoning compliance (P) by the minimum lot area required in the Zone (A) i.e.: [P (squared)]/A < 22]

l. Minimum lot area requirements for all principal uses in all districts located within a Water Resource District, as described in Section 5000, shall be 87,120 square feet.

m. Any industrial use abutting any other district shall be required to have a minimum rear and side yard of 100 feet. (Added ATM 92)

# ARTICLE III
# GENERAL REGULATIONS

**3100. PARKING REQUIREMENTS**

**3110**. **Adequate off-street parking** shall be provided on all-weather surfaces within a reasonable distance to service all parking demands created by new construction, whether through new structures or additions to old ones, or by change of use of existing structures. Such parking shall be either on the same premises as the activity it services, or within three hundred feet (300') on a separate parcel, which may be jointly used with other premises for this purpose. The following minimums must be met unless, after application and hearing, the Board of Appeals grants a special permit upon a showing and determination that the construction of fewer spaces will adequately serve anticipated parking needs, provided that there is area to meet the total requirements of Section 3120. For uses allowed on special permit under Section 2300, the Board of Appeals may require that these minimums be exceeded to meet anticipated demand.

**3111. Parking Overlay District.** The "Parking Overlay District" is herein established as an overlay district and shall be superimposed on other districts established in this Zoning By-law.  A plan entitled "Parking Overlay District" prepared by the Cape Cod Commission; dated February 2, 2000 is on file at the Planning & Development Office delineating this district and is hereby made part of this by-law.

**3112. Parking Overlay District requirements.**  Prior to the expansion of any existing structure or use that is located in the Parking Overlay District and that qualifies for the so-called "religious use exemption" set forth under G.L. c. 40A, Section 3, a parking site plan permit shall be obtained form the Zoning Board of Appeals.  Said parking site plan shall conform to the minimum requirements set forth in Section 3120 for Religious uses and structures.  For any structure or use that qualifies for the G.L. c. 40A, Section 3 religious use exemption, a religious institution may count municipally owned parking located within the Parking Overlay District toward satisfaction of the requirements of Section 3120.  In

Sandwich Protective Zoning By-laws                                    May 2004

issuing the parking site plan permit, the Zoning Board of Appeals may impose reasonable requirements regarding the days and hours of use of the municipal parking to avoid conflicts with municipal parking needs.

3120.   **Table Of Requirements.**
- **Bed & Breakfast**: one and one-eighth (1 1/8) spaces per guest unit (Added ATM /5/97)
- **Bowling Alley:** Four (4) spaces per lane.
- **Dwellings**: Two (2) spaces per dwelling unit.
- **Hospital:** One (1) space per bed.
- **Industrial retail accessory use, offices and stores**: One (1) space per two hundred (200) square feet of gross floor area.
- **Industrial, Wholesale:** One (1) space per one and one-half (1 1/2) employees per shift.
- **Motel, Motor Court, Lodging House**: one and one-eighth (1 1/8) spaces per guest unit.
- **Nursing Home:** One (1) space per four (4) beds.
- **Place of Assembly**: One (1) space for three (3) seats.
- **Religious uses and structures** that qualify for the zoning exemption set forth in G.L. c. 40 A, Section 3: One space for each three seats.
- **Restaurants:** A minimum of five (5) spaces or one (1) space for three (3) seats, plus five (5) spaces per take-out area.
- **Supermarket, Grocery Store, Convenience Store**: One (1) space per 200 square feet of gross floor area.
- **Others individually determined.**

3130.   No **off-street parking** shall be maintained closer to the street line than twenty feet (20'). In **BL-2** and **Industrial District**, no off-street parking shall be located between the principal building and the street line of an arterial street unless completely screened from view from the arterial street by vegetation and topography. Off-street parking servicing a use not allowed in an **R-1** or **R-2 District** shall not be maintained within thirty feet (30') of said district bounds.

3140.   **Centerlines of driveways** serving 20 or more parking spaces if egressing into an arterial street shall observe separations as follows:

|                              | **BL-2 District** | **Other Districts** |
| ---------------------------- | ----------------- | ------------------- |
| Other such driveways:        |                   |                     |
| Same side of road            | 500 ft. min.      | 250 ft. min.        |
| Opposite side of road        | 0 or 200 ft.      | 0 or 125 ft.        |
| Intersecting street sidelines| 250 ft.           | 125 ft.             |

No existing parcel in a **Business Limited or Industrial District** shall be subdivided into lots with frontage which would preclude meeting these requirements, unless access rights-of-way are provided across adjoining lots.
Driveways subject to this section shall have 400-foot visibility in each travel direction, and shall comprise no more than two travel lanes, each not more than twelve feet. (12') in width at the lot line.

3150.   **Parking areas for six (6) or more cars** shall be so designed and located that their use does not require backing on a public way.

3200.   **STANDING AND LOADING REQUIREMENTS**

3210.   Any facility, such as a car wash or drive-in facility, which, from time to time, has **queues of vehicles** waiting for admission, shall have sufficient on-site space for such queues without requiring cars to stand on any public way or across any public sidewalk.

Sandwich Protective Zoning By-laws                                                                 May 2004

3220.  **Adequate off-street loading** facilities and space must be provided to service all needs created by new construction, whether through new structures or additions to old ones, and by change of use of existing structures. Facilities shall be so sized and arranged that no trucks need back onto or off of a public way, or be parked on a public way while loading, unloading or waiting to do so.

3300.  **SIGN REGULATIONS.** See Town By-Law, Section 6.60

3400.  **ENVIRONMENTAL CONTROLS**

3410.  No activity shall be permitted in any district unless it can be demonstrated that its operation will be so conducted that the following requirements will be met:

3420.  No noise, sound from public address or other amplification system, vibration, odor, or flashing light shall be perceptible without instruments more than four hundred (400) feet beyond the boundary of the lot, if originating in the Industrial Limited District, or more than two- hundred (200) feet beyond the boundary, if originating in any other district, except for the following:
   a.  Disturbances produced by maintenance or repair of buildings and grounds.
   b.  Farm equipment.
   c.  Construction equipment between hours of 7 a.m. and 7 p.m. only.
   d.  Warning devices.
   e.  Unamplified human voices.

3430.  Cinders, dust, fumes, gases, radiation or trash or other waste shall be effectively confined out of sight on the premises or disposed of.

3431.  **On-site waste disposal**. Any use resulting in on-site disposal of the following wastes shall require a special permit from the Board of Appeals as provided for in **Section 1380** herein:
   a.  Process wastes from operations other than personal hygiene and food for residents, patrons and employees.
   b.  Other than for single-family residences, sewage flows, as determined by Title 5 of the State Environmental Code, exceeding 110 gallons per day per 10,000 square feet of lot area, or exceeding 15,000 gallons per day regardless of lot area.

3440.  **Smoke density** at the point of discharge shall not exceed #2 on the Ringlemann scale for more than six minutes out of any hour, and at no time shall exceed #3 on that scale.

3450.  **Total airborne particulate matter** measured at all points of emission within the premises shall not exceed thirty (30) grams per hour per acre of lot area. All storage yards, drives or untreated open areas shall be maintained with landscaping, paving, screening, sprinkling, or other means such that there shall be no transmission of dust or other particulate matter measurable from the ground at the boundary of the premises.

3460.  All applicable state and federal requirements pertaining to **radio activity or electrical disturbances** shall be complied with.

3470.  **Lighting.**
   a.  The following forms of lighting are prohibited:
      1.  Lights that outline any part of a structure or strings of lights attached to landscaping elements, except temporary traditional decorations for religious or other recognized holidays.
      2.  Lighting *that* casts direct light or glare onto any neighboring residential property.

3.  Lighting that interferes with the safe vision of vehicle operators or obstructs the view or effectiveness of any official traffic sign, traffic signal or traffic marking.

b.  Outdoor lighting fixtures shall be mounted no higher than twenty (20) feet, except for street lights or lighting for public outdoor recreational facilities.

**3480**.  The Building Inspector may require that the applicant for a facility whose future compliance with these standards is questionable furnish **evidence of probable compliance**, whether by example of similar facilities or by engineering analysis. Issuance of a permit on the basis of that evidence shall certify the Town's acceptance of the conformance of the basic structure and equipment, but future equipment changes and operating procedures must be such as to also comply with these standards.

**3500.  LANDSCAPING AND SCREENING**. The following shall be observed in all districts**:**

**3510.**

a.  **Not more than sixty (60) percent of lot area shall be covered** by structures, paving, driveways, walkways and parking areas, and

b.  **Not less than thirty (30) percent of lot area shall be retained in its natural state** with no more than minor removal of existing trees and ground vegetation.

c.  **Vegetation Restoration.**  Where a lot or a portion of a lot has been previously cleared and does not currently support any vegetation, the 30% requirement described in Section 3510b shall be met by replanting an area that alone or in combination with existing natural state vegetation shall constitute 30% of the lot area.

   1.  Lots that do not meet the requirements of Section 3510b shall be planted with a mixture of trees, shrubs, and groundcover species chosen to replicate natural state growth in nearby undisturbed areas.

   2.  Any permit application for a lot that does not meet the requirements of Section 3510b shall submit, as part of the permit application, a planting plan stamped by a Registered Landscape Architect that shall be acted upon as part of the approval process for the permit.

   3.  The permitting board or agency, as a condition of their permit approval, shall require surety in a form acceptable to the permitting agency or board and the Town Treasurer in an amount sufficient to guarantee the survival of the plantings depicted on the approved restoration planting plan for two growing seasons after planting.

   4.  After such restoration, the restored area shall not be mowed, cleared, or otherwise disturbed.

Variations from these three standards shall require special permits from the Board of Appeals as provided for in **Section 1380** herein.

**3520**.   **Parking lots for six (6) or more cars** shall contain, or be bordered within five (5) feet, by at least one tree per six (6) cars. Trees to be of two (2) inch caliper or larger and, if within the parking area, to be planted in curbed soil plots allowing not less than ten feet by ten feet (10' x 10') of unpaved soil area per tree.

**3530  Erosion Control**. Erosion control provisions showing site design, building design and a construction process sufficient to prevent erosion or excessive uncontrolled surface water runoff shall be shown on plans submitted as part of the building permit and/or disposal works construction permit and shall comply with the following:

   1.  No grading or construction shall take place on slopes in excess of twenty (20) percent unless adequate provisions to protect against erosion, soil instability, uncontrolled surface water runoff, or other environmental degradation are placed and constructed to the satisfaction of the Building Official**.**

   2.  No inspection shall be conducted unless all required erosion control measures are in

Sandwich Protective Zoning By-laws                                                  May 2004

place and fully constructed to the satisfaction of the Building Official.

3.  Permanent erosion control measures including but not limited to re-vegetation, retention basins and siltation barriers shall be placed, constructed and maintained at all times to the satisfaction of the Building Official.

(Amended ATM 5/3/99)

**3540**.   All **outdoor sales display areas**, and all **commercial outdoor recreation** must be screened from any adjacent residential use or district by a wall, fence, or densely planted trees, or shrubs three (3) feet or more in height or be equivalently obscured by natural vegetation. Parking areas of six (6) or more cars, contractor's yards, open storage, and loading or service yards shall be similarly screened from any adjacent residential district or use and from any public way from which they would otherwise be visible. All outdoor sales display areas of merchandise within a residential district shall be located behind the required front yard area.

**3550**.   At **corners**, no sign, fence, wall, hedge, or other obstruction shall be allowed to block vision between two and a half (2 1/2) feet and eight (8) feet above the street grade within an area formed by the intersecting street lines and a straight line joining points on said lines twenty (20) feet back from their point of intersection.

**3560**.   No **sight-obstructing fence or wall** shall exceed three (3) feet in height within a required front yard or exceed six (6) feet in height within a required side or rear yard unless granted a special permit for an exception by the Board of Appeals. Such special permit shall be granted only upon the Board's determination that the increased height will not create hazard, unreasonably obstruct visibility from adjacent properties or habitable rooms in any dwelling, or create an unsightly departure from the character of the environs.

## 3600. POND SETBACK REQUIREMENTS

**3610**.   No **principal structure** shall be erected less than fifty (50) feet from the waters of fresh water ponds and lakes. The water's location of these ponds shall be measured from the elevation as follows:

| | | |
|---|---|---|
| a. | Goodspeed Cemetery Pond | 69 |
| b. | Upper Hog Pond | 64 |
| c. | Lawrence Pond | 65 |
| d. | Peters Pond | 71 |
| e. | Pimlico Pond | 67 |
| f. | Lower Shawme Lake | 20 |
| g. | Upper Shawme Lake | 28 |
| h. | Snake Pond | 72 |
| i. | Spectacle Pond | 67 |
| j. | Triangle Pond | 66 |
| k. | Weeks Pond | 72 |

The waters of any other fresh ponds and lakes shall be determined by the contour of the highest observed elevation, established by measuring the existing elevation and adjusting that elevation by using the methods specified in the U.S.G.S. Water Resources Investigations 83-4112 with subsequent amendments, if any, as if the waters of the pond or lake were the ground water.

**3620**.   No **building permit** shall be issued for any principal structure erected on a lot fronting on fresh waters described above until a plan certified by a Registered Land Surveyor is furnished to the Building Inspector. Said plan shall clearly delineate the distance from the proposed structure to the water body.

23

Sandwich Protective Zoning By-laws                                          May 2004

**3630**. Any lot shown on a plan or described in a deed duly recorded at the Registry of Deeds that has less than one hundred twenty-five (125) feet depth from the measured water mark to the front, side, or rear lot line, whichever is greater, shall be eligible to apply to the Board of Appeals for a **special permit** to construct a single-family residence if, when all setbacks are taken into consideration, including the fifty (50) foot setback required herein, the possible remaining building envelope does not contain a sixty (60) foot diameter circle. In no case shall the Board of Appeals grant a special permit to construct a single-family residence less than thirty (30) feet from the measured water's edge, as described above.

## 3700. BUILDING SITING

**3710**. If a building is sited so that its principal floor elevation on the side nearest the street is below the street elevation, the building shall be set back from the edge of the street pavement a minimum of fifteen (15) feet for each one (1) foot the principal floor elevation is below the street elevation. Street elevation shall be measured at the edge of pavement directly in front of the center of the building. This requirement does not affect the setbacks mandated by Section 2600. (Amended STM 94)

**3720**. No opening into the wall of a building, including a garage or basement wall, shall be located at a lower elevation than the overflow elevation of the lot. The overflow elevation shall be defined as the highest elevation at which water would be contained within the boundaries of the site

## 3800. WIRELESS TELECOMMUNICATIONS SERVICES

Section 3800 is promulgated under the authority of M.G.L. Chapter 40A, the Home Rule Amendment of the Massachusetts Constitution and the 1996 Telecommunications Act, 47 U.S.C. Section 332 (c) (7) (A). A wireless communication facility shall not be placed, constructed or modified except in accordance with the provisions of this Zoning By-law. This By-law shall not apply to federally licensed amateur radio operators protected under M.G.L. Chapter 40A, Section 3, telecommunications facilities which are exclusively accessory to a marine use or other public safety telecommunications, or television antennas which are accessory to a residential use.

**3810**. **Purpose.** The purpose of this section is to enable Commercial Mobile Radio Services (CMRS) providers to reasonably locate within the Town of Sandwich while at the same time protecting the important public interests of health, safety and welfare. Specifically, the Wireless Telecommunications Services Zoning has been created to:
   a.  Protect the general public from potential hazards associated with wireless telecommunications facilities;
   b.  Minimize adverse effects on property values;
   c.  Minimize the visual impacts of wireless telecommunications facilities within Sandwich:
   d.  Encourage co-location and utilization of existing structures;
   e.  Minimize the total number of towers in Sandwich to the extent possible under the federal Telecommunications Act; and
   f.  Ensure strict compliance with all applicable federal regulations concerning the effects of radio frequency emissions

**3820**. **Wireless Telecommunications Overlay District.**
      The Wireless Telecommunications Overlay District is herein established as an overlay district and shall be superimposed on other districts established in this Zoning By-law. A plan **entitled "Wireless Telecommunications Overlay District"** prepared by the Cape Cod Commission, dated March 27, 1998 and as revised on a plan dated January 6, 1999 and as amended at Special Town Meeting March 22, 1999 and January 22, 2002 is on file in the Planning & Development Office delineating this district and is hereby made a

24

part of this By-law.

New telecommunications facilities that are constructed exclusively for the purpose of transmitting and receiving television, AM/FM radio, digital, microwave, cellular, telephone or similar forms of electromagnetic radiation must be located within the Wireless Telecommunications Overlay District.

**3830.** **Definitions.** In addition to the definitions contained in Article VII, the following definitions shall apply to Section 3800.

**ANTENNA -** A device for transmitting and receiving electromagnetic waves.

**BASE STATION -** The primary sending and receiving site in a wireless telecommunications network.  More than one base station and/or more than one variety of telecommunications provider can be located on a single tower or structure

**CHANNEL -** The segment of the radiation spectrum from an antenna that carries one signal.  An antenna may radiate on many channels simultaneously.

**COMMERCIAL MOBILE RADIO SERVICES PROVIDERS (CMRS PROVIDERS) -** Public service corporations within the meaning of M.G.L., Chapter 40A, Section 3 which provide Commercial Mobile Radio Services (CMRS) facilities including cellular, personal communications services (PCS), enhanced specialized mobile radio (ESMR), specialized mobile radio (SMR) and paging.

**DBM -** Unit of measure of the power level of an electromagnetic signal expressed in decibels referenced to 1 milliwatt.

**EMF** - Electromagnetic frequency radiation.

**FCC -** Federal Communications Commission of the United States of America.

**FCC 96-326 -** A report and order that sets national standards for emissions of radio frequency emissions from FCC regulated transmitters.

**GHz - Gigaher**tz- one billion hertz

**GUYED TOWER -** A monopole or lattice tower that is tied to the ground or other surface by diagonal cables.

**HERTZ -** One hertz is the frequency of an electric or magnetic field that reverses polarity once each second, or one cycle per second.

**LATTICE TOWER -** A type of mount that is self-supporting with multiple legs and cross bracing of structural steel.

**MHz - Meg**ahertz - one million hertz.

**MONITORING PROTOCOL -** The testing protocol, such as the Cobbs Protocol, or a protocol substantially similar, including compliance determined in accordance with the National Council on Radiation Protection and Measurements, Reports 86 and 119, that is to be used to monitor emissions from existing and new personal wireless service facilities.  Other testing protocols may be required as the technology changes.

**PRE-EXISTING BUILDING OR STRUCTURE** - Any building or structure that was not originally constructed to house or support telecommunications facilities and does not have as its principal purpose the housing or support of telecommunications facilities.

**RADIAL PLOTS -** Radial plots are the result of drawing equally spaced lines (radials) from the point of the antenna, calculating the expected signal and indicating this graphically on a map.  The relative signal strength may be indicated by varying the size or color at each point being studied along the radial; a threshold plot uses a mark to indicate whether that point is strong enough to provide adequate coverage. Radial plots concentrate plot points close to the antenna while plot points diverge near the ends of the radials at the outer edge of coverage.

**REPEATER -** A small receiver/relay transmitter of not more than 20 watts output designed to provide service to areas which are not able to receive adequate coverage directly from an existing wireless telecommunication facility.

**SPGA -** Special Permit Granting Authority, the Planning Board is the SPGA for wireless telecommunication facilities.

**TELECOMMUNICATIONS BUILDING** - Any building utilized primarily for the installation and operation of equipment for generating and detecting electromagnetic radiation and which is accessory to a communication structure.

25

Sandwich Protective Zoning By-laws                                    May 2004

**TELECOMMUNICATIONS FACILITY** - Any structure including all buildings and appurtenances solely intended to house and/or support equipment (equipment shelter), used for transmission and/or reception of electromagnetic radiation, including towers, monopoles, antennas, wiring or other devices attached thereto, including guy wires.

**TELECOMMUNICATIONS TOWERS**: Any guyed, monopole, or self-supported tower, constructed as a bee-standing structure proposed to mount one or more antennas intended for transmitting and receiving television, AM/FM radio, digital, microwave, cellular, telephone or similar forms of electromagnetic radiation.

**TILED COVERAGE PLOTS -** Tiled plots calculate the signal at uniformly spaced locations on a rectangular grid, or tile, of the proposed coverage area. Relative signal strength may be indicated by varying the size or color at each point being studied. Tiled plots provide a uniform distribution of points over the coverage area. Tiled coverage plots incorporate more topographic data than radial plots and are the preferred form for coverage mapping.

3840.   **Pre-Existing Building, Structure, And Telecommunications Tower.** If feasible, all telecommunications facilities (excluding equipment shelters) shall be located on pre-existing buildings or structures or pre-existing telecommunications towers, in accordance with the requirements of this Zoning By-law. Installation of a new telecommunications facility on a pre-existing building or structure or telecommunications tower, performed in accordance with the requirements of this Zoning By-law, shall be permitted as of right; however, a building permit shall be required in all cases.

The Building Inspector shall determine that the following requirements have been satisfied prior to the issuance of a building permit to install a telecommunications facility on a preexisting building or structure or pre-existing telecommunications tower:

a. Installation of a new telecommunications facility under this section shall not result in an increase in the height of the pre-existing building, structure or tower by more than twenty feet; and,

b. Evidence shall be provided to the Building Inspector that all applicable federal, state and local permits, certificates and other approvals have been acquired including a Certificate of Appropriateness from the Historic District Committee, if applicable; and

c. Installation of any new telecommunications facility and their equipment shelters shall be camouflaged to the greatest extent possible, including use of compatible building materials and colors and vegetative year-round screening from adjacent properties, and

d. Any facade or roof-mounted antenna or panel located on an existing structure that is listed on, or eligible for listing on, the National or Massachusetts Registers of Historic Places shall not alter or destroy the character-defining features, distinctive construction methods or original historic materials of the building. Any alteration made to a structure that is listed on or eligible for listing on the National or Massachusetts Registers of Historic Places to accommodate a facade or roof mounted antenna shall be fully reversible, and

e. Output frequency, number of channels, power input and maximum power output per channel; antenna type and orientation; tiled coverage plots for the proposed facility and for any repeaters to be used in conjunction with the proposed facility shall be filed with the application for a building permit.

3850.   **New Wireless Telecommunications Facilities On New Structures.** All new wireless telecommunications facilities on new structures require a special permit from the Sandwich Planning Board in accordance with M.G.L. Chapter 40A, Section 9 and this By-law. The owner(s) of the land that is the subject of the special permit application shall apply for the special permit together with the telecommunications provider.

3851.   **Special Permit Application Procedure.** The applicant is strongly urged to meet with the Planning Board for a preliminary discussion of their application for a proposed wireless

telecommunications facility.

**3852.** **Special Permit Application Filing Requirements.** The following information must be submitted for an application to be considered complete:
   a.   A fully executed application form.
   b.   A certified abutters list.
   c.   A site plan prepared by a professional engineer at a scale of 1"=40' which shall show the following:
       1.    Tower location, including guy wires, if any, and tower height
       2.    Accessory building or structures for equipment
       3.    Topography at five foot contour intervals
       4.    Fencing, landscaping & lighting
       5.    Access and parking
       6.    Abutters
       7.    Areas to be cleared of vegetation
       8.    Site boundaries
   d.   A locus plan at a scale of 1" = 1000' which shall show all streets, bodies of water, landscape features, historic sites, and all buildings within the parcel and within three hundred (300) feet of the property lines, and the exact location of the proposed structure(s). An aerial photograph of a similar scale encompassing the stated requirements is allowed.
   e.   Detailed calculations and plans for drainage and drainage structures as described in the most recently revised Sandwich Subdivision Rules & Regulations.
   f.   Plans shall satisfy requirements, both transitional and permanent, for the prevention of erosion and excessive surface water runoff during construction and operation of the facility as described in Section 3530 of this by-law.
   g.   A color photograph or rendition of the facility with its antennas and/or panels, illustrating the dish or antenna at the proposed location is required. A rendition shall also be prepared illustrating a view of the facility from the nearest street(s).
   h.   Drawings and studies that show the ultimate appearance and operation of the personal wireless service facility at full build-out are required.
   i.   A description of the facility and the reasons for the proposed location, height and design.
   j.   A professional structural engineer's written description of the proposed tower structure including tower superstructure and foundation and their capacity to support the tower superstructure, the proposed antenna(s) and possible additional antenna(s).
   k.   A description of available space on the tower providing illustrations and examples of the type and number of wireless telecommunications devices that could be mounted on the proposed tower structure.
   l.   A written statement from the applicant that the proposed facility complies with, or is exempt from applicable regulations administered by the Federal, State, and County governments
   m.   Output frequency, number of channels, power input and maximum power output per channel; antenna type and orientation; tiled coverage plots for the proposed facility and for any repeaters to be used in conjunction with the proposed facility**.**

**3853. Site Requirements.**
   a.   Telecommunications buildings and other accessory structures housing support equipment shall be screened from adjacent properties to the greatest extent possible.
   b.   Signs shall be limited to those needed to identify the property and the owner and warn of any danger**.**  Announcement signage shall be provided that indicates "No Trespassing" and "Danger" and a telephone number which shall provide 24-hour

        access to the operator of the facility in the event of an emergency; and otherwise comply with the Town's Sign By-law.

c.     All network connections from the telecommunications site shall be via underground landlines except to the extent that underground landlines are not feasible, due to underground conditions, in the reasonable determination of the Planning Board. Clearing of natural vegetation shall be limited to that which is necessary for the construction, operation, maintenance and access to the facility.

d.     Night lighting shall be the minimum necessary to satisfy the requirements of state and federal laws. Lighting of equipment structures and any other facilities on site shall be shielded from abutting properties. There shall be total cutoff of all light at the property lines of the parcel to be developed, and footcandle measurements at the property line shall be 0.0 initial footcandles when measured at grade.

e.     Telecommunications towers shall be set back from each property line a minimum of the distance equal to the height of the tower.

f.     Telecommunications towers shall not exceed 150 feet in height as measured from the original ground level.

g.     There shall be a minimum of one parking space for each new facility, to be used in connection with the maintenance of the facility and the site, and not to be used for the permanent storage of vehicles.

h.     Towers and facilities shall be a neutral, non-reflective color designed to blend with the surrounding environment

i.     Towers and accessory structures shall not be located in wetlands or in wetland buffer zones.

j.     Stormwater run-off shall be contained on-site.

**3854.**    **Special Waivers.** All of the requirements of **Section 3853** shall apply; however, the Planning Board is authorized to grant the following waivers if requested in writing and if the Board deems they are in the best interest of the Town:

a.     Waive the height of the tower up to 180' above ground level provided that the applicant demonstrates that strict adherence to the 150' foot maximum would effectively prohibit his/her ability to operate; and/or

b.     Waive setback requirements if the applicant can demonstrate control over adjacent property such that the fall zone of the telecommunications tower would be clear of any structures, excluding equipment shelters; and/or

c.     Waive other regulations if the applicant can demonstrate that they are duplicative in nature.

**3855. Other Conditions.**

a.     The Board may also impose, in addition to any applicable conditions specified in the By-law, such conditions as it finds reasonably appropriate to safeguard the neighborhood or otherwise serve the purposes of this By-law, including, but not limited to: screening, lighting, fences, limitation upon size, method of access or traffic features, parking, removal upon cessation of use, or other requirements. Such conditions shall be imposed in writing and the applicant may be required to post bond or other surety for compliance with said conditions in any amount satisfactory to the Board.

b.     The Board may require the proponent to provide or pay for engineering services, including but not limited to the following: to evaluate proposals submitted; determining flexibility of geographic location, loading capacities of structures, and architectural review of camouflage techniques.

**3856.**    **Criteria For Approval.** The Planning Board will act within a reasonable time after closing the public hearing and will issue a special permit if it finds:

a.     That the proposed tower or device satisfies the requirements of this By-law and that the size, height, and design is the minimum necessary for that purpose; and

b.     That the applicant has demonstrated a good faith effort to co-locate with other

carriers or to roof-mounted or facade the wireless telecommunication facility including in such good faith effort as:

1. Submission of a list of alternative candidate sites considered for mounting or co-location and the reasons for rejection; and
2. Contact, as may be feasible, with other licensed carriers for operating in the contiguous communities and the Special Permit Granting Authority finds no technically or economically equal co-location is available; and

c. That the proposed tower or device is in compliance with federal and state requirements regarding aviation safety; and

d. That the proposal complies with FCC Reg. 96-386 regarding emissions of electromagnetic radiation.

**3857. Form For Denial.** If the criteria for approval set forth in **Section 3856** are not met, Planning Board denial of the special permit shall be in writing and supported by substantial evidence contained in a written record.

*3858* **Modification.** The Planning Board shall determine if a proposed modification to a wireless telecommunication facility requires additional review and approval.

**3860. Maintenance.** The applicant shall maintain the telecommunications facility in good condition. Such maintenance shall include, but not be limited to, the structural integrity of the tower and security barrier, and maintenance of the landscaping.

**3870. Monitoring.**

a. Pre-testing: After the granting of the special permit and before the applicant's wireless telecommunication service begins transmission, the applicant shall pay for an independent consultant, hired by the town, to monitor the background levels of EMF radiation, around the proposed facility site and/or any repeater locations to be utilized for the applicant's wireless telecommunication service. The consultant shall use the monitoring protocol as found in Section 3830 definitions.   A report of the monitoring results shall be prepared by the consultant and submitted to the Special Permit Granting Authority to become part of the record.

b. Post-testing:  After transmission begins, the owner(s) of any wireless telecommunications facility shall pay for an independent consultant, hired by the town, to conduct testing and monitoring of EMF radiation emitted from said site, and to report the results of the monitoring as follows:

1. There shall be annual monitoring of emissions by the independent consultant using actual field measurement of radiation, utilizing the monitoring protocol as described in Section 3830.  This monitoring shall measure levels of EMF radiation from the primary antennas at the facility as well as any repeaters. A report of the monitoring results shall be prepared by the consultant and submitted to the Special Permit Granting Authority.
2. Any major modification of an existing facility or the activation of additional permitted channels shall require new monitoring.

c. Excessive Emissions:  Should the monitoring of a facility site document that any facility exceeds the FCC 96-326 standard, the owner(s) of all facilities using that site shall be notified. The owner(s) shall submit to the SPGA plan for the reduction of emissions to a level that complies with FCC 96-326 standard within 10 business days of notification of non-compliance.  That plan shall reduce emissions to accomplish this reduction of emissions within 15 days of initial notification of non-compliance by the Building Inspector.  Failure to accomplish this reduction of emissions shall be a violation of the special permit and subject to penalties and fines as specified in Section 1200 of the Sandwich Protective Zoning By-law.  Such fines shall be payable by the owner(s) of the facility until compliance is achieved.

Sandwich Protective Zoning By-laws                                              May 2004

    d.      Structural Inspection: Tower owner(s) shall pay for a licensed professional structural engineer as an Independent Consultant hired by the town to conduct inspections of the tower's structural integrity and safety.  Guyed towers shall be inspected every three years.  Monopoles and non-guyed lattice towers shall be inspected every five years. The inspection report shall be submitted to the SPGA, the Building Inspector and the Town Engineer.  Any modification of an existing facility that includes changes to tower dimensions or proposes to add more antennas or other wireless communications technology shall require a new structural inspection.

**3880.**    **Duration Of Special Permit/Building Permit For Telecommunications Uses**. The Special Permit is granted for a period of one (1) year and shall lapse if substantial use or construction has not commenced by such a date, except for good cause shown and provided further that such construction, once begun, shall be actively and continuously pursued to completion within a reasonable time.

        The construction or operation under any building or special permit shall conform to any subsequent amendment of this By-law unless the use or construction is commenced within a period of not more than six months after the issuance of the permit and in cases involving construction, unless such construction is continued through to completion as continuously and expeditiously as is reasonable.

**3890.**    **Abandonment Or Discontinuation Of Use.** Non-use of a telecommunications facility for a continuous period of two years shall be deemed to constitute an intent to abandon. Upon abandonment or discontinuation of use, the applicant shall be responsible for the costs to physically remove any tower, including antennas, mount, equipment shelters, and security barriers and restore the location to a natural condition. Once abandonment or discontinuance has occurred, the carrier shall remove the facility from the subject property within ninety days. In the event that the carrier fails to remove the facility, the Town shall give notice to the carrier that the facility shall be removed forthwith and the Town, after according written notice seven days in advance to the carrier, shall remove the facility.

        The applicant shall be responsible for the full reversal of any alteration made to a structure that is listed on or eligible for listing on the National or Massachusetts Register of Historic Places. The Planning Board shall require the applicant to post bond or other form of surety at the time of approval of the special permit to cover costs for the removal of the wireless telecommunications facility in the event the Town must remove the facility. In the event the amount of the surety is insufficient to cover the costs of removal, the Town may place a lien upon the property to cover the difference in cost.

        The applicant(s) and owner(s) of the subject land shall provide the Town with written authority from the owner or owners of record for the subject property where the facility is located that shall bind all successors and assigns of the applicant(s) and owner(s) and shall allow the Town to enter onto the subject property to perform inspections for compliance with the terms of the special permit and to physically remove the facility in the event that the carrier/provider or applicant(s) or owner(s) fail to remove the facility in accordance with the requirements of this Zoning by-law.

        In addition, before final approval of an application for a special permit, the owner(s) of the subject property shall provide the Town with a written agreement that shall be recorded against the property which provides that, if the town removes the facility in accordance with the provisions of this by-law, then the owner(s) of the property shall be liable for the full cost of said removal and the owner(s) consent to the recording of a lien against the property for the full amount of said costs.

## 3900. ADULT ENTERTAINMENT

**3910.    Authority.** This by-law is enacted pursuant to M.G.L. Chapter 40A and pursuant to the Town's authority under the Home Rule Amendment to the Massachusetts Constitution to serve the compelling Town interests of limiting the location of and preventing the clustering and concentration of certain adult entertainment uses, as defined and designated herein, in response to studies demonstrating their deleterious effects.

**3920.    Purpose.** It is the purpose of this Adult Entertainment by-law to address and mitigate the secondary effects of the adult entertainment establishments and sexually oriented businesses that are referenced and defined herein. Secondary effects have been shown to include increased crime, adverse impacts on public health, adverse impacts on the business climate of the Town, adverse impacts on the property values of residential and commercial properties and adverse impacts of the quality of life in the Town. All of said adverse impacts are adverse to the health, safety and general welfare of the Town of Sandwich and its inhabitants. The provisions of this by-law have neither the purpose nor intent of imposing a limitation on the content of any communicative matter or materials, including sexually oriented matter or materials. Similarly, it is not the purpose or intent of this by-law to restrict or deny access by adults to adult entertainment establishments or to sexually oriented matter or materials that are protected by the Constitution of the United States or of the Commonwealth of Massachusetts, nor to restrict or deny rights that distributors or exhibitors of such matter or materials may have to sell, rent, distribute or exhibit such matter or materials. Neither is the purpose or intent of this by-law to legalize the sale, rental, distribution or exhibition of obscene or other illegal matter or materials.

**3930.    Adult Entertainment Overlay District.** The Adult Entertainment Overlay District is herein established as an overlay district and shall be superimposed on other districts established in this bylaw. A plan **entitled "Adult Entertainment Overlay District"** prepared by the Cape Cod Commission, dated March 27, 1998 is on file in the Planning & Development Office delineating this district and is hereby made a part of this By-law.

**3940.    Definitions.** In addition to the definitions contained in Article VII, the following definitions shall apply to **Section 3900**. Adult entertainment uses shall include the following uses:
a.    Adult Bookstores, as defined by M.G.L., c. 40A, §9A;
b.    Adult Motion Picture Theaters, as defined by M.G.L., c. 40A, §9A;
c.    Adult Paraphernalia Store, as defined by M.G.L., c. 40A, § 9A;
d.    Adult Video Store, as defined by M.G.L., c. 40A, § 9A;
e.    Establishment Which Displays Live Nudity For Its Patrons, as defined by M.G.L., c. 40A, § 9A.

**3950.    Adult Entertainment Uses By Special Permit Criteria.** Adult entertainment uses shall be prohibited in all zoning districts except as otherwise permitted in this by-law and may be permitted only upon the grant of a special permit by the Zoning Board of Appeals. Such a special permit shall not be granted unless each of the following standards has been met.
a.    The application for a special permit for an adult use shall provide the name and address of the legal owner of the establishment, the legal owner of the property, and the manager of the proposed establishment.
b.    No adult use special permit shall be issued to any person convicted of violating the provisions of M.G.L. Chapter 119, § 63 or M.G.L. Chapter 272, § 28.
c.    Adult uses shall not be located within:
    1.    1,000 feet from the nearest church, school, park, playground, play field, youth center or other location where groups of minors regularly congregate; or
    2.    1,000 feet from the nearest establishment licensed under M.G.L.Chapter 138, § 12; or

31

       3.   500 feet from the nearest adult entertainment use as defined herein; or

       4.   500 feet from the nearest residential zoning district.

           The distances specified above shall be measured by a straight line from the nearest property line of the premises on which the proposed adult entertainment use is to be located to the nearest boundary line of a residential zoning district or to the nearest property line of any other designated uses set forth above.

    d.     All building openings, entries and windows shall be screened in such a manner as to prevent visual access to the interior of the establishment by the public.

    e.     No adult uses shall be allowed to display for advertisement or other purposes any signs, placards or other like materials to the general public on the exterior of the building or on the interior where the same may be seen through glass or other like transparent material any sexually explicit figures or words as defined in M.G.L., Chapter 272, § 31.

    f.     No adult use shall be allowed to disseminate or offer to disseminate adult matter or paraphernalia to minors or suffer minors to view displays or linger on the premises.

    g.     The proposed adult entertainment use shall comply with all of the parking requirements set forth in this by-law and the sign code set forth in the Sandwich Town Bylaw.

    h.     No adult entertainment use shall have a freestanding accessory sign.

    i.     No adult entertainment use shall be established prior to the submission and approval of site plan by the Board of Appeals. The plan shall be in accordance with **Section 1340** of this By-law.

**3960.**   **Conditions.** The Zoning Board of Appeals may impose reasonable conditions, safeguards and limitations on time or use of any special permit granted and shall require that any such special permit shall be personal to the applicant, shall not run with the land and shall expire upon sale or transfer of the subject property.

**3970.**   **Expiration.** A special permit to conduct an adult entertainment use shall expire after a period of three calendar years from its date of issuance and shall be automatically renewable for successive three-year periods thereafter, provided that a written request for such renewal is made to the Zoning Board of Appeals prior to said expiration and that no objection to said renewal is made and sustained by the Zoning board of Appeals based upon the public safety factors applied at the time that the original special permit was granted.

**3980.**   **Severability.** The provisions of this section are severable and, in the event that any provision of this section is determined to be invalid for any reason, the remaining provisions shall remain in full force and effect.

# ARTICLE IV
# SPECIAL REGULATIONS

## 4100. ACCESSORY USES

**4110.**   **Home Occupations**. Home occupations are permitted if no more than thirty (30) percent of the floor area of the residence is used for the occupation, not more than one person not a member of the household is employed on the premises in the occupation, there is no exterior display or storage or other variation from the residential character of the premises, traffic generated does not exceed that normally expected in a residential neighborhood, and all parking required to service the occupation is provided off-street, other than within a required front yard.

Sandwich Protective Zoning By-laws                                             May 2004

**4111.    Home Occupations - Physician's Office.**
In addition to uses allowed under Section 4110, a physician's office is permitted as a home occupation and may employ not more than three persons not members of the household on the premises in the occupation on lots containing not less than 40,000 square feet. All parking shall be contained on the lot and be screened using natural plantings so as to be non-offensive to abutting lots. For the purpose of this section, physician is defined as a Medical Doctor licensed by the Commonwealth of Massachusetts with a practice limited to family, geriatric, pediatric or internal medicine. (Added ATM 93)

**4120.    Mobile Homes, Campers, And Trailers.**

**4121**.    A **mobile home** may be occupied only if incidental to construction of a permanent structure on the premises and only if granted a temporary permit by the Selectmen; or within a licensed mobile home park.

**4122**.    A **single camper** may be occupied on any residential premises by non-paying guests for a period not exceeding thirty (30) days in any calendar year if granted a permit by the Selectmen, or may be occupied within a licensed campground.

**4123**.    A **camper** (but not a mobile home) may be stored to the rear of a principal structure if placed so as to conform to yard requirements for accessory structures, and a mobile home or camper may be stored within a structure.

**4124**.    Other occupancy or storage of mobile homes or campers is prohibited.

**4125**.    No mobile homes, campers, utility trailers, or similar vehicles being offered for sale or rental as a commercial enterprise shall be stored outdoors within view of a public way. None of the above vehicles nor truck trailers nor similar vehicles shall be occupied for commercial or industrial use, except as a temporary construction office, or temporary construction storage, and no wheel-mounted sign shall be used, except within limits prescribed for permanent signs.

**4130.    Accessory Dwelling Units.** For the purpose of promoting the development of affordable rental housing in Sandwich for year-round residents, one accessory dwelling unit per lot may be allowed by special permit from the Planning Board subject to the standards and conditions listed below:

**4131.**    *Reserved (deleted STM 9/91)*

**4132**.    Accessory dwellings shall not be allowed on lots of less than 40,000 square feet.

**4133**.    Accessory dwellings shall not be larger than 1,000 square feet or thirty (30) percent of the gross square footage of the principal dwelling, whichever is larger. Gross square footage shall be defined as the total floor area of the dwelling, excluding basement, attic, or garage.

**4134.    Site Requirements:**
    a.    Accessory dwellings shall be within or attached to a principal dwelling or garage.
    b.    Accessory units shall be designed so as to be as compatible as possible with existing site and neighborhood conditions.
    c.    No accessory unit shall be located within any minimum front or side yard required by **Section 2600**.
    d.    Two off-street parking spaces shall be provided for each accessory unit. Parking shall be screened from view as determined appropriate by the Planning Board.

    e.  Use of an existing on-site septic system to service accessory units shall be permitted only upon approval of the Board of Health.

**4135.** All appropriate by-laws and regulations shall apply, except those inconsistent with the purpose and provisions of **Section 4130**.

**4136.** The **principal owner** of the property must occupy a minimum of eight (8) months as a primary residence, either the principal or accessory dwelling unit.

**4137.** No accessory unit shall be **separated by ownership** from the principal dwelling.

**4138**. All **occupants** of the accessory rental dwelling unit shall be approved by the Sandwich Housing Authority to assure compliance with the purpose of this by-law and the Affordable Housing Program as described in the <u>1987 Master Plan update</u>. Specifically, accessory dwelling units must be rented to those meeting the guidelines for a low or moderate-income family. For the purpose of this section, low income families shall have an income less than eighty (80) percent of the Town of Sandwich median family income, and moderate income families shall have an income between eighty (80) and one hundred and twenty (120) percent of the Town of Sandwich median family income, as determined by the Federal and/or State Census.

**4139. Application Requirements And Procedures**
    a.  Applicants are encouraged to submit preliminary materials for informal review by the Planning Board prior to the application for a special permit.
    b.  Applicants for a special permit for an Accessory Dwelling Unit shall submit to the Planning Board four (4) copies of the following:
        1.  A completed application form.
        2.  A plot plan conforming to the requirements of **Section 1220.**
        3.  Principal elevation of the exterior of the proposed unit, at a minimum scale of 1/8" = 1'.
    c.  One copy of a certified abutters list shall be submitted with the application. The applicant is responsible for the cost of legal notices. Postage stamps sufficient for the mailing of notices must be submitted with the abutters list.
    d.  Procedures described in **Sections 1330, 1331, 1332,** and **1360** shall be followed.

**4140. Common Driveways.** Common driveways, to serve up to three single-family dwellings on two separate lots are allowed by Special Permit as an accessory use, in order to address existing, significant and recognized public safety concerns. The Planning Board shall be the Special Permit Granting Authority (SPGA).

**4141. Procedures.** Common driveways may be allowed only in accordance with the standards and criteria set out in Section 4142 below.   Special Permit applications under this section shall be accompanied by a completed application form and a plan and profile of the proposed driveway prepared and stamped by a Registered Professional Engineer and Professional Land Surveyor.

**4142. Design Standards.** At a minimum common driveways shall be constructed to the standard set forth in Section 5S of the Sandwich Planning Board Subdivision Rules & Regulations in effect at the time the Special Permit application is submitted unless otherwise recommended by the Town Engineer. Common driveways shall not exceed 500' in length from the lot line where the driveway intersects with the street to and including the end of the driveway on the last lot it serves.

**4143. Special Permit Criteria**. The Planning Board shall review all projects for conformance with the following criteria:

Sandwich Protective Zoning By-laws                                                      May 2004

    a.  The proposed common driveway conforms to the design standards of Section 4142 of this by-law and will safely and adequately serve the lots for which it is intended.

    b.  The proposed common driveway is designed in its proportions, orientation, materials, landscaping, and other features as to provide a desirable character complementary to and integral with existing natural features while ensuring the least impact on the land over which it is to be constructed.

    c.  The Board finds that the driveway would not have a detrimental effect on the safety of the neighborhood.

    d.  A deed rider has been submitted in a form acceptable to the Planning Board providing for the continued use and requiring perpetual maintenance of the common driveway by the owners of the lots to be served by the common driveway.

    e.  Documents have been submitted in a form acceptable to the Planning Board creating a homeowners association with responsibility for the repair and maintenance of by the common driveway by the owners of the lots on which the common driveway is to be located

    f.  The Special Permit applicant has demonstrated to the satisfaction of the Planning Board that the lots that are proposed to be served by the common driveway can also be served by individual driveways through the frontage of each lot.

**4144. Conditions**. In granting the Special Permit under this Section, the Planning Board may impose conditions, safeguards and limitations which it deems necessary to effectuate the intent of this Section.  The Planning Board shall require as a condition of a common driveway Special Permit that the deed rider and homeowners association documents be recorded in the Barnstable County Registry of Deeds prior to construction of the common driveway.

## 4200. EARTH MOVING REGULATIONS

**4210.    General.** Removal or filling of topsoil, borrow, rock, sod, loam, peat, humus, clay, sand or gravel shall be done only in accordance with **Section 4220** through **4250**, **except that the following need not obtain a special permit**:

**4211**.    The **removal of less than fifty (50) cubic yards or placing of less than two hundred (200) cubic yards of material**. Septic system upgrades or initial installations shall be exempt.

**4212.    Removal or filling incidental to construction on the premises,** where such removal or filling is explicitly allowed under a currently valid building permit or under agreements governing road construction in an approved subdivision or on a public way.

**4213**.    **Removal or filling at an active cranberry bog** incidental to the operation thereof.

**4220.    Permit From The Board Of Appeals.** Written application for a special permit must be made to the Board of Appeals. **The following shall be conditions for such   issuance:**

**4221**.    The application shall be accompanied by a plan describing the premises and the proposed operation. **If involving more than two (2) acres or 2,000 cubic yards**,
- The plan shall be prepared by a Registered Land Surveyor or Engineer showing property lines,
- Names and addresses of all abutters, including those across any street or way,
- Existing grades in the area from which the above material is to be removed and in surrounding areas,
- Together with the grades below which no excavation shall take place, and
- The proposed cover vegetation and trees.

**4222**.    A **performance bond** in an amount determined by the Board of Appeals has been

Sandwich Protective Zoning By-laws                                            May 2004

posted in the name of the Town assuring satisfactory performance in the fulfillment of the requirements of this by-law and such other conditions as the Board of Appeals may impose as conditions to the issuance of its permit.

4223.   Before granting a permit, the Board of Appeals shall give due consideration to the location of the proposed earth removal, to the general character of the neighborhood surrounding such location, and to the general safety of the public on the public ways in the vicinity.

4230.   **Filling.** Building permits or special permits allowing filling shall be granted only upon demonstration of the following:

4231.   That the requirements of **Section 4300** (Flood Plain District Requirements) are to be complied with.

4232.   That the requirements of **Section 4220** (Restoration) will be complied with within six (6) months of expiration of the building permit or issuance of a Certificate of Occupancy under **Section 1230**, or within one year of issuance of a special permit for filling.

4233.   That **reasonable care** will be taken to avoid harmful diversion of water onto adjoining properties. The Building Inspector may require a bond to secure compliance in cases involving both two (2) acres or more and 10,000 cubic yards or more of fill.

4240.   **Restoration.** Forthwith, following expiration or withdrawal of a permit, or upon voluntary cessation of operations,
- All land shall be graded leaving no slopes in excess of one foot vertical to two (2) feet horizontal,
- Providing for surface drainage,
- Boulders and stumps buried or disposed of,
- And the entire area covered with not less than four (4) inches of topsoil,
- Planted with cover vegetation, which shall have been established prior to release of the bond.

4250.   **Stockpiling. Topsoil stripped and stockpiled** in preparation for construction or for earth removal shall be restored to its original distribution within thirty-six (36) months of such stripping unless a valid building permit or earth removal permit is in force.

4300.   **FLOOD PLAIN DISTRICT.**
        **Purpose**. The purpose of these regulations is to ensure public safety by reducing personal injury and threats to life; to eliminate new hazards to emergency response officials; to prevent public emergencies resulting from water contamination due to flooding; to avoid the disruption or shutdown of the utility network due to flooding, to the detriment of areas beyond the flooding site; to eliminate costs associated with the response and cleanup of flooding conditions; and to reduce flood damage to public and private property.

4310.   **Creation.** Flood Plain Overlay Districts are hereby created covering the areas designated as "Special Flood Hazard Areas Inundated by 100-Year Flood" on the Town of Sandwich, Massachusetts, Flood Insurance Rate Map (FIRM) of September 25, 1989, and any subsequent map amendments, issued by the Federal Emergency Management Agency (FEMA) for the administration of the National Flood Insurance Program. District boundaries shall be defined by the 100-year base flood elevations shown on the FIRM and, further, by the Town of Sandwich Flood Insurance Study (FIS) of August 5, 1991 as revised through July 2, 1992 and any revisions thereof. The FIRM and FIS are incorporated herein by reference and are on file in the offices of the Town Clerk, Planning Board, Building Inspector, Conservation Commission, and Town Engineer. The Flood

36

Plain District shall be considered to be superimposed over any other district established in this by-law. Land in a Flood Plain District shall be subject to these requirements and to the requirements, which apply to the underlying zoning districts.

4320.  **Definitions.** For the purpose of this section of the Zoning By-Law, terms shall be defined as follows:

**BASE FLOOD** - The flood having one percent chance of being equaled or exceeded in any given year.

**COASTAL HIGH HAZARD AREA** - The area subject to high velocity waters, including but not limited to tidal waves or hurricane wave wash. The area is designated on the FIRM as Zone V, V1-30, and VE.

**DEVELOPMENT** - Any man-made change to improved or unimproved real estate, including but not limited to buildings or other structures, mining, dredging, filling, grading, paving, excavation or drilling operations.

**DISTRICT** - Flood Plain District.

**FEDERAL EMERGENCY MANAGEMENT AGENCY (FEMA)** The agency which administers the National Flood Insurance Program and provides nationwide flood hazard area mapping and regulatory standards for development in flood hazard areas.

**FLOOD HAZARD BOUNDARY MAP (FHBM)** - An official map of a community issued by FEMA where the boundaries of the flood mudslide (i.e. mudflow), or related erosion areas having special hazards have been designated as Zones A, M and/or E.

**FLOOD INSURANCE STUDY (FIS)** - An examination, evaluation and determination of flood hazards and, if appropriate, corresponding water surface elevations, or an examination, evaluation and determination of mudslide (i.e. mudflow) and/or flood related erosion hazards.

**MANUFACTURED HOME** - A structure, transportable in one or more sections, which is built on a permanent chassis and is designed for use with or without a permanent foundation when connected to the required utilities. The term "manufactured home" shall also include park trailers, travel trailers and other similar vehicles.

**NEW CONSTRUCTION** - Structures for which construction commenced on or after the effective date of the Town's Flood Plain District regulations.

**ONE-HUNDRED-YEAR FLOOD** - See Base Flood.

**SPECIAL FLOOD HAZARD AREA** - The land within a flood plain subject to a one-percent or greater chance of flooding in any given year. The area may be designated on the FIRM as Zone A, AO, Al-30, AE, A99, AH, V, V1-30, and VE.

**STRUCTURE** - A walled and roofed building, a gas or liquid storage tank that is principally above ground, as well as a manufactured home.

**SUBSTANTIAL IMPROVEMENT** - Any repair, reconstruction, or improvement of a structure, the cost of which equals or exceeds 50 percent of the market value of the structure either before the improvement or repair is started or, if the structure has been damaged, before the damage occurred. "Substantial improvement" shall be deemed to occur when the first alteration of any wall, ceiling, floor, or other structural part of the building commences, whether or not that alteration affects the external dimensions of the structure.

**ZONE A** - The 100-year flood area where the base flood elevation (BFE) has not been determined. To determine the BFE, use the best available federal, state, local or other data.

**ZONE A1 - A30 AND ZONE AE** - The 100-year flood area where the base flood elevation has been determined.

**ZONE AH AND ZONE AO** - The 100-year flood area with flood depths of one (1) to three (3) feet.

**ZONE 99** - Areas to be protected from the 100-year flood by a federal flood protection system under construction. BFE's have not been determined.

**ZONE V -** See Coastal High Hazard Area.

4330.  **Compliance With State, Federal And Local Regulations. All development activities**

Sandwich Protective Zoning By-laws                                      May 2004

within the District, whether structural or non-structural, shall comply with MGL Chapter 131, Section 40 and with all other applicable state regulations, unless a variance is granted according to the variance procedures required for such regulations, including:

- 780 CMR 2101.0 of the Massachusetts State Building Code which addresses flood plain and coastal high hazard areas;
- 310 CMR 10.00, Wetlands Protection Regulations, Department of Environmental Protection (DEP);
- 302 CMR 6.00, Inland Wetlands Restriction, DEP;
- 302 CMR 4.00, Coastal Wetlands Restriction, DEP;
- 310 CMR 15, Title 5, Minimum Requirements for the-Subsurface Disposal of Sanitary Sewage, DEP.

Any required federal or state permit shall be obtained prior to the issuance of a development permit. Further, the Town of Sandwich Wetlands Protection Bylaw and all Sandwich Board of Health regulations shall be adhered to.
**In addition, the following requirements shall apply:**

4340.    No building permit shall be issued for construction where any land to be excavated or filled in conjunction with **such construction is below the base flood elevation** unless granted a special permit for an exception by the Board of Appeals. Such special permit shall be issued only upon demonstration by the applicant that the proposed development will pose no hazard to the health and safety of the occupants thereof and meets Flood Plain District requirements.

4350.    Without limiting the generality of the foregoing, the following are presumed to be hazardous to health and safety:

a.   Floor level, including basement or cellar of any structure, below the base flood elevation.

b.   Individual sewage disposal systems subject to inundation in the event of coastal flooding during a 100-year flood event.

c.   Methods of filling or foundations subject to displacement by coastal flooding during a 100-year flood event.

d.   Water supply subject to interruption or contamination in the event of coastal flooding during a 100-year flood event. Within ten (10) days of receipt of the application, the receiving agency shall transmit one copy of the development plan to the Conservation Commission, Planning Board, Board of Health, Town Engineer, and Building Inspector. Final action shall not be taken until reports have been received from the above agencies or until thirty-five (35) days have elapsed.

4360.    **No fill may be placed on any lot**, any portion of which is at or below the base flood elevation, without a special permit.

4400.    **CLUSTER DEVELOPMENT.** (Entire section amended May 1, 1995)

4410.    **Objective.** The objective of Cluster Development is to allow relatively intensive use of land while, at the same time, maintaining the existing character; to preserve open space for conservation and recreation; to introduce variety and choice into residential development; to meet housing needs; and to facilitate economic and efficient provision of public services. Cluster Development is the preferred form of development for any proposed project that can comply with the requirements of **Section 4400.**

4420.    **Applicability.** The Planning Board may grant a special permit for the construction and occupancy of a Cluster Development in any district permitting residences subject to the following regulations and conditions.

4430.    **Procedure.**

**4431.    Pre-Application Review.** To promote better communication and avoid misunderstanding, applicants are encouraged to submit preliminary materials for informal review by the Planning Board prior to formal application.

**4432.    Submission.** Proposed Cluster Developments shall comply with the "Cluster Development Special Permit Regulations" of the Sandwich Planning Board. A Cluster Development shall encompass at least twice the lot area required in the district. A new or existing Cluster Development may include a Village Cluster, which meets the requirements of **Section 4444** of the Sandwich Zoning By-laws. In the case of an application to amend an existing Cluster Special Permit to permit a Village Cluster, the procedures in **Section 4440** through **Section 4448**, inclusive shall apply, except as to such materials as the Planning Board may waive as duplicative of materials previously submitted.

**4440.    Requirements.** In addition to compliance with the "Cluster Development Special Permit Regulations" of the Sandwich Planning Board and M.G.L. Chapter 40A, Section 9, a Cluster Development must conform to the following:

**4441.    Number Of Dwelling Units**. The maximum number of dwelling units allowed in a Cluster Development shall be calculated as follows:
  a.    Equal the number of units that could be constructed with a conventional grid subdivision that complies with the zoning in the district and the Subdivision Rules and Regulations of the Planning Board, and any other applicable laws or regulations of the Town and Commonwealth. A preliminary layout of a conventional grid subdivision meeting the above requirements shall be submitted to demonstrate the allowable number of units.
  b.    Where the Cluster Development includes more than one ownership and/or lies in more than one zoning district, the number of units allowed shall be calculated as above for each district and summed to give an overall allowable total.

**4442.    Allowable Uses**. Uses allowed shall be only those allowed in the district in which the proposed cluster is located.

**4443.    Dimensional Regulations.**

**4443.    Flexible Dimensions for Cluster Lots.  (Amended May 2, 2004)** Lot area, frontage, yard and coverage regulations shall be the following, in lieu of the requirements in Section 2600:

| Minimum Lot Area | 5,000 SF |
|---|---|
| Maximum Lot Area | 40,000 SF |
| Minimum Lot Frontage | 50 ft* |
| Maximum Lot Frontage | 75ft* |
| Minimum Front Yard | 15 ft. |
| Minimum Side and Rear Yard | 12 ft.** |
| Maximum Lot Coverage: | |
| 5000 SF To 10000 SF | 45% |
| 10001 SF To 20000 SF | 35% |
| 20001 SF To 30000 SF | 30% |
| 30001 SF To 40000 SF | 25% |

\*    But not less than 150 feet if on an arterial street.
\*\*    Except not less than the requirements of Section 2600 for yards in the development abutting property not located within the Cluster Development. **Accessory buildings** shall not be located within six feet of any property line including property lines shared in common with open space parcels, but shall not

be less than the requirements of Section 2600 for yards abutting property not located within the Cluster Development.

4444. **Village Cluster Regulations**. Village Clusters are prohibited unless they are a part of a Cluster Development. The following regulations apply to Village Clusters:

    a. The lots in the aggregate comprising each Village Cluster shall encompass a minimum of four acres and a maximum of ten acres of land that is contiguous, separated only by open space, streets or ways or bodies of water; and

    b. A Cluster Development may have one or more Village Clusters but no more than twenty-five (25%) percent of the lots within a Cluster Development shall be designated as Village Cluster lots; and

    c. Construction on a Village Cluster lot shall be limited to a single family house of not more than two bedrooms (as that term is defined in Article VII hereof), with a garage or one other accessory building; and

    d. Village Cluster lots shall not gain their frontage from Arterial or Collector streets; and

    e. For all Cluster Developments which include a Village Cluster, the Planning Board shall make a finding that such Cluster Development includes recreational amenities which are intended primarily for the use of residents of the Cluster Development. Such amenities shall include at least one of the following:

    f. A community building for social or sporting activities no less that 3500 square feet.

    g. A golf course no smaller than a regulation 9 hole or an 18 hole par 3.

    h. A pond used for swimming and recreational purposes.

    i. In lieu of the otherwise applicable requirements for the Cluster Development, lot area, frontage, yard, and lot coverage regulations for a Village Cluster shall be the following:

| Minimum Lot Area* | 5000 SF |
|---|---|
| Maximum Lot Area | ⅞ the applicable lot area |
| Minimum Lot Frontage | 30 ft* |
| Maximum Lot Frontage | 50 ft. |
| Minimum Front Yard | 15 ft |
| Minimum Side and Rear Yard ** | 12 ft |
| Maximum Lot Coverage: | |
| 5000 To 10000 SF | 45% |
| 10001 To 20000 SF | 35% |
| 20001 To 30000 SF | 30% |
| 30001 To 40000 SF | 25% |

\*    No part of the lot area employed for zoning compliance shall be further from the street line than a distance equal to five (5) times the lot frontage

\*\*    Except not less than the requirements of Section 2600 for yards in the development abutting property not located within the Cluster Development. **Accessory buildings** shall not be located within six feet of any property line including property lines shared in common with open space parcels, but shall not be less than the requirements of Section 2600 for yards abutting property not located within the Cluster Development.

4445. *Reserved for future use*

4446. **Open Space**. In addition to compliance with the "Cluster Development Special Permit Regulations" of the Sandwich Planning Board and M.G.L. Chapter 40A, Section 9, Cluster Developments must conform to the following open space requirements: Common open space shall be preserved for recreation or conservation, and shall comprise not less than thirty (30) percent of the entire proposed development, excluding land subject to either inland or coastal wetland regulations (Section 40, Chapter 131, MGL). Building coverage shall not exceed five (5) percent within the area designated as open space.

Sandwich Protective Zoning By-laws                                      May 2004

**4447.    Cluster Development Criteria For Approval**. Approval of a Cluster Development shall be granted upon Planning Board determination that the plan complies with the requirements of Section 4430 and 4440 and that the Cluster Development Plan is superior to a conventional subdivision plan in all of the following ways:

a.   In preserving open space for conservation or recreation;
b.   In utilizing natural features of the land;
c.   In allowing more efficient provision of streets; utilities, and other public services;
d.   And at least equal to a conventional plan in other respects.

**4448.    Village Cluster Criteria For Approval**. If a Cluster Development includes a Village Cluster, the Planning Board shall make a determination that the Village Cluster is superior to a conventional subdivision plan in each of the following ways:

a.   Preserving natural areas and
b.   Providing, through the proposed landscaping and siting of structures, an integrated over-all design, enhanced visual effect and a reduced impact on the environment; and
c.   The Cluster Development of which it is a part has recreational amenity in accordance with Section 4444e.
d.   The Village Cluster approval shall not reduce the required amount of Open Space for the Cluster Development or permit the Cluster Development to have more dwelling units than would otherwise be applicable.

**4450.    Affordable Housing Conditional Density Development**

**4451.     Purpose And Authority**. The purpose of Section 4450 is to further the goal of encouraging a variety of affordable housing types for persons of various age and income levels in accordance with Massachusetts General Laws, Chapter 40A, Section 9 which allows municipalities to adopt "incentive" ordinances for the creation of affordable housing, and for the purpose of:

1.   Helping residents and their families who, because of rising land prices, have been unable to obtain suitable housing at an affordable price and,
2.   Maintaining a stable economy by preventing out-migration of residents who are an essential part of our community.

The Planning Board may grant a special permit that allows an increase in density through a relaxation of dimensional requirements of the Sandwich Protective Zoning By-law as described in Section 4453. Any special permit granted pursuant to this section shall require that a percentage of all units developed on the site be sold and maintained at affordable prices according to the standards contained in Section 4453 and 4455.

For the purpose of Section 4450 the Planning Board shall be the Special Permit Granting Authority (SPGA).

**4452.    Procedures.** Density increases shall only be allowed in accordance with the requirements and restrictions set out in Section 4453 and 4455 of this by-law.  **A Conditional Density Affordable Housing Development shall not have more than 40 dwelling units.** Any Special Permit application under this section shall also be accompanied by a definitive plan application, showing the proposed lots and roadways, which shall be advertised and noticed according to the provisions of the M.G.L. Chapter 41, Section 81.   The Planning Board public hearings for the Special Permit and the Definitive Plan shall run concurrently.  As a further incentive for the construction of affordable housing the Board may, at its discretion and upon written request from the applicant, waive certain standards for requirements set forth in the Sandwich Planning Board Subdivision Rules and Regulations

**4453.    Standards.**

a.   **Number Of Dwelling Units**. The number of units allowed in an Affordable Housing Conditional Density Development shall be as follows:

41

Sandwich Protective Zoning By-laws                                    May 2004

| Homeownership | | |
|---|---|---|
| **Number of Dwelling Units** | **Percent Affordable** | **Maximum number of units allowed** |
| 4 Units per acre | 100% Affordable Units | 40 |
| 2 Units per acre | 50% Affordable Units | 20 |

| Rental | | |
|---|---|---|
| I Bedroom Units or Units Deed Restricted to Age 55 and older* | | |
| **Number of Dwelling Units** | **Percent Affordable** | **Maximum number of units allowed** |
| 10 Units per acre | 100 % Affordable Units | 40 |
| 6 Units per acre | 50% Affordable Units | 20 |

| 2 Bedroom Units | | |
|---|---|---|
| **Number of Dwelling Units** | **Percent Affordable** | **Maximum number of units allowed** |
| 4 Units per acre | 50% Affordable Units | **20** |

\*       Occupancy of such units shall be limited to persons fifty-five years of age or older and their dependents, as may be permitted under applicable state and/or federal regulations.

**Flexible Dimensional Regulations.**  Lot area, frontage, yard and coverage regulations shall be the following in lieu of the requirements in section 2600:

| Maximum Lot Coverage: | | | | |
|---|---|---|---|---|
| Lot area | 5000 SF | To | 10000 SF | 45% |
| Lot area | 10001 SF | To | 20000 SF | 35% |
| Lot area | 20001 SF | To | 30000 SF | 30% |
| Lot area | 30001 SF | To | 40000 SF | 25% |
| Minimum Front Yard | 15 ft. | | | |
| Minimum Lot Frontage | 50 ft* | | Maximum Lot Frontage | 75ft* |
| Minimum Side and Rear Yard | 12 ft.** | | | |

 \*But not less than 150 feet if on an arterial street.
\*\*Except not less than the requirements of Section 2600 for yards in the development abutting property not located within the Affordable Housing Conditional Density Development.   **Accessory buildings** shall not be located within six feet of any property line including property lines shared in common with open space parcels, but shall not be less than the requirements of Section 2600 for yards abutting property not located within the Affordable Housing Conditional Density Development.

b.   **Design Standards.** Affordable housing units created through this by-law shall be harmonious with the rest of the development and shall be similar in design, appearance, construction, and quality of materials with other units in the development and with the surrounding neighborhood.

c.   **Lottery.** The lottery for any affordable units permitted under this section shall be conducted before commencement of any construction of roads or structures on the site and before any building permits are granted.  The Planning Board shall designate a lottery agent as a condition of the special permit.

d.   **Phasing**. A schedule of construction that provides for the timely delivery of affordable units must be submitted to and approved by the Planning Board prior to the endorsement of the Definitive Plan.

   1.   In no case shall building permits be issued for more than 25% of the market rate units until 25% of the affordable units are constructed.  After the initial 25% of the market rates units and 25% of the affordable units are constructed, building permits for the remainder of the units shall only be issued on a 1 to 1 basis, that is 1 affordable then 1 market rate and so on until all the affordable units are permitted and constructed. The last unit

42

     permitted and constructed shall be a market rate unit.

2. The project may also be constructed in its entirety with all permits applied for at one time provided that the occupancy permits are issued with an initial phase of no more than 25% of the market-rate units being issued certificates of occupancy until 25% of the affordable units are issued certificates of occupancy. After this initial phase, certificates of occupancy shall only be issued on a 1 to 1 basis, that is 1 affordable and 1 market-rate and so on until all the affordable units have certificates of occupancy. The last unit to be issued a certificate of occupancy shall be a market rate unit.

3. Projects that are 100% affordable are not subject to phasing.

**4454.  Special Permit Criteria.** The Planning Board will review all projects for conformance with the following criteria:

a. The proposed development conforms to the design standards of this by-law and will deliver the affordable units according to the provisions of Section 4453d.

b. The proposed development site plan is designed in its proportions, orientation, materials, landscaping, and other features as to provide a stable and desirable character complementary to and integral with the natural features.

c. The Board finds that the development and commensurate density increase does not have a detrimental effect on the character of the neighborhood or community and is consistent with the performance standards of the Sandwich Protective Zoning By-law.

d. The proposed development is consistent with all municipal comprehensive plans, policies and objectives.

**4455.  Long Term Affordability.** As a condition to any special permit issued under Section 4450 All affordable housing units created under Section 4450 shall be subject to an affordable housing restriction and a regulatory agreement in a form acceptable to the Planning Board. The special permit shall not take effect until the restriction, the regulatory agreement and the special permit are recorded at the Registry of Deeds and a copy provided to the Planning Board and the Inspector of Buildings.

a. **Affordable Housing Restriction**

    1. **Homeownership Units**. The Restriction shall provide that units made available for ownership shall be made available at a cost including mortgage interest, principal, taxes, insurance and common charges not exceeding 30% of annual income for a household at or below 70% of the Area Median Income (AMI) of the Barnstable-Yarmouth Metropolitan Statistical Area (MSA), and shall be sold to households earning at or below 70% of the Area Median Income (AMI) of Barnstable-Yarmouth MSA. The Restriction shall limit the re-sale price of any ownership units, and shall bind all subsequent purchasers in perpetuity, consistent with Massachusetts Department of Housing and Community Development's (DHCD) regulations and guidelines under Chapter 40B of the Massachusetts General Laws.

    2. **Rental Units**. The Restriction shall provide that units made available for rental shall be rented to a person or family whose income is 70% or less of the Area Median Income (AMI) of Barnstable-Yarmouth Metropolitan Statistical Area (MSA). The rent, including heat but not other utilities, shall not exceed the rents established by the Department of Housing and Urban Development (HUD) for a household whose income is 70% or less of the median income of MSA. In the event that utilities are separately metered, the utility allowance established by the Sandwich Housing Authority shall be deducted from HUD's rent level.

b. **Regulatory Agreement.** The resale of affordable units created under this section shall be governed by the regulatory agreement executed as a condition of any special permit granted under this section. Eligible purchasers are given the

opportunity to purchase the Affordable Units at a reduced price of the Affordable Unit's appraised fair market value if the purchaser agrees to convey the Affordable Unit on resale:

1. To an eligible purchaser located by the Town of Sandwich or the Monitoring Agent or the property owner or,
2. To the Town of Sandwich, for an amount equal to the Maximum Resale Price, which is determined by multiplying the most recent published area median income as determined by the United States Department of Housing and Urban Development ("HUD") (the "Base Income Number") by the Maximum Resale Price Multiplier. Maximum Resale Price Multiplier is calculated at the initial sale by dividing the Initial Sales Price by the Base Income Number.

**4456.** **Application Requirements**.

    a. **Special Permit.** Applicants for a Special Permit under this section shall include the following materials with the application:

1. A completed application form.
2. A plan depicting existing conditions and a general description of existing conditions for abutting properties; the nature and location of existing buildings on the property or within 300' of the property line; existing street layouts and elevations and open spaces within the neighborhood of the property.
3. Preliminary, scaled architectural drawings, signed by a registered architect, for each proposed building as well as elevations for each building. In the case of rental properties these plans shall include floor plans for each unit proposed.
4. A tabulation of proposed buildings by type, size including number of bedrooms; lot coverage by structure and all impervious areas; and any additional area to be developed for any use for example parking, driveways, lawns, gardens and so forth.
5. A preliminary utilities plan.
6. Draft documents that comply with the provisions of Section 4455. Such documentation shall also include the proposed affordable housing unit sales price or rental amounts.

    b. **Definitive Plan.** Applicants for a definitive plan pursuant to Section 4450 shall include the following materials with the application:

1. A completed application form (Form C).
2. A municipal lien certificate.
3. Subdivision plans prepared according to the requirements of the Sandwich Panning Board Subdivision Rules & Regulations.

**4500.** *Deleted ATM 5/4/98*

**4600.** **MULTI-FAMILY DWELLING.** Multi-family dwellings shall be governed by this section. Special permits for multi-family dwellings shall be granted only after all of the following conditions have been completely met:

**4610.** Multi-family dwellings shall have the following **minimum frontages** on either a state highway or an accepted town way:

| | |
|---|---|
| R-I, BL-1, and Shore Districts | 150 ft. |
| R-2 and BL-2 Districts | 200 ft. |
| Ridge District | 200 ft. |

Multi-family dwellings shall not be permitted on those ways that have been designated by the Town as Scenic Roads.

**4620.** **Multi-family dwellings** shall be permitted only where it can be shown that the danger of

Sandwich Protective Zoning By-laws                                    May 2004

pollution of ground or surface water is no greater than the danger to those same waters from single-family dwellings at the same location. The burden of this proof shall rest with the applicant. The pollutant loading from the on-site disposal system for a single family residence shall be considered to be twenty-one (21) pounds of nitrogen per year with an additional loading of nine (9) pounds of nitrogen per year for each 5000 square feet of lawn area.

4621.   No special permit shall be issued until the Board of Appeals has been supplied with a complete set of **design plans for all on-site disposal facilities**. These plans shall include all percolation test results, properly witnessed by the health agent, test pit logs, design calculations, and a written certification from the Board of Health that the plans comply with all of the requirements of the state and local health codes in effect at the time of the filing of the application for special permit.

4630.   The site shall be so designed that **all improvements** shall be in accordance with the standards set forth in the Subdivision Rules and Regulations of the Sandwich Planning Board and no special permit shall be issued until the Planning Board certifies to the Board of Appeals that the plans as submitted do so comply. The minimum design standards shall be those that apply to a minor street. The site design shall be such that visibility of parking areas from public ways or abutting properties is minimized; lighting of parking areas avoid casting glare onto adjoining properties; major topographic changes or removal of existing trees are avoided and effective use is made of topography, landscaping and building placement to maintain the character of the neighborhood and existing water views from public ways or abutting properties.

4640.   Multi-family dwellings shall have an **applicable land area** per dwelling unit equal to at least 1.20 times the lot area required at the location for a single family dwelling. In calculating the total number of dwelling units, the definition of applicable land area contained in Section 4441 of these by-laws shall apply and no upward rounding of fractional parts of dwelling units will be allowed.

Front and rear yards and each side yard requirements shall be determined by multiplying the total number of units allowable on the lot by ten (10) feet. The minimum requirements shall be 100 feet and the maximum shall be 250 feet for multi-family dwellings containing more that 10 units. The Board of Appeals may reduce front, rear and side yard requirements if the topography of the parcel is such that placement of the structure or structures on the parcel, as required by these by-laws, would create a hardship for the owner. This reduction may be to the extent that the Board of Appeals determines necessary, provided that, by so doing, the required setback is not reduced below the minimum of 100 feet. These yard areas shall be retained in a natural undisturbed condition for the purpose of screening, except that the front yard may be penetrated by the necessary means of access and egress. Additional plantings shall be made to bring the screening density up to the required amount. The type and location of this screening shall be approved by the Planning Board.

4650.   If the number of multi-family dwelling units allowed on a lot exceeds 10, there shall be two separate points of access and egress supplied. The location of these shall comply with the dimensional requirements for separation and visibility of **Section 3140** of these by-laws. These access roads shall be interconnected on the lot so as not to form separate dead ends.

4660.   The applicant shall notify the agencies listed below that an application for a special permit along with an accompanying plan is being filed with the Board of Appeals and is available for review. Copies of receipts for those notifications shall be presented to the Board of Appeals as part of the application for special permit.
        a.   Fire Chief

b. Chief of Police
c. Superintendent of Public Works
d. Water District Superintendent
e. Conservation Commission
f. Electric Company
g. Gas Company
h. Telephone Company
i. Cable Company

**4670**.  The Board of Appeals shall require as a condition of the special permit that the applicant shall covenant with the Planning Board for the completion of all roadways and parking areas. These covenants and their ultimate release shall be in accordance with the rules and regulations of the Planning Board as contained in its Subdivision Control Regulations.

## 4700. CONVERSION OF SEASONAL OR INTERMITTENT-USE STRUCTURES.

**4710.**  **Cottage Colonies.** Any **existing cottage colony** may not be converted to single-family dwelling use under separate ownership unless the lot upon which each building is located complies with the minimum requirements for single family dwellings in the zoning district in which the land is located, and such non-conforming cottage colony may not be converted to single-family use under condominium, cooperative, time sharing condominium, or any other single-family dwelling use more intensive or frequent than seasonal or intermittent use, unless the lot meets the minimum requirements for Cluster Developments, as set forth in **Section 4440**. This section shall apply whether or not the lot is situated in a district in which Cluster Development is a prohibited use.

**4720.**  **Motels And Motor Courts.** Any **existing motel or motor court** may not be converted to single-family use under condominium, cooperative, time sharing condominium or any other single-family use more intensive or frequent than the intermittent or seasonal use, unless the lot meets the minimum requirements and is in a district that permits multi-family dwellings as set forth in **Section 4600**. This section shall apply whether or not the lot is situated in a district in which multi-family dwellings are a prohibited use.

**4730.**  **Lodging Houses.** Any **existing lodging house** may not be converted to condominium, cooperative, of time sharing condominium unless the lot area per dwelling unit is at least equal to the lot area required at that location for **a** single-family dwelling. The maximum number of converted dwellings shall be equal to the "Applicable Land Area," as defined in **Section 4441**, divided by 1.20 times the minimum lot area for a single-family dwelling in the district in which the lot is located.

**4740.**  **Procedures.** The **conversion of any structure** provided herein shall be governed by the procedures contained in **Section 4431** through **4437**; and, in addition, the Planning Board shall thereafter submit its recommendations to the Board of Appeals within thirty (30) days after receipt of reports from the Board of Health and/or Conservation Commission, or within seventy-five (75) days of the date of pre-application review, whichever is sooner.  The Board of Appeals shall act upon said application as an application for special permit as set forth in **Section 1330** through **1360** and, where applicable, **Section 2400**.

## 4800. SWIMMING POOLS.

**4810.**  Each swimming pool, whether public or private as defined in Section 4442 of the Commonwealth of Massachusetts State Building Code, shall be enclosed by a fence, not less than four (4) feet in height for a private pool and five (5) feet high for a public pool with a self-latching gate, which shall completely enclose the swimming pool and

surrounding walks and diving platforms. Fences will be installed before any water is placed within the pool.

4820. The **pool wall** itself, if forty-eight (48) inches or more in height above grade, or a building, natural barrier, hedge, pool cover, or other protective device may be approved by the Building Inspector if giving protection comparable to the above.

4830. **Mesh or openings in a metal fence** shall be no larger than two (2) inches wide. All metal fences, enclosures, or railings to which the bathers have access near or adjacent to a swimming pool, and which may become electrically charged as a result of contact with broken overhead conductors or from any other cause, shall be effectively grounded.

## 4900. DEVELOPMENT SCHEDULING.

4910. **Purpose**. The purpose of **Section 4900 Development Scheduling** is to insure that a harmonious pattern and rate of development occurs in Sandwich to protect the welfare of current and future Sandwich residents. The consequences of the historical pattern and rate of development in Sandwich are described in the Master Plan Update of 1987. The rate of development in Sandwich shall be determined by, and should not exceed, the ability of the Town to provide adequate schools, roads, police, fire protection, and other services necessary to safeguard the health, welfare and safety of current and future residents. In addition, this development rate is intended to further the legitimate Commonwealth and local interests in the provision of a fair share of housing that is affordable to persons of low or moderate income.

4915. **Definitions.**
**Applicant** - Individuals, partnerships, corporations, trusts and other legal entities in which the applicant of record holds a legal or beneficial ownership of greater than one (1) percent.
**Calendar Year** - The period beginning January 1 and ending December 31.

4920. **Applicability. Section 4900** applies to **the issuance of building permits for all new residential dwelling units**, including those proposed for single or common lots for single-and two-family residential use as outlined in MGL Chapter 40A, Section 6. Two-family and multi-family dwellings shall be considered to have one building permit per dwelling unit for the purpose of this Section.

4930. **Activation**. This by-law will be activated upon the vote of Town Meeting. During the first calendar year it is in effect, the total number of building permits for residential units issued between January 1 of that year and the vote of Town Meeting shall count toward the 170 permit total described in Section 4940.

4940. **Rate Of Residential Development**. The Building Inspector shall issue permits for construction of new residential dwelling units only if permit issuance will not result in authorizing construction of a total of more than **170 dwelling units in a single calendar year**. This rate is intended to insure that the Town, with prudent reliance on local and other financial sources, and in compliance with the revenue generating limitations of Proposition 2 1/2, can and will provide infrastructure and operate in a manner that provides an adequate and responsible level of town services.

4950. **Building Permit Authorization.**
   a. No applicant may have more than one (1) request for a building permit pending before the Building Inspector in any given month.
   b. No more than six (6) building permits shall be issued to any one applicant within a single calendar year.
   c. Applications for building permits shall be dated and time-stamped upon receipt by the

Sandwich Protective Zoning By-laws                                    May 2004

Building Inspector. Building permits shall be issued on a first-in-time basis in twelve (12) even monthly amounts, with any partial or un-issued permits to be carried forward for issuance in the subsequent month until the 170 permits have been issued. No un-issued building permits shall be carried forward from one calendar year to the next.

**4955.    Exceptions From Section 4950.**
    a.    Any units of housing proposed to be built under any program or statute intended to assist the construction of low or moderate income housing, as defined in the applicable statute or regulation, shall be exempt from the provisions of **Section 4950**, including affordable units created under **Sections 4130** and **4450** of the Sandwich Protective Zoning By-Law.
    b.    Units proposed for lots under an existing Development Schedule Covenant with the Planning Board shall not be subject to **Section 4950**.
    c.    All exempt units, as described in **4955** (b) shall be counted toward the 170 permit total described in Section 4940.

**4960.    Issuance Of Building Permits.** The Building Inspector shall issue building permits for construction of residential dwelling units only if permit issuance complies with the requirements of **Section 4900**.


# ARTICLE V
# WATER PROTECTION DISTRICTS


**5000.    PURPOSE.** The **purpose of these regulations** is, in the interest of public health, safety and general welfare, to preserve the quality and quantity of the Town's groundwater resources in order to insure a safe and healthy public water supply.

**5010.    CREATION.  Water Resource Overlay Districts** are hereby created covering the areas described on the Map entitled "Town of Sandwich, Massachusetts, Water Resource Districts," dated October 1, 1989 and revised through by Graphic Data Specialists of East Sandwich. Said map is on file with the Planning Board and the Town Engineer and is hereby made a part of this By-Law. These Water Resource Districts shall be considered to be superimposed over any other districts established in this By-Law.  Where applicable, the requirements of this overlay district shall be construed to supersede any less stringent requirements of the underlying districts. (Amended STM 4/1/96 and ATM 99)

**5020.    DEFINITIONS**. (Amended ATM 92) For the purpose of this bylaw, the following will define terms used within:
**CULTIVATED LAWNS** - shall mean a vegetation cover of sod forming grass species, which is regularly fertilized, irrigated, and maintained at a height of four inches (4) or less, on an appropriate loam base.
**DISPOSAL** - shall mean the deposit, injection, dumping, spilling, leaking, incineration or placing of any material into or on any land or water so that such material or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground water.
**GROUND WATER** - shall mean all the water found beneath the surface of the ground.
**HAZARDOUS MATERIALS** - shall mean any product or waste or combination of substances which, because of quantity, concentration, or physical or chemical, or infectious, or radioactive characteristics may reasonably pose, in the determination of the enforcing authority, a substantial present or potential hazard to human health, safety or welfare, or the environment when improperly treated, stored, transported, used or

disposed of, or otherwise managed; any substance which may create a special hazard in the event of spill, leak, fire, or exposure; and all substances deemed to be hazardous waste as defined in MGL chapter 21C Section 2 and the Hazardous Waste Regulations promulgated thereunder by Massachusetts Department of Environment Protection (DEP) at 310C CMR 30.010 in amounts in excess of that normally used in household maintenance; or other materials which are listed as toxic, hazardous or a priority pollutant by the United States Environment Protection Agency.

**HISTORICAL HIGH GROUND WATER LEVEL** - shall mean the highest ground water elevation that is likely to occur at a given location, based on calculations according to the High Ground water methodology specified in the U.S.G.S. Water Resource Investigations 83-4112 by Frimpter et.al. and any subsequent revisions.

**IMPERVIOUS SURFACE** - shall mean any material on the ground that does not allow surface water to penetrate into the soil.

**LOAM** - shall mean fertile, friable, natural topsoil of the locality, without admixture of subsoil, refuse or other foreign materials, and as further defined by the Barnstable County Extension Service.

**PROCESS WASTEWATER**- shall mean wastewaters disposed of on site other than sanitary wastewater.

**RECHARGE AREA** - shall mean the area encompassing land and water surface through which precipitation enters the groundwater body, and from which groundwater flows naturally or is drawn by pumping into a water well**.**

**SURFACE WATER LEVEL** - shall be determined as provided for under Section 3610 of this Zoning Bylaw.

**5030. USE REGULATIONS.** (Amended ATM 92 and ATM 99)

**PROHIBITED USES**.  Within the Water Resource District, the **following uses are prohibited:**

a.  Sanitary landfills and open dumps;
b.  Landfilling or land disposal of septage or sewage  sludge;
c.  Automobile graveyards or junk yards;
d.  Storage of liquid petroleum products of any kind, except those incidental to:
    1.  Normal household use and outdoor maintenance of the heating of a structure;
    2.  Waste oil retention facilities required by MGL Chapter 21, Section 52A; or
    3.  Emergency generators required by statute, rule or regulations; provided that such storage is in a free standing container either within a building or above ground level that the Board of Appeals and the Board of Health find so designed as to prevent an accidental release onto or below the land surface;
e.  Dry cleaning establishments;
f.  Metal plating;
g.  Boat and motor vehicle service and repair;
h.  Car washes - unless with 100% recycle process;
i.  Chemical or bacteriological laboratories;
j.  Any activity or occupations that generate, treat, store or dispose of hazardous waste, which is subject to MGL Chapter 21C and 310 CMR 30.00, including without limitation, solid waste, hazardous waste, leachable waste, chemical waste, radioactive waste, and waste oil, except for waste oil retention facilities required by MGL Chapter 21, Section 41a that meet the standards set forth in 310 CMR 22.22(2)(a) 4. Storage of household quantities may be allowed only by special permit.
k.  Industrial or commercial uses which dispose process liquids on site.
l.  Storage of sodium chloride, calcium chloride, chemically treated abrasives or other chemicals used for the removal of snow and ice on roads, or the stockpiling and disposal of snow and ice containing sodium chloride, calcium chloride, chemically treated abrasives or other chemicals used for removal from highways and streets located outside the Water Resource District.
m.  Storage of pesticides, as defined in MGL Chapter 132B,  Section 2, unless such

storage is within a building or structure with an impermeable cover and liner that, pursuant to a special permit, the Board of Appeals and the Board of Health find so designed as to prevent an accidental release onto or below the land surface, or the storage of commercial fertilizers and soil conditions, as defined in MGL Chapter 128, Section 64, except in a structure with an impermeable cover and liner which, pursuant to a special permit, the Board of Appeals and Board of Health find so designed as to prevent an accidental release onto or below the land surface;

n. Any wastewater treatment plants except those that discharge outside the Water Resource District. A hydrogeologic evaluation shall be required if wastewater flows exceed 2000 g.p.d.;

o. Animal feedlots; (not applicable to parcels of land over five acres in size)

p. Stockpiling of animal manures, except in a structure with an impermeable cover and liner;

q. Storage of septage or sewage sludge except in a structure with an impermeable cover and liner that, pursuant to a special permit, the Board of Appeals and the Board of Health find so designed as to prevent an accidental release onto or land surface;

r. Any other use which involves as a principal activity the manufacture, use, transportation, or disposal of toxic or hazardous materials.

**5040. PERFORMANCE STANDARDS.** (Amended ATM 92) To preserve the natural land surface providing high quality recharge to the groundwater, to limit sewage and septage flow and fertilizer application to amounts which will be diluted adequately by natural recharge, to prevent the formation of plumes of contamination in the groundwater system, and to **prevent the discharge of leakage of toxic or hazardous substances into the groundwater,** all uses shall meet the following performance standards:

a. The **concentration of nitrate** resulting from wastewater disposal and from fertilizer application, when diluted by rainwater recharge on the lot shall not exceed five (5) parts per million (p.p.m.).

    1. **Existing buildings** are exempt and must adhere to a standard of seven (7) parts per million (p.p.m.).

b. For all uses combined, **wastewater flow disposed on site** shall not exceed 20,000 gallons per day. All cultivated lawns shall have a loam base of six inches (6").

c. **All toxic or hazardous materials** shall be stored in product tight containers protected from corrosion, accidental damage or vandalism and shall be used and handled in such a way as to prevent spillage into the ground or surface waters. Spill containment will be provided for all storage. A product inventory shall be maintained and reconciled with purchase, use, sales and disposal records at sufficient intervals to detect product loss.

d. No toxic or hazardous materials shall be present in **wastes disposed on site**. Wastes composed in part or entirely of toxic or hazardous materials shall be retained in product tight containers for removal and disposal by a licensed scavenger service or as directed by the Board of Health.

e. With the exception of five (5) parts per million (p.p.m.) nitrate limit as stated in Section 5040 (a), **contaminant levels in groundwater** resulting from disposal of process wastes from operations other than personal hygiene and food for residents, patrons and employees, or from wastewater treatment and disposal systems greater than 10,000 gallons per day capacity shall not exceed those levels specified in Tables C and E of the "Drinking Water Regulations of Massachusetts" (DEQE, June 15, 1977), after allowing for dilution by natural recharge on the premises.

f. All **runoff from impervious surfaces** shall be recharged on the site by diversion to areas covered with vegetation for surface infiltration to the extent possible. Dry wells shall be used only where other methods are infeasible, and shall be preceded by oil, grease and sediment traps to facilitate removal of contaminated

     solids. In the vicinity of chemical or fuel delivery points, provision shall be made for spill control.

g.  Except for excavations for the construction of building foundations, for the installation of utility works or for the laying out of roads, the **removal of soil, loam, sand, gravel or any other mineral substance** will be limited to a depth of ten (10) feet above the historical high ground and surface water level. The amount of land area exposed at any one time shall be limited to five (5) acre area being reclaimed to a natural vegetative state prior to issuance of the special permit for the use of the next five (5) acres. Upon the completion of operations, the remainder of the parcel of land shall be reclaimed to a natural vegetative state within one (1) year.

h.  The **application of fertilizers** for non-domestic or non-agricultural activities shall be limited to areas having at least six inches (6") of loam or naturally occurring top soil and made strictly in accordance with a management and site plan, delineating at a minimum the manner in which the application is to be performed in order to minimize adverse impacts on surface and groundwater due to nutrient transport and deposition and sedimentation.

i.  Where the premises are **partially outside a Water Resource District**, such potential pollution sources as on-site waste disposal systems shall, to the degree feasible, be located outside the District.

**5050. WATER QUALITY REVIEW COMMITTEE.**

**5051.** There is hereby established a **Water Quality Review Committee** (WQRC), comprising one representative each appointed from time to time by and from the Board of Selectmen, Board of Health, Planning Board, Conservation Commission, Water District and the Health Agent.

**5052.** **CERTIFICATE OF WATER QUALITY COMPLIANCE**.
  A C**ertificate of Water Quality Compliance** shall be obtained by the owner of the premises from the WQRC for erection of any new principal structure other than a single family dwelling or for change in occupancy requiring a Certificate of Use and Occupancy under the State Building Code. No Building Permit or Certificate of Use and Occupancy shall be issued by the Building Inspector unless a Certificate of Water Quality Compliance, if required, has been obtained.

**5053.** **REQUIREMENTS.** A **certificate of Water Quality Compliance** shall be granted only as follows: For new construction or additions of new activities not involving structures, or for changes in occupancy or operation on previously developed premises, only if in full compliance with all requirements of Section 5040 Performance Standards.

**5054.** **SUBMITTALS.** In applying for a Certificate of Water Quality Compliance, seven (7) sets of app**lication materials** shall be submitted to the Building Inspector, who shall forward one set to each member of the WQRC. All information necessary to demonstrate compliance must be submitted, including but not limited to the following:

a.  A complete list of all chemicals, pesticides, fuels and other potentially toxic or hazardous materials to be used or stored on the premises in quantities greater than those associated with normal household use, accompanied by a description of measures to protect from vandalism, corrosion or leakage, and to provide control of spills.

b.  A description of potentially toxic or hazardous wastes to be generated, indicating storage and disposal methods.

c.  Evidence of compliance with all requirements of Section 5040 Performance Standards.

d.  All multi-family developments which will have five or more dwelling units, hotels and motels, cluster developments, nursing homes and hospitals, and any project

resulting in a wastewater discharge of greater than 2,000 gallons per day (g.p.d.) on any single acre shall be required to submit the following:

1. A water table contour map and a geologic description of the area in the vicinity of the proposed project to determine groundwater flow directions;
2. Projections of nitrogen levels in downgradient groundwater, simulation of contaminant movement in groundwater and delineation of plumes; and
3. A projection of the impacts on downgradient drinking water (public and private wells; existing, future and potential), on lakes and ponds, and on coastal waters. The information submitted to the WQRC must demonstrate that no significant impact to downgradient water resources will occur as a result of the project.

5055.   **ACTION.  The WQRC shall act within twenty-one (21) days** of acceptance of a complete application, approving it by issuing a Certificate of Compliance if a majority determines that the applicant has adequately demonstrated compliance with the requirements of the Water Resource District, and rejecting the application otherwise.

5056.   **CERTIFICATE REVIEW.  Each three years**, the WQRC shall review compliance with this by-law and the Certificate of Water Quality Compliance. Upon request, Certificate holders shall submit the following:

a.      Description of any changes from the originally submitted materials.
b.      Certification that the waste disposal system has been inspected by a licensed septic system installer or treatment plant operator within the preceding ninety (90) days and found to be properly maintained and in proper operating condition.
c.      Results from analysis of leachate or wastewaters as may be required by the Board of Health.

Evidence of non-compliance shall be reported to the Board of Health for enforcement action.

5060.   **ENFORCEMENT.**

5061.   **INSPECTION.** These provisions shall be enforced by **the Agent of the Board of Health.** The Inspector of Buildings or Agent of the Board of Health may enter upon the premises at any reasonable time to inspect for compliance with provisions of this by-law. Evidence of compliance with approved waste disposal plans may be required by the enforcing officers. All records pertaining to waste removal shall be retained.

5062.   **VIOLATIONS.   Written notice of any violations** shall be provided to the holder of the Certificate of Water Quality Compliance specifying a time for compliance including cleanup of any spilled materials which is reasonable in relation to the public health hazard involved and the difficulty of compliance, but in no event shall more than thirty (30) days be allowed for either compliance or finalization of a plan for longer term compliance approved by the WQRC.

5100.   **SURFACE WATER PROTECTION DISTRICT.**

5110.   **SPECIAL PERMIT REQUIREMENTS IN SURFACE WATER PROTECTION DISTRICT.** The Zoning Board of Appeals may withhold approval of a special permit for construction of any new principal structure or portion thereof intended for multi-family or commercial use, requiring a special permit as defined by the Zoning By-Law, whose septic disposal systems or any portion thereof lie within three hundred (300) feet of a surface water pond (see Section 5120) if, after weighing all the pertinent facts and evidence, the Board of Appeals finds that:

a.      The existing condition of the receiving waters is at or above critical eutrophic levels; or
b.      The nutrient contribution from the proposed development, when added to the existing and potential nutrient level of developments within the specific recharge

area, will generate, on a pounds per acre basis, nutrient levels that exceed the receiving waters' critical eutrophic level.

However, the Board of Appeals shall not withhold approval of an application for a special permit if the applicant provides measures for reduction of the nutrient loading rate, on a pounds per acre basis, to a rate below that which would produce critical eutrophic levels in the water body. It shall be the responsibility of the applicant to demonstrate to the Board of Appeals that the proposed mitigating measures will work as designed, and the Board of Appeals may require the applicant to demonstrate on an annual basis that said mitigating measures are operating satisfactorily.

**5120.** **SURFACE WATER BODIES.** Surface water ponds, as shown on the Zoning Map, shall be considered superimposed over any other districts established by this by-law.

**5130.** **ANALYSIS OF DEVELOPMENT IMPACT.** The applicant under Section 5110 shall provide an analysis of development impact, which, at a minimum, includes the following:

a. The existing condition of water body or water supply, including physical characteristics and water chemistry;

b. The expected change in the condition of the water body or water supply as a result of the proposed development;

c. The comparison, on a per acre basis, of the total nutrient loading from the proposed development with:

1. The existing and potential loading from all other developments and acreage within the recharge area of the water supply or water body; and

2. The loading rate which would be expected to produce critical eutrophic levels in the water body.

d. In determining the impact of nutrient loading from a development, the following standards and definitions shall be used (unless the applicant demonstrates to the Appeals Board that, given the nature of the proposed project and/or receiving waters, other standards are appropriate):

1. Loading per person: .25 lbs. phosphorus per person per year for sewage disposal systems within three hundred (300) feet of the shoreline;

2. Loading from road runoff: .25 lbs. phosphorous per curb mile per day;

3. Critical eutrophic levels - fresh water concentration: total phosphorous = .02 mg/liter.

**5140.** **EXEMPTIONS.** The Zoning Board of Appeals may except an application from the requirements of Section 5100 provided that the applicant can demonstrate that:

a. Nutrients from the development will not, in fact, be recharged to the designated water body; or

b. The development will not result in any increase in loading the relevant nutrient.

**5150.** **RELATION TO OTHER REQUIREMENTS OF THE ZONING BY-LAW.** Approval of a special permit as noted in Section 5110 shall not substitute for compliance with any other requirement of the Zoning Act or the Sandwich Zoning By-Law.

# ARTICLE VI
## GROWTH CENTER TECHNOLOGY DISTRICT.
### (ATM94)

**6000.** **PURPOSES.** To provide for small and medium scales of business or commercial developments related solely to research, development, manufacturing, assembly or transmission of goods or information related to computers, medicine, high-technology, finance, science, education and electronic transmission of information and other uses as specified in this Section of the Sandwich Protective Zoning By-laws. To provide for small and medium scales of office space for Medical Doctors and patient services.

**6100.** **DEFINITIONS.** In addition to the definitions contained in the Definitions Section, the following definitions shall apply to Article VI. Any definition used in this section shall be strictly construed by all permit-granting authorities.
**Ancillary Uses:** Uses which are incidental and subordinate to the principal permitted use which may not occupy more than 25% of the total floor space of the building.

**6200.** **OBJECTIVE.** The objective of the Growth Center Technology District is to allow technological and medical uses of land through the use of site plan approval which shall provide for compatibility with nearby residential developments; encourage economic development of good, clean commercial activities that    are consistent with the Town of Sandwich Master Plan, the Town of Sandwich Local Comprehensive Plan and the Regional Policy Plan of the Cape Cod Commission; to establish zoning regulations to encourage and set guidelines for such development while minimizing any adverse impact of development in the Town of Sandwich.

**6300.** **REGULATIONS.** Land located within the Growth Center Technology District shall be subject to the following requirements:

**6310.** **Dimensional Regulations.** Lot size, lot width, setbacks, coverage and height regulations shall be the following in lieu of the requirements in **Section 2600**:

| Minimum lot size | 3 acres |
|---|---|
| Maximum lot size | 12 acres |
| Minimum lot Frontage | 250 feet |
| Minimum side and rear yard setback | 40 feet |
| Maximum lot coverage by impervious material | 60% |
| Maximum building height | 45 feet |
| Minimum front building setback | 45 feet |

**6320. Aesthetic Regulations.**
   a.   The exterior of buildings shall be wood, brick, glass, stucco, or decorated facade
   b.   All landscaping shall be installed in such a way as to preserve, restore and enhance the natural vegetation of the site. In order to ensure satisfactory performance in the fulfillment of landscaping requirements a cash surety in an amount determined by the Planning Board, shall be posted in the name of Town of Sandwich. Disturbance of the existing contours shall be minimized. All disturbed areas shall be replanted with an effective combination of shrubs, trees, ground cover, and lawn using the following planting standards:
      1.   All trees shall be balled and burlapped or container grown when brought to the site.
      2.   Ground cover and lawn areas shall receive a minimum of 6" of loam.
      3.   A list of trees, shrubs, evergreens and grasses that are compatible with the Cape environment is available at the Planning Board Office and shall be used as a guideline.
      4.   If entrances incorporate special landscaping treatment, they shall be of an

   appropriate scale and detailed on the site plan.

5. Any vehicle in excess of two tons gross vehicle weight or equipment stored full or part-time shall be screened from roadways and abutting property.

c. An undisturbed buffer zone of 100 feet shall exist between the Growth Center Technology District and its boundary with any other zoning district. There shall be a minimum 20 foot undisturbed buffer along the side and rear lot lines of all lots. Any lot line which does not abut the 100 foot buffer shall have a 20 foot undisturbed buffer.

d. Cluster Development is the preferred form of development for any proposed project in this district.

e. Parking requirements shall be in accordance with Section 3100 of the Sandwich Protective Zoning By-laws. In addition, the following guidelines shall apply:

1. Parking shall be prohibited between buildings and street layout, except for handicap access.

2. Placement of all or most of the parking behind buildings is encouraged. Rows of parking should be interrupted by landscaped or naturally vegetated islands of not less than ten feet in width. A row shall be considered to consist of the ten foot wide island with parking spaces on one or both sides.

3. There shall be a minimum of 250 feet between driveway curb cuts. Common driveways are permitted if approved by the Planning Board.

f. All road layouts within the Growth Center Technology District shall be a minimum of 80 feet, travel lanes shall be a minimum of 15 feet and a sidewalk shall be required on one side of the street. The Sandwich Planning Board Subdivision Rules and Regulations shall apply to all roadways and sidewalks within this district, including surety requirements. All utilities shall be underground.

g. All proposed exterior lighting shall conform to **Section 3470** of the Sandwich Protective Zoning By-laws. In addition, the following guidelines shall apply:

1. Parking areas shall have light fixtures that have a total cutoff of all light at less than 90 degrees. Attached building or wall pack lighting shall be screened by the building's architectural features or contain a 45 degree cutoff shield.

2. Outdoor lighting shall be designed to provide uniform distribution of light without compromising safety and security. The intensity of light fixtures shall be restricted to 250 watts.

**6400.** **PERMITTED USES**. The following uses shall be permitted in the Growth Center Technology District. Site Plan Approval is required by the Sandwich Planning Board before a building permit can be issued by the Inspector of Buildings.

| | |
|---|---|
| Communication Company | Marine Research Facility |
| Computer Hardware Assembly | Market Research Facility |
| Computer Hardware Manufacturing | Medical Information Gathering |
| Computer Software Development | Medical Information Distribution |
| Computer Software Manufacturing | Medical Offices for patient examinations |
| Computer Software Research | and treatment |
| Computer Technology Development | Municipal Uses |
| Computer Technology Research | Museum |
| Day Care Center for Children of Employees | Office |
| Educational Institution | Parking Garage for Employees and |
| Electronic Information Gathering | Visitor Parking Only |
| Electronic Information Distribution | Pharmaceutical Facility |
| Financial Information Distribution | Pharmaceutical Manufacturing |
| Financial Information Gathering | Philanthropic Institution |
| Hospital | Private Utility Office |
| Hotel w/ Restaurant | Public Utility Office |
| Indoor Health Club | Religious Uses |
| Marine Product Development | Single Heliport Pad within entire GCTD |

**6410.** Any use not allowed is prohibited

**6420.** No more than three uses on any single lot is permitted.

**6430.** All uses in **Section 6000** shall comply with **Section 5000** of the Sandwich Protective Zoning By-Laws regardless of location within or without the Water Resource Protection District. Medical x-rays discharge and wastewater treatment discharge shall not be permitted within the Water Resource District.

**6500. PERMITTED ANCILLARY USES.** The following uses shall be permitted within the Growth Center Technology District provided that they are ancillary uses.
Auditorium
Cafeteria
Day Care Center for Children of Employees
Function Room
Gymnasium
Health Club
Meeting Room
Professional Show Room

**6600.** **SITE PLAN REVIEW.** Site Plan approval by the Sandwich Planning Board shall be required for all uses within the Growth Center Technology District. The purpose of the site plan review procedure is to encourage a desirable and compatible character of development within the Town of Sandwich and to assure safety, imagination and innovation in the design process while complying with all zoning requirements. Site plan review and Subdivision Control Law approval may be applied for simultaneously to expedite the review process, if applicable.

**6610.** **Site Plan Submittal.** The following items shall be submitted to the Sandwich Planning Board. The Planning Board, at its discretion, may waive submittal requirements.
a. Original signed application and four copies and an abutters list;
b. Application fee, $250.00 per lot and $.05 per square footage of building;
c. List of all hazardous materials and quantities on site;
d. Six copies of the Site Plan (24" x 36") at an appropriate scale to show adequate detail of the following:
1. Location and boundaries of the site;
2. Lot lines and abutting property owners;
3. Building elevation, shape, height, location and use of proposed structures;
4. Parking and lighting plan;
5. Analysis of hydrologic system, vegetation cover, land forms, and natural land characteristics;
6. Proposed landscaping plan;
7. Location of buffer zones;
8. Existing topography, grading plan, location and width of streets and ways;
9. Areas of proposed and retained vegetation, distinctions between upland and wetland;
10. Existing trees on the site, which are a caliper of twelve (12) inches or larger in disturbed areas between the footprint of building and buffer zones;
11. Vehicle and Pedestrian circulation;
12. Handling of surface drainage, including drainage basins;
13. Intended location of proposed utilities, location and size of septic tanks and leaching fields, if applicable;
14. Extent and nature of proposed cutting of natural vegetation;
15. Location of outdoor storage, trash receptacle, fencing and screening;
16. Proposed or existing easements of any type;
17. The Site Plan shall be signed and stamped by a team to include a Massachusetts Registered Civil Engineer, a Massachusetts Registered Land

Surveyor and a Massachusetts Registered Landscape Architect.

**6611**. The Site Plan shall contain a sufficient level of detail to ensure constructability of the project. Supporting details and documentation shall be presented as part of the site plan submission.

**6620. Site Plan Review Procedures.**

**6621. Pre-Application Review.** To promote better communication and avoid misunderstanding, applicants are encouraged to submit preliminary materials for informal review by the Planning Board prior to submitting a formal application.

**6622. Planning Board Action.**
   a.   Within sixty days after the receipt of the Site Plan pursuant to this section, or such further time as may be agreed upon at the written request of the applicant, the Sandwich Planning Board must grant approval or deny the site plan based upon comments from the Board of Health, Town Engineer, Director of Planning & Development, and Conservation Commission.
   b.   The Planning Board shall, by a majority thereof, make a determination as to whether or not the submission meets the requirements of the Sandwich Protective Zoning By-laws **Section 6000**. Prior to making such a determination, the Planning Board shall give notice of the time and place of the public meeting at which it will consider such determination. Notification of said public meeting shall be in accordance with the Sandwich Planning Board Subdivision Rules and Regulations for Definitive Plans. Upon making such a determination the Planning Board shall certify its determination in writing to the Town Clerk, Inspector of Buildings and the submitting applicant.
   c.   If the Planning Board determines that the submission does not meet such requirements, it shall in its certification set forth in reasonable detail the reasons why the submission does not comply with such requirements.
   d.   All applications denied shall have 45 days to resubmit application, one time, at no cost to the applicant, with corrections of deficiencies.

**6623. Appeals.** Appeals of **Section 6000** of the Sandwich Protective Zoning By-laws shall be made to the Town of Sandwich Board of Appeals established pursuant to **Section 1300** of the Sandwich Protective Zoning By-laws and G.L. Chapter 40A, Section 8.

**6624. Expiration.** Site plan approval shall expire within one year from the date of filing said approval with the Town Clerk if construction has not commenced.

**6625. Certificate Of Compliance**. Prior to the Inspector of Buildings issuing an occupancy permit, the owner shall obtain a Certificate of Compliance from the Planning Board. An as-built plan shall be submitted to the Planning Board showing all site improvements, including: buildings, utilities, parking areas with spaces indicated, drives, drainage basins, if applicable, and any other improvements shown on the approved site plans. The plan shall be certified by a Registered Land Surveyor, Civil Engineer, and Landscape Architect as to conformance with the approved site plan.

# ARTICLE VII
# THREE PONDS DISTRICT

**7000. PURPOSES AND OBJECTIVE.** The purpose and objective of the Three Ponds District (the "District") is to accomplish the following:
   ▪   Protect, to the greatest extent possible, surface and groundwater resources and their quality;

- Preserve rare and endangered species and habitat existing within fragile ecosystems;
- Preserve the scenic character of the District roads as well as the scenic views of the pond shores and woodlands;
- Foster carefully planned land uses such as small scale densely clustered residential development with recreational amenities of an appropriate scale;
- Preserve existing single family homes;
- Foster existing open space and recreation land uses including summer camps as this is a use that encompasses both recreation and education;
- Allow for additional recreational uses that are compatible with resource protection;
- Manage growth in a manner that will not adversely affect municipal infrastructure.

**7010.** **Three Ponds District**. The District encompasses approximately 692 acres of land area and approximately 313 acres of pond surface area. The boundaries of the District are shown on a plan entitled "Three Ponds District" prepared by the Cape Cod Commission, dated January 30, 2001 is hereby made a part of this by-law. This plan is on file in the Planning & Development Office. In addition, a natural resources inventory prepared by Horsley & Witten, Inc. and dated October 5, 2000 is on file in the Planning & Development Office.

**7020.** **Definitions.** In addition to the definitions contained in the Definition Section of the Sandwich Protective Zoning By-law, the following definitions shall apply to the provisions of this bylaw. In the event of a conflict, the definitions below shall be applied to uses or structures located in the District. Any definition used in this section shall be strictly interpreted by all permit granting authorities.

**Adult Retirement Development.** (ARD) A self contained alternative residential community located on a parcel or contiguous parcels that total at least five (5) acres in area. An ARD shall be developed expressly for and specifically limited to use and residency by persons, and their dependents as defined under state and federal regulations, who have achieved a minimum age requirement for residency of at least fifty five (55) years of age. A resident or occupant of an ARD shall mean a person who has achieved a minimum age of at least 55 years. An ARD shall be established for the following purposes:
    a. To meet the housing needs of an older population;
    b. To provide an attractive and suitable residential environment that is amenable to the needs of an older population;
    c. To encourage creative and innovative site design to enhance the attractiveness and suitability of smaller homes, the preferred housing for the older population; and to preserve open space in perpetuity for the protection of natural resources and the character of the existing land.
An ARD shall be subject to all the provisions of Article VI, Sections 7700 through 7790 inclusive.

**Adult Retirement Development Accessory Uses.** Accessory facilities including but not limited to the provision of services to residents of the Adult Retirement Development, including daily meals, necessary personal services, medical monitoring and supervision. Such accessory facilities shall be of a reasonable size and in no case shall the general public use any facility accessory to an adult retirement development.

**Accessory dwelling unit**. See Section 4130 of these Zoning By-laws.

**Accessory structures to a single-family dwelling.** The following structures may be allowed as of right as accessory to a single-family dwelling. A garage for the storage or keeping overnight of not more than four motor vehicles. Only one of said vehicles may be a commercial vehicle and shall not exceed a gross vehicle weight of twelve thousand five hundred (12,500) pounds or measure more than seven feet, six inches (7'6") from the

Sandwich Protective Zoning By-laws                                    May 2004

ground to the top of the roof, or measure more than twenty one feet (21') from the front bumper to the rear bumper.  A shed such as a greenhouse, tool shed or playhouse may be allowed.

**Accessory uses to single-family dwelling.**  Home occupation, bed and breakfast, stable, accessory dwelling unit.

**Agricultural Use.**  The agricultural uses provided for under Massachusetts General Law, Chapter 40A, Section 3 shall be allowed in the District on any parcel or series of contiguous parcels containing at least five acres.  Premises, including necessary structures and equipment, containing at least five acres, which are used for gain in the growing of agricultural crops, or the raising of livestock including a stand for the sale of produce, 50% or more of which is raised on the premises upon which the farm stand is located.  Structures which house or otherwise contain animals shall be set back a minimum of 100 feet from every lot line lot line and a minimum of 200 feet from every dwelling.  Agriculture shall not mean the removal from the District of any natural resource such as minerals, rocks, air, or water.

**Assisted Living Facility.**  An assisted living facility shall include: single and/or multi-family dwelling units and accessory facilities designed for independent living that provides continuous protective oversight and assistance with activities of daily living to frail elderly persons or other persons needing such assistance.  Assistance with the activities of daily living may include, but is not limited to, bathing, dressing, eating getting on to and out of bed or chairs, walking, going outdoors, using toilet facilities, laundry, home management, meal preparation, shopping, supervision or medication and housework.

**Assisted Living Accessory Facilities**.  Facilities allowed only in conjunction with a duly permitted Assisted Living Facility.  Such accessory facilities may include food service, small-scale medical facility, recreational facility housing for staff.  The total floor area of all combined accessory facilities shall not exceed 20% of the total square footage of the assisted living facility.  Parking shall be the minimum parking area required by Section 3100 of this Zoning By-law.  In no case shall the general public use any facility accessory to an adult assisted living facility.

**Bed and Breakfast.**  An owner-occupied dwelling for the rooming and boarding of guests.  Food or beverage shall only be served to those who let a room in such a dwelling.  A Bed & Breakfast shall not be considered a Home Occupation.

**Boathouse.**  A structure erected for the sole purpose of storing only personal property of the boathouse owner such as watercraft and related equipment such as personal flotation devices, oars and other items necessary to the use of personal watercraft.  Storage of gasoline, motor oil, engine oil, and all hazardous materials shall be strictly prohibited.  A boathouse shall not include permanent sanitary facilities, sleeping quarters, food service of any sort including vending machines, office space, recreational space or any other area or use other than watercraft storage.  The minimum lot area required for any principal use to site an accessory boathouse shall be 60 acres and the 60 acres shall have been owned by the owner of the principal use at the time of the passage of this Zoning By-law.

**Campground – Not for Profit.**  Premises operated by a not-for-profit organization that is tax exempt under the Internal Revenue Code used for travel trailers, campers, tenting or for temporary overnight facilities of any kind where a fee is charged.

**Camping, Supervised – Not for Profit.**  Facilities operated by a not-for-profit organization that is tax exempt under the Internal Revenue Code on a primarily seasonal basis for continuing supervised recreational, health, educational, religious, and/or athletic programs, with persons enrolled primarily for periods of not less than one week, and with a group dining facility only if overnight accommodations are included.  Such a camp may erect or maintain one boathouse per pond per camp facility ownership in effect at the time of the passage of this by-law.  Such structures shall be permitted only in accordance with the provisions of Section 7550.

**Campground – For Profit.**  Premises used for campers, tenting or for temporary overnight facilities of any kind where a fee is charged.

**Camping, Supervised – For Profit**.  Facilities operated on a seasonal basis for

Sandwich Protective Zoning By-laws                                    May 2004

continuing supervised recreational, health, educational, religious, and/or athletic programs, with persons enrolled for periods of not less than one week, and with a group dining if overnight accommodations are included.

**Educational Use.**  Use of land and structures within the meaning of M.G.L. Chapter 40A, Section 3.

**Golf Course.**  A recreational facility for the practice, instruction and playing of golf. Miniature golf courses and any golf course of more than nine (9) holes shall be prohibited.  A nine (9) hole golf course shall be permitted only as an accessory use to a principal use such as a supervised campground or an adult retirement cluster subdivision, and only upon issuance of a special permit.  The minimum lot area required for any principal use that desires to construct a nine (9) hole golf course shall be 300 acres owned by the principal use at the time of the passage of this Zoning By-law.

**Home Occupation.**  A business or profession engaged in within a dwelling by a resident of thereof as a secondary use of the dwelling.  Home occupations shall comprise no more than 30% of the floor area of the dwelling.  All outdoor storage of equipment shall be prohibited.  The provisions of Section 4110 of this Zoning By-law shall apply to all home occupations.

**Lot Coverage.**  For the purposes of this Article, lot coverage shall mean any land surface area covered by an impervious surface.  Impervious surfaces shall include, but not be limited to, any roof, concrete or other impervious material or surface, swimming pool, any impervious sport or recreation area such as basketball or tennis courts, driveways constructed with asphalt or other types of impervious paving.  The roof(s) of accessory structures shall be included in the maximum lot coverage calculation.

**Municipal Use.**  A municipal use shall include any use of land, buildings, and structures by the Town of Sandwich that is compatible with the purpose of the District.  No state or municipal entity shall locate a public well within the District without first demonstrating that the water withdrawals proposed by such public supply well will not be a detriment to the ponds, rare or endangered species or any other resource within the District.

**Museum.**  Premises for the procurement care and display of inanimate objects of lasting historical or cultural interest and value.

**Nursing home, convalescent home.**  An establishment providing housing and general care for the aged or the convalescent including any premises licensed as such by the Massachusetts Department of Public Health under Section 51 or 71 of Chapter 111, Massachusetts General Law.

**Open Space Residential Development.**  A form of residential subdivision that encourages variation in development styles and minimizes the impacts of development while providing efficient arrangement of roads and utilities and preserves open space in perpetuity for the protection of natural resources and the character of the District.  All parcels or contiguous parcels of land of 80 or more acres seeking subdivision approval shall be subdivided as an Open Space Residential Development through a special permit from the Planning Board.

**Philanthropic Institution.**  An endowed or charitably supported, not-for-profit religious, educational or non-sectarian activity maintained for public or semi-public use.

**Preservation Zone.**  An area of land depicted on the Three Ponds District Map that is not suitable for development due to the sensitive nature of the natural resources located there.  No new development or extension of any existing use or structure shall occur within any Preservation Zone.

**Religious Use.**  Use of land, buildings, and structures by a religious sect, denomination, or community service organization as defined under M.G.L. c.40A, Section 3.

**Seasonal Facility.**  A facility that offers activities that do not occur and are not designed to occur on a year round basis.

**Single Family Home.**  A free standing building located on a separate building lot that is used exclusively for residential use by not more than one family.

**Spa.**  A resort that provides services that enhances the health and well being of its guests.  Typical spa facilities provide: instruction in exercise, nutrition, general health and fitness; opportunities to access a wide variety of exercise equipment, body work

60

Sandwich Protective Zoning By-laws                                    May 2004

therapists, swimming facilities, outdoor hiking trails and small scale outdoor recreation such as tennis courts, croquet courts etc., The spa shall consist of a building or group of buildings, a portion thereof designed for serving food in a dining room and containing 15 or more sleeping rooms for overnight guests together with both the indoor and outdoor recreational facilities.  All spa facilities shall be for the exclusive use of the overnight guests of the spa.  A spa is not allowed on parcels less than 25 acres in area.  Setback requirements of the district are doubled for spa lots.  The spa lot must maintain a 50' undisturbed vegetated buffer around the lot perimeter.

**Stables.**  Premises used for the shelter and feeding of horses.

**Structure.**  See Definition section of this Zoning By-law.

**Swimming Pool.**  See Definition section of this Zoning By-law.

**Water Dependent Structures.**  Any structure that requires direct access to or location on Lawrence, Spectacle or Triangle ponds.  Such a structure shall include, but not be limited to, any structure that provides access to the ponds for the purposes of fishing, swimming, diving, boating or other water based recreational activities.  Any boardwalk or other walkway constructed for the purpose of gaining access to the ponds shall be limited to three (3) feet in width, or any greater width required by law.  Water dependent uses and structures other than those proposed or used for recreation or education shall be prohibited.

**Wireless Telecommunications Services.**  As provided in Section 3800 of this Zoning By-law.

## 7100.    PERMITTED USES.

Agricultural Uses on Parcels of more than 5 acres
Accessory Structures: Garage, shed, boathouse, or swimming pool
Campground by a not-for-profit organization
Camping, supervised by a not-for-profit organization
Educational Use
Home Occupation
Municipal Use
Religious Use
Single Family Home
Wireless Telecommunications Services

**CONDITIONAL USES**.  A special permit may be granted to allow the following accessory and principal uses, with appropriate conditions.  Such a permit shall be granted unless it appears that nuisance, hazard, or congestion will be created by the proposed use or if for other reasons the proposed use would cause substantial harm to the neighborhood or derogate from the intent of this by-law so that the purposes and objectives of the District would not be satisfied.

Accessory Uses:
      Accessory Dwelling Unit
      Stables as an accessory to a principal use
      Swimming Pool as an accessory to a principal use
      Nine (9) Hole Golf Course as an accessory use to a principal use
Adult Retirement Development
Assisted Living Facility
Bed & Breakfast
Campground – For Profit
Camping, Supervised – For Profit
Nursing home, convalescent home
Museum
Open Space Residential Development
Philanthropic institutions
Spa

**PROHIBITED USES.**  Any use not specifically allowed as of right or by special permit within this district is prohibited.

Sandwich Protective Zoning By-laws                                              May 2004

7110.   **Special Permit Granting Authority.**  For the purpose of Article VII, the Planning Board shall serve as the Special Permit Granting Authority (SPGA) unless otherwise indicated in Article VII.

7120.   **Special Permit Application Guidelines.**  The issuance of any special permit for any use or structure in the District shall be governed by the requirements of this Article and by the requirements and procedures set forth under Sections 1330 through 1370 of this Zoning By-law.  In the event of a conflict between these provisions the stricter provisions shall be applied.  The SPGA is authorized, upon receipt of a written request, to waive specific submission requirements of Sections 1330 through Sections 1370 if the SPGA deems a particular requirement to be duplicative or unnecessary.

7130.
   a.   **Protections under M.G.L. c.40A, Sections.**  All of the protections afforded under M.G.L. c. 40A, Section 6 shall apply to the land within the District.
   b.   **Nonconforming Vacant Lots.**  If a vacant lot, protected under either M.G.L. Chapter 40A, Section 6 as a separate lot or under Section 2550 of this by-law, is too small to conform to any particular requirement set forth under this Article, these structures shall be located at least 300 feet or the maximum reasonable distance from the shoreline elevation of any pond located in the District.

7140.   **Existing Single Family Homes.**  An existing single family home that, at the time of the adoption of this by-law, does not meet the requirements of Article VII shall be allowed to continue to exist.  Any additions, alterations, or septic system upgrades shall conform to the provisions of this by-law.  To the extent that this provision is inconsistent with any other portion of this Zoning By-law, this Article shall control.  Notwithstanding the foregoing, a landowner shall be allowed to take the following actions:

   a.   Bring a substandard or failing septic system into compliance with Title V, provided that said system shall be sited at least 300 feet or the maximum reasonable distance from the shoreline elevation of any pond located in the District;
   b.   Add onto any existing residential structure, provided that the cumulative resulting increase in the floor area of the addition does not exceed 60% of the total floor area of the dwelling before the first such addition (such floor area calculation shall include only habitable areas of the existing structure as defined by the Massachusetts Building Code) provided that said addition shall be sited at least 300 feet or the maximum reasonable distance from the shoreline elevation of any pond located in the District; or
   c.   Site an accessory structure provided that said structure shall be sited at least 300 feet or the maximum reasonable distance from the shoreline elevation of any pond located in the District.

7150.   **Change, Extension or Alteration.**  No change, extension or alteration of a pre-existing non-conforming use and no change extension or alteration of a pre-existing non-conforming structure shall be made except upon issuance of a special permit from the SPGA.  Such special permit shall be granted only when the SPGA finds that the proposed change, extension or alteration of a pre-existing non-conforming use or the change, extension or alteration of a pre-existing non-conforming structure is not substantially more detrimental to the neighborhood than the existing non-conforming use or non-conforming structure.  The following conditions shall apply to any special permit granted under this section:
   a.   Any change, extension or alteration may occur only upon those parcels of land upon which the pre-existing non-conforming use or structure is located.

62

Sandwich Protective Zoning By-laws                                        May 2004

b. Soil absorption systems, structures, including stormwater structures and stormwater discharge, shall be located at least 300 feet or the maximum reasonable distance from the shoreline elevation of any pond located in the District.

c. All new construction including any parking, driveways or roadways shall be substantially screened from abutters, District scenic roads, and the ponds located in the District.

d. All new construction shall strive to preserve any scenic views from scenic roads or from the ponds located in the District.

e. The SPGA may consider proposals to change, extend, alter or relocate a pre-existing non-conforming use or a pre-existing non-conforming structure that provide a clearly demonstrated benefit to the District, the District surface waters and other District's resources. The applicant shall factually demonstrate to the satisfaction of the SPGA using scientific methods that the proposed change, extension or alteration better protects the resources of the District than the existing structure or use does in its present location or configuration.

**7200. DIMENSIONAL REGULATIONS.** Lot size, lot width, set backs, coverage and height regulations shall be as set forth below:

| Minimum Lot Size | 2 acres |
|---|---|
| Minimum Lot Frontage | 200 feet |
| Minimum front yard setbacks | 50 feet |
| Minimum side and rear yard setbacks | 45 feet |
| Maximum lot coverage % | 25 % |
| Maximum building height | 35 feet |

**7500. POND SHORELINE BUFFER REQUIREMENTS**

**7510. Shoreline Location.** The pond shoreline location for District's ponds shall be measured from the following elevations as shown on the map "Three Ponds District drawn by the Cape Cod Commission and dated January 30, 2001":

| Pond | Elevation |
|---|---|
| Lawrence Pond | 65 |
| Spectacle Pond | 67 |
| Triangle Pond | 66 |

**7520. Prohibitions.** The following are prohibited within 300 feet of a pond's shoreline:

a. Septic Systems (Soil Absorption Systems) and leaching fields.

b. Direct discharge of stormwater or stormwater runoff that travels through or upon the 300 feet pond buffer originating from roads, rooftops, developed land areas and any other uses and/or activities.

c. Use of pesticides, herbicides and fertilizers, which contain nitrogen and phosphorous, in amounts detrimental to the surface water quality.

d. No agricultural animals shall be housed, stored, grazed or herded within the 300 foot shore buffer for any pond located in the District. No agricultural animal waste shall be stored or otherwise located within the 300 foot shore buffer for any pond located in the District.

e. All principal and accessory structures, including impervious paving, fencing, walls and water dependent structures except as provided in Section 7020 and 7150.

**7530. Water Dependent Structures.** Any new water dependent structure or change, extension or alteration to an existing water dependent structure that may be allowed under Section 7150 or under the definitions in Article VII shall be located no closer than 300 feet from the shoreline elevation of any pond located in the District. However, a

water dependent structure may be allowed within 300 feet of the shoreline elevation for any pond located in the District by special permit, but only if the following criteria are met:

    a. Sections 1330 and 7520 subsections a. through d. of the Sandwich Protective Zoning By-law are adhered to;

    b. The proposed structure shall have a footprint that does not exceed 24' by 30';

    c. The applicant shall demonstrate the need for placing the structure within the 300 foot buffer; and

    d. The applicant shall demonstrate the benefit of placing the structure within the 300 foot buffer.

**7600. SCENIC ROAD CORRIDOR.** The following regulations shall apply to the following roadways and roadway segments within the District:

    a. Farmersville Road from the westerly intersection with Stowe Road to the easterly intersection of Stowe Road;

    b. Pinkham Road from Stowe Road to the northern boundary of the district;

    c. Great Hill Road from Farmersville Road to Popple Bottom Road; and

    d. Stowe Road in its entirety.

**7610. New Structures.** The following criteria shall be met to preserve the character and enhance safe travel on the scenic roadways:

    a. New structures shall not be located closer than 100 feet from the edge of pavement on any of the roadways or roadway segments described in Section 7600.

    b. With the exception of a curb cut for a driveway, a minimum 100 foot buffer of natural vegetation, including over story and understory vegetation, shall be maintained along the frontage of all lots fronting on the roadways and roadway segments described in Section 7610.

    c. Where a lot in existence at the time of the adoption of this Article is of a size that the 100 foot scenic road buffer and/or the 300 foot pond buffer as required in Section 7500 cannot be met and the lot is protected as buildable under state or local law, development may be allowed provided the following criteria apply:

        1. Dense plantings of evergreen vegetation combined with the construction of berms shall be installed to screen new construction from the scenic road. Plant varieties shall be indigenous to the area and may include rhododendron, cedar, white pine, American holly, inkberry, spruce, fir, and sheep laurel.

        2. New lawn area shall not be planted within the 100 foot scenic road corridor.

    d. New subdivisions shall be designed to incorporate the 100 foot scenic road corridor along subdivision roadways as part of the required open space.

**7620. Shared or Common Driveways.** The following guidelines shall apply to new Development and driveway construction on any of the roadways and roadway segments as described in Section 7600.

    a. The use of shared driveways is encouraged whenever two lots are being created by any division of land regulated by the Subdivision Control Law including Approval Not Required divisions of land.

    b. Where 3 to 5 lots are being created as described in Section 7620 subsection a. a special permit from the Planning Board may reduce the frontage required by Section 7200 to a minimum of 100 foot for any lot that is subject to a permanent deed restriction requiring a shared driveway. The deed restriction language shall be submitted with the application for the division of the land and must be of a form and content acceptable to the Planning Board and Town Counsel. The deed restriction shall be recorded with the plan that

Sandwich Protective Zoning By-laws                                    May 2004

divides the parcel.  This provision shall only apply to the frontage dimensional requirement; no other dimensional requirement shall be lessened through this provision.  Common driveway(s) created by such a special permit shall not be used as frontage for any lot.

c.   Where shared driveways are not feasible, driveways and new subdivision roadways shall be designed to meander or wind to obscure views of new development from the scenic roadway.

d.   The use of board fencing stained to blend with the natural landscape or natural finish wooden fencing especially split rail fencing is encouraged when installing fencing along front lot lines.

e.   Landowners and land developers are strongly encouraged to use siding and roofing colors that blend with the natural landscape.  Such colors include browns, greys, dark greens and naturally stained building materials.

f.   New structures shall be sited to prevent obstruction of existing views of the ponds located in the District from any scenic roadway located in the District.

## 7700.   SPECIAL PERMIT CRITERIA FOR USES ACCESSORY TO AN ALLOWED PRINCIPAL USE.

1.   **Nine (9) Hole Golf Course**:  The SPGA may grant a special permit for a nine (9) hole golf course in the District, but only after the applicant has demonstrated the following:

a.   The design and layout of the golf course minimizes to the greatest extent possible impacts to the environment, water bodies, adjacent properties, and the natural habitats of plants and animals.  These impacts shall be minimized or eliminated by retaining original land contours; by the installation of monitoring wells to ensure continued protection of the ground water and surface water quality; by conducting a thorough natural resources inventory; and by using encapsulated greens and/or other protective technologies that eliminate any threat to the resources of the District.

b.   The design and layout of any nine (9) hole golf course shall avoid disturbing, impacting or altering key features of the landscape; natural landforms; plant and/or animal habitat; unfragmented forest areas; cultural and historical features; existing scenic views of the ponds; surface water bodies; surface and groundwater quality.

c.   The plan shall show large buffer zones around the edges of habitat areas.

d.   The proposal complies with all applicable sections of the Sandwich Protective Zoning By-law.

e.   The proposal includes a thorough description of best management practices for maintenance of the course that includes minimizing or eliminating the use of pesticides, herbicides and fertilizers; installing irrigation systems that reduce water demand and reuses water; and by using drought and disease resistant plants and grasses.  Best management practices shall be included as a condition of approval of any special permit.

f.   The land upon which the golf course is to be constructed may include up to 50 acres of adjacent land not owned by the owner of the principal use to which the golf course is accessory.  The owner of the principal use shall demonstrate control over any such adjacent property to the satisfaction of the SPGA.

2.   **Stables.**  The SPGA may grant a special permit for an accessory stable only after the applicant demonstrates the following:

a.   Stables housing or otherwise containing animals shall be set back a minimum of 100 feet from every lot line and a minimum of 200 feet from every dwelling or other principal structure.

b.   No animals shall be housed, grazed, or herded within the 300 foot shore buffer for any pond located in the District.  No animal waste shall be stored or otherwise located within the 300 foot shore buffer for any pond located in the District.

3.  **Swimming Pools.**  The SPGA may grant a special permit for an accessory swimming pool after the applicant demonstrates the following:

    a.  That the installation of the swimming pool does not alter the natural landforms or topography in any way that is detrimental to the surface water quality of the ponds in the District or to any adjacent habitat areas.

    b.  That the erosion control plan submitted for approval by the Town Engineer prevents all erosion during site preparation, construction, installation, use, and maintenance of the swimming pool.

    c.  That the process of draining and/or filling the swimming pool is not detrimental to the pond water quality or to any adjacent habitat areas.

**7800.  OPEN SPACE RESIDENTIAL DEVELOPMENT (OSRD).**  This section is established to permit variation in development styles and minimize the impacts of development while providing efficient provision of roads and utilities and to preserve open space in perpetuity for the protection of natural resources, the character of existing land by a special permit from the Planning Board.

**7810.  Application.**  An open space residential development is permitted in the District on upon issuance of a special permit from the Planning Board in accordance with Section 1330 of this Zoning By-law and Section 4400 through Section 4448 and upon issuance of definitive subdivision approval.  The applications for a special permit and definitive subdivision approval shall proceed concurrently.

**7820.  Number of Dwelling Units.**  In addition to the provisions of Section 4441 of this Zoning By-law, the total number of residential units allowed within an open space residential district shall not exceed the number of units that would be allowed as demonstrated by the submission of an engineered plan of a conventional grid subdivision that conforms to the dimensional requirements of Section 7200 and the requirements of the most recent edition of the Sandwich Planning Board's Subdivision Rules & Regulations.

**7821.  Preservation Zone Transfer Of Development Rights.**  The allowed number of dwelling units (density) in an OSRD may include the number of units that could be constructed in any Preservation Zone depicted on the District map.  The calculation for the applicable number of dwelling units shall be made in accordance with Section 7830.  This number of units transferred to adjacent property shall be under the same ownership.

    a.  No development shall take place within a Preservation Zone.

    b.  The density allowed in the OSRD shall be calculated as the sum of the number of dwelling units transferred from a specifically described portion of a Preservation Zone plus the number of dwelling units allowed on the parcel(s) to be developed.

    c.  Land that is the subject of a permanent conservation restriction or that has been dedicated as open space by any special permit or Development of Regional Impact decision shall not be used in the density calculation/transfer of development rights calculation.

    d.  In no case shall the total density of any development in the District increase over the total allowed as demonstrated by an engineered plan of a conventional grid subdivision for all parcels included in the density calculation/transfer of development rights according to the dimensional requirements of Section 7200 and the requirements of the most recent edition of the Sandwich Planning Board's Subdivision Rules & Regulations.

**7830.  Dimensional Requirements.**  OSRD lot coverage, yard, frontage, and lot area regulations shall be as follows in lieu of Section 7200:

| | |
|---|---|
| Minimum Lot Area | 5,000 SF |
| Minimum Frontage | 25 feet |

| Maximum Frontage | 100 feet |
| Minimum Front Yard Setback | 10 feet |
| Minimum Side and Rear Yard Setback | 0 feet |
| Maximum Lot Coverage: | |
| Lot area – 5000 – 10000 SF | 80 % |
| Lot area – 10001 – 20000 SF | 70% |
| Lot area – 20001 – 30000 SF | 60% |
| Lot area – 30001 – 1 acre | 50% |

**7840.  Permitted Uses.**  The following uses are permitted in an open space residential development:

    a.  Single Family Dwelling: Detached, single family dwellings.

    b.  Uses and structures accessory to single family homes including a duly permitted wastewater treatment facility.

    c.  Open Space: Common open space, restricted in perpetuity.

    d.  Recreational Facilities; Recreational facilities and activities for the exclusive use by the residents of the open space residential development.

    e.  Commercial Uses: One commercial structure in OSRD's of 50 acres or more in size is allowed by special permit in conjunction with the construction of single or multi-family homes.  Such structures shall house only the following uses: a general store that provides groceries, conveniences, sundries, mail center, indoor automatic teller machines, or a combination of these uses.  All other commercial uses shall be prohibited.  If a use proposed for such commercial structures is expected to generate traffic of more than 300 vehicle trips per day, such use shall be prohibited.  Any such commercial structure shall have a maximum square footage of 800SF including all storage areas.  Basement areas of the commercial structure may also be used for storage.  Public use of basement areas is prohibited.  Additionally, a second or third story for such structures may be allowed but shall be dedicated solely to residential use.  The architecture of such a commercial structure shall be compatible with the architecture of the area and shall be designed to blend with the OSRD and the surrounding community.  A maximum of 6 parking spaces (as defined in the Definition Section of this Zoning By-law) including employee parking and delivery areas may be constructed and shall be located entirely to the rear of the structure.  Provisions for on street parking are encouraged.  Lighting shall follow the requirements of Section 3470 of this Zoning By-law.  Signage shall be limited to two signs per structure with a total area of 16SF painted to blend with the surrounding landscape and architecture.

**7850.  Waste Water.**  The OSRD shall comply with the provisions of 310 CMR 15.00 of the State Environmental Code (Title V), as amended, and the onsite wastewater disposal regulations of the Board of Health, as amended, including regulations for the design, operation, and maintenance of small wastewater treatment facilities.  Based upon the recommendation of the Board of Health pursuant to Massachusetts General Law Chapter 41, Section 81U, OSRD lots may be developed utilizing a shared waste water system subject to under 310 C.M.R. 15.00 of the State Environmental Code and the wastewater Disposal Regulations of the Board of Health for the Design, Operation and Maintenance of Small Wastewater Treatment Facilities and subject to the following conditions and limitations which apply in addition to the provisions of Article V of this by-law.

    a.      Any such wastewater system shall comply with all other provisions of this Article and the Zoning By-law.

    b.      The concentration of nitrate resulting from such wastewater disposal system shall not exceed five (5) parts per million (PPM).

7860.  **Common Open Space.**  Within an OSRD the balance of the area requirement for lot size shall be provided in common open space, designated as an open space lot or lots on the definitive subdivision plan.  Common open space shall be maintained in an open and natural condition, without clearing, in its natural condition for the protection of habitat.  The open space shall be used, designed and maintained in accordance with the following standards:

    a.  Purposes: Open space shall be used solely for recreation, conservation, or agricultural purposes by residents of the OSRD and/or the public.  A minimum of 80% of the open space shall be left in the undisturbed, natural state existing at the time of the submission of the plan.  In no case shall any land within the Preservation Zone be disturbed for any purpose.  The proposed use of the open space shall be specified in the application and depicted on the plan.  The Planning Board shall reserve the authority to approve or disapprove use(s) proposed for designated open space.

    b.  Recreation lands: Where appropriate to the topography and natural features of the site, the Planning Board may require that 10% of the open space or two acres, whichever is less, shall be of a shape, slope, location and condition to provide an informal field for group recreation or community gardens for the residents of the OSRD.

    c.  Leaching Facilities: Subject to the approval of the Board of Health, as otherwise required by law, the Planning Board may permit a portion of the open space to be used for components of sewage disposal systems serving the OSRD only, where the Planning Board finds that such use will not be detrimental to the character, quality or the use of open space, wetlands, surface water, or rare and endangered species habitat.  The Planning Board shall require adequate legal safeguards and covenants that such facilities shall be adequately maintained by the landowners in the OSRD.

    d.  Accessory Structures:  Up to 5% of the open space may be set aside and designated to allow for the construction of structures and facilities accessory to the proposed use of the open space.  The portion of the open space shall be calculated using the definition of maximum lot coverage in Section 7020.

7870.  **Common Open Space Ownership and Management**.  The Applicant for the approval of an OSRD special permit shall demonstrate to the Planning Board ownership and control of the open space as specified in the Cluster Special Permit Regulations of the Planning Board.

7900.  **APPLICATION PROCEDURES**

7910.  **Pre-Application Review.**  To promote better communication and avoid misunderstanding, applicants are encouraged to submit preliminary materials for informal review by the SPGA and the Director of Planning & Development before filing a formal application.

7920.  **Submission.**  Proposed Open Space Residential Developments shall comply with the "Cluster Development Special Permit Regulations" of the Sandwich Planning Board.  In the case of an application to amend an existing Cluster Special Permit, the procedures in Section 4440 through Section 4448 inclusive shall apply, except as to such materials as the Planning Board may waive as duplicative of materials previously submitted.  In the event that the above referenced sections conflict with any portion of this Zoning By-law, the more restrictive provision shall apply.

7930.  **Requirements.**  In addition to the provisions of this Article and the Zoning By-law, the OSRD shall comply with the "Cluster Development Special Permit Regulations" of the

Sandwich Planning Board and M.G.L. Chapter 40A, Section 9.

**7940.    Open Space Residential Development Criteria for Approval.**  Approval of an Open
Space Residential Development may be granted upon a determination by the Planning
Board that the plan complies with all of the requirements of this Article, the other
provisions of this Zoning By-law, the Planning Board's Regulations, and that the
proposed plan meets or exceeds the following criteria:

      a.   Preserves open space for conservation, recreation and the protection of the
resources within the District;

      b.   Utilizes, preserves and enhances the natural features of the land in the
District;

      c.   Provides the most efficient arrangement of streets, utilities and other public
services in the District;

      d.   Minimizes to the greatest extent possible the impacts of development upon
the natural features and resources of the District;

      e.   Enhances the character of the District by preserving scenic vistas, limiting
traffic impacts, limiting the height of structures to the height of existing tree
canopy and using building materials that blend with existing structures and
the surrounding area; and

      f.   Preserves, improves or enhances the surface water quality of the District.

**7990.    Other Conditions.**  The SPGA may require the applicant to provide or pay for
engineering services, including but not limited to the following: evaluation of submitted
proposals; natural resources inventory; evaluation of potential impacts to surface and
ground water quality and any other reasonable evaluation for which the SPGA or town
staff is not professionally qualified to conduct.

# DEFINITIONS

In this ordinance the following terms, unless a contrary meaning is required by the context or is
specifically prescribed, shall have the following meanings. Words used in the present tense
include the future, and plural includes the singular; the word "lot" includes the word "plot"; the
word "building" includes the word "structure"; the word "shall" is intended to be mandatory;
"occupied" or "used" shall be considered as though followed by the words "or intended, arranged
or designed to be used or occupied." The word "person" includes a corporation as well as an
individual.

**ACCESSORY BUILDING OR USE -** A building or use customarily incidental to and located on
the same lot with the principal building or use, except that if more than thirty (30) percent of the lot
area is occupied by such use, it shall no longer be considered accessory.

**ANIMAL KENNEL OR HOSPITAL -** Premises licensed for the harboring and/or care of more
than three dogs more than six (6) months old, or other domestic animals.

**ARTERIAL STREET** - Any state numbered highway, plus the following named streets: Beale
Avenue, Chase Road, Farmersville Road, Great Hill Road, Mid-Cape Service Road, Newtown
Road, Race Lane, Quaker Meetinghouse Road, Sandwich-Cotuit Road, Snake Pond Road.

**BED & BREAKFAST -** An owner-occupied dwelling for the rooming and boarding of guests. Food
or beverage shall only be served to those who let a room in such a dwelling. A Bed & Breakfast
shall not be considered a Home Occupation. A Bed & Breakfast shall require a special permit
from the Zoning Board of Appeals. A Bed & Breakfast shall only be allowed in the following
zoning districts: Residential-1, Residential-2, Business Limited-l, Business Limited-2, Ridge
District and Shore District. **(Added May 1, 1995)**

**BEDROOM** - Any habitable room in a dwelling, if such room exceeds sixty (60) square feet, other

Sandwich Protective Zoning By-laws                                                May 2004

than a living room, dining room, kitchen, utility room, or bathroom. Any dwelling unit in which no such room exists shall be construed to contain one bedroom.

**BOAT AND WATERCRAFT STORAGE BUILDING -** A structure used for indoor storage of boat and watercraft. The storage of hazardous materials greater than those quantities normally associated with household use is prohibited in such structures.

**BORDERING** - As defined under the Wetlands Act (G.L. Chapter 131, Section 40) shall include any land within either of the following:
    a.  100 feet horizontally landward from the bank of any beach, dune, flat, marsh, meadow or swamp bordering the ocean, estuary, creek, river, stream, pond, lake, freshwater wetland or coastal wetland.
    b.  100 feet horizontally landward from the water elevation of the 100-year storm or whatever is the greater distance of (a) or (b).

**BORDERING VEGETATED WETLAND (BVW) - A** vegetational community where fifty (50) percent of the vegetation consists of wetland plant species, identified in the Wetlands Protection Act (MGL Chapter 131, Section 40), which borders a wetland resource area or watercourse defined by the Wetlands Protection Act (MGL Chapter 130, Section 140, 310 CM~ 10.00), the Town of Sandwich Wetlands Bylaw and its regulations. The upland boundary of the BVW is established at the line, within which fifty (50) percent or more of the vegetational community consists of wetland plant species identified in the Act. **(Added STM94)**

**BUILDING HEIGHT -** The vertical distance from the mean existing grade at the front line of the building to the highest point of the roof for flat or shed roofs, to the deck line for mansard roofs and to the ridge for gable, hip and gambrel roofs. Not included are spires, cupolas, TV antennae and other parts of structures, which do not enclose potentially habitable floor space.

**BULK STORAGE -** Exposed outside storage of sand, lumber, coal, or bulk materials, bulk storage of liquids in tanks except underground as an accessory use.

**CAMPER** - A portable dwelling, eligible to be registered and insured for highway use, designated to be used for travel, recreational and vacation uses, but not for permanent residence. Includes equipment commonly called travel trailers, pick-up coaches, or campers, motorized campers, and tent trailers, but not mobile homes.

**CAMPGROUND -** Premises used for travel trailers, campers, tenting or for temporary overnight facilities of any kind where a fee is charged.

**CAMPING SUPERVISED -** Facilities operated on a seasonal basis for continuing supervised recreational, health, educational, religious, and/or athletic programs, with persons enrolled for periods of not less than one week, and with a group dining if overnight accommodations are included.

**CLUSTER DEVELOPMENT** - A development under the provisions of Section 4400.

**COLLECTOR STREET -** Any street, which meets or has met all of the design and construction standards for a Collector Street contained in the Subdivision Control Regulations of the Sandwich Planning Board.

**COMMERCIAL MARINE FISHING EQUIPMENT STORAGE –** Storage of a boat, boat trailer and/or equipment necessary to a commercial marine fishing business. If stored outdoors such items shall not be stored less than 25 feet from any front lot line and not less than 10 feet from any side or rear lot line. No stored boat shall be used for dwelling or sleeping purposes.

**COMMERCIAL RADIO TOWER** - deleted ATM 5/4/98

**COMMON DRIVEWAY** – An alternative means of access for no more than three single-family dwellings on no more than two separate lots as may be allowed by Special Permit Section 4140 of the by-law.  Common driveways are not streets and do not provide lot frontage.

**CONTRACTOR'S YARD -** A lot without structures used by an individual building contractor or sub-contractor for storage of equipment, supplies, and sub-assemblies, or parking of wheeled equipment.

**CONVALESCENT HOME** - An establishment providing housing and general care for the aged, or the convalescent. Convalescent Home as set forth in Chapter 111 Section 71 of the Massachusetts General Law is hereby incorporated by reference.

**COTTAGE COLONY -** Two or more detached seasonal dwellings located on the same lot, each designed for independent family living and including cooking facilities. **(Amended May 1, 1995)**

**DISPOSAL AREA** - Premises, whether licensed or not, where waste or scrap articles or materials are abandoned or stored, sorted, packed, bought or sold, except where such activities are carried on entirely within an enclosed building.

**DUNE, PRIMARY -** A hill or ridge of sand piled up by the wind with no other dune between it and the oceanfront.

**DWELLING** - A building or part of a building used exclusively as the living quarters for one or more families.

**DWELLING, SINGLE-FAMILY** - One dwelling unit on a single lot irrespective of structure type, ownership or tenure. **(Added STM 9/91)**

**DWELLING, TWO-FAMILY** - Two dwelling units on a single lot irrespective of structure type, ownership or tenure. **(Added STM 9/91)**

**DWELLING, MULTI-FAMILY** - Three or more dwelling units on a single lot irrespective of structure type, ownership or tenure.

**DWELLING UNIT** - Living quarters for a single family and not more than two (2) boarders or lodgers, with cooking, living, sanitary, and sleeping facilities, independent of any other unit.

**ELEVATION** - Height relative to Mean Sea Level.

**FAMILY** - One or more persons, including domestic employees, occupying a dwelling unit and living as a single, non-profit housekeeping unit; provided that a group of six or more persons who are not within the second degree of kinship to each other, as defined by civil law, shall not be deemed to constitute a family.

**FARM** - Premises, including necessary structures and equipment, containing at least five acres, which are used for gain in the raising of agricultural products, or livestock, except horses (see stables).

**FLOOR AREA -** The sum of the gross horizontal area of the several floors of a building and its accessory buildings on the same lot, including the area of basements not more than fifty (50) percent below grade, roofed porches and roofed terraces, excluding areas with less than six feet floor to ceiling height. All dimensions shall be measured between exterior faces of walls.

**GAME ROOM** - A commercial facility exclusively for playing of billiards, pool, darts and/or table games, but not including video games or pinball machines. **(Added STM 11/18/97).**

Sandwich Protective Zoning By-laws                                    May 2004

**GARAGE** - A building for the storing of motor vehicles.

**GOLF COURSE, STANDARD OR PAR 3 -** Course, including customary accessory buildings, where tee to hole distance averages not less than eighty (80) yards.

**HOME OCCUPATION -** A business or profession engaged in within a dwelling by a resident thereof as a secondary use of the dwelling. **(Amended ATM 5/5/97).**

**HOSPITAL, NURSING HOME, CONVALESCENT HOME -** Premises licensed as such by the Massachusetts Department of Public Health under Section 51 or 71 of Chapter 111, Massachusetts General Law.

**HOTEL** - A building or group of buildings, whether detached or connected, each containing three or more rooming units. Each individual unit shall have its own sanitary facilities. A hotel may include such accessory uses as function rooms, health club, restaurants, swimming pools, and/or tennis courts.

**LANDSCAPED OPEN SPACE -** Space not covered by any structure, and not used for drives, parking, utilities, or storage; comprising landscaped areas and outdoor recreational facilities, including those on balconies and roofs over structures, if so developed. Area shall be measured horizontally and not include any land with slope over twenty (20) percent, or any land under water other than swimming pool.

**LANE -** Any street which meets, or has met, the design and construction standards of a lane, contained in the Subdivision Control Regulations of the Sandwich Planning Board and, by its locations and design, may not be reasonably expected to service non-residential property, or serve as a means of access to more than ten (10) homes.

**LODGING HOUSE -** A dwelling used for the taking of more than six (6) boarders or the renting of rooms, without cooking facilities, to more than six (6) and fewer than ten (10) persons, but not including buildings of charitable, educational, or philanthropic institutions.

**LOT AREA -** The horizontal area of a lot exclusive of any area in a street or way open to public use, or easement of any type. All of the lot area used for zoning compliance shall be land other than that under water nine (9) months or more in a normal year, or considered as wetland resource area as defined in the Wetlands Protective Act, Chapter 131, Section 40 of MGL and subsequent regulations, 310 CMR 10.00, and no part of the lot area employed for zoning compliance shall be more distant from the street line than four (4) times the lot frontage. **(Amended STM 9/91)**

**LOT COVERAGE -** Percentage of lot area that is covered by structures, paving, driveways, walkways and parking area.

**LOT FRONTAGE** - That portion of a lot fronting upon and having access to a street, measured continuously along the street sideline between side lot lines or, in the case of corner lots, between one side lot line and the midpoint of the corner radius. For lots on the outside of a curve whose radius is 120 feet or less, the lot frontage may be reduced at the street line to sixty (60) percent of the required lot frontage, provided that the full required frontage can be met at the front building line. No lot width shall measure less than sixty (60) percent of the required lot frontage between side lot lines within a distance of one hundred (100) feet from the street sideline.

**MAJOR COMMERCIAL COMPLEX** - Facilities for retail trade or services containing more than 10,000 square feet gross floor area.

**MARINE MEDICAL & REHABILITATION FACILITY -** A facility that rescues, rehabilitates and

then releases marine mammals and serves as an educational resource for studies in oceanic health and marine mammal care and medicine. **(Added ATM94)**

**MEAN SEA LEVEL -** The current Mean Sea Level Datum Plane established by the United States Geological Survey.

**MEDICAL SERVICES AND TECHNOLOGY** - offices and clinics for medical or other health services for the examination and treatment of persons as outpatients, including laboratories that are part of such offices and clinics.

**MINOR STREET** - Any street, with the exception of those designated in these by-laws as Arterial or Collector Streets, which meets or has met all of the design and construction standards for a Minor Street contained in the Subdivision Control Regulations of the Sandwich Planning Board.

**MOBILE HOME -** A movable or portable dwelling built on a chassis, designed for connection to utilities when in use, and designed without necessity of a permanent foundation for year-round living.

**MOBILE HOME PARK -** Premises which have been planned and improved for the placement of mobile homes for year-round occupancy.

**MOTEL** - A building or a group of buildings, whether detached or connected, each containing three or more rooming units. Each rooming unit may include such accessory uses as swimming pools and tennis courts, and shall be no more than 480 square feet in size and no fewer than 225 square feet in size; and no structure shall be fewer than 20 feet from any other structures. The units shall be used, or designed to be used, as individual sleeping and dwelling units by transient travelers, tourists or vacationers. Each integral sleeping unit shall have its own attached sanitary facilities. A motel may include accessory uses such as a restaurant and other secondary facilities commonly associated with the operation of a motel.

**MUSEUM -** Premises of the procurement, care and display of inanimate objects of lasting interest and value.

**NURSING HOME -** A residence equipped and staffed to provide care for the infirm, chronically ill, or disabled. A Nursing Home is hereby incorporated as set forth in Chapter 111, Section 71 of the Massachusetts General Laws.

**OFFICE –** Office and meeting space for conducting professional services, clerical or administrative work for occupations including but not limited to business, healthcare, not-for-profit organization and trades or for conducting a home occupation.

**OTHER RETAIL BUSINESS OR SERVICE** - An establishment selling or renting goods and services to the general public for personal and household consumption, including but not limited to florist, grocery, or hair styling; stores that offer the following items, including but not limited to antiques, apparel, appliances, art, candy, consignment goods, convenience, crafts, drugs, electronics, liquor, photo supplies, shoes, stationery, video and variety stores.  A convenience store that sells gasoline and auto supplies but does not repair, service, or store vehicles shall be considered a retail business.

**PARKING SPACE -** Space adequate to park an automobile, plus means of access. Where spaces are not marked, each space shall be assumed to require 350 square feet. Spaces to be not less than nine (9) feet wide or eighteen (18) feet long.

**PHILANTHROPIC INSTITUTION** - An endowed or charitably supported, nonprofit religious or non-sectarian activity maintained for public or semi-public use.

Sandwich Protective Zoning By-laws                                    May 2004

**PLANNED UNIT DEVELOPMENT -** deleted ATM 5/4/98

**REGIONAL SERVICE -** Regional service generally denotes retail and professional/business service activities serving the resident population of Sandwich and the Upper Cape Region (Sandwich/Mashpee/Falmouth/Bourne).

**RESEARCH LABORATORY -** Industrial or commercial experimentation, design, and production of prototypes, but exclusive of volume or continuous production.

**RESIDENCE -** The same as dwelling unit defined herein.

**RESTAURANT –** Any food service business serving the public on the premises and/or preparing food for takeout. (Added ATM 5/5/97)

**ROOMING UNIT -** A room or suite of rooms in a motel or lodging house suitable for separate rental.

**SPA** - A resort that provides services that enhance the health and well being of its guests. Typical spa facilities provide: instruction in exercise, nutrition, general health and fitness; opportunities to access a wide variety of exercise equipment, body work therapists, swimming facilities, outdoor hiking trails and small scale outdoor recreation such as tennis courts, croquet courts etc., The spa may consist of a building or group of buildings, a portion thereof designed for serving food in a dining room and containing 15 or more sleeping rooms for overnight guests together with both the indoor and outdoor recreational facilities.  Spa facilities shall be for the exclusive use of the spa's registered, overnight guests.  Spa facilities shall not be used for functions attended by any person who is not a registered, overnight guest of the spa.

**STABLES** - Premises used for the shelter and feeding of horses.

**STREET -** An accepted Town way, or way established by or maintained under County, State or Federal authority, or a way established by a subdivision plan approved in accordance with the Subdivision Control Law, or a way certified by the Planning Board to have sufficient width, suitable grades, and adequate construction to provide for the needs of vehicular traffic in relation to the proposed use of the land and the buildings erected or to be erected thereon.

**STRUCTURE** - Anything constructed or erected, the use of which requires fixed location on the ground, or attachment to something on the ground, including all buildings, mobile homes, billboards, towers, swimming pools or tanks that have a capacity of 4,000 gallons or more, or the like, or part thereof; but not including paving, usual lawn accessories, fences or retaining walls six (6) feet in height or less.

**SWIMMING POOL** - Any constructed pool, located above or below ground, whether portable or fixed, used or capable of being used for swimming, wading, of bathing purposes. Pools having a depth of two feet or more and having a capacity of 4,000 gallons or more in volume shall be considered structures.

**TATTOO ESTABLISHMENT/ BODY ART ESTABLISHMENT -** A location, place, or business where the practices of body art are performed either for profit or not for profit and as further defined by the Sandwich Board of Health Regulations

**TECHNOLOGY BUSINESS OR SERVICE** · Such businesses or services include: communications; data warehousing of any media; sales, service, data collection, research, development, assembly and manufacture of communication products, information service products and other electronic technology based business or service.

**TOXIC OR HAZARDOUS MATERIALS** - Any substance or mixture of such physical, chemical or

74

infectious characteristics as to pose a significant, actual or potential hazard to water supplies, or other hazard to human health, if such substance or mixture were discharged to land or waters of this Town.

Toxic or hazardous materials include, without limitation, organic chemicals, petroleum products, heavy metals, radioactive or infectious wastes, acids and alkalis, and include products such as pesticides, herbicides, solvents and thinners.

Waste generated by the following activities, without limitation, are presumed to be toxic or hazardous, unless and except to the extent that anyone engaging in such an activity can demonstrate the contrary to the satisfaction of the Board of Appeals:

- Airplane, boat and motor vehicle service and repair.
- Chemical and bacteriological laboratory operation.
- Cabinet making.
- Dry cleaning.
- Electronic circuit assembly.
- Metal plating, finishing and polishing.
- Motor and machinery service and assembly.
- Painting, wood preserving and furniture stripping.
- Pesticide and herbicide storage.
- Photographic processing.
- Printing.

**WHOLESALE AND RETAIL WAREHOUSE -** one building on one lot occupied by one business for the sole purpose of selling goods or merchandise to both retail and wholesale customers. **(ST 92)**

**YARD -** A required open space, unobstructed with structures more than thirty (30) inches high, other than fences or other customary yard accessories.

**YARD, FRONT -** A yard extending between lot sidelines across the front of a lot adjacent to each street it adjoins.

**YARD, SIDE -** A yard extending from the rear line of the required front yard to the rear lot line adjacent to the lot sideline.

**YARD, REAR -** A yard extending across the rear of the lot between the inner side yard lines.

1 of 1 DOCUMENT

ANNOTATED LAWS OF MASSACHUSETTS
Copyright 2000 LEXIS Law Publishing, a division of Reed Elsevier Inc.
All rights reserved.

*** THIS DOCUMENT IS CURRENT THROUGH ALL 2000 LEGISLATION ***

PART I.  ADMINISTRATION OF THE GOVERNMENT

TITLE VII. CITIES, TOWNS AND DISTRICTS

CHAPTER 41.  OFFICERS AND EMPLOYEES OF CITIES, TOWNS AND DISTRICTS

SUBDIVISION CONTROL

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

Mass. Ann. Laws ch. 41, §  81L (2000)

§  81L. Definitions.

In construing the subdivision control law, the following words shall have the following meaning, unless a contrary intention clearly appears:--

"Applicant" shall include an owner or his agent or representative, or his assigns.

"Certified by [or endorsed by] a planning board", as applied to a plan or other instrument required or authorized by the subdivision control law to be recorded, shall mean, bearing a certification or endorsement signed by a majority of the members of a planning board, or by its chairman or clerk or any other person authorized by it to certify or endorse its approval or other action and named in a written statement to the register of deeds and recorder of the land court, signed by a majority of the board.

"Drainage", shall mean the control of surface water within the tract of land to be subdivided.

"Lot" shall mean an area of land in one ownership, with definite boundaries, used, or available for use, as the site of one or more buildings.

"Municipal service" shall mean public utilities furnished by the city or town in which a subdivision is located, such as water, sewerage, gas and electricity.

"Planning board" shall mean a planning board established under section eighty-one A, or a board of selectmen acting as a planning board under said section, or a board of survey in a city or town which has accepted the provisions

of the subdivision control law as provided in section eighty-one N or corresponding provisions of earlier laws, or has been established by special law with powers of subdivision control.

"Preliminary plan" shall mean a plan of a proposed subdivision or resubdivision of land drawn on tracing paper, or a print thereof, showing (a) the subdivision name, boundaries, north point, date, scale, legend and title "Preliminary Plan"; (b) the names of the record owner and the applicant and the name of the designer, engineer or surveyor; (c) the names of all abutters, as determined from the most recent local tax list; (d) the existing and proposed lines of streets, ways, easements and any public areas within the subdivision in a general manner; (e) the proposed system of drainage, including adjacent existing natural waterways, in a general manner; (f) the approximate boundary lines of proposed lots, with approximate areas and dimensions; (g) the names, approximate location and widths of adjacent streets; (h) and the topography of the land in a general manner.

"Recorded" shall mean recorded in the registry of deeds of the county or district in which the land in question is situated, except that, as affecting registered land, it shall mean filed with the recorder of the land court.

"Register of deeds" shall mean the register of deeds of the county or district in which the land in question, or the city or town in question, is situated, and, when appropriate, shall include the recorder of the land court.

"Registered mail" shall mean registered or certified mail.

"Registry of deeds" shall mean the registry of deeds of the county or district in which the land in question is situated, and, when appropriate, shall include the land court.

"Subdivision" shall mean the division of a tract of land into two or more lots and shall include resubdivision, and, when appropriate to the context, shall relate to the process of subdivision or the land or territory subdivided;

provided, however, that the division of a tract of land into two or more lots shall not be deemed to constitute a subdivision within the meaning of the subdivision control law if, at the time when it is made, every lot within the tract so divided has frontage on

(a) a public way or a way which the clerk of the city or town certifies is maintained and used as a public way, or

(b) a way shown on a plan theretofore approved and endorsed in accordance with the subdivision control law, or

(c) a way in existence when the subdivision control law became effective in the city or town in which the land lies, having, in the opinion of the planning board, sufficient width, suitable grades and adequate construction to provide for the needs of vehicular traffic in relation to the proposed use of the land abutting thereon or served thereby, and for the installation of municipal services to serve such land and the buildings erected or to be erected thereon.

Such frontage shall be of at least such distance as is then required by zoning or other ordinance or by-law if any, of said city or town for erection of a building on such lot, and if no distance is so required, such frontage shall be of at least twenty feet.

Conveyances or other instruments adding to, taking away from, or changing the size and shape of, lots in such a manner as not to leave any lot so affected without the frontage above set forth, or the division of a tract of land on which two or more buildings were standing when the subdivision control law went into effect in the city or town in which the land lies into separate lots on each of which one of such buildings remains standing, shall not constitute a subdivision.

"Subdivision control" shall mean the power of regulating the subdivision of land granted by the subdivision control law.

HISTORY: 1953, 674, § 7; 1955, 411, § 2; 1956, 282; 1957, 138, § 1; 1957, 163; 1958, 206, § 1; 1961, 331; 1963, 580; 1965, 61; 1979, 534

NOTES:

EDITORIAL NOTE--
  The 1955 amendment struck a former paragraph defining "Industrial".

  The 1956 amendment rewrote the paragraph defining "Subdivision".

  The first 1957 amendment added a definition of "Registered mail".

  The second 1957 amendment added a definition of "Applicant".

  The 1958 amendment inserted a paragraph defining "Preliminary plan".

  The 1961 amendment added to the end of the paragraph defining "Applicant", "or his assigns".

  The 1963 amendment inserted in clause (a) of the first sentence of the definition of "Subdivision", "or a way which the clerk of the city or town certifies is maintained and used as a public way".

  The 1965 amendment, in the definition of "Subdivision", in clause (b) of the first sentence, following "approved", inserted "and endorsed".

  The 1979 amendment added the definition of "Drainage.".

24 Mass. App. Ct. 425, *; 509 N.E.2d 284, **;
1987 Mass. App. LEXIS 2013, ***

LEXSEE 24 Mass. App. Ct. 425

**CITGO PETROLEUM CORPORATION & another n1 v.
PLANNING BOARD OF BRAINTREE**

**n1 Clean Harbors of Braintree, Inc., referred to in the text
as "Clean Harbors".**

**No. N. 86-1078**

**Appeals Court of Massachusetts, Norfolk**

**24 Mass. App. Ct. 425; 509 N.E.2d 284; 1987 Mass. App.
LEXIS 2013**

**May 8, 1987, Argued**

**July 3, 1987, Decided**

**PRIOR HISTORY:**
 [***1]

CIVIL ACTION commenced in the Land Court Department on June 24, 1986.

The case was heard by *Robert V. Cauchon*, J.

**DISPOSITION:**
*Judgment affirmed.*

**HEADNOTES:**

*Subdivision Control*, Exemption.

**SYLLABUS:**

An exclusion contained in G. L. c. 41, § 81L, as appearing in St. 1953, c. 674, § 7, was applicable to a sixty-eight acre tract of land containing several substantial buildings, all of which were standing when the Subdivision Control Law took effect in the town where the land is located, so that

the owner, without seeking approval under the Subdivision Control Law, was entitled to divide the tract into two lots, each with one or more of the buildings.  [426-427]

**COUNSEL:**
*Douglas A. Randall* for the defendant.

*Julian J. D'Agostine (Judith Ashton* with him) for the plaintiffs.

**JUDGES:**
Armstrong, Dreben, & Fine, JJ.

**OPINIONBY:**
ARMSTRONG

**OPINION:**

[*425]   [**284]  The general revision of the Subdivision Control Law effected by St. 1953, c. 674, § 7, inserted into G. L. c. 41, §  81L, which  [**285]  defines "subdivision", a new exclusion: namely, "[T]he division of a tract of land on which

24 Mass. App. Ct. 425, *; 509 N.E.2d 284, **;
1987 Mass. App. LEXIS 2013, ***

two or more buildings were standing when the subdivision control law went into effect in the city [***2] or town in which the land lies into separate lots on each of which one of such buildings remains standing ...." Perhaps the existence of the exclusion is not widely known; perhaps it is so clear as not to require interpretation. For whatever reason, we find no reported case in which the effect of the exclusion has been determined.

[*426] Citgo Petroleum Corporation owns a parcel of some sixty-eight acres of land with several buildings in Braintree. Clean Harbors leased eleven acres of it with buildings for a hazardous waste terminal. In late 1985 or early 1986, Clean Harbors reached an agreement with Citgo to buy the leased property.

Citgo prepared a plan dividing the parcel into two lots, one to be sold and the other to be retained. This Citgo submitted to the planning board for an endorsement, under G. L. c. 41, § 81P, that approval was not required because the plan was not a subdivision. Citgo's contention, undisputed below, n2 was that buildings existing before the Subdivision Control Law went into effect in Braintree were standing on both lots, and thus the plan was not a subdivision under the sentence of § 81L quoted above. The board denied the endorsement. [***3] Citgo appealed to the Land Court under G. L. c. 41, § 81BB, as amended through St. 1982, c. 533, § 2, and moved for summary judgment. A judge of that court allowed the motion, ruling that Citgo was entitled to prevail as matter of law. The board has appealed from the ensuing judgment.

n2 The planning board's claim upon appeal, that two affidavits are hearsay, was not raised below, and the grounds raised below for excluding them are not now argued. Thus, neither will be considered. *Thibeault* v. *Massachusetts Elec. Co.*, 2 Mass. App. Ct. 24, 28 (1974). Liacos, Massachusetts Evidence 73 (5th ed. 1981).

As applied to this case, the text of the statutory exclusion is unambiguous, and Citgo falls within it. The exclusion for lots with two or more buildings is distinct from the more commonly used exception, also in § 81L, for plans where every lot has the requisite frontage on a public way or other suitable way as defined in the statute. Thus, the board's argument that the lot to be sold to Clean Harbors [***4] lacks adequate frontage misses the point. If plans under the provision in question must also qualify under the frontage exception, then the provision in question is surplusage.

The defendants argue that a literal reading of this exception would completely undercut the purposes of the Subdivision Control Law, as set out in G. L. c. 41, § 81M, by allowing a homeowner to use any detached garage, shed, or other outbuilding [*427] as a basis for unrestricted backland development. There are several replies. First, this language in § 81L is not the result of legislative oversight. The original versions of the Subdivision Control Law, appearing in St. 1936, c. 211, and St. 1947, c. 340, did not contain this exception. It was added, as mentioned above, in the 1953 general revision. The legislative history of the 1953 statute shows that the drafters were quite aware of what they were doing, although it does not explain their reasons. n3 Report of the Special Commission on Planning and Zoning, 1953 House Doc. No. 2249, at 54. Second, just because a lot can be divided under this exception does not mean that the resulting

24 Mass. App. Ct. 425, *; 509 N.E.2d 284, **;
1987 Mass. App. LEXIS 2013, ***

lots will be buildable under the zoning ordinance. *Smalley* [***5] v. *Planning Board of Harwich*, 10 Mass. App. Ct. 599, 603 (1980). Third, the lots in this case are being used for distinct, independent business operations, and the preexisting buildings relied upon -- the main office, the underwriter's pump house/machine shop, the wax plant building, the earth burner building, and the new yard office -- are substantial buildings.    A claim that a detached garage or a chicken house or woodshed qualifies under this exception might present a different case. Finally, a building, to qualify under this provision, must have been in existence when the Subdivision Control Law went into effect in the town.   It is too late for speculators to buy tracts of back land, cover them with shacks, and divide them into lots accordingly. [**286]   In short, we see no sufficient

reason to refuse application of the plain language of the exclusion in this case.

n3 The decision in *Howland* v. *Acting Supt. of Bldgs. & Insp. of Bldgs. of Cambridge*, 328 Mass. 155 (1951), suggests that the board could be correct in hypothesizing that the 1953 provision may have been inserted to deal with lots where a house was built in the back yard of another house, with no street frontage. The statutory language, however, is not nearly so narrow.

[***6]

*Judgment affirmed.*

10 Mass. App. Ct. 599, *; 410 N.E.2d 1219, **;
1980 Mass. App. LEXIS 1357, ***

LEXSEE 10 Mass app 599

**ANNE L. SMALLEY v. PLANNING BOARD OF HARWICH**

**[NO NUMBER IN ORIGINAL]**

**Appeals Court of Massachusetts, Barnstable**

**10 Mass. App. Ct. 599; 410 N.E.2d 1219; 1980 Mass. App. LEXIS 1357**

**May 13, 1980, Argued**

**October 14, 1980, Decided**

**PRIOR HISTORY:**
 [***1]

Civil action commenced in the Superior Court on April 10, 1978.

The case was heard by *Prince*, J.

The case was submitted on briefs.

**DISPOSITION:**
*Judgment affirmed.*

**COUNSEL:**
*Anne L. Smalley*, pro se.

*James M. Falla*, for the defendant.

**JUDGES:**
Goodman, Dreben, & Nolan, JJ.

**OPINIONBY:**
GOODMAN

**OPINION:**

[*599]  [**1220]  This is an appeal ( G. L. c. 41, § 81BB) by the planning board of Harwich (board) from a judgment annulling its decision refusing an endorsement under G. L. c. 41, § 81P, n1 that "approval under the subdivision control [*600] law [was] not required" [***2] (a § 81P endorsement) on a plan submitted on March 20, 1978, by the plaintiff, dividing into two lots a tract of land which she owns in Harwichport (locus). (The board filed its decision of refusal with the town clerk on March 24, 1978.) The judgment also declared that the owner was entitled to the endorsement. The case was tried on a "Statement of Agreed Facts," including various exhibits from which the following appears.   The locus consists of 34,925 square feet on which there are two buildings, a residence and a barn. Of the two lots shown on the plan, one has an area of 14,897 square feet and includes the residence; the other has an area of 20,028 square feet and includes the barn. Both structures were standing when the Subdivision Control Law went into effect in Harwich, and each of the lots shown on the plan has frontage on a public way greater than the 100-foot minimum

10 Mass. App. Ct. 599, *; 410 N.E.2d 1219, **;
1980 Mass. App. LEXIS 1357, ***

frontage required by the Harwich zoning by-law. See definition of "subdivision" in G. L. c. 41, § 81L, n2 clauses [*601] designated [2], [3], and [**1221] [4]. However, the zoning by-law requires a minimum area of 20,000 square feet for any use other than a guest house, n3 so that the smaller [***3] lot of 14,897 square feet containing the residence does not conform to the area requirements of the by-law. The plan also indicates violations of the sideline requirements of the zoning by-law.

n1 General Laws c. 41, § 81P, as appearing in St. 1963, c. 363, § 1, provides in pertinent part:

"Any person wishing to cause to be recorded a plan of land situated in a city or town in which the subdivision control law is in effect, who believes that his plan does not require approval under the subdivision control law, may submit his plan to the planning board of such city or town in the manner prescribed in section eighty-one T, and, if the board finds that the plan does not require such approval, it shall forthwith, without a public hearing, endorse thereon or cause to be endorsed thereon by a person authorized by it the words 'approval under the subdivision control law not required' or words of similar import .... Such endorsement shall not be withheld unless such plan shows a subdivision."

n2 General Laws c. 41, § 81L, as amended through St. 1965, c. 61, defines "subdivision" as:

"[1] *Subdivision' shall mean the division of a tract of land into two or more lots* and shall include resubdivision, and, when appropriate

to the context, shall relate to the process of subdivision or the land or territory subdivided; [2] *provided, however, that the division of a tract of land into two or more lots shall not be deemed to constitute a subdivision within the meaning of the subdivision control law if, at the time when it is made, every lot within the tract so divided has frontage on (a) a public way* or a way which the clerk of the city or town certifies is maintained and used as a public way, or (*b*) a way shown on a plan theretofore approved and endorsed in accordance with the subdivision control law, or (*c*) a way in existence when the subdivision control law became effective in the city or town in which the land lies, having, in the opinion of the planning board, sufficient width, suitable grades and adequate construction to provide for the needs of vehicular traffic in relation to the proposed use of the land abutting thereon or served thereby, and for the installation of municipal services to serve such land and the buildings erected or to be erected thereon. [3] *Such frontage shall be of at least such distance as is so then required by zoning or other ordinance or by-law*, if any, of said city or town for erection of a building on such lot, and if no distance is required, such frontage shall be of at least twenty feet. Conveyances or other instruments adding to, taking away from, or changing the size and shape of, lots in such a manner as not to leave any lot so affected without the frontage above set forth, or [4] *the division of a tract of land on which two or more buildings were standing when the subdivision control law went into effect in the*

10 Mass. App. Ct. 599, *; 410 N.E.2d 1219, **;
1980 Mass. App. LEXIS 1357, ***

*city or town in which the land lies
into separate lots on each of which
one of such buildings remains
standing, shall not constitute a
subdivision* [emphasis supplied]."

Each italicized clause will be
referred to by the bracketed number
preceding it. [***4]

n3 Guest houses require 20,000
square feet plus 2,000 square feet per
unit.

The board contends that the zoning
violations indicated on the plan justify its
decision to withhold a § 81P endorsement.
It points to G. L. c. 41, § 81M, which sets
out the general purpose of the subdivision
control law and declares that "[t]he powers
of a planning board ... under the
subdivision control law shall be exercised
with due regard ... for insuring compliance
with the applicable zoning ordinances or
by-laws ...." n4

n4 General Laws c. 41, § 81M, as
amended through St. 1969, c. 884, §
2, reads:

"The subdivision control law has
been enacted for the purpose of
protecting the safety, convenience
and welfare of the inhabitants of the
cities and towns in which it is, or may
hereafter be, put in effect by
regulating the laying out and
construction of ways in subdivisions
providing access to the several lots
therein, but which have not become
public ways, and ensuring sanitary
conditions in subdivisions and in
proper cases parks and open areas.
The powers of a planning board and
of a board of appeal under the
subdivision control law shall be

exercised with due regard to the
provision of adequate access to all of
the lots in a subdivision by ways that
will be safe and convenient for travel;
for lessening congestion in such ways
and in the adjacent public ways; for
reducing danger to life and limb in
the operation of motor vehicles; for
securing safety in the case of fire,
flood, panic and other emergencies;
for insuring compliance with the
applicable zoning ordinances or by-
laws; for securing adequate provision
for water, sewerage, drainage,
underground utility services, fire,
police, and other similar municipal
equipment, and street lighting and
other requirements where necessary
in a subdivision; and for coordinating
the ways in a subdivision with each
other and with the public ways in the
city or town in which it is located and
with the ways in neighboring
subdivisions. It is the intent of the
subdivision control law that any
subdivision plan filed with the
planning board shall receive the
approval of such board if said plan
conforms to the recommendation of
the board of health and to the
reasonable rules and regulations of
the planning board pertaining to
subdivisions of land; provided,
however, that such board may, when
appropriate, waive, as provided for in
section eighty-one R, such portions of
the rules and regulations as is
deemed advisable."

[***5]

[*602] In view of the legislative history
and judicial interpretation of § 81P, we do
not read that section to place the same
duties and responsibilities on the board as
it has when it is called upon to approve a
subdivision. Compare G. L. c. 41, § 81U;

Case 1:05-cv-10116-DPW    Document 24-71    Filed 12/27/2005    Page 4 of 6

Page 4

10 Mass. App. Ct. 599, *; 410 N.E.2d 1219, **;
1980 Mass. App. LEXIS 1357, ***

*Doliner* v. *Planning Bd. of Millis*, 343 Mass. 1, 6 (1961). Provision for an endorsement that approval was not required first appeared in 1953, when § 81P was enacted.  St. 1953, c. 674, § 7. Theretofore plans not requiring approval by a planning board could be lawfully recorded without reference to the planning board. The purpose of § 81P, as explained by Mr. Philip Nichols on behalf of the sponsors of the 1953 legislation, was to alleviate the "difficulty ... encountered by registers of deeds in deciding whether a plan showing ways and lots could lawfully be recorded." 1953 House Doc. No. 2249, at 55.  The entire explanation is illuminating and is set out in the margin. n5  [*603] This purpose is manifested in [**1222] the insertion by St. 1953, c. 674, § 7, of G. L. c. 41, § 81X, which provided -- as it now provides -- that: "No register of deeds shall record any plan showing a division of a tract [***6] of land into two or more lots, and ways, ... unless (1) such plan bears an endorsement of the planning board of such city or town that such plan has been approved by such planning board, ... or (2) such plan bears an endorsement ... as provided in [§ 81P]." See 1953 House Doc. No. 2249, at 59.  See also 1954 Ann. Survey Mass. Law § 2.7; Johnson, Note on the New Subdivision Control Law, 38 Mass.L.Q. (No. 4) 13 (1953).

n5 "Section 81P is entirely new.  It should be remembered that under the present law a plan showing lots and ways may be recorded without the approval of the planning board if such ways are existing ways and not 'proposed ways.' So much difficulty has been encountered by registers of deeds in deciding whether a plan showing ways and lots could lawfully be recorded under this provision without the approval of the local planning board, that it seemed best to require the person who intends to record such a plan and who contends that it is not a 'subdivision' within the meaning of the law, because all of the ways shown on the plan are already existing ways, to submit it to the planning board, and if the board agrees with his contention, it can endorse on the plan a statement that approval is not required, and the plan can be recorded without more ado. Provision is made for settling the question as summarily as possible in the unlikely event that there is a disagreement over the necessity of approval."

[***7]

Thus § 81P was not intended to enlarge the substantive powers of the board but rather to provide a simple method to inform the register that the board was not concerned with the plan -- to "relieve [ ] certain divisions of land of regulation and approval by a planning board ('approval ... not required') ... because the vital access is reasonably guaranteed ...." *Gifford* v. *Planning Bd. of Nantucket*, 376 Mass. 801, 807 (1978). n6 Thus, we have held that a § 81P endorsement "gives the lots no standing under the zoning ordinance." *Gattozzi* v. *Director of Inspection Servs. of Melrose*, 6 Mass. App. Ct. 889 (1978), citing *Alley* v. *Building Inspector of Danvers*, 354 Mass. 6, 7-8 (1968). See *Goldman* v. *Planning Bd. of Burlington*, 347 Mass. 320, 324 (1964); *Giovannucci* v. *Board of Appeals of Plainville*, 4 Mass. App. Ct. 239, 243 (1976). The generally routine [*604] nature of a § 81P endorsement is further indicated by the provision in § 81P that such an endorsement be made "forthwith, without a public hearing." It is also emphasized by St. 1961, c. 332, which adds the provision:

"Such endorsement shall not be withheld unless such plan [***8] shows a subdivision." (See n.1.) Further, were we to accept the defendant's contention that a planning board has a responsibility with reference to zoning when making a § 81P endorsement, it would imply a similar responsibility with reference to the other considerations in § 81M (see n.4), not only "for insuring compliance with the applicable zoning [laws]" but "for securing adequate provision for water, sewerage, drainage, underground utility services," etc. A § 81P endorsement is obviously not a declaration that these matters are in any way satisfactory to the planning board. In acting under § 81P, a planning board's judgment is confined to determining whether a plan shows a subdivision.

n6 That case presented "quite exceptional" circumstances which made it necessary to determine whether there was in fact compliance with the "frontage" requirements rather than a "purely formal or technical compliance" lending itself to evasion and circumvention of the primary purpose of the Subdivision Control Law to provide "practical accessability." See *McCarthy* v. *Planning Bd. of Edgartown*, 381 Mass. 86, 87 (1980). Cf. *Gallitano* v. *Board of Survey & Planning of Waltham, ante* 269, 272-273 (1980).

[***9]

Nor can we say that the recording of a plan showing a zoning violation, as this one does, can serve no legitimate purpose. The recording of a plan such as the plaintiff's may be preliminary to an attempt to obtain a variance, or to buy abutting land which would bring the lot into compliance, or even to sell the nonconforming lot to an abutter and in that way bring it into compliance. [**1223] In any event, nothing that we say here in any way precludes the enforcement of the zoning by-law should the recording of her plan eventuate in a violation.

The board also argues that the phrase "used, or available for use" in the definition of "lot" n7 refers to a lot meeting the zoning requirements. From that it concludes that the two exclusions from the definition of "subdivision" (see n.2, clauses [2], [3], and [4]) on which the plaintiff relies for a § 81P endorsement have no application because they both refer to lots meeting the zoning requirements. The argument [*605] is without merit. The short answer is that it is self-defeating. If a nonconforming "lot" takes a plan out of the exceptions to a subdivision it must also take it out of the definition of "subdivision" [***10] itself: - - "the division of a tract of land into two or more *lots*" (emphasis supplied). G. L. c. 41, § 81L (see n.2, cl. [1]). See *Bloom* v. *Planning Bd. of Brookline*, 346 Mass. 278, 283-284 (1963). But as we have indicated above, if this plan does not create a subdivision within § 81L, it is entitled to an endorsement under the second sentence of § 81P inserted by St. 1961, c. 332. In any event the defendant points to nothing to indicate that the definition of "lot" sets out anything but physical characteristics rather than zoning limitations. Indeed, it appears that this argument is a mere afterthought, for the statement of agreed facts uses the word "lot" without reference to whether it conforms to a zoning by-law.

n7 General Laws c. 41, § 81L, defines "lot" as follows: "'lot' shall mean an area of land in one ownership, with definite boundaries, used, or available for use, as the site of one or more buildings."

10 Mass. App. Ct. 599, *; 410 N.E.2d 1219, **;
1980 Mass. App. LEXIS 1357, ***

We therefore affirm the judgment. In this connection we note that the lower [***11] court has retained jurisdiction though so far as appears nothing remains to be done but to place a § 81P endorsement on the plan in accordance with the judgment. Judgment is thus sufficiently final to warrant our review. *Cape Ann Land Dev. Corp.* v. *Gloucester*, 371 Mass. 19, 25 n.8 (1976). We cannot say that the retention of jurisdiction (which the parties do not argue) was an abuse of discretion.

*Judgment affirmed.*

1 of 1 DOCUMENT

ANNOTATED LAWS OF MASSACHUSETTS
Copyright (c) 2005 Matthew Bender & Company, Inc.,
one of the LEXIS Publishing (TM) companies
All rights reserved

*** THIS DOCUMENT IS CURRENT THROUGH CHAPTER 120, 10/27/05 ***
*** WITH THE EXCEPTION OF CHAPTERS 90, 91, 99 AND 106 ***

PART I.  ADMINISTRATION OF THE GOVERNMENT
TITLE VII. CITIES, TOWNS AND DISTRICTS
CHAPTER 40A.  ZONING

## GO TO MASSACHUSETTS CODE ARCHIVE DIRECTORY

ALM GL ch. 40A, § 16 (2005)

§ 16. Moratorium on Favorable Action Following Adverse Ruling; Withdrawal of Application for Special Permit or Variance.

No appeal, application or petition which has been unfavorably and finally acted upon by the special permit granting or permit granting authority shall be acted favorably upon within two years after the date of final unfavorable action unless said special permit granting authority or permit granting authority finds, by a unanimous vote of a board of three members or by a vote of four members of a board of five members or two-thirds vote of a board of more than five members, specific and material changes in the conditions upon which the previous unfavorable action was based, and describes such changes in the record of its proceedings, and unless all but one of the members of the planning board consents thereto and after notice is given to parties in interest of the time and place of the proceedings when the question of such consent will be considered.

Any petition for a variance or application for a special permit which has been transmitted to the permit granting authority or special permit granting authority may be withdrawn, without prejudice by the petitioner prior to the publication of the notice of a public hearing thereon, but thereafter be withdrawn without prejudice only with the approval of the special permit granting authority or permit granting authority.

**HISTORY:** 1975, 808, § 3

**NOTES:**

EDITORIAL NOTE--
  Section 7 of the inserting act provides as follows:

Section 7. This act shall take effect on January first, nineteen hundred and seventy-six as to zoning ordinances and by-laws and amendments, other than zoning map amendments, adopted after said date.

| # Parcel | St # | Sf | Location | Owner of Record 1/1/2003 | Deed Reference | Cls | Cls Desc | Lnd Area | Yr Blt |
|---|---|---|---|---|---|---|---|---|---|
| 1 70-042- | 77 | | PLOUGHED NECK ROAD | HAMILTON, JANE E | 81454 | | 101 Single Family | 0.09 | 1948 |
| 2 70-043- | 81 | | PLOUGHED NECK ROAD | NOBILE, NATALIE A ESTATE OF | 62026 | | 101 Single Family | 0.10 | 1953 |
| 3 70-022- | 9 | | BEACH ROAD | CAMPBELL, BRUCE J | 114544 | | 101 Single Family | 0.11 | 1970 |
| 4 70-025- | 8 | | BEACH ROAD | DION, MARGARET | 743624 | | 101 Single Family | 0.11 | 1959 |
| 5 70-014- | 3 | | OCEAN ROAD | IADONISI, ROBERT G | 164627 | | 101 Single Family | 0.11 | 2002 |
| 6 70-015- | 7 | | OCEAN ROAD | IADONISI, DIANE M | 164626 | | 101 Single Family | 0.11 | 2002 |
| 7 70-019- | 4 | | OCEAN ROAD | MAGNER, ELLEN M | 144908 | | 101 Single Family | 0.11 | 1955 |
| 8 61-012- | 47 | | PLOUGHED NECK ROAD | COLWELL, JO-ANN N | 014050-00159 | | 101 Single Family | 0.12 | 1957 |
| 9 70-044- | 85 | | PLOUGHED NECK ROAD | MIRKIN, ARTHUR L & LINDA M (TE) | 165775 | | 101 Single Family | 0.12 | 1953 |
| 10 70-020- | 2 | | OCEAN ROAD | LORICCO, THOMAS A & JENNIE M (TE) | 154331 | | 101 Single Family | 0.13 | 1950 |
| 11 70-030- | 49 | | PINE ROAD | WILLIAMSON, GRETEL P ET ALS S. CARD & S. OBERG | 009114-00311 | | 101 Single Family | 0.13 | 1954 |
| 12 70-045- | 89 | | PLOUGHED NECK ROAD | MOTT, ARTHUR H ETUX & GLORIA J | 819153 | | 101 Single Family | 0.14 | 1946 |
| 13 70-066- | 101 | | PLOUGHED NECK ROAD | RAFANIELLO, JERALD A ETUX & CARROLL L | 65808 | | 101 Single Family | 0.14 | 1975 |
| 14 70-026- | 6 | | BEACH ROAD | PAUL, ROBERT J & ALICE L (TE) | 143869 | | 101 Single Family | 0.15 | 1959 |
| 15 70-040- | 22 | | PINE ROAD | SPINELLI, CARLOS J & JULIA P KINGSBURY (TE) | 149034 | | 101 Single Family | 0.16 | 1968 |
| 16 61-011- | 45 | | PLOUGHED NECK ROAD | GUSTAFSON, KAREN L | 011063-00101 | | 101 Single Family | 0.16 | 1954 |
| 17 70-067- | 103 | | PLOUGHED NECK ROAD | KING, JAMES E ET UX ELIZABETH J | 168263 | | 101 Single Family | 0.17 | 1974 |
| 18 52-044- | 404 | | ROUTE 6A | TROIANO, ANTHONY J & LAURIE ZISK (TE) | 009849-00317 | | 101 Single Family | 0.17 | 1900 |
| 19 70-036- | 44 | | PINE ROAD | RICCI, FRED A. | 104115 | | 101 Single Family | 0.18 | 1953 |
| 20 70-007- | 12 | | FERN AVENUE | SMITH, WILLIAM L ET AL JANET M SMITH (1/2 UN INT) | 119049 | | 101 Single Family | 0.19 | 1988 |
| 21 70-068- | 105 | | PLOUGHED NECK ROAD | WILCOX, JEFFREY A & MARIBEL (TE) | 162380 | | 101 Single Family | 0.19 | 1974 |
| 22 61-039- | 48 | | PLOUGHED NECK ROAD | HALL, JOHN F & C KATHLEEN (TE) | 015477-00046 | | 101 Single Family | 0.20 | 1958 |
| 23 61-040- | 42 | | PLOUGHED NECK ROAD | KELLEY, JOAN E | 001673-00219 | | 101 Single Family | 0.20 | 1957 |
| 24 70-003- | 73 | | PLOUGHED NECK ROAD | DUMAS, MICHAEL & PATRICIA (TE) | 169027 | | 101 Single Family | 0.20 | 1950 |
| 25 70-004- | 3 | | FERN AVENUE | LOUGHLIN, PATRICK F & MARGARET M (TE) | 158922 | | 101 Single Family | 0.21 | 1952 |
| 26 70-005- | 5 | | FERN AVENUE | DEFRANCHI, ETTORE & KAREN (TE) | 145636 | | 101 Single Family | 0.21 | 1958 |
| 27 70-006- | 7 | | FERN AVENUE | DEMERS, NORMAN E & CLARA (TE) | 160492 | | 101 Single Family | 0.21 | 1960 |
| 28 70-009- | 8 | | FERN AVENUE | BARTUCCA, MICHAEL A & KRISTIN D (TE) | 164343 | | 101 Single Family | 0.21 | 1967 |
| 29 70-010- | 6 | | FERN AVENUE | SLEVIN, DANIEL ETUX CAROL AN | 68316 | | 101 Single Family | 0.21 | 1962 |
| 30 70-011- | 4 | | FERN AVENUE | DANEHY, OLGA E | 160272 | | 101 Single Family | 0.21 | 1950 |
| 31 61-027- | 56 | | PLOUGHED NECK ROAD | BRENNAN, KEVIN J & MICHELE (TE) | 012467-00132 | | 101 Single Family | 0.21 | 1955 |
| 32 61-037- | 52 | | PLOUGHED NECK ROAD | SIMPSON, KIM M & FLOYD C ROBBINS (JT) | 012830-00234 | | 101 Single Family | 0.21 | 1956 |
| 33 61-038- | 50 | | PLOUGHED NECK ROAD | PHILLIPS, CHERYL A | 013906-0003 | | 101 Single Family | 0.21 | 1956 |
| 34 70-012- | 75 | | PLOUGHED NECK ROAD | LINNELL, LAURA A | 160290 | | 101 Single Family | 0.21 | 1950 |
| 35 70-153- | 15 | | OCEAN ROAD | GIAMPIETRO, LOUIS F JR & DIANA (TE) | 160015 | | 101 Single Family | 0.22 | 2001 |
| 36 70-155- | 11 | | OCEAN ROAD | ZYGADLO REALTY TRUST EIGHTY-SIX, PA KELLY, KJ ZYGA | 165540 | | 101 Single Family | 0.22 | 2002 |
| 37 70-024- | 10 | | BEACH ROAD | KOBEL, F WILLIAM JR ET UX MARILYN M | 83052 | | 101 Single Family | 0.23 | 1959 |
| 38 52-013- | 16 | | PLOUGHED NECK ROAD | MILLER, JOHN V & GAYLE G (TE) | 012710-00036 | | 101 Single Family | 0.23 | 1948 |
| 39 52-013-001 | 3 | | PLOUGHED NECK ROAD EXT | HAMMOND, DANA E & CINDY R (TE) | 013796-00335 | | 105 Three Family | 0.23 | 1948 |
| 40 70-017- | 12 | | OCEAN ROAD | ROCK, WILFRED A & CATHERINE S (TE) | 163501 | | 101 Single Family | 0.24 | 1950 |

| # Parcel | St # | Sf | Location | Owner of Record 1/1/2003 | Deed Reference | Cls | Cls Desc | Lnd Area | Yr Blt |
|---|---|---|---|---|---|---|---|---|---|
| 41 70-037- | 40 | | PINE ROAD | RICHARDSON, FRANK D & DONNA R ST.PIERRE (TE) | 136352 | | 101 Single Family | 0.24 | 1959 |
| 42 70-069- | 107 | | PLOUGHED NECK ROAD | WALL, JOHN A ET ALS T & J W ELLIOTT | 97039 | | 101 Single Family | 0.24 | 1975 |
| 43 40-095- | 374 | | ROUTE 6A | BAKER, JANE DUNWORTH, TTEE, (DAVID J PARROTT, LE) | 006007-00313 | | 101 Single Family | 0.24 | 1930 |
| 44 52-054- | 17 | | PLOUGHED NECK ROAD | GARNHUM, HEATHER J | 015288-00105 | | 101 Single Family | 0.25 | 1948 |
| 45 61-026- | 58 | | PLOUGHED NECK ROAD | JOHNSON, DOLLY DAWN | 001143-00437 | | 101 Single Family | 0.25 | 1958 |
| 46 70-008- | 10 | | FERN AVENUE | EISNOR, WAYNE L & MARGARET A (TE) | 140519 | | 101 Single Family | 0.28 | 1950 |
| 47 70-038- | 30 | | PINE ROAD | TOSI, LORRAINE | 9833 | | 101 Single Family | 0.28 | 1950 |
| 48 70-027- | 25 | | PINE ROAD | JONES, GEORGE ET UX & JUDITH A. | 106215 | | 101 Single Family | 0.29 | 1950 |
| 49 52-055- | 19 | | PLOUGHED NECK ROAD | PAULETTE SASVILLE REALTY TRUST, P SASVILLE, TR | 010529-00042 | | 101 Single Family | 0.30 | 1948 |
| 50 53-003- | 477 | | ROUTE 6A | ABERCROMBIE, DAVID & AMY S (TE) | 015252-00313 | | 101 Single Family | 0.30 | 1930 |
| 51 52-056- | 15 | | PLOUGHED NECK ROAD | DUMAS, MICHAEL E & PATRICIA A | 014365-00046 | | 101 Single Family | 0.32 | 1948 |
| 52 61-009- | 39 | | PLOUGHED NECK ROAD | DRAKE, CHRISTINE R | 009192-00198 | | 101 Single Family | 0.33 | 1974 |
| 53 61-013- | 49 | | PLOUGHED NECK ROAD | MANATIS, CONSTANTINA LIVERI & ANNA MANATIS-LORNELL | 017499-00171 | | 101 Single Family | 0.33 | 1952 |
| 54 61-016- | 57 | | PLOUGHED NECK ROAD | DEAN, HARRIET A | 010559-00169 | | 101 Single Family | 0.33 | 1947 |
| 55 52-008- | 7 | | PLOUGHED NECK ROAD | CAMERLENGO, SUSAN B | 012805-00078 | | 101 Single Family | 0.34 | 1961 |
| 56 52-053- | 13 | | PLOUGHED NECK ROAD | COLLIS, MARJORIE A | 014754-00137 | | 101 Single Family | 0.35 | 1948 |
| 57 70-035- | 48 | | PINE ROAD | SNELLING, RONALD HJ ET UX CAROL M | 931307 | | 101 Single Family | 0.37 | 1945 |
| 58 40-042- | 5 | | GRAY BIRCH ROAD | ROSINOFF, BRUCE J & SUSAN R (TE) | 007736-00206 | | 101 Single Family | 0.40 | 1984 |
| 59 52-051- | 9 | | PLOUGHED NECK ROAD | PEROTTI-CYRUS, PATRICIA | 015579-00245 | | 101 Single Family | 0.40 | 1948 |
| 60 70-046- | 93 | | PLOUGHED NECK ROAD | LEVIN, PHYLLIS J | 000920-00094 | | 101 Single Family | 0.40 | 1953 |
| 61 52-052- | 11 | | PLOUGHED NECK ROAD | PEROTTI-CYRUS, PATRICIA | 014121-00204 | | 101 Single Family | 0.43 | 1948 |
| 62 34-028- | 34 | | CRESTVIEW DRIVE | ROBERTSON, KENNETH E ET UX PHYLLIS J | 007111-00295 | | 101 Single Family | 0.45 | 1971 |
| 63 34-038- | 27 | | CRESTVIEW DRIVE | FLOOD FAMILY REALTY TRUST, DARLENE S FLOOD, TR | 017495-00196 | | 101 Single Family | 0.45 | 1984 |
| 64 34-039- | 29 | | CRESTVIEW DRIVE | HARTMAN, DAVID & MAUREEN (TE) | 014991-00183 | | 101 Single Family | 0.45 | 1973 |
| 65 40-084- | 3 | | EARL ROAD | PALMER, FAITH B | 001419-00803 | | 101 Single Family | 0.45 | 1968 |
| 67 70-139- | 10 | | ROBERTS WAY | RAFFERTY, THOMAS S | 007697-00011 | | 101 Single Family | 0.45 | 1968 |
| 68 70-136- | 4 | | BARBARA LANE | GEDUTIS, JOHN S & ROBERTA L (TE) | 013383-00104 | | 101 Single Family | 0.46 | 1982 |
| 69 70-140- | 7 | | BARBARA LANE | WATSON, VIVIAN A | 007380-00321 | | 101 Single Family | 0.46 | 1969 |
| 70 34-029- | 32 | | CRESTVIEW DRIVE | HONKONEN, DONNA M | 014035-00064 | | 101 Single Family | 0.46 | 1971 |
| 76 34-032- | 26 | | CRESTVIEW DRIVE | JOHNSON, WILLIAM H & FRANCES | 004088-00099 | | 101 Single Family | 0.46 | 1984 |
| 77 34-033- | 24 | | CRESTVIEW DRIVE | BURKE, WILLIAM E & BONNIE A | 009022-00183 | | 101 Single Family | 0.46 | 1994 |
| 78 34-041- | 33 | | CRESTVIEW DRIVE | HAMEL, MARY CATHERINE | 010971-00103 | | 101 Single Family | 0.46 | 1985 |
| 79 34-060- | 46 | | CRESTVIEW DRIVE | PADDOCK, PAUL R (LE) & ALICE C ERNST (LE) | 012862-00102 | | 101 Single Family | 0.46 | 1972 |
| 80 40-048- | 4 | | GRAY BIRCH ROAD | ACKER FAMILY TRUST, D.E.ACKER & C.J. SHUPP, TR | 008517-00134 | | 101 Single Family | 0.46 | 1982 |
| 81 61-057- | 37 | | MARSHVIEW CIRCLE | SARKISIAN, JOSEPH ETUX & MICHELE A. | 005101-00121 | | 101 Single Family | 0.46 | 1979 |
| 82 61-068- | 51 | | MARSHVIEW CIRCLE | FLANNERY, KEVIN M & MAUREEN A (TE) | 012694-00285 | | 101 Single Family | 0.46 | 1999 |
| 83 61-072- | 9 | | MARSHVIEW CIRCLE | MCQUAID, ELIAS A. ETUX & PAULA N. | 004869-00174 | | 101 Single Family | 0.46 | 1985 |
| 84 62-003- | 29 | | MARSHVIEW CIRCLE | PURDY, CHARLES D & MARY JANE E. (TE) | 008656-00239 | | 101 Single Family | 0.46 | 1983 |
| 85 70-138- | 12 | | ROBERTS WAY | O'KEEFE, MARGARET A | 016474-00026 | | 101 Single Family | 0.46 | 1968 |
| 86 34-031- | 28 | | CRESTVIEW DRIVE | TROVATO, JOHN M & ELEANOR P BASSICK (JT) | 016747-00337 | | 101 Single Family | 0.47 | 1978 |

| # Parcel | St # | Sf | Location | Owner of Record 1/1/2003 | Deed Reference | Cls | Cls Desc | Lnd Area | Yr Blt |
|---|---|---|---|---|---|---|---|---|---|
| 87 40-049- | 16 | | CRESTVIEW DRIVE | ROBERTS, FREDERICK G & BARBARA L | 004185-00260 | | 101 Single Family | 0.47 | 1983 |
| 88 40-050- | 14 | | CRESTVIEW DRIVE | O'BRIEN, CHARLES J JR | 004318-00161 | | 101 Single Family | 0.47 | 1972 |
| 89 40-074- | 18 | | EARL ROAD | MARKOVICH, RONALD J ET UX ROBIN A | 006889-00088 | | 101 Single Family | 0.47 | 1989 |
| 90 40-078- | 10 | | EARL ROAD | MORGAN NOMINEE TRUST, ROBERT L & BARBARA MORGAN,TR | 013140-00024 | | 101 Single Family | 0.47 | 1984 |
| 91 40-083- | 1 | | EARL ROAD | RUTHERFORD, JOHN G ET UX | 003572-00140 | | 101 Single Family | 0.47 | 1971 |
| 92 40-047- | 6 | | GRAY BIRCH ROAD | POWERS, JOSEPH C & JOAN M (TE) | 014660-00123 | | 101 Single Family | 0.47 | 1993 |
| 93 40-068- | 13 | | MANOR DRIVE | SWAN, MARY E | 005952-00142 | | 101 Single Family | 0.47 | 1973 |
| 94 40-069- | 15 | | MANOR DRIVE | BIDGOOD, DONALD F JR ET UX JOAN | 007300-00057 | | 101 Single Family | 0.47 | 1971 |
| 95 61-045- | 58 | | MARSHVIEW CIRCLE | ZANELLI, KENNETH ETUX | 005135-00290 | | 101 Single Family | 0.47 | 1981 |
| 96 61-053- | 42 | | MARSHVIEW CIRCLE | HOXIE, WILLIAM M & ELDANA A | 004501-00271 | | 101 Single Family | 0.47 | 1986 |
| 97 61-054- | 40 | | MARSHVIEW CIRCLE | MARSHVIEW NOMINEE TRUST,THE JOHN BUGBEE, TRUSTEE | 011054-00344 | | 101 Single Family | 0.47 | 1984 |
| 98 41-014- | 6 | | PINE TERRACE | NESOM, ROBERT S & VIRGINIA S HORVATH (TE) | 011516-00176 | | 101 Single Family | 0.47 | 1973 |
| 99 70-144- | 5 | | ROBERTS WAY | DOHERTY, WILLIAM F & ALICE J (TE) | 015686-00196 | | 101 Single Family | 0.47 | 1971 |
| 100 70-149- | 4 | | ARROWHEAD CIRCLE | FISH, ROBERT W | 004294-00334 | | 101 Single Family | 0.48 | 1998 |
| 101 61-059- | 1 | | BAYBERRY LANE | SONGIN, CATHERINE CURRIVAN | 008706-00175 | | 101 Single Family | 0.48 | 1978 |
| 102 40-040- | 18 | | CRESTVIEW DRIVE | MILITELLO, EVA | 017688-00135 | | 101 Single Family | 0.48 | 1977 |
| 103 40-075- | 16 | | EARL ROAD | ZONA, PASQUALE J ETUX ALICE M. | 003564-00024 | | 101 Single Family | 0.48 | 1982 |
| 104 40-085- | 7 | | EARL ROAD | 1996 LANDALL FAMILY INVESTMENT TRUST | 010044-00176 | | 101 Single Family | 0.48 | 1977 |
| 105 61-058- | 41 | | MARSHVIEW CIRCLE | LESIAK NOMINEE TRUST,WALTER J & JUDITH F LESIAK,TR | 014435-00086 | | 101 Single Family | 0.48 | 1985 |
| 106 61-062- | 15 | | MARSHVIEW CIRCLE | EAST SANDWICH REALTY TRUST, R C & S BEEMAN, TRS | 011618-00089 | | 101 Single Family | 0.48 | 1990 |
| 107 61-069- | 55 | | MARSHVIEW CIRCLE | BATTAGLIA, FREDERICK R & MAUREEN K (TE) | 012515-00230 | | 101 Single Family | 0.48 | 1999 |
| 108 61-021- | 2 | | ROBERTS WAY | MARTIN, ROBERT J III & DEIRDRE A (TE) | 015700-00080 | | 101 Single Family | 0.48 | 1969 |
| 109 70-135- | 3 | | BARBARA LANE | JOHNSON FAMILY NOMINEE TRUST, A F & E B JOHNSON,TR | 013092-00009 | | 101 Single Family | 0.49 | 1973 |
| 110 70-137- | 2 | | BARBARA LANE | BARTOSIK, RICHARD & LINDA | 014829-00021 | | 101 Single Family | 0.49 | 1971 |
| 111 61-060- | 3 | | BAYBERRY LANE | ABLONDI, ROBERT E | 014581-00194 | | 101 Single Family | 0.49 | 1986 |
| 112 61-061- | 5 | | BAYBERRY LANE | MITCHELL, EUGENE F & JOAN C (TE) | 008445-00220 | | 101 Single Family | 0.49 | 1993 |
| 113 34-016- | 5 | | CRESTVIEW DRIVE EXTENSION | PHILIE, MARK J ET UX PAULINE C | 113331 | | 101 Single Family | 0.49 | 1988 |
| 114 34-017- | 7 | | CRESTVIEW DRIVE EXTENSION | GAJDA, JOSEPH & BARBARA O (TE) | 159784 | | 101 Single Family | 0.49 | 1985 |
| 115 34-023- | 8 | | CRESTVIEW DRIVE EXTENSION | FITZGERALD, PHILIP D & GAIL L | 105462 | | 101 Single Family | 0.49 | 1986 |
| 116 34-024- | 6 | | CRESTVIEW DRIVE EXTENSION | FORTUNA, PETER P | 155524 | | 101 Single Family | 0.49 | 1986 |
| 117 40-077- | 12 | | EARL ROAD | HOULIHAN, JOAN M | 009687-00152 | | 101 Single Family | 0.49 | 1980 |
| 118 40-086- | 15 | | EARL ROAD | HOWE, JOHN F III & KAREN C (TE) | 010507-00242 | | 101 Single Family | 0.49 | 1976 |
| 119 61-044- | 9 | | FLEETWOOD ROAD | FREEDMAN, IRWIN & JANET (TE) | 009273-00256 | | 101 Single Family | 0.49 | 1974 |
| 120 70-028- | 47 | | PINE ROAD | WATKINS, JAMES G JR & CHRISTINE M & STEVEN OBERG | 154600 | | 101 Single Family | 0.49 | 1962 |
| 121 61-064- | 3 | | SCORTON CIRCLE | JEWETT, ALAN D ET UX ELIZABETH A | 005876-00231 | | 101 Single Family | 0.49 | 1989 |
| 122 70-134- | 1 | | BARBARA LANE | SAMPSON, MARY J ET AL THERESA C TAYLOR | 006334-00098 | | 101 Single Family | 0.50 | 1972 |
| 123 40-054- | 6 | | CRESTVIEW DRIVE | SULLIVAN, WALTER J ETUX & MARJORIE E | 001906-00199 | | 101 Single Family | 0.50 | 1971 |
| 124 61-055- | 31 | | MARSHVIEW CIRCLE | SHORT, JOHN R JR. & ANN MARIE (TE) | 011396-00289 | | 101 Single Family | 0.50 | 1985 |

| # Parcel | St # | Sf | Location | Owner of Record 1/1/2003 | Deed Reference | Cls | Cls Desc | Lnd Area | Yr Blt |
|---|---|---|---|---|---|---|---|---|---|
| 125 62-002- | 21 | | MARSHVIEW CIRCLE | LUKAS, EDMUND & MARGARET ELIZABETH (TE) | 015443-00241 | | 101 Single Family | 0.50 | 1986 |
| 126 70-151- | 34 | | MARSHVIEW CIRCLE | GREAT NECK ROAD, L.L.C. | 013154-00036 | | 101 Single Family | 0.50 | 1979 |
| 127 70-152- | 32 | | MARSHVIEW CIRCLE | SPILMAN, JEFFREY M & ROBIN B (TE) | 011188-00134 | | 101 Single Family | 0.50 | 1986 |
| 128 71-064- | 26 | | MARSHVIEW CIRCLE | PHILLIPS, JAMES R & CONSTANCE A (TE) | 013130-00142 | | 101 Single Family | 0.50 | 1987 |
| 129 70-142- | 9 | | ROBERTS WAY | 9 ROBERTS WAY NOMINEE TRUST,P.F.& ANTOINETTE SMITH | 010210-00149 | | 101 Single Family | 0.50 | 1969 |
| 130 70-145- | 6 | | ROBERTS WAY | MARCONI, KENNETH J & ELIZABETH A (TE) | 017711-00020 | | 101 Single Family | 0.50 | 1969 |
| 131 41-023- | 476 | | ROUTE 6A | WESTFIELD, JAMES D | 147001 | | 101 Single Family | 0.50 | 1999 |
| 132 70-146- | 1 | | ARROWHEAD CIRCLE | LYON, JOHN A | 008410-00094 | | 101 Single Family | 0.51 | 1985 |
| 133 40-073- | 18 | | MANOR DRIVE | CONATHAN, PETER N & CAROL A (TE) | 006590-00324 | | 101 Single Family | 0.51 | 1971 |
| 134 40-076- | 14 | | EARL ROAD | SPERO, FREDERICK H ETUX & RITA | 002703-00050 | | 101 Single Family | 0.52 | 1978 |
| 135 40-088- | 19 | | EARL ROAD | BRYANT, LOUIS C JR & PATRICIA I (TE) | 009680-00255 | | 101 Single Family | 0.52 | 1987 |
| 136 61-052- | 44 | | MARSHVIEW CIRCLE | SULFARO, JEANNE (LE) | 013917-00009 | | 101 Single Family | 0.52 | 1978 |
| 137 61-063- | 17 | | MARSHVIEW CIRCLE | KRAFTON, JOHN E & SANDRA J (TE) | 010775-00205 | | 101 Single Family | 0.52 | 1985 |
| 138 71-062- | 30 | | MARSHVIEW CIRCLE | CURLEY, DONALD P & VIRGINIA S (TE) | 012874-00214 | | 101 Single Family | 0.52 | 1983 |
| 139 70-141- | 8 | | ROBERTS WAY | MCDERMOTT, CHRISTOPHER P & HILARY (TE) | 014060-00218 | | 101 Single Family | 0.52 | 1970 |
| 140 34-040- | 31 | | CRESTVIEW DRIVE | MEAD, MARY C ET AL ROBERT O NAIL | 007463-00219 | | 101 Single Family | 0.53 | 1973 |
| 141 40-038- | 22 | | CRESTVIEW DRIVE | IZZO, DIANE L | 011501-00313 | | 101 Single Family | 0.53 | 1973 |
| 142 40-079- | 8 | | EARL ROAD | BAER, ROBERT REED & CHRISTINE E BURNS (TE) | 016439-00145 | | 101 Single Family | 0.53 | 1987 |
| 143 40-041- | 3 | | GRAY BIRCH ROAD | KELLY, BRYAN R. ET UX & DENISE G | 003336-00162 | | 101 Single Family | 0.53 | 1984 |
| 144 62-004- | 24 | | MARSHVIEW CIRCLE | CARLSON, JEFFREY L & SUSAN M FARIA (TE) | 012925-00008 | | 101 Single Family | 0.53 | 2001 |
| 145 61-073- | 63 | | PLOUGHED NECK ROAD | RICHAR, MARGARET | 145996 | | 101 Single Family | 0.53 | 1962 |
| 146 61-042- | 38 | | PLOUGHED NECK ROAD | MCDONALD, ROBERT A ET UX GERALDINE R | 001912-00193 | | 101 Single Family | 0.53 | 1967 |
| 147 61-020- | 4 | | ROBERTS WAY | CHALLIES, GEORGE E ET UX MARY E | 002598-00097 | | 101 Single Family | 0.53 | 1969 |
| 148 52-040- | 52 | | ATKINS ROAD | BRITTON, CHRIS & COLLEEN (TE) | 165467 | | 101 Single Family | 0.54 | 1970 |
| 149 61-043- | 7 | | FLEETWOOD ROAD | KING, HENRY E JR ET UX TERESA A | 002227-00077 | | 101 Single Family | 0.54 | 1975 |
| 150 61-041- | 40 | | PLOUGHED NECK ROAD | O'BRIEN, JOSEPH P | 017723-00215 | | 101 Single Family | 0.54 | 1932 |
| 151 70-047- | 95 | | PLOUGHED NECK ROAD | BRODERICK, JOAN | 014175-00112 | | 101 Single Family | 0.54 | 1930 |
| 152 34-030- | 30 | | CRESTVIEW DRIVE | CABRAL, FLORENCE G | 012498-00049 | | 101 Single Family | 0.55 | 1971 |
| 153 34-044- | 47 | | CRESTVIEW DRIVE | PROTHERO, STEPHEN R & EDYTHE E NESMITH (TE) | 013820-00201 | | 101 Single Family | 0.55 | 1987 |
| 154 40-070- | 24 | | MANOR DRIVE | HAMILTON, BARBARA | 010234-00147 | | 101 Single Family | 0.55 | 1983 |
| 155 61-056- | 33 | | MARSHVIEW CIRCLE | ZICKO, THEODORE ETUX LESLEY A | 005960-00016 | | 101 Single Family | 0.55 | 1987 |
| 156 62-001- | 2 | | SCORTON CIRCLE | LOUD, FREDRICK A. JR. ETUX & SUSAN W. | 005088-00039 | | 101 Single Family | 0.55 | 1980 |
| 157 40-057- | 45 | | ATKINS ROAD | FRAONE, VINCENT M & JENNIFER (TE) | 015043-00227 | | 101 Single Family | 0.56 | 1965 |
| 158 40-043- | 7 | | GRAY BIRCH ROAD | MCCRACKEN, PAULA L | 003852-00309 | | 101 Single Family | 0.56 | 1983 |
| 159 61-073-001 | 11 | | MARSHVIEW CIRCLE | WOLFE, ALICE C | 011824-00227 | | 101 Single Family | 0.56 | 1999 |
| 160 61-024- | 62 | | PLOUGHED NECK ROAD | GIORDANO, REMO F II & PHYLLIS A | 003756-00002 | | 101 Single Family | 0.56 | 1953 |
| 161 34-043- | 45 | | CRESTVIEW DRIVE | SCHEIBLE, SUSAN N | 001945-00343 | | 101 Single Family | 0.57 | 1973 |
| 162 40-051- | 12 | | CRESTVIEW DRIVE | SCHACHT, DETLEF-JOACHIM & HELGE E (TE) | 010020-00307 | | 101 Single Family | 0.57 | 1984 |
| 163 70-143- | 11 | | ROBERTS WAY | O'MALLEY, JOHN J & JENNIFER T (TE) | 011112-00272 | | 101 Single Family | 0.57 | 1971 |
| 164 77-068- | 111 B | | SALT MARSH ROAD | DUNBAR REALTY TRUST, J.K. DUNBAR, TRUSTEE | 007522-00346 | | 101 Single Family | 0.57 | 1910 |

4

| # Parcel | St # | Sf | Location | Owner of Record 1/1/2003 | Deed Reference | Cls | Cls Desc | Lnd Area | Yr Blt |
|---|---|---|---|---|---|---|---|---|---|
| 165 34-048- | 25 | | ATKINS ROAD | SCHLEBECKER, JOHN PETER & JUDITH L (TE) | 011081-00180 | | 101 Single Family | 0.58 | 1977 |
| 166 34-022- | 10 | | CRESTVIEW DRIVE EXTENSION | FLAHERTY, MICHAEL K & KELLY A (TE) | 169548 | | 101 Single Family | 0.58 | 1985 |
| 167 61-078- | 4 | | FLEETWOOD ROAD | DOULD, PHILIP E & ROSE P (TE) | 009894-00001 | | 101 Single Family | 0.58 | 1986 |
| 168 71-063- | 28 | | MARSHVIEW CIRCLE | TASSINARY, HAROLD F ETUX | 003141-00101 | | 101 Single Family | 0.58 | 1988 |
| 169 34-049- | 29 | | ATKINS ROAD | FIELD, JONATHAN P | 013643-00150 | | 101 Single Family | 0.59 | 1976 |
| 170 40-032- | 11 | | CRESTVIEW DRIVE | HANRAHAN, DONALD M & GERALDINE A MCDONOUGH (TE) | 009727-00159 | | 101 Single Family | 0.59 | 1972 |
| 171 85-014- | 90 | | SALT MARSH ROAD | TERNULLO, JOHN S & ANN M | 006586-00272 | | 101 Single Family | 0.60 | 1966 |
| 172 34-047- | 23 | | ATKINS ROAD | DENOFRIO, MICHAEL J & CAROL ANN | 017209-00052 | | 101 Single Family | 0.61 | 1973 |
| 173 34-042- | 43 | | CRESTVIEW DRIVE | ZEPPENFELD, ROSE | 001588-00291 | | 101 Single Family | 0.61 | 1973 |
| 174 34-064- | 38 | | CRESTVIEW DRIVE | O'ROURKE, GEORGE W & LAURA L (TE) | 013461-00086 | | 101 Single Family | 0.61 | 1975 |
| 175 61-048- | 52 | | MARSHVIEW CIRCLE | NAPOLEONE, JOHN P & LAURA M (TE) | 013108-00263 | | 101 Single Family | 0.61 | 1976 |
| 176 34-045- | 19 | | ATKINS ROAD | TILLEY, JAMES N & RUTH L (TE) | 013041-00060 | | 101 Single Family | 0.62 | 1974 |
| 177 61-065- | 2 | | BAYBERRY LANE | MORRISON, THOMAS J & CATHERINE C (TE) | 013265-00220 | | 101 Single Family | 0.62 | 1982 |
| 178 34-037- | 25 | | CRESTVIEW DRIVE | MORRISSEY, THOMAS P. & JANIS (TE) | 007791-00131 | | 101 Single Family | 0.63 | 1975 |
| 179 40-082- | 2 | | EARL ROAD | NEGRON, RAFAEL JR & GAIL P (TE) | 011541-00310 | | 101 Single Family | 0.63 | 1981 |
| 180   61-023- | 64 | | PLOUGHED NECK ROAD | GLUCKMAN FAMILY TRUST, MARVIN & JUDITH GLUCKMAN TR | 014603-0091 | | 101 Single Family | 0.63 | 1996 |
| 181 61-067- | 49 | | MARSHVIEW CIRCLE | SULA, WILLIAM J & JOYCE L (TE) | 012392-00286 | | 101 Single Family | 0.64 | 1999 |
| 182 34-036- | 23 | | CRESTVIEW DRIVE | KING, WALTER C & WENDY W (TE) | 008422-00044 | | 101 Single Family | 0.65 | 1973 |
| 183 40-066- | 9 | | MANOR DRIVE | ARVIN, JAMES R & JOELLE S (TE) | 017873-00206 | | 101 Single Family | 0.67 | 2000 |
| 184 70-147- | 7 | | ARROWHEAD CIRCLE | DICKIE FAMILY NOMINEE TRUST, GEORGE D & BARBARA, T | 010746-00322 | | 101 Single Family | 0.68 | 1987 |
| 185 40-036- | 19 | | CRESTVIEW DRIVE | R.M. PROPERTIES, INC | 017804-00136 | | 101 Single Family | 0.68 | 2003 |
| 186 40-037- | 21 | | CRESTVIEW DRIVE | WILLITTS, ROBERT A & DIANNE (TE) | 017583-00331 | | 101 Single Family | 0.69 | 1997 |
| 187 40-034- | 15 | | CRESTVIEW DRIVE | TESSEIN, TERRY C ET UX PAULINE H | 007258-00160 | | 101 Single Family | 0.70 | 1984 |
| 188 40-072- | 20 | | MANOR DRIVE | DURNO, DAVID G & VICTORIA I (TE) | 011805-00282 | | 101 Single Family | 0.71 | 1989 |
| 189 34-046- | 21 | | ATKINS ROAD | ATKINS ROAD REALTY TRUST, JOYCE A CRIPPS & ANNAMAR | 015212-00236 | | 101 Single Family | 0.72 | 1999 |
| 190 34-025- | 4 | | CRESTVIEW DRIVE EXTENSION | SMITH, DANIEL B & NATALIE J (TE) | 148641 | | 101 Single Family | 0.72 | 1986 |
| 191 70-148- | 6 | | ARROWHEAD CIRCLE | FISH, ROBT. R SR | 003325-00287 | | 101 Single Family | 0.73 | 1983 |
| 192 40-035- | 17 | | CRESTVIEW DRIVE | HARTNETT, THOMAS & PATRICE M (TE) | 012768-00215 | | 101 Single Family | 0.73 | 1986 |
| 193 34-024- | 9 | | CRESTVIEW DRIVE EXTENSION | CARR FAMILY INVESTMENT TRUST, A B & R CARR, TRS | 169552 | | 101 Single Family | 0.73 | 1985 |
| 194 34-015- | 37 | | CRESTVIEW DRIVE | BRONSTEIN, L DAVID & JOYCE M (TE) | 153960 | | 101 Single Family | 0.74 | 1982 |
| 195 61-010- | 41 | | PLOUGHED NECK ROAD | DUNHAM, GEORGE H & MICHELE ANN (TE) | 017691-00344 | | 101 Single Family | 0.74 | 1985 |
| 196 76-044- | 28 | | BOULDER BROOK ROAD | SAUCIER, WADE D & DEBORAH J (TE) | 153476 | | 101 Single Family | 0.75 | 1974 |
| 197 61-083- | 18 | | PLOUGHED NECK ROAD | SPRAGUE, ELIZABETH W | 016884-00259 | | 101 Single Family | 0.75 | 1972 |
| 198 34-058- | 48 | | CRESTVIEW DRIVE | DALLAL, AMIR & RONNA | 005025-00025 | | 101 Single Family | 0.76 | 1971 |
| 199 40-045- | 10 | | GRAY BIRCH ROAD | MULLEN NOMINEE TRUST, LARRY MULLEN & SANDRA MULLEN | 014426-00217 | | 101 Single Family | 0.77 | 1987 |
| 200 40-081- | 4 | | EARL ROAD | PIANTEDOSI, JOHN L | 008642-00054 | | 101 Single Family | 0.78 | 1984 |
| 201 60-002- | 339 | | ROUTE 6A | GIBBS, DOROTHY M | 002331-00063 | | 101 Single Family | 0.78 | 1830 |
| 202 34-062- | 42 | | CRESTVIEW DRIVE | MALOLEPSZY, JOHN & MARY E (TE) | 011162-00040 | | 101 Single Family | 0.79 | 1997 |

| # Parcel | St # | Sf | Location | Owner of Record 1/1/2003 | Deed Reference | Cls | Cls Desc | Lnd Area | Yr Blt |
|---|---|---|---|---|---|---|---|---|---|
| 203 70-033- | 53 | | PINE ROAD | SERRA, PATRICIA A & RICHARD W STAHLE (JT) | 015248-00084 | | 101 Single Family | 0.84 | 1959 |
| 204 40-044- | 9 | | GRAY BIRCH ROAD | MCGUIRE, JOHN F & KATHLEEN (TE) | 010847-00317 | | 101 Single Family | 0.85 | 1983 |
| 205 34-063- | 40 | | CRESTVIEW DRIVE | WARREN, DEAN J & RITA VANDERBECK (TE) | 012274-00280 | | 101 Single Family | 0.87 | 1976 |
| 206 61-081- | 28 | | PLOUGHED NECK ROAD | LOMBARD, CHARLES W JR & SHIRLEY F | 004134-00161 | | 101 Single Family | 0.89 | 1958 |
| 207 40-052- | 10 | | CRESTVIEW DRIVE | PERKINS, DWIGHT A ETUX & BELINDA E | 016695-00142 | | 101 Single Family | 0.91 | 1971 |
| 208 40-064- | 1 | | MANOR DRIVE | BELCHER, DENISSA L | 013114-00313 | | 101 Single Family | 0.91 | 1940 |
| 209 61-034- | 9 | | PLOUGHED NECK ROAD EXT | BERIAU, BERNARD R JR & TERESA O (TE) | 009766-00076 | | 101 Single Family | 0.91 | 1995 |
| 210 40-071- | 22 | | MANOR DRIVE | FALKOWSKI, THOMAS J & MICHELLE (TE) | 012369-00258 | | 101 Single Family | 0.93 | 1976 |
| 211 61-007- | 35 | | PLOUGHED NECK ROAD | SNYDER, PAULA R & STEPHEN M (TE) | 008656-00179 | | 101 Single Family | 0.93 | 1974 |
| 212 61-003- | 23 | | PLOUGHED NECK ROAD | DIETRICH, ROBERT E & PATRICIA P (TE) | 014546-00230 | | 101 Single Family | 0.94 | 1988 |
| 213 61-025- | 60 | | PLOUGHED NECK ROAD | FIXLER, MICHAEL | 014513-00285 | | 101 Single Family | 0.95 | 1961 |
| 214 40-062- | 392 | | ROUTE 6A | BRIDGES, MARK S ET UX LORI J | 006415-00205 | | 101 Single Family | 0.95 | 1890 |
| 215 61-073-216 | 4 | | BAYBERRY LANE | FOUR BAYBERRY LANE NOMINEE TRUST, R A SPRAGUE, TR | 012260-00328 | | 101 Single Family | 0.98 | 1981 |
| 61-071- | 7 | | MARSHVIEW CIRCLE | CORSINI, PETER H & RACHAEL (TE) | 015448-00178 | | 101 Single Family | 0.98 | 1998 |
| 217 70-032- | 51 | | PINE ROAD | DARCY, CAROL A & JAMES S (TE) | 013815-00265 | | 101 Single Family | 0.98 | 1960 |
| 218 52-006- | 417 | | ROUTE 6A | TENO, AUDREY M | 012883-00202 | | 101 Single Family | 0.98 | 2001 |
| 219 40-063- | 390 | | ROUTE 6A | CURCI, CHARLES ET AL NANCY DAY | 008399-00180 | | 101 Single Family | 1.00 | 1742 |
| 220 40-029- | 33 | | ATKINS ROAD | SULLIVAN, DAVID N & ALISON G (TE) | 008447-00140 | | 101 Single Family | 1.01 | 1968 |
| 221 52-020- | 429 | | ROUTE 6A | GAUQUIER, GEORGE A & LINDA S (TE) | 009720-00025 | | 101 Single Family | 1.03 | 1984 |
| 222 40-030- | 35 | | ATKINS ROAD | SKIRIUS FAMILY INVESTMENT TRUST, A J & D A SKIRIUS | 013977-00178 | | 101 Single Family | 1.05 | 1967 |
| 223 34-035- | 26 | | MANOR DRIVE | BOBER, G WARREN ET UX ANITA M | 001511-00074 | | 101 Single Family | 1.08 | 1979 |
| 224 40-027- | 50 | | ATKINS ROAD | HOPKINS, DAVID C & MELVA K | 001443-01075 | | 101 Single Family | 1.10 | 1825 |
| 225 40-080- | 6 | | EARL ROAD | ADU-GYAMFI, R SIISI | 014308-00298 | | 101 Single Family | 1.10 | 1984 |
| 226 61-085- | 11 | | PLOUGHED NECK ROAD EXT | MACLEOD, JOHN L & MAUREEN J (TE) | 015538-00208 | | 101 Single Family | 1.10 | 1705 |
| 227 52-033- | 446 | | ROUTE 6A | NICHOLS, MADELYN F | 001237-00522 | | 101 Single Family | 1.10 | 1976 |
| 228 61-080- | 32 | | PLOUGHED NECK ROAD | SILKS, ALDONA L | 011154-00100 | | 101 Single Family | 1.11 | 1966 |
| 229 61-005- | 29 | | PLOUGHED NECK ROAD | CUCINOTTA, STEPHEN J & FRANCES T | 013149-00038 | | 101 Single Family | 1.12 | 1985 |
| 230 40-065- | 7 | | MANOR DRIVE | HAGGERTY, JEAN L | 012637-00251 | | 101 Single Family | 1.16 | 1975 |
| 231 61-077- | 8 | | FLEETWOOD ROAD | MCMILLAN, DANIEL L ETUX SUZANNE K | 005605-00308 | | 101 Single Family | 1.17 | 1983 |
| 232 61-004- | 27 | | PLOUGHED NECK ROAD | SMITH, STEPHEN W ET ALS STUART, CRAIG & MARK SMITH | 007110-00237 | | 101 Single Family | 1.18 | 1863 |
| 233 40-031- | 1 | | CRESTVIEW DRIVE | SKIRIUS FAMILY INVESTMENT TRUST, A J & D A SKIRIUS | 013977-00180 | | 101 Single Family | 1.23 | 1969 |
| 234 60-016- | 379 | | ROUTE 6A | MOLLOY, JULIE C | 012980-00069 | | 101 Single Family | 1.24 | 1789 |
| 235 52-041- | 53 | | ATKINS ROAD | ALMA, ANGELO | 010078-00085 | | 101 Single Family | 1.25 | 1984 |
| 236 52-019- | 425 | | ROUTE 6A | BRICKLEY, MIRIAM J & GERALD P (TE) | 008229-00251 | | 101 Single Family | 1.27 | 1913 |
| 237 61-019- | 65 | | PLOUGHED NECK ROAD | CONNOR, JAMES L & SYLVIA A (TE) | 128561 | | 101 Single Family | 1.32 | 1946 |
| 238 61-006- | 33 | | PLOUGHED NECK ROAD | IRVING, CLIFFORD P ET UX CHRISTINE L | 003686-00110 | | 101 Single Family | 1.37 | 1814 |
| 239 77-076- | 9 | | ARROWHEAD DRIVE | YOUNG, THEODORE E ET UX BARBARA A | 26525 | | 101 Single Family | 1.38 | 1920 |
| 240 61-076- | 10 | | FLEETWOOD ROAD | FLEET, EDITH LUCILLE | 000656-00055 | | 101 Single Family | 1.41 | 1948 |

| # Parcel | St # | Sf | Location | Owner of Record 1/1/2003 | Deed Reference | Cls | Cls Desc | Lnd Area | Yr Blt |
|---|---|---|---|---|---|---|---|---|---|
| 241 40-114- | 344 | | ROUTE 6A | DELANO, RUSSELL S JR & A GAIL | 011677-00207 | | 101 Single Family | 1.42 | 1998 |
| 242 61-046- | 56 | | MARSHVIEW CIRCLE | DUBAY, E PETER & CAROL D (TE) | 013090-00260 | | 101 Single Family | 1.43 | 2000 |
| 243 40-092- | 8 | | MANOR DRIVE | GOURLEY, LYNNE I | 011131-00276 | | 101 Single Family | 1.58 | 1998 |
| 244 52-011- | 5 | | HERITAGE WAY | D&K REALTY TRUST, BEVERLY SOUZA, TRUSTEE | 010623-00263 | | 101 Single Family | 1.59 | 1989 |
| 245 52-012- | 6 | | HERITAGE WAY | RUSSELL, JAMES M & EMMA M (TE) | 014190-0001 | | 101 Single Family | 1.59 | 1996 |
| 246 53-011- | 493 | | ROUTE 6A | MCKAY NOMINEE TRUST, EDWARD B & DONALD MCKAY,CO-TR | 013653-00102 | | 101 Single Family | 1.78 | 1973 |
| 247 61-050- | 48 | | MARSHVIEW CIRCLE | DOLAN, CHRISTOPHER J & LISA I (TE) | 011093-00317 | | 101 Single Family | 1.85 | 1998 |
| 248 40-097- | 370 | | ROUTE 6A | 1996 GILL FAMILY INVESTMENT TRUST,C.S.& B.L.GILL | 010113-00169 | | 101 Single Family | 1.97 | 1875 |
| 249 40-028- | 42 | | ATKINS ROAD | HOLMES, PHILIP J | 012238-00230 | | 101 Single Family | 1.98 | 2000 |
| 250 52-015- | 2 | | PLOUGHED NECK ROAD EXT | NOONAN, RICHARD E ET UX & CAROL A | 004046-00243 | | 101 Single Family | 2.22 | 1984 |
| 251 52-017- | 10 | | PLOUGHED NECK ROAD | YOGIS, GREG & KELLY C FITZPATRICK (TE) | 011402-00191 | | 101 Single Family | 2.24 | 1986 |
| 252 52-016- | 12 | | PLOUGHED NECK ROAD | KILELEE, KEVIN E & LINDA ENZ (JTWROS) | 012924-00233 | | 101 Single Family | 2.25 | 1998 |
| 253 52-022- | 439 | | ROUTE 6A | BEARSE, MASA L | 015186-00086 | | 101 Single Family | 2.25 | 1985 |
| 254 53-008- | 489 | | ROUTE 6A | CANNING, RICHARD E JR ET UX SHIRLEY H | 94176 | | 101 Single Family | 2.33 | 1952 |
| 255 53-013- | 497 A | | ROUTE 6A | JUDITH A EARLE REALTY TRUST, WM E EARLE, TRUSTEE | 017642-00054 | | 101 Single Family | 2.33 | 1920 |
| 256 40-109- | 14 A | | EARL ROAD | NORTON, RUSSELL B ET UX & KATHERINE L | 003830-00226 | | 101 Single Family | 2.52 | 1983 |
| 257 61-008- | 37 | | PLOUGHED NECK ROAD | GAGE, ROBERT E | 011168-00007 | | 101 Single Family | 2.60 | 1930 |
| 258 69-009- | 12 | | ARROWHEAD DRIVE | DAVIS, LAWRENCE & LISA (TE) | 138534 | | 101 Single Family | 2.63 | 1900 |
| 259 52-014- | 8 | | PLOUGHED NECK ROAD EXT | TRIPP, DONALD M & MARION I (TE) | 009608-00255 | | 101 Single Family | 2.63 | 1985 |
| 260 40-016- | 334 | | ROUTE 6A | SMITH, PETER & JUDITH (TE) | 014110-00333 | | 101 Single Family | 4.06 | 1857 |
| 261 70-031- | 55 | | PINE ROAD | KEARNEY, STEPHEN J & KIMBERLI A (TE) | 011158-00111 | | 101 Single Family | 4.46 | 1998 |
| 262 40-096- | 372 | | ROUTE 6A | THIBAULT, DONALD | 007227-00301 | | 101 Single Family | 6.70 | 1875 |

25 Mass. App. Ct. 15, *; 514 N.E.2d 369, **;
1987 Mass. App. LEXIS 2254, ***

LEXSEE 25 Mass. App. Ct. 15

## DAVID B. WILLARD, trustee, v. BOARD OF APPEALS OF ORLEANS

## No. 86-1110

### Appeals Court of Massachusetts, Barnstable

25 Mass. App. Ct. 15; 514 N.E.2d 369; 1987 **Mass. App. LEXIS 2254**

### September 11, 1987, Argued

### October 26, 1987, Decided

**PRIOR HISTORY:**
 [***1]

CIVIL ACTION commenced in the Superior Court Department on June 13, 1985.

The case was heard by *James J. Nixon*, J.

**DISPOSITION:**
*So ordered.*

**COUNSEL:**
*Lawrence O. Spaulding, Jr.*, for the plaintiff.

*Michael D. Ford*, Town Counsel, for the defendant.

**JUDGES:**
Grant, Perretta, & Smith, JJ.

**OPINIONBY:**
GRANT

**OPINION:**

[*16]  [**370]  In 1985 the plaintiff, in his individual capacity, n1 acquired title to a lot in Orleans with an area of some 0.8 acres and a frontage of more than 100 feet on the northerly side of Cliff Road, a private way.  The lot had been in separate ownership from that of any adjoining lot since 1965.  A single-family house had been constructed on the lot at least as early as 1964; one corner of the house abutted the northerly sideline of Cliff Road. n2 There was no minimum setback requirement in the Orleans zoning by-law until 1972, when a twenty-five foot setback was established in the residential zoning district in which the plaintiff's lot is located.

n1 The plaintiff describes himself in the complaint as the trustee of a real estate trust known as Preservation Advocacy Trust.  It makes no difference for present purposes whether the locus is held by

25 Mass. App. Ct. 15, *; 514 N.E.2d 369, **;
1987 Mass. App. LEXIS 2254, ***

the plaintiff in his individual capacity or in a fiduciary capacity. [***4]

n2 A small portion of that corner of the house and the associated portion of a retaining wall actually intrude into the layout of Cliff Road. Nothing in this opinion turns on either intrusion.

In 1985, following his acquisition, the plaintiff applied to the local building inspector for a permit to construct an addition to his house which would be located partly within the twenty-five foot setback. The building inspector denied the application for some reason or reasons which do not appear. The plaintiff appealed from that decision to the board of appeals and also applied to the board for a special permit authorizing the construction of the desired addition. The board, after hearing, sustained the decision of the building inspector and denied the application for a special permit. The plaintiff appealed to the Superior Court ( G. L. c. 40A, § 17), which, in effect, affirmed both aspects of the board's decision. We reverse the judgment of the Superior Court and order the case remanded to the board for further proceedings.

[*17] 1. *The relevant statutory provision.* The first question [***5] for decision is whether this case is governed by the first n3 or by the fourth n4 paragraph of G. L. c. 40A, § 6, as [**371] amended through St. 1979, c. 106. Town counsel argues for the former; the [*18] plaintiff espouses the latter. There is nothing on the face of the fourth paragraph to suggest that it was intended to apply to anything but vacant land. The only reference to a building is found in the last sentence of the paragraph, which sets out one of the circumstances (not applicable here) in

which a "lot" may be "built upon." The immediate statutory ancestor of the fourth paragraph ( G. L. c. 40A, § 5A, as in effect prior to St. 1975, c. 808, § 3) applied to original construction on vacant lots but not to alterations of existing structures which had become nonconforming, such as the one involved in this case. *Maynard* v. *Tomyl*, 347 Mass. 397, 400 (1964). There is no support for the plaintiff's position in *Sturges* v. *Chilmark*, 380 Mass. 246, 260-261 (1980), decided under the present fourth paragraph, in which the court was dealing with two vacant lots and the only question for decision was whether those lots were "adjoining" within the meaning of [***6] the fourth paragraph of the present § 6. The case of *Baldiga* v. *Board of Appeals of Uxbridge*, 395 Mass. 829 (1985), was also concerned with vacant lots.

n3 The first paragraph of the present G. L. c. 40A, § 6, reads in relevant part as follows: "Except as hereinafter provided, a zoning ordinance or by-law shall not apply to structures or uses lawfully in existence or lawfully begun, or to a building or special permit issued before the first publication of notice of the public hearing on such ordinance or by-law required by section five, but shall apply to any change or substantial extension of such use, to a building or special permit issued after the first notice of said public hearing, to any reconstruction, extension or structural change of such structure and to any alteration of a structure begun after the first notice of said public hearing to provide for its use for a substantially different purpose or for the same purpose in a substantially different manner or to a

Case 1:05-cv-10116-DPW    Document 24-14    Filed 12/27/2005    Page 3 of 8

Page 3

25 Mass. App. Ct. 15, *; 514 N.E.2d 369, **;
1987 Mass. App. LEXIS 2254, ***

substantially greater extent *except* where alteration, reconstruction, extension or structural change to a single or two-family residential structure does not increase the nonconforming nature of said structure. Pre-existing nonconforming structures or uses may be extended or altered, provided, that no such extension or alteration shall be permitted unless there is a finding by the permit granting authority or by the special permit granting authority designated by ordinance or by-law that such change, extension or alteration shall not be substantially more detrimental than the existing nonconforming use to the neighborhood ..." (emphasis supplied). [***7]

n4 The fourth paragraph of the present G. L. c. 40A, § 6, reads: "Any increase in area, frontage, width, yard, or depth requirements of a zoning ordinance or by-law shall not apply to a lot for single and two-family residential use which at the time of recording or endorsement, whichever occurs sooner was not held in common ownership with any adjoining land, conformed to then existing requirements and had less than the proposed requirement but at least five thousand square feet of area and fifty feet of frontage. Any increase in area, frontage, width, yard or depth requirement of a zoning ordinance or by-law shall not apply for a period of five years from its effective date or for five years after January first, nineteen hundred and seventy-six, whichever is later, to a lot for single and two family residential use, provided the plan for such lot was recorded or endorsed and such lot was held in common

ownership with any adjoining land and conformed to the existing zoning requirements as of January first, nineteen hundred and seventy-six, and had less area, frontage, width, yard or depth requirements than the newly effective zoning requirements but contained at least seven thousand five hundred square feet of area and seventy-five feet of frontage, and provided that said five year period does not commence prior to January first, nineteen hundred and seventy-six, and provided further that the provisions of this sentence shall not apply to more than three of such adjoining lots held in common ownership. The provisions of this paragraph shall not be construed to prohibit a lot being built upon, if at the time of the building, building upon such lot is not prohibited by the zoning ordinances or by-laws in effect in a city or town."

[***8]

The portion of the first paragraph of the present § 6 with which we are concerned has no identifiable ancestor in G. L. c. 40A, as in effect prior to St. 1975, c. 808, § 3. That portion made its first appearance, without accompanying explanation (see *Baldiga* v. *Board of Appeals of Uxbridge*, 395 Mass. at 835), in 1974 House Doc. No. 5864. To be specific, the second "except" clause of the first paragraph of § 6 is addressed to "alteration[s], reconstruction, extension[s and] structural change[s] to ... single or two-family residential structure[s]," none of which is referred to in the fourth paragraph. The second sentence of the first paragraph is specific in its references to extensions and alterations of "[p]re-existing nonconforming structures" ( *Fitzsimonds* v. *Board of Appeals of Chatham*, 21 Mass. App. Ct. 53,

Case 1:05-cv-10116-DPW    Document 24-14    Filed 12/27/2005    Page 4 of 8

Page 4

25 Mass. App. Ct. 15, *; 514 N.E.2d 369, **;
1987 Mass. App. LEXIS 2254, ***

55-56 [1985] n5). We have no hesitancy in concluding that the portion of the first paragraph of § 6 which [*19] commences with the second "except" clause sets out the statutory provisions which govern a case such as the present. Compare *Walker* v. *Board of Appeals of Harwich*, 388 Mass. 42, 50-52 (1983).

n5 The *Fitzsimonds* case was not decided until more than four months after the board had acted in this case. It was decided more than eight months prior to the decision of the Superior Court and was specifically brought to the attention of the judge in the course of the trial.

[***9]

2. *The relevant provision of the zoning by-law.* The next question is whether this case is governed by § 1:3-3-1 n6 or by § 6:4-3 n7 of the Orleans zoning [**372] by-law. Section 1:3-3-1 makes specific reference to the present G. L. c. 40A, § 6, and reads almost directly on the language of the second "except" clause of the first paragraph of § 6, as discussed in part 1 hereof. Section 6:4-3 makes no reference to any particular section of c. 40A, but it is clear from a comparison of its language with that of § 9 of c. 40A that § 6:4-3 was intended to implement the general provisions with respect to the issuance of special permits which are found in § 9 and to apply in special permit situations not specifically covered by other sections of the by-law. n8 Compare *Walker* v. *Board of Appeals of Harwich*, [*20] 388 Mass. at 51-52. Accordingly, we hold that it is § 1:3-3-1 which governs in this case.

n6 "Change, Extension or Alteration: As provided in Section 6

of Chapter 40A, General Laws, a nonconforming single- or two-family dwelling may be altered or extended provided that doing so does not increase the non-conforming nature of said structure. Other pre-existing, non-conforming structures or uses may be extended, altered, or changed in use on Special Permit from the Board of Appeals if the Board of Appeals finds that such extension, alteration or change will not be substantially more detrimental to the neighborhood than the existing non-conforming use. Once changed to a conforming use, no structure or land shall be permitted to revert to a non-conforming use." [***10]

n7 "Criteria. Special Permits may be granted when it has been found that the use involved will not be detrimental to the established or future character of the neighborhood and the Town, and when it has been found that the use involved will be in harmony with the general purpose and intent of the Bylaw and shall include consideration of each of the following:
"6:4-3-1 Adequacy of the site in terms of size for the proposed use.
"6:4-3-2 Suitability of site for proposed use.
"6:4-3-3 Impact on traffic flow and safety.
"6:4-3-4 Impact on neighborhood visual character, including views and vistas.
"6:4-3-5 Adequacy of method of sewage disposal, source of water and drainage.
"6:4-3-6 Adequacy of utilities and other public services.
"6:4-3-7 Noise and litter."

n8 Section 1:3-3-1 is but one of several sections of the by-law making

25 Mass. App. Ct. 15, *; 514 N.E.2d 369, **;
1987 Mass. App. LEXIS 2254, ***

provision for the issuance of special permits in particular circumstances. See, e.g., § § 3:9-1-2 (shoreline zoning district), 4:3-9(b) (sidelines in VC zoning district), 5:7 (timesharing and interval ownership) and 5:11-2-3 (numbers of spaces required in off-street parking areas).

[***11]

3. *The proper construction of the statute and the by-law.* The first paragraph of G. L. c. 40A, § 6 (note 3, *supra*), contains an obscurity of the type which has come to be recognized as one of the hallmarks of the chapter. See, e.g., *O'Kane* v. *Board of Appeals of Hingham*, 20 Mass. App. Ct. 162 (1985), and cases cited; *Fitzsimonds* v. *Board of Appeals of Chatham*, 21 Mass. App. Ct. at 55-56. The first "except" clause of the statute is concerned with the application of zoning ordinances and by-laws to nonconforming "structures or uses," to any change in or substantial extension of such a "use", and to the alteration of such a "structure." The second "except" clause deals with the alteration, reconstruction, extension or structural change "to [*sic*] a single or two-family residential structure [which] does not increase the nonconforming nature of [the] structure." The immediately ensuing sentence speaks of not permitting extensions or alterations of "[p]re-existing nonconforming structures or uses" unless there is a finding by the permit or special permit authority that such change, extension or alteration "*shall not be substantially more detrimental* [***12] *than the existing nonconforming use* to the neighborhood" (emphasis supplied).

It will be noted that all the portions of the statute which have just been summarized or quoted except the portion italicized are expressly directed to

nonconforming structures as well as nonconforming uses. In the present case, the existing and proposed nonconformities arise out of the position of a house on a lot of land rather than out of the use which is being or is proposed to be made of the house or of the lot on which the house is and would continue to be located. The italicized portion of the statute makes no sense in these circumstances because, as worded, it appears to contemplate a determination of whether an alteration to an existing structure would be more detrimental to the neighborhood by reference to the existing [*21] residential use of the land, which would not change if the structure were altered. n9 We are of opinion that this is one of those rare instances in which a court must overcome its reluctance to supply a word or words which were not employed by the Legislature (see, e.g., [**373] *Murray* v. *Board of Appeals of Barnstable*, 22 Mass. App. Ct. 473, 479 [1986]) [***13] in order to render a statute intelligible and so effectuate its obvious intent. Compare *Chelmsford Trailer Park, Inc.* v. *Chelmsford*, 393 Mass. 186, 196-197 (1984). Accordingly, we read the concluding portion of the second sentence of the first paragraph of the present G. L. c. 40A, § 6, as follows: "shall not be substantially more detrimental than the existing nonconforming *structure or* use to the neighborhood" (emphasis supplied).

n9 As one commentator has put it, "[T]here is an apples-compared-to-oranges problem regarding buildings in sentence two of new Section 6 in that any extension or alteration of a [nonconforming] structure depends on a demonstration to and a finding by the [permit granting authority] that the same will not be substantially more

25 Mass. App. Ct. 15, *; 514 N.E.2d 369, **;
1987 Mass. App. LEXIS 2254, ***

detrimental to the neighborhood than the existing nonconforming use. Presumably the Appeals Court will, at some point, instruct [permit granting authorities] how to go about comparing structures to uses." Hays, Application of Chapter 808 to Existing Structures, Uses, Plan Variances and Permits, 22 B.B.J. 17, 19 (1978). The apples and oranges were present but not sorted out in *Tamerlane Realty Trust* v. *Board of Appeals of Provincetown*, 23 Mass. App. Ct. 450 (1987).

[***14]

On a parity of reasoning, we think the concluding portion of the penultimate sentence of § 1:3-3-1 of the by-law (note 6, *supra*) is to be read: "will not be substantially more detrimental to the neighborhood than the existing non-conforming *structure or* use" (emphasis supplied).

There is one more question of construction. As pointed out in *Fitzsimonds* v. *Board of Appeals of Chatham*, the second "except" clause of the first paragraph of c. 40A, § 6, requires a board of appeals in a case such as this one to make an initial determination whether a proposed alteration of or addition to a nonconforming structure would "'increase the nonconforming nature of said structure'" (21 Mass. App. Ct. at 56). This part of the statute is not concerned with the use of the structure or of the land on which it is located. We think the quoted language should be read as requiring a board of appeals to identify the [*22] particular respect or respects in which the existing structure does not conform to the requirements of the present by-law and then determine whether the proposed alteration or addition would intensify the

existing nonconformities or result in additional ones. If [***15] the answer to that question is in the negative, the applicant will be entitled to the issuance of a special permit under the second "except" clause of G. L. c. 40A, § 6, and any implementing by-law. Only if the answer to that question is in the affirmative will there be any occasion for consideration of the additional question illuminated in the *Fitzsimonds* case (21 Mass. App. Ct. at 56).

4. *Shortcomings in the board's and the judge's findings.* The board found that the addition proposed in this case "would increase the non-conforming nature of the present structure." That finding is not suspect because there was evidence in the Superior Court from which it could be found (as was agreed at the argument before us) that at least one portion of the addition would protrude beyond the footprint of the present structure.

When it came to the plaintiff's alternative request for a special permit, the board found that the proposed addition would result in increasing the height of the existing structure by nine feet [n10] and that "this would interfere with the views or vistas of the surrounding property owners and be substantially more detrimental to the neighborhood and the town." [***16] The references to the "town," which appears in § 6:4-3 of the by-law (note 7, *supra*) but not in the first paragraph of G. L. c. 40A, § 6 (note 3, *supra*) or in § 1:3-3-1 of the by-law (note 6, *supra*), and to "views and vistas," which appear in § 6:4-3-4 of the by-law (note 7, *supra*) but not in the statute or in § 1:3-3-1 of the by-law, strongly suggest that the board may have proceeded under the wrong special permit provisions of the by-law. See part 2 hereof. We do not say that the board, in the exercise of its discretion, could not properly consider the factors set [*23] out in § 6:4-3-4 of the by-law in determining

25 Mass. App. Ct. 15, *; 514 N.E.2d 369, **;
1987 Mass. App. LEXIS 2254, ***

whether the proposed addition would result in a structure substantially more detrimental to the neighborhood than the existing structure (part 3 hereof). We do say that on this record it does not appear with any measure of certainty that the board proceeded under the first paragraph of c. 40A, § 6, and § 1:3-3-1 of the by-law.

n10 The judge found that the increase would be sixteen feet. Neither the board nor the judge made any finding that the increase in height, whatever it might be, would result in any nonconformity under the present by-law. See the *Fitzsimonds* case, 21 Mass. App. Ct. at 57.

[***17]

[**374] The board, in its decision, gave no indication what it considered the "neighborhood" to be. The board referred loosely to "surrounding property owners," but we do not know whether it had in mind the owners of lots contiguous to or across Cliff Road from the plaintiff's lot, all the fifteen owners to whom notice of the public hearing was given under G. L. c. 40A, § 11, the owners of all the other 229 lots in the subdivision which includes the plaintiff's lot, or something else. n11 There is need for clarification in this area because at the hearing in the Superior Court there was evidence of whether the top of the proposed addition would be visible from certain nearby properties and from certain public landings, some of which are undoubtedly parts of the "town" within the meaning of § 6:4-3 of the by-law but may not be parts of the "neighborhood" within the meaning of the first paragraph of c. 40A, § 6, and § 1:3-3-1 of the by-law.

n11 The judge nowhere used the word "neighborhood."

The judge's [***18] findings and rulings are subject to many of the same frailties. For instance, he said in the early part of his findings that the plaintiff's application for a special permit had been filed under § 1:3:3-1 of the by-law, and he referred to "compliance with section 6 of chapter 40A." Somewhat later, the judge ruled (erroneously) that the issuance of a special permit of the type sought in this case is governed by § 6:4-3 of the by-law. There are additional problems. The judge found that "[t]he planned construction would be a substantial extension of the non-conforming use" and that "[t]he extensive increase in use of the lot through expansive decking will materially change the structure." Nowhere did the judge make any finding on the question whether the proposed addition would increase the nonconforming nature of the structure or the question [*24] whether the addition would result in a structure not substantially more detrimental to the neighborhood than the existing structure.

It is clear that the judge failed to make independent findings of fact ( G. L. c. 40A, § 17) on all the issues raised by the appeal to the Superior Court before determining the validity of the [***19] board's decision. See, e.g., *Pendergast* v. *Board of Appeals of Barnstable*, 331 Mass. 555, 558-559 (1954); *Planning Bd. of Springfield* v. *Board of Appeals of Springfield*, 355 Mass. 460, 462 (1969); *Josephs* v. *Board of Appeals of Brookline*, 362 Mass. 290, 295, 298-300 (1972). There is nothing in the judge's findings that can be relied on to salvage either aspect of the board's decision.

The judgment is reversed, and the decision of the board of appeals is

25 Mass. App. Ct. 15, *; 514 N.E.2d 369, **;
1987 Mass. App. LEXIS 2254, ***

annulled; the case is to be remanded to the board for further proceedings consistent with this opinion; the board, after new notices under G. L. c. 40A, § 11, may reopen the hearing for the purpose of taking further evidence; the board shall render a new decision; the Superior Court may retain jurisdiction over the case; costs of appeal are not to be awarded to any party.

*So ordered.*

1 of 1 DOCUMENT

ANNOTATED LAWS OF MASSACHUSETTS
Copyright (c) 2005 Matthew Bender & Company, Inc.,
one of the LEXIS Publishing (TM) companies
All rights reserved

*** THIS DOCUMENT IS CURRENT THROUGH CHAPTER 120, 10/27/05 ***
*** WITH THE EXCEPTION OF CHAPTERS 90, 91, 99 AND 106 ***

PART I.  ADMINISTRATION OF THE GOVERNMENT
TITLE VII. CITIES, TOWNS AND DISTRICTS
CHAPTER 43B.  HOME RULE PROCEDURES

**GO TO MASSACHUSETTS CODE ARCHIVE DIRECTORY**

ALM GL ch. 43B, §  13 (2005)

§  13. Powers Exercisable by Cities and Towns; Limitations and Exceptions.

   Any city or town may, by the adoption, amendment or repeal of local ordinances or by-laws, exercise any power or function which the general court has power to confer upon it, which is not inconsistent with the constitution or laws enacted by the general court in conformity with powers reserved to the general court by Section 8 of Article LXXXIX of the Amendments to the Constitution and which is not denied, either expressly or by clear implication, to the city or town by its charter. Whenever appropriations, appointments, orders, regulations or other legislative or executive actions within the scope of any such ordinance or by-law are necessary in the exercise of any power or function authorized by such ordinance or by-law, any such actions which are to be taken by a city council or town meeting may be taken by ordinance, by-law, resolution, order or vote, and any such actions which are to be taken by executive officers may be taken in any appropriate manner, subject, however, as to both such categories, to all provisions of the ordinance or by-law in question, the city or town charter, and other applicable law. Any requirement that an ordinance or by-law be entitled as such, or that it contain the word "ordained," "enacted" or words of similar import shall not affect the validity of any action which is required to be taken by ordinance or by-law. Nothing in this section shall be construed to permit any city or town, by ordinance or by-law, to exercise any power or function which is inconsistent with any general law enacted by the general court before November eighth, nineteen hundred and sixty-six which applies alike to all cities, or to all towns, or to all cities and towns, or to a class of not fewer than two. No exercise of a power or function denied to the city or town, expressly or by clear implication, by special laws having the force of a charter under section nine of said Article, and no change in the composition, mode of election or appointment, or terms of office of the legislative body, the mayor or city manager or the board of selectmen or town manager, may be accomplished by by-law or ordinance. Such

special laws may be made inapplicable, and such changes may be accomplished, only under procedures for the adoption, revision or amendment of a charter under this chapter.

**HISTORY:** 1966, 734, § 1

1 of 1 DOCUMENT

ANNOTATED LAWS OF MASSACHUSETTS
Copyright (c) 2005 Matthew Bender & Company, Inc.,
one of the LEXIS Publishing (TM) companies
All rights reserved

*** THIS DOCUMENT IS CURRENT THROUGH CHAPTER 120, 10/27/05 ***
*** WITH THE EXCEPTION OF CHAPTERS 90, 91, 99 AND 106 ***

PART I.  ADMINISTRATION OF THE GOVERNMENT
TITLE VII. CITIES, TOWNS AND DISTRICTS
CHAPTER 43B.  HOME RULE PROCEDURES

**GO TO MASSACHUSETTS CODE ARCHIVE DIRECTORY**

ALM GL ch. 43B, § 14 (2005)

§ 14. Judicial Enforcement and Review.

   (1) The superior court shall, upon petition of ten or more registered voters or of the attorney general, have jurisdiction in equity to enforce the provisions of this chapter.

   (2) The provisions of chapter two hundred and thirty-one A applicable to municipal by-laws or ordinances shall apply to charters, charter revisions, charter amendments, by-laws and ordinances of a city or town adopted under this chapter. In addition, a petition for declaratory relief under chapter two hundred and thirty-one A may be brought on behalf of the public by the attorney general or, by leave of the court, by ten or more registered voters of the city or town. In the case of a petition brought by ten registered voters, the attorney general shall be served with notice of the preliminary petition for leave, and may intervene as a party at any stage of the proceedings; and the petitioners shall be liable for, but may in the court's discretion also be awarded, costs, which may include reasonable counsel fees.

   (3) Judicial review to determine the validity of the procedures whereby any charter is adopted, revised or amended may be had by petition of ten or more registered voters of the city or town brought within thirty days after the election at which such charter, revision or amendment is approved. If no such petition is filed within such period, compliance with all the procedures required by this act and the validity of the manner in which such charter, revision or amendment was approved shall be conclusively presumed. No charter adoption, revision or amendment shall be deemed invalid on account of any procedural error or omission unless it is shown that the error or omission materially and substantially affected such adoption, revision or amendment.

**HISTORY:** 1966, 734, § 1

1 of 1 DOCUMENT

ANNOTATED LAWS OF MASSACHUSETTS
Copyright (c) 2005 Matthew Bender & Company, Inc.,
one of the LEXIS Publishing (TM) companies
All rights reserved

*** THIS DOCUMENT IS CURRENT THROUGH CHAPTER 120, 10/27/05 ***
*** WITH THE EXCEPTION OF CHAPTERS 90, 91, 99 AND 106 ***

PART III.  COURTS, JUDICIAL OFFICERS AND PROCEEDINGS IN CIVIL CASES
TITLE II. ACTIONS AND PROCEEDINGS THEREIN
CHAPTER 231A.  PROCEDURE FOR DECLARATORY JUDGMENTS

**GO TO MASSACHUSETTS CODE ARCHIVE DIRECTORY**

ALM GL ch. 231A, § 2  (2005)

§ 2. Procedure Applicable to Deeds, Wills, Contracts, Charters, Statutes, Ordinances, By-laws and Administrative Regulations.

   The procedure under section one may be used to secure determinations of right, duty, status or other legal relations under deeds, wills or written contracts or other writings constituting a contract or contracts or under the common law, or a charter, statute, municipal ordinance or by-law, or administrative regulation, including determination of any question of construction or validity thereof which may be involved in such determination. Said procedure under section one may be used in the superior court to enjoin and to obtain a determination of the legality of the administrative practices and procedures of any municipal, county or state agency or official which practices or procedures are alleged to be in violation of the Constitution of the United States or of the constitution or laws of the commonwealth, or are in violation of rules or regulations promulgated under the authority of such laws, which violation has been consistently repeated; provided, however, that this section shall not apply to the governor and council or the legislative and judicial departments. For the purpose of this section practices or procedures mean the customary and usual method of conducting municipal, county, state agency or official business.

   The foregoing enumeration shall not limit or restrict the exercise of the general powers conferred in section one in any proceeding where declaratory relief is sought, in which a judgment or decree will terminate the controversy or remove an uncertainty.

**HISTORY:** 1945, 582, § 1; 1974, 630, § 1

**NOTES:**

EDITORIAL NOTE-

The 1974 amendment added two sentences to the first paragraph relative to use of the section one procedure in Superior Court to enjoin and determine legality of allegedly unconstitutional administrative practices or procedures by governmental bodies.

TOTAL CLIENT-SERVICE LIBRARY REFERENCES--
   22A Am Jur 2d, Declaratory Judgments §§ 61 et seq.

ANNOTATIONS--
   Availability of declaratory judgment to determine validity of lease of real property. 60 ALR2d 400.

   Declaratory judgment, during lifetime of spouses, as to construction of agreement dealing with property rights of survivor. 80 ALR2d 941.

   Pretrial testimony or disclosure on discovery by party to personal injury action as to nature of injuries or treatment as waiver of physician-patient privilege. 25 ALR3d 1401.

   Validity, construction, and effect of statute establishing compensation for claims not paid because of insurer's insolvency. 30 ALR4th 1110.

TEXTS--
   Bogdanow, Massachusetts Tort Damages, 2d ed (Michie) § 10-1.

   Cozen, Insuring Real Property (Matthew Bender) § 31.02.

LAW REVIEW REFERENCES--
   Gahan, The Headless Fourth Branch of Government. 64 Mass L Rev 21, February, 1979.

   FORMS:
   See "FORMS" heading following "NOTES SECTION", infra.

CASE NOTES
1. In general
2. Application to particular matters
3. Municipal government
4. Prisons and prisoners

1. In general

   This section applies only to existing charters, statutes, ordinances or bylaws, and no jurisdiction is conferred by the statute to determine the validity or possible effect of mere proposed municipal or other legislation. Hodgman v Taunton (1948) 323 Mass 79, 80 NE2d 31.

   Sections 1 and 2 of this chapter contain language similar to that contained in ALM GL c 30A, § 7 (State Administrative Procedure Act), setting up a permissive procedure for the review of certain regulations. Allied Theatres of New England, Inc. v Commissioner of Labor & Industries (1959) 338 Mass 609, 156 NE2d 424, 36 CCH LC P 65246.

   This chapter was intended to expand prior provisions for the interpretation of written instruments. Billings v Fowler (1972) 361 Mass 230, 279 NE2d 906.

Cases arising upon traditional petitions for instructions are not to be regarded as necessarily precluding declaratory relief, although substantial discretion is given by this chapter to deny relief in appropriate cases. Billings v Fowler (1972) 361 Mass 230, 279 NE2d 906.

Section 7 of the Administrative Procedure Act in GL ALM GL c 30A provides the basis for judicial review of a "regulation" by means of proceedings for declaratory relief under ALM GL c 231A, § 2. Cambridge Electric Light Co. v Department of Public Utilities (1973) 363 Mass 474, 295 NE2d 876.

General Court sitting in joint session under Art. 48 of Amendments to Constitution is legislative department within meaning of ALM GL c 231A § 2. Limits v President of Senate (1992) 414 Mass 31, 604 NE2d 1307.

Declaratory judgment action brought against Governor seeking declaration of Commonwealth's duty to provide education and challenging constitutionality of public school financing system dismissed. McDuffy v Secretary of Executive Office of Educ. (1993) 415 Mass 545, 615 NE2d 516, summary op at (Mass) 21 MLW 2882.

In case in which labor unions representing government employees challenged authority of Governor to disapprove portion of budget item funding 39 positions for early childhood intervention and Attorney General took position agreeing with plaintiffs and refused to defend defendants (Commonwealth, Secretary of Administration and Finance, Department of Public Health, and Commissioner of Public Health), there was no controversy between parties as demanded by declaratory judgment statute; action dismissed for lack of jurisdiction. Alliance, AFSCME/SEIU v Commonwealth (1997) 425 Mass 534, 682 NE2d 607.

In case in which labor unions representing government employees challenged authority of Governor to disapprove portion of budget item funding 39 positions for early childhood intervention and Attorney General took position agreeing with plaintiffs and refused to defend defendants (Commonwealth, Secretary of Administration and Finance, Department of Public Health, and Commissioner of Public Health), there was no controversy between parties as demanded by declaratory judgment statute; action dismissed for lack of jurisdiction. Alliance, AFSCME/SEIU v Commonwealth (1997) 425 Mass 534, 682 NE2d 607.

In absence of special circumstances, declaratory relief cannot be used to circumvent period prescribed by statute for obtaining judicial review. Board of Appeals v DeCarolis (1992) 32 Mass App 348, 588 NE2d 1378.

## 2. Application to particular matters

Instructions concerning the meaning of a will may be obtained even though no direct immediate interest of a present life beneficiary will be affected. Billings v Fowler (1972) 361 Mass 230, 279 NE2d 906.

Power and authority of Industrial Accident Board to promulgate discovery rule could be decided without exhaustion of administrative remedies. Ciszewski v Industrial Acci. Board (1975) 367 Mass 135, 325 NE2d 270.

Class action for declaratory relief and injunctive relief against state welfare officials should not have been dismissed for mootness, although named plaintiff's claim was satisfied when replacement welfare check was sent. Wolf v Commissioner of Public Welfare (1975) 367 Mass 293, 327 NE2d 885.

Resort to declaratory relief was appropriate where tobacco grower challenged validity of statute and regulations pertaining to rights of visitation for migrant workers housed in its facilities. Consolidated Cigar Corp. v Department of Public Health (1977) 372 Mass 844, 364 NE2d 1202.

Declaratory relief was appropriate vehicle by which to raise questions of whether will provisions evinced intent of testator to take maximum federal estate tax marital deduction. Babson v Babson (1977) 374 Mass 96, 371 NE2d 430, 41 AFTR 2d 1449.

Landowners who were not parties to contracts between Metropolitan District Commission and two towns with respect to construction and operation of sewer line had no standing to seek declaration of rights under contracts. Gallo v Division of Water Pollution Control (1978) 374 Mass 278, 372 NE2d 1258.

Landowners refused permission to connect lots to town sewer system because of Division of Water Pollution Control's moratorium on such connection did not state claim under ALM GL c 231A against Division, because they failed to allege that moratorium was usual practice of Division which was unconstitutional and which was consistently repeated, and because they failed to exhaust specific administrative remedies respecting the obtaining of permits from Division. Gallo v Division of Water Pollution Control (1978) 374 Mass 278, 372 NE2d 1258.

Because administrative remedies were not exhausted, action by pharamacy seeking declaratory judgment that it was victim of unlawful searches and seizures by state police and injunction restraining Board of Registration in Pharmacy from using any evidence obtained as a result thereof in administrative disciplinary proceedings was not appropriate. Samuels Pharmacy, Inc. v Board of Registration in Pharmacy (1983) 390 Mass 583, 458 NE2d 728.

Former employee of state department not entitled to declaratory relief against Governor with respect to claim of entitlement to award of back pay, attorney's fees and management position under Governor's executive order implementing policy of affirmative action. Avery v Commissioner of Dep't of Social Services (1990) 406 Mass 1006, 550 NE2d 869, 53 BNA FEP Cas 814.

Superior Court had subject matter jurisdiction under ALM GL c 231A to review decision of Secretary of Environmental Affairs regarding scope of environmental impact report that Secretary required of land developers in conjunction with access road from state highway to development. Villages Dev. Co. v Secretary of Executive Office of Environmental Affairs (1991) 410 Mass 100, 571 NE2d 361.

To secure declaratory relief in case involving administrative action, plaintiff must show that (1) there is actual controversy, (2) he has standing, (3) necessary parties have been joined, and (4) available administrative remedies have been exhausted. Villages Dev. Co. v Secretary of Executive Office of Environmental Affairs (1991) 410 Mass 100, 571 NE2d 361.

Action brought by Mental Health Legal Advisors Committee on behalf of 13 children in custody of Department of Social Services, concerning placement of children in inpatient mental health facility, was appropriate one for declaratory belief. D.L. v Commissioner of Social Services (1992) 412 Mass 558, 591 NE2d 173.

Supporters of proposed initiative amendment to Massachusetts Constitution limiting number of consecutive terms for certain elected officials were not entitled to relief in nature of mandamus and declaration ordering joint session of General Court to take final action on proposed amendment, since under separation of powers principles judiciary may not intrude on power and function of joint session of legislature. Limits v President of Senate (1992) 414 Mass 31, 604 NE2d 1307.

ALM GL c 231A § 2 is appropriate route by which to challenge administrative agency's noncompliance with its statutory mandate. Williams v Secretary of Executive Office of Human Servs. (1993) 414 Mass 551, 609 NE2d 447, 1 ADD 949, 2 AD Cas 625.

Adjudication of title to tidal flats as well as public use of privately held property is appropriate subject for declaratory judgment. Pazolt v Director of the Div. of Marine Fisheries (1994) 417 Mass 565, 631 NE2d 547, summary op at (Mass) 22 MLW 1680.

Although criminal charges for public begging prohibited by ALM GL c 272 § 66 were disposed of by admissions amounting to functional equivalent of guilty pleas, defendant in criminal cases had standing to seek declaratory relief that statute was unconstitutional because of likelihood of continuing arrests and prosecutions. Benefit v City of Cambridge (1997) 424 Mass 918, 679 NE2d 184.

As a private citizen, a senate president had no official duties to bring an initiative amendment to a vote of a joint session of the general court, and an individual had no actual controversy with him in that capacity; therefore, declaratory relief was unwarranted. Pawlick v Birmingham (2002) 438 Mass 1010, 780 NE2d 466.

Normal procedure for attacking will on grounds of undue influence or lack of testamentary capacity is to oppose allowance of will after it has been offered for probate, not by declaratory judgment in advance of probate proceeding. Dodson v Maroney (1983) 15 Mass App 982, 447 NE2d 1256.

Trial court in a declaratory judgment action properly found that a motor vehicle exclusion clause in a homeowner's insurance policy precluded coverage for bodily injury claims incurred in an automobile accident. Phoenix Ins. Co. v Churchwell (2003) 57 Mass App 612, 785 NE2d 392.

Superior court had jurisdiction under ALM GL c 231A § § 1, 2 to hear a father's declaratory judgment action in which he sought a declaration that he was entitled to an administrative hearing regarding two child support matters and the actions taken by the Massachusetts Department of Revenue (DOR) to suspend the father's driver's license and professional licenses for non-payment of child support; the jurisdictional restrictions in ALM GL c 119A, § 6 applied only to determinations made pursuant to § 6 as to the amount of an arrearage, which was not the subject of the father's declaratory judgment action. Naranjo v Dep't of Revenue (2005) 63 Mass App 260, 825 NE2d 1051.

Trial court declared that (1) the supermarket tenant's buyer was a "supermarket" as intended by the lease and under the common parlance definition and that the lease could be assigned to the buyer, (2) that the tenant did not have an irrevocable right to exercise the right of first refusal for 20,000 square feet since there was no consideration or detrimental reliance, (3) that the landlord was enjoined and restrained from terminating the lease, based in part upon the tenant or buyer not being a supermarket that emphasized and con-

centrated in the sale of Asian foods. Slawsby v Cifrino (2003, Super Ct) 16 Mass L Rep 405, 2003 Mass Super LEXIS 186.

Declaratory relief was granted to a college in its dispute with a college athletic conference over an amendment to the conference constitution, which increased the penalty for withdrawal from the conference; the superior court declared that the amendment was null and void because it was not adopted pursuant to the procedures outlined in the conference's constitution. Trs. of Boston College v Big E. Conf. (2004, Super Ct) 18 Mass L Rep 177, 2004 Mass Super LEXIS 298.

3. Municipal government

Plaintiffs (town and its officials) stated actual controversy concerning powers and duties of Commissioner of Corporation and Taxation and state tax commission with respect to taxation of property at full and fair cash value by local assessors, in that showing of probable loss of revenue by plaintiff gave them substantial economic interest in controversy. Sudbury v Commissioner of Corps. & Taxation (1974) 366 Mass 558, 321 NE2d 641.

Request for declaratory relief with respect to constitutionality of statute was proper, although review of administrative agency's decision was available under ALM GL c 30A § 14. Samel v Pittsfield Licensing Board (1979) 377 Mass 908, 384 NE2d 1230.

Superintendent of schools and school committee had standing to challenge Mayor's refusal to submit school budget to city council without change. Superintendent of Schools v Mayor of Leominster (1982) 386 Mass 114, 434 NE2d 1230.

Declaratory relief as to meaning of terms used in 1904 legislation authorizing town to purchase water company was appropriate even though town had not yet committed itself to purchase. Oxford v Oxford Water Co. (1984) 391 Mass 581, 463 NE2d 330.

Superior Court judge had jurisdiction to declare rights of parties, where littoral landowner had independent claims concerning his title and rights as property owner with respect to board of selectmen's issuance of license for conduct of shellfishing on tidal flats. Pazolt v Director of the Div. of Marine Fisheries (1994) 417 Mass 565, 631 NE2d 547, summary op at (Mass) 22 MLW 1680.

Town of Holden had standing to bring action for declaratory relief against Division of Water Pollution Control with respect to interpretation of ALM GL c 21 § 43. Holden v Division of Water Pollution Control (1978) 6 Mass App 423, 376 NE2d 1259.

Superior Court lacked jurisdiction to determine if Rate Setting Commission properly considered municipal geriatric authority's contribution to retirement system in setting per diem reimbursement rate for publicly aided patients, where authority did not take administrative appeal. Geriatric Authority of Holyoke v Rate Setting Com. (1986) 21 Mass App 953, 487 NE2d 857, review den 396 Mass 1107, 489 NE2d 1263.

District Court's refusal to temporarily enjoin town prosecution of pharmacy owner for violation of town's public display minors law is not abuse of discretion, since (1) pharmacy owner can raise constitutional defenses if represented, even though he failed to do so when earlier prosecuted, (2) there is no showing of unreasonable hostility to assertion of constitutional rights, and (3) pharmacy owner's suggestion that law in question is repugnant to state obscenity laws renders state forum particularly appropriate for resolving such issues.

Rushia v Ashburnham (1983, CA1 Mass) 701 F2d 7, later proceeding (DC Mass) 582 F Supp 900 (disapproved by Upper Midwest Booksellers Assoc. v Minneapolis (CA8 Minn) 780 F2d 1389, 12 Media L R 1913).

When subdivision lot owners sought to require that development conditions originally imposed on some of their lots be imposed on a proposed new development within the subdivision, their request for declaratory relief, when the local conservation commission declined to impose these conditions, presented no actual controversy, as the owners could not seek administrative review of a certificate that the original conditions were complied with or of the new conditions imposed on the developer, so the court had no jurisdiction to grant declaratory relief. Wolfe v Gormally (2003, Super Ct) 16 Mass L Rep 617, 2003 Mass Super LEXIS 265.

4. Prisons and prisoners

Judge's order that inmate be released from segregation unit was declaratory and injunctive, and superintendent of correctional institution could appeal from order. Stokes v Superintendent, Massachusetts Correctional Institution (1983) 389 Mass 883, 452 NE2d 1123.

Prison inmates properly brought action for declaratory judgment challenging constitutionality of prison disciplinary board procedures as set out in regulations. Nelson v Commissioner of Correction (1983) 390 Mass 379, 456 NE2d 1100.

Complaint by prison inmate that transfer to segregation unit was in violation of state statutes and regulations and state and federal constitutions stated claim for declaratory relief. Royce v Commissioner of Correction (1983) 390 Mass 425, 456 NE2d 1127.

Inmate's action challenging confinement in segregation unit treated as one seeking declaratory relief. Kenney v Commissioner of Correction (1984) 393 Mass 28, 468 NE2d 616.

Superior court held that, pursuant to ALM GL c 231, § 2, an inmate housed at the Massachusetts Correctional Institution Cedar Junction (MCI-CJ) could seek a declaratory judgment in order to determine whether the Commissioner of the Massachusetts Department of Correction was fulfilling the requirements imposed by ALM GL c 124, § 1 and ALM GL c 127, § 48, without exhausting administrative remedies, but the court granted the Commissioner's motion for summary judgment because the inmate did not show that the Commissioner violated the inmate's right to equal protection by offering fewer educational programs to inmates housed MCI-CJ or because inmates housed at MCI-CJ were not allowed to have contact visits. Cepulonis v Maloney (2003, Super Ct) 15 Mass L Rep 683, 2003 Mass Super LEXIS 27.

Inmate's possession of an exacto-type knife, while violating five rules, could not be the basis for redundant charges, and therefore, punishment that included two terms of 15-days in isolation was not permissible, under ALM GL c 127, § 140; because a declaratory action only provided a remedy for violations of rules and regulations that were consistently repeated, under ALM GL c 231A, § 2, the only remedy for disciplinary sanctions imposed in violation of the Department of Correction's regulations was in the nature of certiorari under ALM GL c 249, § 4. Moniz v Dep't of Corr. (2003, Super Ct) 16 Mass L Rep 12, 2003 Mass Super LEXIS 47.

FORMS
Complaint to Determine Rights with Respect to Administration of Trust or Estate [Title of Court and Cause]

Plaintiff alleges:

1. At all times herein mentioned plaintiff was, and now is, ----- [describe plaintiff's status as executor, administrator, trustee, guardian, or other fiduciary].

2. At all times herein mentioned defendants were, and now are, the ----- [describe relationships defendants hold toward the trust or estate, such as next of kin, legatees, or creditors] and other interested parties, and were, and now are, residents of the County of -----, Commonwealth of Massachusetts.

3. Plaintiff's rights, duties, and obligations with regard to the ----- [trust or estate] arise under and by virtue of a trust instrument dated -----, 19--. A copy of that instrument is attached hereto, marked Exhibit "---," and made a part hereof.

4. A dispute now exists between plaintiff and defendant ----- as to ----- [the interpretation of a part of such instrument or certain of plaintiff's rights and duties regarding his administration of the ----- (trust or estate)], and until such dispute is settled, plaintiff cannot properly proceed to perform his duties as such ----- [administrator].

5. The specific matter in dispute is as follows: ----- [describe dispute and state facts indicating whether judgment is sought to ascertain a class of creditors, devisees, legatees, heirs, next of kin, or others, to direct plaintiff to do or refrain from doing a particular act, or to determine a question arising in the administration of the trust or estate, such as on the construction of a will or other writing].

This action is brought under the Annotated Laws of Massachusetts Chapter 231A.

Wherefore, plaintiff prays:

1. For a judgment declaring the rights, duties, and legal relations of plaintiff and defendants with regard to ----- [specify matter in dispute] so that plaintiff can proceed with the administration of the ----- [trust or estate].

2. For costs herein, and

3. For such further relief as is proper.

Dated -----, 19--.

[Signature]

[Verification]

1 of 1 DOCUMENT

ANNOTATED LAWS OF MASSACHUSETTS
Copyright (c) 2002 Matthew Bender & Company, Inc.,
one of the LEXIS Publishing (TM) companies
All rights reserved

*** THIS DOCUMENT IS CURRENT THROUGH 2002 CH. 235, 7/31/02 ***

PART I.  ADMINISTRATION OF THE GOVERNMENT

TITLE VII. CITIES, TOWNS AND DISTRICTS

CHAPTER 40A.  ZONING

**GO TO MASSACHUSETTS CODE ARCHIVE DIRECTORY**

Mass. Ann. Laws ch. 40A, § 6 (2002)

§ 6. Prior Nonconforming Uses.

[1]  ***Except as hereinafter provided, a zoning ordinance or by-law shall not apply to*** structures or uses lawfully in existence or lawfully begun, or to a building or special permit issued before the first publication of notice of the public hearing on such ordinance or by-law required by section five, but shall apply to any change or substantial extension of such use, to a building or special permit issued after the first notice of said public hearing, to any reconstruction, extension or structural change of such structure and to any alteration of a structure begun after the first notice of said public hearing to provide for its use for a substantially different purpose or for the same purpose in a substantially different manner or to a substantially greater extent except where alteration, reconstruction, extension or structural change to a single or two-family residential structure does not increase the nonconforming nature of said structure. Pre-existing nonconforming structures or uses may be extended or altered, provided, that no such extension or alteration shall be permitted unless there is a finding by the permit granting authority or by the special permit granting authority designated by ordinance or by-law that such change, extension or alteration shall not be substantially more detrimental than the existing nonconforming use to the neighborhood. This section shall not apply to establishments which display live nudity for their patrons, as defined in section nine A, adult bookstores, adult motion picture theaters, adult paraphernalia shops, or adult video stores subject to the provisions of section nine A.

[2] A zoning ordinance or by-law shall provide that construction or operations under a building or special permit shall conform to any subsequent amendment of the ordinance or by-law unless the use or construction is commenced within a period of not more than six months after the issuance of the permit and in cases involving construction, unless such

construction is continued through to completion as continuously and expeditiously as is reasonable.

[3] A zoning ordinance or by-law may define and regulate nonconforming uses and structures abandoned or not used for a period of two years or more.

[4] Any increase in area, frontage, width, yard, or depth requirements of a zoning ordinance or by-law shall not apply to a lot for single and two-family residential use which at the time of recording or endorsement, whichever occurs sooner was not held in common ownership with any adjoining land, conformed to then existing requirements and had less than the proposed requirement but at least five thousand square feet of area and fifty feet of frontage. Any increase in area, frontage, width, yard or depth requirement of a zoning ordinance or by-law shall not apply for a period of five years from its effective date or for five years after January first, nineteen hundred and seventy-six, whichever is later, to a lot for single and two family residential use, provided the plan for such lot was recorded or endorsed and such lot was held in common ownership with an adjoining land and conformed to the existing zoning requirements as of January first, nineteen hundred and seventy-six, and had less area, frontage, width, yard or depth requirements than the newly effective zoning requirements but contained at least seven thousand five hundred square feet of area and seventy-five feet of frontage, and provided that said five year period does not commence prior to January first, nineteen hundred and seventy-six, and provided further that the provisions of this sentence shall not apply to more than three of such adjoining lots held in common ownership. The provisions of this paragraph shall not be construed to prohibit a lot being built upon, if at the time of the building, building upon such lot is not prohibited by the zoning ordinances or by-laws in effect in a city or town.

[5] If a definitive plan, or a preliminary plan followed within seven months by a definitive plan, is submitted to a planning board for approval under the subdivision control law, and written notice of such submission has been given to the city or town clerk before the effective date of ordinance or by-law, the land shown on such plan shall be governed by the applicable provisions of the zoning ordinance or by-law, if any, in effect at the time of the first such submission while such plan or plans are being processed under the subdivision control law, and, if such definitive plan or an amendment thereof is finally approved, for eight years from the date of the endorsement of such approval, except in the case where such plan was submitted or submitted and approved before January first, nineteen hundred and seventy-six, for seven years from the date of the endorsement of such approval. Whether such period is eight years or seven years, it shall be extended by a period equal to the time which a city or town imposes or has imposed upon it by a state, a federal agency or a court, a moratorium on construction, the issuance of permits or utility connections.

[6] When a plan referred to in section eighty-one P of chapter forty-one has been submitted to a planning board and written notice of such submission has been given to the city or town clerk, and use of the land shown on such plan shall be governed by applicable provisions of the zoning ordinance or by-law in effect at the time of the submission of such plan while such plan is being processed under the subdivision control law including the time required to pursue or await the determination of an appeal referred to in said section, and for a period of three years from the date of endorsement by the planning board that approval under the subdivision control law is not required, or words of similar import.

[7] Disapproval of a plan shall not serve to terminate any rights which shall have accrued under the provisions of this section, provided an appeal from the decision disapproving said plan is made under applicable provisions of law. Such appeal shall stay, pending either (1) the conclusion of voluntary mediation proceedings and the filing of a written agreement for judgment or stipulation of dismissal, or (2) the entry of an order or decree of a court of final jurisdiction, the applicability to land shown on said plan of the provisions of any zoning ordinance or by-law which became effective after the date of submission of the plan first submitted, together with time required to comply with any such agreement or with the terms of any order or decree of the court.

[8] In the event that any lot shown on a plan endorsed by the planning board is the subject matter of any appeal or any litigation, the exemptive provisions of this section shall be extended for a period equal to that from the date of filing of said appeal or the commencement of litigation, whichever is earlier, to the date of final disposition thereof, provided final adjudication is in favor of the owner of said lot.

[9] The record owner of the land shall have the right, at any time, by an instrument duly recorded in the registry of deeds for the district in which the land lies, to waive the provisions of this section, in which case the ordinance or by-law then or thereafter in effect shall apply. The submission of an amended plan or of a further subdivision of all or part of the land shall not constitute such a waiver, nor shall it have the effect of further extending the applicability of the ordinance or by-law that was extended by the original submission, but, if accompanied by the waiver described above, shall have the effect of extending, but only to extent aforesaid, the ordinance or by-law made then applicable by such waiver.

HISTORY: 1975, 808, § 3; 1977, 829, § 3D; 1979, 106; 1985, 494; 1986, 557, § 54 Amended by 1994, 60, § 67, approved July 10, 1994, by § 315, effective July 1, 1994; 1996, 345, § 1, approved Aug 9, 1996, effective Nov 7, 1996; 2000, 29, approved Feb 17, 2000, effective May 17, 2000; 2000, 232, approved, Aug 10, 2000, effective Nov 8, 2000

NOTES:

EDITORIAL NOTE--
   Section 7 of the inserting act provides as follows:

   Section 7. This act shall take effect on January first, nineteen hundred and seventy-six as to zoning ordinances and by-laws and amendments, other than zoning map amendments, adopted after said date.

   The 1977 amendment corrected the second paragraph, substituting "more" for "less".

   The 1979 amendment, in the fourth paragraph, inserted the second sentence relative to nonconforming uses where area, side yard, etc. restrictions are increased.

   The 1982 amendment, in the fifth paragraph, increased the time for which land shown on an approved definitive plan shall be governed by the applicable provisions of the zoning ordinance or bylaw from 5 years to 8 years from the date of the endorsement of such approval.

The 1985 amendment, in the fifth paragraph, added a sentence concerning moratoriums upon subdivision plans.

The 1986 amendment, in the sixth paragraph, inserted "in" following the first occurrence of "to".

The 1994 amendment, in the first paragraph, after "chapter ninety-three D", inserted "or to adult bookstores, adult motion picture theaters, adult paraphernalia shops, or adult video stores subject to the provisions of section nine A".

The 1996 amendment, in the first paragraph, following "adult" the first time it appears, inserted "establishments which display live nudity for their patrons, as defined in section nine A, adult".

The first 2000 amendment, (Ch. 29) in the third sentence of the first paragraph, following "This section shall not apply to" deleted "billboards, signs and other advertising devices subject to the provisions of sections twenty-nine through thirty-three, inclusive, of chapter ninety-three, and to chapter ninety-three D or to".

The second 2000 amendment, (Ch. 232) substituted the seventh paragraph for one which read: "Disapproval of a plan shall not serve to terminate any rights which shall have accrued under the provisions of this section, provided an appeal from the decision disapproving said plan is made under applicable provisions of the subdivision control law. Such appeal shall stay, pending an order or decree of a court of final jurisdiction, the applicability to land shown on said plan of the provisions of any zoning ordinance or by-law which became effective after the date of submission of the plan first submitted.".

Case 1:05-cv-10116-DPW    Document 24-15    Filed 12/27/2005    Page 1 of 6

Page 1

12 LCR 208, *; 2004 Mass. LCR LEXIS 44, **

LEXSEE

NORWELL-ARCH, LLC. V. EARL S. OPDYKE III, ABIGAIL R. CHILDS, AND G. BRIAN SHONTZ, AS MEMBERS OF THE NORWELL ZONING BOARD OF APPEALS

MISC. CASE NO. 285113

MASSACHUSETTS LAND COURT

12 LCR 208; 2004 MASS. LCR LEXIS 44

May 24, 2004, Decided

HEADNOTES: Nonconformity Finding-Grandfather Lot-Buildings in Existence at the Time of the Adoption of the Subdivision Control Law-Subsequent Addition

SYLLABUS: [**1] The Norwell Zoning Board could not simply deny a special permit to alter a nonconforming structure merely because the structure had been rendered nonconforming by an ANR division pursuant to § 81L but would have to determine whether the proposal would intensify existing nonconformities.

COUNSEL: Richard Serkey, Esq., Winokur Winokur Serkey & Rosenberg, P.C. for Plaintiff.

Robert E. Galvin, Esq., Galvin & Galvin, SP for Defendant.

JUDGES: Charles W. Trombly, Jr., Justice

OPINIONBY: TROMBLY, JR.

OPINION:

[*208] ORDER ALLOWING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND ORDER OF REMAND

On November 12, 2002, plaintiff Norwell-Arch, Inc. ("Norwell-Arch"), filed this case pursuant to G. L. c. 40A, § 17, appealing a decision of the Norwell Zoning Board of Appeals (the "ZBA") denying its application for a special permit under Sections 1420 and 1642 of the Norwell Zoning Bylaws which would allow it to construct an addition to a nonconforming single family dwelling. As permitted by G. L. c. 40A, § 17, the ZBA did not file an answer. Norwell-Arch then filed a request that the case be [**2] assigned for a pre-trial conference, which the court scheduled for September 29, 2003. At the conference, counsel discussed the case with the court (Trombly, J.) and concluded that the case could be decided upon the filing of motions for summary judgment. The motions, which had not yet been filed, were scheduled for argument on November 13, 2003.

On November 7, 2003, Norwell-Arch filed its motion for summary judgment, together with a memorandum in support, and

supporting exhibits and documentation. On November 10, 2003, the ZBA filed its cross-motion for summary judgment and memorandum in support. The court (Trombly, J.) held a hearing on November 13, 2003, at which the cross-motions were argued and taken under advisement.

I find the material facts to be substantially undisputed and to be as follows:

1. By deed dated September 27, 2000, and recorded at the Plymouth County Registry of Deeds n1 in Book 18915, Page 6, Norwell-Arch acquired a parcel of land containing two single family dwellings situated on the northerly side of Grove Street in Norwell. Both buildings had been in existence since before the Subdivision Control Law went into effect in Norwell in 1953. The [**3] parcel conveyed was shown as Lot 2 on a plan referred to in the deed, a copy of the plan is attached hereto as "Exhibit A."

n1 All references herein to recorded instruments or plans relate to items recorded at the Plymouth County Registry of Deeds.

2. The land which is the subject of this litigation is located in Residential District A and in the Norwell Aquifer Protection (Overlay) District which requires a minimum lot size of one acre pursuant to Section 2421 of the Norwell Zoning Bylaw.

[Paragraph 3 omitted in original.]

4. On January 7, 2002, the Norwell Planning Board endorsed as "Approval Not Required" a plan subdividing the aforementioned Lot 2 into two new lots, designated as Lot 3 and Lot 4 (the "ANR Plan"). The ANR Plan was entitled to endorsement pursuant to G. L. c. 41, § 81L, whereby a plan is entitled to endorsement if the planning board determines that two or more buildings were standing on the land being divided when the subdivision control law went [**4] into effect in that community, and each of the new lots holds one of those structures. A copy of the ANR Plan showing Lots 3 and 4 is attached hereto as "Exhibit B."

5. On April 22, 2002, Norwell-Arch conveyed Lot 3 as shown on the ANR Plan to Keith A. Hague and Angela A. Hague by deed recorded in Book 21943, Page 83. The ANR Plan was also recorded at that time, in Plan Book 45, Page 500. It appears that Lot 3 does not conform in some respects to the provisions of the Norwell Zoning Bylaw, but is not at issue in this case.

6. On September 17, 2002, Norwell-Arch submitted an application to the ZBA seeking a special permit pursuant to G. L. c. 40A, § 6, in order to construct an addition to the single family dwelling on Lot 4 as shown on the ANR Plan. This proposed addition, according to Norwell-Arch, would not increase the nonconforming nature of the dwelling and would comply with all applicable property line setback requirements. n2

n2 In March, 2002, Norwell-Arch submitted an application to the ZBA seeking permission to raze the existing building on Lot 4 and to replace it with a new building. This application was denied by the ZBA for several reasons and is the subject of an appeal by Norwell-Arch in Land Court Misc. Case No. 282462, which is still pending before this court.

Case 1:05-cv-10116-DPW    Document 24-15    Filed 12/27/2005    Page 3 of 6

Page 3

12 LCR 208, *; 2004 Mass. LCR LEXIS 44, **

[**5]

7. At the time Norwell-Arch's application was submitted, Lot 4 was already nonconforming in that it did not conform to the frontage requirement of the Norwell Zoning Bylaw, having only 50.81 feet of frontage, considerably less than the required 80 feet. Its width at the required setback line was also inadequate, being less than the required 150 feet. In addition, the existing house on Lot 4 was nonconforming with respect to its side setback line.

8. The ZBA conducted a public hearing on Norwell-Arch's application on October 16, 2002, after which it voted two to one to deny the application. The ZBA's decision was filed in the office of the Town Clerk on October 30, 2002. In its decision and at the [*209] hearing, the ZBA informed Norwell-Arch that its application should have sought a variance, rather than a special permit, because Lot 4 "was non-conforming as a result of ... [the] ... subdivision under 81L."

***

"Summary judgment is granted where there are no issues of genuine material fact, and the moving party is entitled to judgment as a matter of law." Ng Bros. Constr., Inc. v. Cranney, 436 Mass. 638, 643-644 (2002); Mass. R. Civ. [**6] P. 56(c). I find that there are no material facts at issue and that summary judgment is, therefore, appropriate in this matter.

Norwell-Arch averred in its application that it, as the owner of a nonconforming lot containing a nonconforming single family dwelling as a result of a plan endorsed under G. L. c. 41, § 81L, was entitled to a special permit finding under G. L. c. 40A, § 6, which would allow it to construct an addition that would not increase the nonconforming nature of the existing dwelling and would comply with all applicable property line setback requirements. For this position, Norwell-Arch relies on the second "except" clause of G. L. c. 40A, § 6 P 1, providing zoning protection for single and two-family residential structures. G. L. c. 40A, § 6 provides in pertinent part, that:

> except as hereinafter provided, a zoning ordinance or by-law shall not apply to structures ... lawfully in existence ... before the first publication of notice of the public hearing on such ordinance or by-law required by section five, but shall apply ... to any reconstruction, extension [**7] or structural change ... except where alteration, reconstruction, extension or structural change to a single or two-family residential structure does not increase the nonconforming nature of said structure. (emphasis added).

Norwell-Arch further relies on Section 1642 of the Norwell Zoning Bylaw which states, "as provided in G. L. c. 40A, s. 6, a nonconforming single- or two-family dwelling may be altered or extended provided that doing so does not increase the nonconforming nature of said structure."

The ZBA argues that Norwell-Arch is not entitled to any zoning protection under G. L. c. 40A, § 6, because Lot 4 is an unlawful nonconforming structure established by Norwell-Arch's own voluntary act pursuant to G. L. c. 41, § 81L. Neither Lot 3 nor Lot 4 as shown on the ANR Plan were in compliance with the Norwell Zoning Bylaw

in effect at the time the ANR Plan was endorsed. The ZBA, therefore, contends that Lot 4, lacking sufficient frontage and width, and having a structure thereon which is in violation of several set back and side yard requirements, is not a lawful nonconforming structure but rather an [**8] unlawful structure with no zoning protection afforded to it. Thus, it argues, Norwell-Arch must first seek and obtain a variance to bring the lot into zoning compliance before it may perform any alterations or changes outside of the existing footprint of the existing structure.

Norwell-Arch contends that it does not matter how Lot 4 and the dwelling thereon came into existence and became nonconforming, and that a nonconforming single family dwelling may be treated as lawfully nonconforming when the nonconformity was established voluntarily under G. L. c. 41, § 81L. See Goldhirsh v. McNear, 32 Mass. App. Ct. 455, 459 (1992) ("In applying the second 'except' clause of Section 6 and the by-law to the present structure, the appropriate focus is not how or when the nonconforming building came to be used as a single-family dwelling. Rather, the question is whether the proposed changes to the nonconforming residential structure will increase its nonconforming nature."); Serieka v. Town of Winchester Bd. of Zoning Appeals, 1 LCR 91, 92 (1993) (Misc. Case No. 183095) ("A nonconforming single or two-family structure [**9] is not disqualified from being treated as lawfully nonconforming under G. L. c. 40A, s. 6 even if the nonconformity was established by a variance").

Clearly, the General Court intended to provide special protection for residential structures in existence before the adoption of the subdivision control law in each locality when it added the two building exception to G. L. c. 41, 81L, in 1953. Citgo Petroleum Corp. v. Planning Bd. of Braintree, 24 Mass. App. Ct. 425, 427 (1987); G. L. c. 41, § 81L (excepting from the subdivision control law the "division of a tract of land on which two or more buildings were standing when the subdivision control law went into effect in the city or town in which land lies into separate lots on each of which one of such buildings remains standing"). Similarly, single and two-family residential structures enjoy preferential zoning treatment under the second "except" clause of G. L. c. 40A, § 6. The second "except" clause of G. L. c. 40A, § 6, provides residential structures preferential zoning treatment when the proposed changes [**10] to a nonconforming residential structure will not increase its nonconforming nature. Goldhirsh, 32 Mass. App. Ct. at 458-461 (discussing board of appeal's review of nonconforming structures under G. L. c. 40A, § 6). To fully protect single and two-family residential structures, G. L. c. 41, § 81L, and c. 40A, § 6, must be read together. The Special Permit Granting Authority, in this case the ZBA, cannot merely deny the request on the grounds that the structure is nonconforming as a result of a G. L. c. 41, 81L endorsement, without first determining "whether the proposed changes to the nonconforming residential structure will increase its nonconforming nature." Id. at 459. By skipping this review, the ZBA effectively negated G. L. c. 40A, § 6, rendering it meaningless in this context. The initial question under the second "except" clause does not guarantee a nonconforming residential structure zoning protection, but it does guarantee that the local board will at least make a determination as to whether the proposed change to the

12 LCR 208, *; 2004 Mass. LCR LEXIS 44, **

nonconforming residential [**11] structure will increase its nonconforming nature. n3

> n3 The Special Permit Granting Authority still retains discretionary authority to deny a permit provided such denial is not based on legally untenable or arbitrary and capricious grounds. Davis v. Zoning Bd. of Chatham, 52 Mass. App. Ct. 349, 355 (2001). Moreover, a "local board of appeals brings to the matter an intimate understanding of the immediate circumstances, of local conditions, and of the background and purposes of the entire by-law ..." Fitzsimonds, 21 Mass. App. Ct. at 57.

As set forth in Willard v. Bd. of Appeals of Orleans, 25 Mass. App. Ct. 15, 21-22 (1987), the Appeals Court held that an application for changes to a nonconforming residential structure [*210] "requires a board of appeals to identify the particular respect or respects in which the existing structure does not conform to the requirements of the present by-law and then determine whether the proposed alteration [**12] or addition would intensify the existing nonconformities or result in additional ones." If the board answers this initial question in the negative, finding that there will be no intensification or addition, the applicant is entitled to a special permit under the second "except" clause of G. L. c. 40A, § 6, and any implementing by-law. If the conclusion is otherwise, the applicant will then be required to show that the proposed change will not be "substantially more detrimental than the existing nonconforming structure or use to the neighborhood." Id. at 21; Fitzsimonds v.

Bd. of Appeals of Chatham, 21 Mass. App. Ct. 53, 56-57 (1985); G. L. c. 40A, § 6.

Such a result is entirely consistent with the well settled rule that just because a lot can be divided under G. L. c. 41, § 81 L, does not mean that the resulting lot will be buildable under the zoning ordinance. Smalley v. Planning Bd. of Harwich, 10 Mass. App. Ct. 599, 603 (1980). See also Bisson v. Planning Bd. of Dover, 43 Mass. App. Ct. 504, 506 (1997) (planning board's review [**13] of ANR plan confined to determining whether plan shows a subdivision). What a local board cannot do, however, as the ZBA did in the instant case, is deny an applicant a G. L. c. 40A, § 6 finding without conducting the proper zoning review. Fitzsimonds, 21 Mass. App. Ct. at 56 ("the board should first have considered whether the alteration fit the 'except' clause and, if the answer was no, gone on to the question of 'detriment'"). In the instant case, the ZBA made no determination as to whether the proposed changes to the nonconforming residential structure on Lot 4 would increase its nonconforming nature.

Based upon the foregoing, it is hereby

ORDERED and ADJUDGED that Norwell-Arch's motion for summary judgment is ALLOWED, and the ZBA's cross-motion for summary judgment is DENIED; it is further

ORDERED and ADJUDGED that the decision of the ZBA denying Norwell-Arch a special permit finding was in excess of its authority and is annulled; and it is further

ORDERED and ADJUDGED that the matter be remanded to the ZBA for further proceedings consistent with this order; and it is further

12 LCR 208, *; 2004 Mass. LCR LEXIS 44, **

ORDERED and ADJUDGED that the ZBA shall, [**14] within sixty (60) days following the date of this decision, conduct a public hearing in this matter and shall render and file its decision with the Norwell Town Clerk within thirty (30) days thereafter; notice of such hearing shall be given pursuant to G. L. c. 40A, § 11 and c. 39, § 23B, and such hearing, and the decision issued pursuant thereto, shall conform to the requirements of G. L. c. 40A, § 15; and it is further;

ORDERED and ADJUDGED that this court shall retain jurisdiction for purposes of any necessary review of the board's further proceedings.

So ordered.

[SEE "EXHIBIT A" IN ORIGINAL]

[SEE "EXHIBIT B" IN ORIGINAL]

Case No:     Miscellaneous Case No. 174671
Date:     July 6, 1992
Parties:     James W. Shkliew And John P. Bannon Vs. Kenneth Sheehan,
John Fyfe, Robert Burnstein, Shirley Allard, And Alan Flazarano As They
Are The Board Of Appeals Of Salisbury, And The Town Of Salisbury
Decision Type: Decision And Judgment

This matter has been submitted to the Court on an agreed
statement of facts as to Count II of the Complaint, which Count
seeks a determination under G.L. c. 240, s.14A as to the validity
and application of the Salisbury Zoning By-Law to a certain parcel
of land described below. The parties agree that if Plaintiff
prevails on Count II, Count I of the Complaint will become moot and
may be dismissed.

In reviewing the agreed statement of facts, I find that there
are no material facts in dispute and that, accordingly, this matter
is ripe for summary judgment under Mass. Rules Civ. Pro. R. 56.
Community National Bank v. Dawes, 369 Mass. 550 (1976). I find the
following facts to be pertinent.

1. Plaintiffs are the owners of land and buildings located at 356 Old Elm
Street, Salisbury ("Locus") as more particularly shown on an "approval not
required" plan recorded with Essex South District Deeds in Plan Book 260,
Plan 33 ("the Plan"). The Plan divides Locus, an undersized non-
conforming lot, into two smaller lots.

2. Locus is located partially in a Commercial II Zone and partially in a
Medium Density Residential Zone. As the Plan shows, Locus has been
divided into two lots. Lot 1 is in the Commercial II Zone; Lot II is for the
most part in the Medium Density Residential Zone. The minimum lot size
in both zones is one acre. Lot 1 contains 11,710± square feet; Lot 2 contains
17,999± square feet.

3. The buildings on Locus were in existence prior to the Subdivision
Control Law going into effect in Salisbury. The division of Locus, as shown
on the Plan leaves one building on each lot.

4. Certain commercial uses as well as residential uses are allowed in a
Commercial II Zone. Such uses require a frontage of 150 feet and an area
of one acre.

5. Certain residential uses are allowed in a Medium Density Residential
Zone. Such uses require 150 feet of frontage and an area of one acre.

6. Locus has not been held in common ownership with any abutting
land at least since just prior to the adoption of zoning. It is non-
conforming even without the subdivision inasmuch as it is less than one
acre and has less than 150 feet of frontage.

7. The "ANR" endorsement referred to in Finding Number 1 above bears
the further notation:

Planning Board Endorsement of this plan is not intended to imply that
Lot 1 and Lot 2 comply with current Salisbury  Zoning By-Law
requirements with respect to minimum frontage  and lot size.

8. The Building Inspector has required that a variance be obtained for frontage and lot size to allow the subdivision of the pre-existing lot into the new non-conforming lots. Plaintiff's application for such variance has been denied.

In consideration of the foregoing Defendant's Motion for Summary Judgment is denied; summary judgment is allowed in favor of Plaintiff.

The controlling case in this instance is Citgo Petroleum Corporation, et al v. Planning Board of Braintree, 24 Mass. App Ct. 425 (1978), where lots similarly divided were held not to be a subdivision. The only difference between the instant case and Citgo appears to be that while the lots in Citgo contained ample size, there was inadequate frontage (in fact there was none), whereas here the lots have both inadequate size and frontage. This appears to be a difference without a distinction. Were size a requirement, the pertinent provision of G.L. c. 41, s.81L would be a surplusage to paraphrase Citgo.

While it is not clear from the documents what, if any, use is being made of the "commercial building" on lot 2, it would appear that the building may be used for any permitted use in the governing zoning district as may the building on Lot 1. As Defendants point out, the division of lots in circumstances such as this does not necessarily mean the lots are buildable under the zoning by-law, Smalley v. Planning Board at Harwich, 10 Mass. App. Ct. 599, 603 (1980) and indeed in this instance they appear not to be, Plaintiff does not seek a building permit, only an apparently permitted use. Should Plaintiff seek to enlarge or structurally expand the structures, a zoning adjustment may well be required.  To find that buildings on lots as divided may remain, but without any allowed use would also render the 81L phrase meaningless.

Accordingly it is ADJUDGED AND ORDERED that either or both of the lots shown on the said plan may be conveyed; and it is further ADJUDGED AND ORDERED that the dimensional requirements of the Salisbury Zoning By-Law do not apply to the said lots or building thereon insofar as the buildings presently exist and as set forth in this decision.

Count I of the Complaint is dismissed by agreement of the parties.

By the Court

Judge:     Robert V. Cauchon
Chief Justice

Attest:

Charles W. Trombly, Jr.

Recorder

End Of Decision

*County:*   BRISTOL, SS.
*Case No:*   MISCELLANEOUS CASE No. 180789
*Date:*   December 10, 1996
*Parties:*   RAYMOND LISTON, EDWIN BUSHELL AND BARBARA CROWE
BUSHELL, vs. BOARD OF APPEALS FOR THE TOWN OF DARTMOUTH
JOSEPH COSENTINO, RAYMOND SOUZA, JOHN DELUCCA, WILLIAM
WHIPP, JOSEPH BARBERO, JR. AND JOSE ABREU AS THEY ARE AND
CONSTITUTE THE BOARD OF APPEALS FOR THE TOWN OF DARTMOUTH
*Decision Type:* ORDER GRANTING THE PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

In this complaint brought pursuant to General Laws, c. 231A, s.1 the plaintiffs,
Raymond Liston, Edwin Bushell and Barbara Crowe Bushell. seek a declaration
that the restrictions set forth in a Variance ranted to their predecessor in title.
Emily Fay, by the defendant, Board of Appeals for the Town of Dartmouth, dated
Decemher 11, 1980 and recorded in the Bristol County (S.D.) Registry of Deeds in
Book 1816, Page 105 are null and void and therefore unenenforceable. The
plaintiffs rely on the provisions of G.L. c. 41 s.81L that the division of the Fay
property into six separate lots. each with an existing structure which was
standing when subdivision went into effect in Dartmouth, did not constitute  a
subdivision and is permitted without a variance; they further argue that the
variance was needlessly granted and so a nullity.

The defendant Board answered but did not file a brief in opposition. A motion for
summary judgment by the plaintiffs was argued on December 2, 1993; the
defendant Board did not participate.  In reviewing this matter I find that there
are no material facts in dispute and that, accordingly, this matter is ripe for
summary judgment under Mass. Rules Civ. Pro. R. 56. I find the following facts to
be pertinent.

   Six cottages had been built in the late 1800's or early 1900's on a tract of land
off Gulf Road, South Dartmouth, Massachusetts. Subdivision Control was
adopted by the Town of Dartmouth on April 7, 1953. In 1980, Emily C. Fay, the
predecessor in title to the plaintiffs sought to divide the tract of land into six
separate lots. Each lot would contain a cottage. A variance was required by the
Town of Dartmouth; said variance was granted on December 11, 1980 (the "Fay
Variance"). The Fay Variance also imposed several use restrictions.

   In consideration of the foregoing, the Plaintiffs Motion for Summary
Judgment is allowed.

   It is well established that the division of a tract of land on which two or more
buildings were standing when the subdivision control law went into effect in the
town into separate lots on each of which one such building remains standing is
not considered a subdivision. General Laws Chapter 41 s.81L; Citgo Petroleum
Corp v. Planning Board of Braintree, 24 Mass. App. Ct. 425, 426 (1978). While
the division of lots in circumstances such as this does not necessarily mean that

the lots are buildable under the zoning by-law Smalley v. Planning Board of Harwich, 10 Mass.App.Ct, 599, 603 (1980), the plaintiffs do not seek a building permit but rather an apparently permitted use. Should the Plaintiffs seek to enlarge or structurally expand the structures, a zoning adjustment may well be required.

In light of the foregoing, the Fay Variance was needlessly granted and so is hereby declared null and void. See Goldhisch v. Goddard, et al, Land Court Misc. #131417 (December 13, 1989).

   Judgment accordingly.

*Judge:*    ROBERT V. CAUCHON
CHIEF JUSTICE


End Of Decision

*Parties:*    RAYMOND LISTON, EDWEN BUSHEEE AND BARBARA CROWE BUSHEEL, vs BOARD OF APPEALS FOR THE TOWN OF DARTMOUTH AND JOSEPH COSENTINO, RAYMOND SOUZA, JOHN DELUCCA, WILLIAM WHIPP, JOSEPH BARBERO, JR. AND JOSE ABREU AS THEY ARE AND CONSTITUTE THE BOARD OE APPEALS FOR THE TOWN OF DARTMOUTH, *Decision Type:* DEFENDANTS

This cause came to he heard on Plaintiffs' Motion for Summary Judyment on December 2, 1993 and was argued by counsel and there appearing no opposition, upon consideration thereof, it is

   ADJUDGED AND ORDERED that the division of the property formerly owned by Emily C. Fay off of Gulf Road, South Dartmouth, Massachusetts into six separate lots, each with an existing structure, was not a subdivision within the meaning of the Subdivision Control Law, but was a permissible division of property pursuant to G.L. c. 41 s.81L; and it is

   FURTHER ADJUDGED AND ORDERED that the variance granted to said Emily C. Fay by the Defendant Board of Appeals for the Town of Dartmouth dated December 11, 1980 and recorded in the Bristol County (S.D.) Registry of Deeds in Book 1816 Page 105 (the "Fay Variance") was unnecessary and needlessly granted and so is invalid and unenforceable; and it is

   FURTHER ADJUDGED AND ORDERED that the restrictions set forth in the Fay Variance are null and void, and so unenforceable; and it is

   FURTHER ADJUDGED AND ORDERED that the structures existing on the separate lots are "non-conforming structures" as that term is defined by G.L. c.

40A, s.6, and as such enjoy the rights and protections afforded non-conforming structures; as it is

FURTHER ADJUDGED AND ORDERED that an attested copy of this Judgment and the accompanying Order be recorded in the Bristol County (S.D.) Registry of Deeds.

By the Court.

*Judge:*    Robert V. Cauchon
Chief Justice

41 Mass. App. Ct. 165, *; 669 N.E.2d 446, **;
1996 Mass. App. LEXIS 778, ***

LEXSEE

**DIAL AWAY CO., INC. vs. ZONING BOARD OF APPEALS OF AUBURN.**

**No. 94-P-2095.**

**APPEALS COURT OF MASSACHUSETTS**

**41 Mass. App. Ct. 165; 669 N.E.2d 446; 1996 Mass. App. LEXIS 778**

**January 12, 1996, Argued**
**August 21, 1996, Decided**

**PRIOR HISTORY:** [***1]

Worcester. Civil action commenced in the Superior Court Department on January 18, 1994. The case was heard by Elizabeth Butler, J., on motions for summary judgment.

**DISPOSITION:**

Judgment reversed and case remanded to Superior Court for entry of judgment affirming decision of board of appeals.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:**

The case was submitted on briefs.

Edward P. Healy, Town Counsel, for the defendant.

Richard T. Tucker for the plaintiff.

**JUDGES:** Present: Dreben, Greenberg, & Flannery, JJ.

**OPINIONBY:** DREBEN

**OPINION:** [*165]

[**446]    DREBEN, J. The question before us is whether, under the Auburn zoning by-law, an undersized lot retains its protected character as a buildable lot twenty-three years after a nonconforming dwelling on the lot was razed. The building inspector of the town and the defendant board of appeals said no. On the plaintiff's appeal, pursuant to G. L. c. 40A, § 17, a judge of the Superior Court, on cross motions for summary judgment, ordered the defendants to issue a building permit and annulled the decision of the board of appeals denying the plaintiff a permit. We reverse.

Many of the facts are not in dispute. In 1969, the plaintiff purchased [***2] a 5,023 square foot parcel of land containing a dwelling and a garage. These structures were lawfully built [*166] before 1947

41 Mass. App. Ct. 165, *; 669 N.E.2d 446, **;
1996 Mass. App. LEXIS 778, ***

(that is, they conformed to the then applicable law) when the town of Auburn amended its zoning by-law to require in residential districts a minimum lot size of 7,500 square feet. Prior to the plaintiff's purchase of the lot, its predecessor in title [**447] had requested a permit to raze the dwelling, n1 and, shortly after buying the property, the plaintiff had the dwelling demolished. Twenty-one years later, it obtained a permit to demolish the garage, and that structure was razed in 1990.

> n1 In its affidavit in support of its motion for summary judgment, the plaintiff averred that the building had been destroyed by a truck.

By 1993, the zoning by-law had been further amended, this time to require a minimum lot size of 10,000 square feet. The plaintiff sought a building permit to erect a single-family house on its 5,023 square foot lot, a request the building inspector denied. Thereupon, the plaintiff [***3] appealed to the zoning board of appeals and also applied for a variance. n2 Noting that the lot contained only fifty percent of the now required square footage, the board affirmed the decision of the building inspector, ruling that the buildings were "abandoned" no later than 1990, and, therefore, their "grandfathered" nonconforming status ceased two years later in 1992. The board presumably relied on § 8.2.4.2 of the zoning by-law which is set out in the margin. n3 The entire text of art. 8 of the by-law and the first four paragraphs of G. L. c. 40A, § 6, as in effect prior to St. 1994, c. 60, § 67, are reproduced in an appendix to this opinion.

> n2 The plaintiff did not cross appeal from the denial of the variance by the board.

> n3 "8.2 Nonconforming Uses
>
> . . .
>
> 8.2.4    Abandonment-A nonconforming use which is abandoned shall not be resumed. A conforming [sic] use shall be considered abandoned:
>
> . . .
>
> 8.2.4.2.    When a nonconforming use is discontinued for a period of two years or more . . . ."

[***4]

The motion judge disagreed, ruling that § 8.1 of the zoning [*167] by-law and G. L. c. 40A, § 6, par. 4, n4 were the governing provisions and that they permit Dial Away to use the lot for a single-family residence despite its noncompliance with the current by-law, which requires an area of 10,000 square feet and 100 feet of frontage; the lot also is deficient in frontage, having 82.9 feet. In relevant part, § 8.1 of the by-law provides:

> "8.1 Nonconforming Lots - Any lot which complied with the minimum area, frontage, and lot width requirements, if any, in effect at the time the boundaries of the lot were defined by recorded deed or plan may be built upon or used for single-family residential use, notwithstanding the adoption of new or increased lot

area; frontage or lot width requirements, provided that:

. . .

8.1.2. The lot had at least 5,000 square feet of area and 50 feet of frontage at the time the boundaries of the lot were defined . . . ."

n4 The judge noted that it was unnecessary to determine if Dial Away complied with every requirement of c. 40A, § 6, par. 4, since, unlike other sections of the by-law, § 8.1 did not state that the requirements of § 6 "shall apply."

[***5]

Ruling that Dial Away's proposal for the single-family dwelling submitted to the building inspector and the board conformed to the conditions of §§ 8.1.1, 8.1.2, and 8.1.3, the judge held that, because the lot complied with the zoning requirements in 1944, when the property was deeded to the previous owners, § 8.1 "permits Dial Away to use the lot for a single-family residence despite current zoning by-laws . . . ."

1. Applicability of G. L. c. 40A, § 6, par. 1, rather than par. 4 inapplicability of § 8.1 of the by-law. An analysis of art. 8 of the zoning by-law and of c. 40A, § 6, leads us to conclude that the judge was wrong in ruling that § 8.1 of the by-law and § 6, par. 4, of G. L. c. 40A are the applicable provisions, and that the board is correct that c. 40A, § 6, par. 1, is the controlling statute.

The first sentence of G. L. c. 40A, § 6, par. 4, reads as follows:

[*168]

"Any increase in area, frontage, width, yard, or depth requirements of a zoning ordinance or by-law shall not apply to a lot for single and two-family residential use which at the time of recording or endorsement, whichever occurs sooner was not held in common ownership with any adjoining land, [***6] conformed to then existing requirements and had less than the proposed [**448] requirement but at least five thousand square feet of area and fifty feet of frontage."

In Willard v. Board of Appeals of Orleans, 25 Mass. App. Ct. 15, 514 N.E.2d 369 (1987), this court was also faced with the question whether the case was governed by the first or by the fourth paragraph of G. L. c. 40A, § 6. In holding that the first paragraph and not the fourth governed the construction of an addition to the nonconforming residence belonging to the plaintiff in that case, we indicated that par. 4 applies only to vacant land, pointing out that its "immediate statutory ancestor," G. L. c. 40A, § 5A, as in effect prior to St. 1975, c. 808, § 3 (a provision which did not differ materially from par. 4), "applied to original construction on vacant lots but not to alterations of existing structures which had become nonconforming, such as the one involved in this [Willard's] case." Id. at 18. Similarly, here, we consider that par. 4 of c. 40A, § 6, while applying to some construction on vacant lots, does not apply to "reconstruction" of a single or two-family residential structure. Such reconstruction, as was the [***7] alteration to a single or two-family structure in Willard, is explicitly governed by the second "except" clause of par. 1 of § 6. Id. at 18-19.

41 Mass. App. Ct. 165, *; 669 N.E.2d 446, **;
1996 Mass. App. LEXIS 778, ***

The first paragraph of c. 40A, § 6, is set forth in the margin, and the second "except" clause is italicized. n5 Paragraph 1, but not par. 4, addresses reconstruction. See [*169] Planning Bd. of Reading v. Board of Appeals of Reading, 333 Mass. 657, 661, 132 N.E.2d 386 (1956) (demolition of existing buildings and erection of a new building for the same nonconforming use not permitted where by-law contained words "alteration" and "extension" but not "reconstruction"). Cf. Angus v. Miller, 5 Mass. App. Ct. 470, 473, 363 N.E.2d 1349 (1977) (stress on word "rebuilt" in one part of by-law contrasted with word "enlarged" to preclude board of appeals under latter term to grant a permit for the voluntary razing of existing buildings and the construction of entirely new nonconforming buildings in their place). n6, n7

n5 Paragraph 1 of G. L. c. 40A, § 6, in relevant part provides: "Except as hereinafter provided, a zoning ordinance or by-law shall not apply to structures or uses lawfully in existence or lawfully begun, or to a building or special permit issued before the first publication of notice of the public hearing on such ordinance or by-law required by section five, but shall apply to any change or substantial extension of such use, to a building or special permit issued after the first notice of said public hearing, to any reconstruction, extension or structural change of such structure and to any alteration of a structure begun after the first notice of said public hearing to provide for its use for a substantially different purpose or for the same purpose in a substantially different manner or to a substantially greater extent except where alteration, reconstruction, extension or structural change to a single or two-family residential structure does not increase the nonconforming nature of said structure. . ." (emphasis supplied). [***8]

n6 We also find some support for this construction in 1972 House Doc. No. 5009, Report of the Department of Community Affairs Relative to Proposed Changes and Additions to the Zoning Enabling Act, at 36-37, where § 5A is referred to as applying to "undeveloped lots" that is "to lots on which construction has not yet commenced and/or no building permit has been issued at the time the ordinance or by-law is amended in such a way to create the potential of illegality through the imposition of more restrictive dimensional (and in some cases 'use') regulations."

n7 Our interpretation of G. L. c. 40A, § 6, par. 4, does not mean that the paragraph applies only to original construction. In Adamowicz v. Ipswich, 395 Mass. 757, 764, 481 N.E.2d 1368 (1985), the court held that "compliance of a lot with the common ownership requirement [in § 6, par. 4] is determined by looking at the most recent instrument of record prior to the effective date of the zoning change from which the exemption is sought." If a buyer bought vacant land (even if a building thereon had been previously demolished) and the by-law at the time of purchase permitted building on that lot, it would seem that the lot would have protection from a subsequent zoning change. The

Case 1:05-cv-10116-DPW    Document 24-22    Filed 12/27/2005    Page 5 of 10

Page 5

41 Mass. App. Ct. 165, *; 669 N.E.2d 446, **;
1996 Mass. App. LEXIS 778, ***

plaintiff, however, is not protected by this interpretation of par. 4 because, at the time of its purchase, the minimum lot size requirement was 7,500 feet.

[***9]

An analysis of the Auburn by-law leads to the conclusion that § 8.1 also is not applicable here. Article 8 is the parallel to c. 40A, § 6, and is divided into three parts. Section 8.1, discussed earlier, relates to nonconforming lots and is the analog to par. 4 of § 6, c. 40A. Section 8.2 concerns nonconforming uses; and provides that such uses cannot be resumed if discontinued for a period of two years or more, see note 3, supra, and § 8.3 treats nonconforming structures. Section [**449] 8.3.1 states that the requirements of c. 40A, § 6, shall apply. Section 8.3.2 relates to changing a nonconforming structure and allows such structures to be altered, reconstructed, [*170] extended, or structurally changed, provided that such alteration, reconstruction, extension, or structural change conforms to all the dimensional requirements of the by-law. Section 8.3.3 precludes rebuilding or reconstruction without a special permit if a nonconforming structure is damaged to an extent greater than fifty percent of its fair market value before it was damaged, unless reconstruction is completed within two years.

Sections 8.2 and 8.3 evidence a legislative disfavor of nonconformities and [***10] an intent to eliminate them where possible. In the context of these provisions, it would be anomalous indeed to construe § 8.1 to allow in perpetuity the rebuilding and demolition of dwellings on the plaintiff's undersized lot because of the happenstance that in 1944 a house was built that conformed to the then existing by-law.

"Considering the eventual elimination of nonconforming uses as an objective underlying zoning regulations," Dowling v. Board of Health of Chilmark, 28 Mass. App. Ct. 547, 551, 552 N.E.2d 866 (1990) (discussing c. 40A, § 6, par 4), citing Strazzulla v. Building Inspector of Wellesley, 357 Mass. 694, 697, 260 N.E.2d 163 (1970), cert. denied, 400 U.S. 1004, 27 L. Ed. 2d 618, 91 S. Ct. 568 (1971), and, in particular, that of Auburn's, we interpret § 8.1 to apply only to original construction. n8

> n8 Our interpretation of § 8.1 to apply only to original construction differs from our construction of par. 4, of § 6 of c. 40A, see note 7, supra, because the language of the by-law does not permit the construction put on the timing of the "recording" by Adamowicz v. Ipswich, 395 Mass. at 764. Paragraph 4, of course, would control. Planning Bd. of Reading v. Board of Appeals of Reading, 333 Mass. at 660.

[***11]

2. Application of G. L. c. 40A, § 6, par. 1, to reconstruction of single and two-family residences. Having decided that neither par. 4 of G. L. c. 40A, § 6, nor § 8.1 of the Auburn by-law supports the construction of a house in replacement for one torn down, we turn to the governing provision, par. 1 of § 6 of c. 40A, see note 5 supra. That paragraph, in the second except clause, gives special status to nonconforming single and two-family residences and allows them to be rebuilt despite changes in the zoning bylaws. Goldhirsh v. McNear, 32 Mass. App. Ct. 455, 460, 590 N.E.2d 709 (1992). For these buildings, "alteration, reconstruction, extension or structural change" is

41 Mass. App. Ct. 165, *; 669 N.E.2d 446, **;
1996 Mass. App. LEXIS 778, ***

permitted despite a change in the zoning by-law if such activity "does not increase the nonconforming nature of said [*171] structure." If not for this provision, § 8.3.3 of the by-law would probably apply.

3. Abandonment. The board, as indicated earlier, determined that the plaintiff's nonconformity had been abandoned. Although c. 40A, § 6, and art. 8 of the by-law to some degree protect nonconformities, both provide that nonconformities may be deemed abandoned in certain situations. Thus, G. L. c. 40A, § [***12] 6, par. 3, provides:

"A zoning ordinance or by-law may define and regulate nonconforming uses and structures abandoned or not used for a period of two years or more."

Nothing in par. 3 suggests that it does not apply to single and two-family residences; and we assume it is applicable to such dwellings. As we have seen, § 8.2.4.2, see note 3, supra, provides for abandonment of discontinued uses, and § 8.3 limits the rebuilding of nonconforming structures to two years without a special permit.

Neither § 6, par. 3, of c. 40A nor § 8.2 of the by-law specifically refer to abandonment of the right to rebuild on a nonconforming lot. Nevertheless, it is apparent that, when a building is totally demolished, the use to which it was put is necessarily discontinued. Although construction of § 8.2.4.2 to apply here would promote the policy of the by-law as a whole, our cases seem to distinguish between nonconforming uses and structures. n9 Cf. Willard v. Board of Appeals of Orleans, 25 Mass. App. Ct. at 20; Goldhirsh [**450] v. McNear, 32 Mass. App. Ct. at 456; Watros v. Greater Lynn Mental Health & Retardation Assoc.,

37 Mass. App. Ct. 657, 658, 642 N.E.2d 599 (1994), [***13] S.C., 421 Mass. 106, 653 N.E.2d 589 (1995). Moreover, since there is a distinction in art. 8 among nonconforming lots, uses, and structures, we are not persuaded that the two-year abandonment of use provision may be directly applied to the failure to rebuild on an undersized lot.

n9 The term "nonconforming use" is sometimes used generically to cover all nonconformities. See 1972 House Document No. 5009, at 35. Also cf. Williams, 4A American Planning Law c. 117, at 283-89 (1986).

Abandonment, however, may be found apart from ordinance. An affidavit of the president of Dial Away states that the dwelling had been destroyed by accident when a truck ran into it and that the building was' removed as it "was [*172] dangerous, uninhabitable and an eye sore." He also stated that he always intended to construct a single-family residence. The judge noted that "there is nothing in the record to contradict the assertions of Dial Away's sole owner and president . . . that he had always intended to build another single-family residence on the lot [***14] but that he decided to forestall construction until sewers were installed." The president's affidavit, however, acknowledged that sewers were constructed in the early 1980s, thus weakening his avowals.

"To constitute an abandonment [other than where defined by ordinance], the discontinuance of a nonconforming use [structure or lot] must result from 'the concurrence of two factors, (1) the intent to abandon and (2) voluntary conduct, whether affirmative or negative, which

41 Mass. App. Ct. 165, *; 669 N.E.2d 446, **;
1996 Mass. App. LEXIS 778, ***

carries the implication of abandonment.'" Derby Ref. Co. v. Chelsea, 407 Mass. 703, 708, 555 N.E.2d 534 (1990). The voluntary demolition of a building constitutes abandonment, Berliner v. Feldman, 363 Mass. 767, 772, 298 N.E.2d 153 (1973), but "mere nonuse or sale of property does not, by itself, constitute an abandonment." Derby, supra at 709. An involuntary demolition may permit the owner to rebuild under certain circumstances: See Berliner, supra at 772 & n.5.

The record before us does not sufficiently explain the nature of the 1969 demolition to enable us to determine whether the plaintiff was entitled to rebuild within a reasonable time. Ibid. Nevertheless, we consider this a case where the lapse of time following [***15] the demolition -- twenty-three years -- is so significant that abandonment exists as matter of law. Here, the "evidence of things done or not done . . . carries the implication of abandonment . . . [and] supports a finding of intent, whatever the avowed state of mind of the owner. . . ." Dobbs v. Board of Appeals of Northampton, 339 Mass. 684, 686-687, 162 N.E.2d 32 (1959). See Mioduszewski v. Saugus, 337 Mass. 140, 145, 148 N.E.2d 655 (1958) (four-year cessation "may well have fatally interrupted" nonconforming use). See also Attorney Gen. v. Johnson, 355 S.W.2d 305, 308 (Ky. 1962) (five-year period of nonuse); Holloway Ready Mix Co. v. Monfort, 474 S.W.2d 80, 83 (Ky. 1971) ("10-year period of nonuse as a quarry was sufficient to show an intention to abandon that use").

The judgment is reversed, and the case is remanded to the Superior Court for the entry of judgment affirming the decision of the board of appeals.

So ordered. [*173]

APPENDIX

Article 8 of the town of Auburn zoning by-law as in effect in 1993:

"8.1 Nonconforming Lots - Any lot which complied with the minimum area, frontage, and lot width requirements, if any, in effect at the time the boundaries of [***16] the lot were defined by recorded deed or plan may be built upon or used for single-family residential use, notwithstanding the adoption of new or increased lot area, frontage or lot width requirements, provided that:

8.1.1 At the time of the adoption of such new or increased requirements or while building oh such lot was otherwise permitted, whichever occurs later, such lot was held, and has continued to be held, in ownership separate from that of adjoining land; and

8.1.2 The lot had at least 5,000 square feet of area and 50 feet of frontage at the time the boundaries of the lot were defined; and

[**451] 8.1.3 Any proposed structure is situated on the lot so as to conform with the minimum yard requirements, if any, in effect at the time the boundaries of such lot were defined. In the case where no minimum yard requirements were in effect at the time the boundaries of such lot were defined, the minimum front yard shall be 20 feet and the minimum side and rear yards shall be 10 feet.

"8.2 Nonconforming Uses

41 Mass. App. Ct. 165, *; 669 N.E.2d 446, **;
1996 Mass. App. LEXIS 778, ***

8.2.1 Continuing of Existing Use - The requirements of Section 6 of 'The Zoning Act', Chapter 40A of the General Laws, as amended, shall apply.

8.2.2 [***17] Changing a Nonconforming Use - A nonconforming use may be changed to another nonconforming use by special permit from the Board of Appeals provided the Board of Appeals finds that the proposed use is more or equally in harmony with the character of the neighborhood and the applicable requirements of the zoning district than the existing use.

8.2.3 Extending a Nonconforming Use - A nonconforming use may be extended in an area by special permit from the Board of Appeals.

8.2.4 Abandonment - A nonconforming use which is abandoned shall not be resumed. A conforming [sic] use shall be considered abandoned:

8.2.4.1 When a nonconforming use has been replaced by a conforming use; or

8.2.4.2 When a nonconforming use is discontinued for a period of two years or more; or

8.2.4.3 When a nonconforming use has been changed to another nonconforming use by special permit from the Board of Appeals.

"8.3 Nonconforming Structures

8.3.1 Continuation of Existing Structure - The requirements of Section 6 of 'The Zoning Act', Chapter 40A of the General Laws shall apply.

8.3.2 Changing a Nonconforming Structure - A nonconforming structure may be altered, [***18] reconstructed, extended or structurally changed [*174] provided that such alteration, reconstruction, extension or structural change conforms to all the dimensional requirements of this by-law.

8.3.3 Restoration - If a nonconforming structure is damaged by fire, flood or similar disaster to an extent greater than 50% of its fair market value before it was damaged, it may be rebuilt or reconstructed without a special permit from the Board of Appeals if such reconstruction is completed within two years. After two years, a special permit shall be required. However, no such special permit shall be granted unless the Board of Appeals finds that: (1) such

41 Mass. App. Ct. 165, *; 669 N.E.2d 446, **;
1996 Mass. App. LEXIS 778, ***

rebuilding or reconstruction will not be detrimental to the neighborhood, and (2) to the extent possible the structure will be rebuilt or reconstructed in conformity with the dimensional requirements of this by-law.

"8.4 Nonconforming Parking - This by-law shall not be deemed to prohibit the continued use of any land or structure that is nonconforming with respect to parking requirements."

The first four paragraphs of G. L. c. 40A, § 6, as in effect prior to St. 1994, c. 60, § 67, provide:

"Except as hereinafter provided, [***19] a zoning ordinance or by-law shall not apply to structures or uses lawfully in existence or lawfully begun, or to a building or special permit issued before the first publication of notice of the public hearing on such ordinance or by-law required by section five, but shall apply to any change or substantial extension of such use, to a building or special permit issued after the first notice of said public hearing, to any reconstruction, extension or structural change of such structure and to any alteration of a structure begun after the first notice of said public hearing to provide for its use for a substantially different purpose or for the same purpose in a substantially different manner or to a substantially greater extent except where alteration,

reconstruction, extension or structural change to a single or two-family residential structure does not increase the nonconforming nature [**452] of said structure. Pre-existing nonconforming structures or uses may be extended or altered, provided, that no such extension or alteration shall be permitted unless there is a finding by the permit granting authority or by the special permit granting authority designated by ordinance or by-law that [***20] such change, extension or alteration shall not be substantially more detrimental than the existing nonconforming use to the neighborhood. This section shall not apply to billboards, signs and other advertising devices subject to the provisions of sections twenty-nine through thirty-three, inclusive, of chapter ninety-three, and to chapter ninety-three D.

"A zoning ordinance or by-law shall provide that construction or operations under a building or special permit shall conform to any subsequent amendment of the ordinance or by-law unless the use or construction is commenced within a period of not more than six months after the issuance of the permit and in cases involving construction, unless such construction is continued through to completion as continuously and expeditiously as is reasonable.

41 Mass. App. Ct. 165, *; 669 N.E.2d 446, **;
1996 Mass. App. LEXIS 778, ***

"A zoning ordinance or by-law may define and regulate nonconforming uses and structures abandoned or not used for a period of two years or more.

"Any increase in area, frontage, width; yard, or depth requirements of a zoning ordinance or by-law shall not apply to a lot for single and two-family [*175] residential use which at the time of recording or endorsement, whichever occurs sooner was not [***21] held in common ownership with any adjoining land, conformed to then existing requirements and had less than the proposed requirement but at least five thousand square feet of area and fifty feet of frontage. Any increase in area, frontage, width, yard or depth requirement of a zoning ordinance or by-law shall not apply for a period of five years from its effective date or for five years after January first, nineteen hundred and seventy-six, whichever is later, to a lot for single and two family residential use, provided the plan for such lot was recorded or endorsed and such lot was held in common ownership with any adjoining land and conformed to the existing zoning requirements as of January first, nineteen hundred and seventy-six, and had less area, frontage, width, yard or depth requirements than the newly effective zoning requirements but contained at least seven thousand five hundred square feet of area and seventy-five feet of frontage, and provided that said five year period does not commence prior to January first, nineteen hundred and seventy-six, and provided further that the provisions of this sentence shall not apply to more than three of such adjoining lots held in common [***22] ownership. The provisions of this paragraph shall not be construed to prohibit a lot being built upon, if at the time of the building, building upon such lot is not prohibited by the zoning ordinances or by-laws in effect in a city or town."

The case was submitted on briefs.

25 Mass. App. Ct. 15, *; 514 N.E.2d 369, **;
1987 Mass. App. LEXIS 2254, ***

LEXSEE 25 Mass. App. Ct. 15

## DAVID B. WILLARD, trustee, v. BOARD OF APPEALS OF ORLEANS

## No. 86-1110

## Appeals Court of Massachusetts, Barnstable

25 Mass. App. Ct. 15; 514 N.E.2d 369; 1987 **Mass. App. LEXIS 2254**

### September 11, 1987, Argued

### October 26, 1987, Decided

**PRIOR HISTORY:**
 [***1]

CIVIL ACTION commenced in the Superior Court Department on June 13, 1985.

The case was heard by *James J. Nixon*, J.

**DISPOSITION:**
 *So ordered.*

**COUNSEL:**
 *Lawrence O. Spaulding, Jr.*, for the plaintiff.

*Michael D. Ford*, Town Counsel, for the defendant.

**JUDGES:**
 Grant, Perretta, & Smith, JJ.

**OPINIONBY:**
 GRANT

**OPINION:**

[*16]  [**370]  In 1985 the plaintiff, in his individual capacity, n1 acquired title to a lot in Orleans with an area of some 0.8 acres and a frontage of more than 100 feet on the northerly side of Cliff Road, a private way.  The lot had been in separate ownership from that of any adjoining lot since 1965.  A single-family house had been constructed on the lot at least as early as 1964; one corner of the house abutted the northerly sideline of Cliff Road. n2 There was no minimum setback requirement in the Orleans zoning by-law until 1972, when a twenty-five foot setback was established in the residential zoning district in which the plaintiff's lot is located.

n1 The plaintiff describes himself in the complaint as the trustee of a real estate trust known as Preservation Advocacy Trust.  It makes no difference for present purposes whether the locus is held by the plaintiff in his individual capacity or in a fiduciary capacity.  [***4]

25 Mass. App. Ct. 15, *; 514 N.E.2d 369, **;
1987 Mass. App. LEXIS 2254, ***

n2 A small portion of that corner of the house and the associated portion of a retaining wall actually intrude into the layout of Cliff Road. Nothing in this opinion turns on either intrusion.

In 1985, following his acquisition, the plaintiff applied to the local building inspector for a permit to construct an addition to his house which would be located partly within the twenty-five foot setback. The building inspector denied the application for some reason or reasons which do not appear. The plaintiff appealed from that decision to the board of appeals and also applied to the board for a special permit authorizing the construction of the desired addition. The board, after hearing, sustained the decision of the building inspector and denied the application for a special permit. The plaintiff appealed to the Superior Court ( G. L. c. 40A, § 17), which, in effect, affirmed both aspects of the board's decision. We reverse the judgment of the Superior Court and order the case remanded to the board for further proceedings.

[*17]   1.   *The relevant statutory provision.* The first question [***5] for decision is whether this case is governed by the first n3 or by the fourth n4 paragraph of G. L. c. 40A, § 6, as [*371] amended through St. 1979, c. 106. Town counsel argues for the former; the [*18] plaintiff espouses the latter. There is nothing on the face of the fourth paragraph to suggest that it was intended to apply to anything but vacant land. The only reference to a building is found in the last sentence of the paragraph, which sets out one of the circumstances (not applicable here) in which a "lot" may be "built upon." The immediate statutory ancestor of the fourth

paragraph ( G. L. c. 40A, § 5A, as in effect prior to St. 1975, c. 808, § 3) applied to original construction on vacant lots but not to alterations of existing structures which had become nonconforming, such as the one involved in this case. *Maynard* v. *Tomyl*, 347 Mass. 397, 400 (1964). There is no support for the plaintiff's position in *Sturges* v. *Chilmark*, 380 Mass. 246, 260-261 (1980), decided under the present fourth paragraph, in which the court was dealing with two vacant lots and the only question for decision was whether those lots were "adjoining" within the meaning of [***6] the fourth paragraph of the present § 6. The case of *Baldiga* v. *Board of Appeals of Uxbridge*, 395 Mass. 829 (1985), was also concerned with vacant lots.

n3 The first paragraph of the present G. L. c. 40A, § 6, reads in relevant part as follows: "Except as hereinafter provided, a zoning ordinance or by-law shall not apply to structures or uses lawfully in existence or lawfully begun, or to a building or special permit issued before the first publication of notice of the public hearing on such ordinance or by-law required by section five, but shall apply to any change or substantial extension of such use, to a building or special permit issued after the first notice of said public hearing, to any reconstruction, extension or structural change of such structure and to any alteration of a structure begun after the first notice of said public hearing to provide for its use for a substantially different purpose or for the same purpose in a substantially different manner or to a substantially greater extent *except* where alteration, reconstruction,

extension or structural change to a single or two-family residential structure does not increase the nonconforming nature of said structure. Pre-existing nonconforming structures or uses may be extended or altered, provided, that no such extension or alteration shall be permitted unless there is a finding by the permit granting authority or by the special permit granting authority designated by ordinance or by-law that such change, extension or alteration shall not be substantially more detrimental than the existing nonconforming use to the neighborhood ..." (emphasis supplied). [***7]

n4 The fourth paragraph of the present G. L. c. 40A, § 6, reads: "Any increase in area, frontage, width, yard, or depth requirements of a zoning ordinance or by-law shall not apply to a lot for single and two-family residential use which at the time of recording or endorsement, whichever occurs sooner was not held in common ownership with any adjoining land, conformed to then existing requirements and had less than the proposed requirement but at least five thousand square feet of area and fifty feet of frontage. Any increase in area, frontage, width, yard or depth requirement of a zoning ordinance or by-law shall not apply for a period of five years from its effective date or for five years after January first, nineteen hundred and seventy-six, whichever is later, to a lot for single and two family residential use, provided the plan for such lot was recorded or endorsed and such lot was held in common ownership with any adjoining land and conformed to the existing zoning requirements as of January first, nineteen hundred and seventy-six, and had less area, frontage, width, yard or depth requirements than the newly effective zoning requirements but contained at least seven thousand five hundred square feet of area and seventy-five feet of frontage, and provided that said five year period does not commence prior to January first, nineteen hundred and seventy-six, and provided further that the provisions of this sentence shall not apply to more than three of such adjoining lots held in common ownership. The provisions of this paragraph shall not be construed to prohibit a lot being built upon, if at the time of the building, building upon such lot is not prohibited by the zoning ordinances or by-laws in effect in a city or town."

[***8]

The portion of the first paragraph of the present § 6 with which we are concerned has no identifiable ancestor in G. L. c. 40A, as in effect prior to St. 1975, c. 808, § 3. That portion made its first appearance, without accompanying explanation (see *Baldiga* v. *Board of Appeals of Uxbridge*, 395 Mass. at 835), in 1974 House Doc. No. 5864. To be specific, the second "except" clause of the first paragraph of § 6 is addressed to "alteration[s], reconstruction, extension[s and] structural change[s] to ... single or two-family residential structure[s]," none of which is referred to in the fourth paragraph. The second sentence of the first paragraph is specific in its references to extensions and alterations of "[p]re-existing nonconforming structures" ( *Fitzsimons* v. *Board of Appeals of Chatham*, 21 Mass. App. Ct. 53, 55-56 [1985] n5). We have no hesitancy in concluding that the portion of the first

25 Mass. App. Ct. 15, *; 514 N.E.2d 369, **;
1987 Mass. App. LEXIS 2254, ***

paragraph of § 6 which [*19] commences with the second "except" clause sets out the statutory provisions which govern a case such as the present.  Compare *Walker* v. *Board of Appeals of Harwich*, 388 Mass. 42, 50-52 (1983).

n5 The *Fitzsimonds* case was not decided until more than four months after the board had acted in this case. It was decided more than eight months prior to the decision of the Superior Court and was specifically brought to the attention of the judge in the course of the trial.

[***9]

2. *The relevant provision of the zoning by-law.*  The next question is whether this case is governed by § 1:3-3-1 n6 or by § 6:4-3 n7 of the Orleans zoning [**372] by-law.  Section 1:3-3-1 makes specific reference to the present G. L. c. 40A, § 6, and reads almost directly on the language of the second "except" clause of the first paragraph of § 6, as discussed in part 1 hereof.  Section 6:4-3 makes no reference to any particular section of c. 40A, but it is clear from a comparison of its language with that of § 9 of c. 40A that § 6:4-3 was intended to implement the general provisions with respect to the issuance of special permits which are found in § 9 and to apply in special permit situations not specifically covered by other sections of the by-law. n8 Compare *Walker* v. *Board of Appeals of Harwich*, [*20] 388 Mass. at 51-52. Accordingly, we hold that it is § 1:3-3-1 which governs in this case.

n6 "Change, Extension or Alteration: As provided in Section 6 of Chapter 40A, General Laws, a nonconforming single- or two-family dwelling may be altered or extended provided that doing so does not increase the non-conforming nature of said structure.  Other pre-existing, non-conforming structures or uses may be extended, altered, or changed in use on Special Permit from the Board of Appeals if the Board of Appeals finds that such extension, alteration or change will not be substantially more detrimental to the neighborhood than the existing non-conforming use.  Once changed to a conforming use, no structure or land shall be permitted to revert to a non-conforming use." [***10]

n7 "Criteria.  Special Permits may be granted when it has been found that the use involved will not be detrimental to the established or future character of the neighborhood and the Town, and when it has been found that the use involved will be in harmony with the general purpose and intent of the Bylaw and shall include consideration of each of the following:
"6:4-3-1 Adequacy of the site in terms of size for the proposed use.
"6:4-3-2 Suitability of site for proposed use.
"6:4-3-3 Impact on traffic flow and safety.
"6:4-3-4 Impact on neighborhood visual character, including views and vistas.
"6:4-3-5 Adequacy of method of sewage disposal, source of water and drainage.
"6:4-3-6 Adequacy of utilities and other public services.
"6:4-3-7 Noise and litter."

n8 Section 1:3-3-1 is but one of several sections of the by-law making provision for the issuance of special permits in particular circumstances.

25 Mass. App. Ct. 15, *; 514 N.E.2d 369, **;
1987 Mass. App. LEXIS 2254, ***

See, e.g., § § 3:9-1-2 (shoreline zoning district), 4:3-9(b) (sidelines in VC zoning district), 5:7 (timesharing and interval ownership) and 5:11-2-3 (numbers of spaces required in off-street parking areas).

[***11]

3. *The proper construction of the statute and the by-law.* The first paragraph of G. L. c. 40A, § 6 (note 3, *supra*), contains an obscurity of the type which has come to be recognized as one of the hallmarks of the chapter. See, e.g., *O'Kane* v. *Board of Appeals of Hingham*, 20 Mass. App. Ct. 162 (1985), and cases cited; *Fitzsimonds* v. *Board of Appeals of Chatham*, 21 Mass. App. Ct. at 55-56. The first "except" clause of the statute is concerned with the application of zoning ordinances and by-laws to nonconforming "structures or uses," to any change in or substantial extension of such a "use", and to the alteration of such a "structure." The second "except" clause deals with the alteration, reconstruction, extension or structural change "to [*sic*] a single or two-family residential structure [which] does not increase the nonconforming nature of [the] structure." The immediately ensuing sentence speaks of not permitting extensions or alterations of "[p]re-existing nonconforming structures or uses" unless there is a finding by the permit or special permit authority that such change, extension or alteration "*shall not be substantially more detrimental* [***12] *than the existing nonconforming use* to the neighborhood" (emphasis supplied).

It will be noted that all the portions of the statute which have just been summarized or quoted except the portion italicized are expressly directed to nonconforming structures as well as nonconforming uses. In the present case,

the existing and proposed nonconformities arise out of the position of a house on a lot of land rather than out of the use which is being or is proposed to be made of the house or of the lot on which the house is and would continue to be located. The italicized portion of the statute makes no sense in these circumstances because, as worded, it appears to contemplate a determination of whether an alteration to an existing structure would be more detrimental to the neighborhood by reference to the existing [*21] residential use of the land, which would not change if the structure were altered. n9 We are of opinion that this is one of those rare instances in which a court must overcome its reluctance to supply a word or words which were not employed by the Legislature (see, e.g., [**373] *Murray* v. *Board of Appeals of Barnstable*, 22 Mass. App. Ct. 473, 479 [1986]) [***13] in order to render a statute intelligible and so effectuate its obvious intent. Compare *Chelmsford Trailer Park, Inc.* v. *Chelmsford*, 393 Mass. 186, 196-197 (1984). Accordingly, we read the concluding portion of the second sentence of the first paragraph of the present G. L. c. 40A, § 6, as follows: "shall not be substantially more detrimental than the existing nonconforming *structure or* use to the neighborhood" (emphasis supplied).

n9 As one commentator has put it, "[T]here is an apples-compared-to-oranges problem regarding buildings in sentence two of new Section 6 in that any extension or alteration of a [nonconforming] structure depends on a demonstration to and a finding by the [permit granting authority] that the same will not be substantially more detrimental to the neighborhood than the existing nonconforming use.

Case 1:05-cv-10116-DPW    Document 24-23    Filed 12/27/2005    Page 6 of 8

Page 6

25 Mass. App. Ct. 15, *; 514 N.E.2d 369, **;
1987 Mass. App. LEXIS 2254, ***

Presumably the Appeals Court will, at some point, instruct [permit granting authorities] how to go about comparing structures to uses." Hays, Application of Chapter 808 to Existing Structures, Uses, Plan Variances and Permits, 22 B.B.J. 17, 19 (1978). The apples and oranges were present but not sorted out in *Tamerlane Realty Trust* v. *Board of Appeals of Provincetown*, 23 Mass. App. Ct. 450 (1987).

[***14]

On a parity of reasoning, we think the concluding portion of the penultimate sentence of § 1:3-3-1 of the by-law (note 6, *supra*) is to be read: "will not be substantially more detrimental to the neighborhood than the existing non-conforming *structure or* use" (emphasis supplied).

There is one more question of construction. As pointed out in *Fitzsimonds* v. *Board of Appeals of Chatham*, the second "except" clause of the first paragraph of c. 40A, § 6, requires a board of appeals in a case such as this one to make an initial determination whether a proposed alteration of or addition to a nonconforming structure would "'increase the nonconforming nature of said structure'" (21 Mass. App. Ct. at 56). This part of the statute is not concerned with the use of the structure or of the land on which it is located. We think the quoted language should be read as requiring a board of appeals to identify the [*22] particular respect or respects in which the existing structure does not conform to the requirements of the present by-law and then determine whether the proposed alteration or addition would intensify the existing nonconformities or result in additional ones. If [***15] the answer to

that question is in the negative, the applicant will be entitled to the issuance of a special permit under the second "except" clause of G. L. c. 40A, § 6, and any implementing by-law. Only if the answer to that question is in the affirmative will there be any occasion for consideration of the additional question illuminated in the *Fitzsimonds* case (21 Mass. App. Ct. at 56).

4. *Shortcomings in the board's and the judge's findings.* The board found that the addition proposed in this case "would increase the non-conforming nature of the present structure." That finding is not suspect because there was evidence in the Superior Court from which it could be found (as was agreed at the argument before us) that at least one portion of the addition would protrude beyond the footprint of the present structure.

When it came to the plaintiff's alternative request for a special permit, the board found that the proposed addition would result in increasing the height of the existing structure by nine feet [n10] and that "this would interfere with the views or vistas of the surrounding property owners and be substantially more detrimental to the neighborhood and the town." [***16] The references to the "town", which appears in § 6:4-3 of the by-law (note 7, *supra*) but not in the first paragraph of G. L. c. 40A, § 6 (note 3, *supra*) or in § 1:3-3-1 of the by-law (note 6, *supra*), and to "views and vistas," which appear in § 6:4-3-4 of the by-law (note 7, *supra*) but not in the statute or in § 1:3-3-1 of the by-law, strongly suggest that the board may have proceeded under the wrong special permit provisions of the by-law. See part 2 hereof. We do not say that the board, in the exercise of its discretion, could not properly consider the factors set [*23] out in § 6:4-3-4 of the by-law in determining whether the proposed addition would result in a structure substantially more

detrimental to the neighborhood than the existing structure (part 3 hereof). We do say that on this record it does not appear with any measure of certainty that the board proceeded under the first paragraph of c. 40A, § 6, and § 1:3-3-1 of the by-law.

n10 The judge found that the increase would be sixteen feet. Neither the board nor the judge made any finding that the increase in height, whatever it might be, would result in any nonconformity under the present by-law. See the *Fitzsimonds* case, 21 Mass. App. Ct. at 57.

[***17]

[**374] The board, in its decision, gave no indication what it considered the "neighborhood" to be. The board referred loosely to "surrounding property owners," but we do not know whether it had in mind the owners of lots contiguous to or across Cliff Road from the plaintiff's lot, all the fifteen owners to whom notice of the public hearing was given under G. L. c. 40A, § 11, the owners of all the other 229 lots in the subdivision which includes the plaintiff's lot, or something else. n11 There is need for clarification in this area because at the hearing in the Superior Court there was evidence of whether the top of the proposed addition would be visible from certain nearby properties and from certain public landings, some of which are undoubtedly parts of the "town" within the meaning of § 6:4-3 of the by-law but may not be parts of the "neighborhood" within the meaning of the first paragraph of c. 40A, § 6, and § 1:3-3-1 of the by-law.

n11 The judge nowhere used the word "neighborhood."

The judge's [***18] findings and rulings are subject to many of the same frailties. For instance, he said in the early part of his findings that the plaintiff's application for a special permit had been filed under § 1:3:3-1 of the by-law, and he referred to "compliance with section 6 of chapter 40A." Somewhat later, the judge ruled (erroneously) that the issuance of a special permit of the type sought in this case is governed by § 6:4-3 of the by-law. There are additional problems. The judge found that "[t]he planned construction would be a substantial extension of the non-conforming use" and that "[t]he extensive increase in use of the lot through expansive decking will materially change the structure." Nowhere did the judge make any finding on the question whether the proposed addition would increase the nonconforming nature of the structure or the question [*24] whether the addition would result in a structure not substantially more detrimental to the neighborhood than the existing structure.

It is clear that the judge failed to make independent findings of fact ( G. L. c. 40A, § 17) on all the issues raised by the appeal to the Superior Court before determining the validity of the [***19] board's decision. See, e.g., *Pendergast* v. *Board of Appeals of Barnstable*, 331 Mass. 555, 558-559 (1954); *Planning Bd. of Springfield* v. *Board of Appeals of Springfield*, 355 Mass. 460, 462 (1969); *Josephs* v. *Board of Appeals of Brookline*, 362 Mass. 290, 295, 298-300 (1972). There is nothing in the judge's findings that can be relied on to salvage either aspect of the board's decision.

The judgment is reversed, and the decision of the board of appeals is annulled; the case is to be remanded to the board for further proceedings consistent

25 Mass. App. Ct. 15, *; 514 N.E.2d 369, **;
1987 Mass. App. LEXIS 2254, ***

with this opinion; the board, after new notices under G. L. c. 40A, § 11, may reopen the hearing for the purpose of taking further evidence; the board shall render a new decision; the Superior Court may retain jurisdiction over the case; costs of appeal are not to be awarded to any party.

*So ordered.*

Properties with less than 5,000 square feet
Per Assessor's list of properties with structures in existence as of 1954
(5,000 s.f. = 0.11 acres-> 5,000/43,560 = 0.11)

| Address (Map/Parcel ID) | Owner   (per Assessors) | Structure (Yr Blt) | Acreage |
|---|---|---|---|
| 1. 23 Canary St. (83-27) | Pola, Fernando & Louise | single family (1857) | 0.06 |
| 2. 2 Freeman St. (83-16) | Kruse, Sandra Lee | two family (1850) | 0.10 |
| 3. 3 Freeman St. (83-13) | Barber, Donald & Ann | single family (1857) | 0.08 |
| 4. 9 Georges Rock Rd. (74-53) | Rodenhizer, Bruce | single family (1776) | 0.08 |
| 5. 11 Georges Rock Rd. (74-54) | Dvorski, Stella | single family (1850) | 0.10 |
| 6. 1 Holway Rd. (71-42) | McCormack, James & Jenifer | single family (1927) | 0.08 |
| 7. 20 Holway Rd. (71-42) | Smith, Stephen et al. | single family (1950) | 0.07 |
| 8. 2 Jarves St. (73-30) | Trovato, Frank & Carole | small retail (1930) | 0.04 |
| 9. 32 Jarves St. (82-151) | Russell, Joan | single family (1860) | 0.10 |
| 10. 34 Jarves St. (82-149) | Madden, Parke  et al. | single family (1860) | 0.10 |
| 11.  38 Jarves St. (82-150) | Deshler, John | single family (1930) | 0.10 |
| 12. 43 Jarves St. (82-143) | Burke, Walter & Ellen | single family (1857) | 0.07 |
| 13.  16 Liberty St. (73-079) | Dennison, Shawn Marie | single family (1850) | 0.10 |
| 14.  146 Main St. (73-182) | Madden Realty Trust | mixed use (1868) | 0.02 |
| 15.  153 Main St. (73-020) | ESP Realty Trust | small retail (1876) | 0.08 |
| 16.  157 Main St. (73-31) | J&R Realty Trust | mixed use (1900) | 0.06 |
| 17.  181 Main St. (73-088) | St. Hilaire, Marie | single family (1840) | 0.08 |
| 18. 142 North Shore Blvd (70-127) | Hutchings, Charles J. | single family (1928) | 0.10 |
| 19.  214 North Shore Blvd. (71-43) | Neale, Priscilla et al. | single family (1927) | 0.08 |
| 20. 197 Phillips Rd. (98-002) | Munro, Robert & Marieann | single family (1950) | 0.09 |
| 21. 203 Phillips Rd. (96-004) | Dondero, John & Linda | single family (1954) | 0.07 |
| 22. 10 Pine Grove Cir. (47-17) | Hatt Everett & Eva | single family (1949) | 0.07 |
| 23.  8 Pine Grove Cir. (47-16) | Tirrell Family Trust | single family (1950) | 0.10 |
| 24. 8 Pleasant St. (73-042) | Borjeson, Ronald G. | single family (1857) | 0.07 |
| 25. 14 Pleasant St. (73-052) | Hood, R. Scott | single family (1850) | 0.09 |

| | | | |
|---|---|---|---|
| 26. 17 Pleasant St. (73-050) | Garland, Marsha | single family (1857) | 0.09 |
| 27. 77 Ploughed Neck Rd. (70-42) | Hamilton, Jane | single family (1948) | 0.09 |
| 28. 81 Ploughed Neck (70-043) | Estate of Natalie Nobile | single family (1953) | 0.10 |
| 29. 130 Route 6A (82-67) | Blue Sky Realty Trust | small retail (1900) | 0.07 |
| 30. 111 Salt Marsh Rd. (77-66) | Dunbar Realty Trust | single family (1952) | 0.10 |
| 31. 1 Sand Castle Dr. (96-001) | Raymond, Kevin | single family (1954) | 0.04 |
| 32. 3 Sand Castle Dr. (96-002) | Notartomaso, Cheryl | single family (1954) | 0.04 |
| 33. 5 Sand Castle Dr. (96-003) | Deak, Edward | single family (1954) | 0.04 |
| 34. 7 Sand Castle Dr. (98-006) | Hayes, Louise | single family (1954) | 0.05 |
| 35. 9 Sand Castle Dr. (98-008) | Hogan, Carol | single family (1954) | 0.05 |
| 36. 17 Sand Castle Dr. (96-007) | DiRienzo, Mark | single family (1953) | 0.04 |
| 37. 19 Sand Castle Dr. (96-008) | Waite, Stephen | single family (1954) | 0.04 |
| 38. 3 School St. (73-119) | Eklund, Linda | single family (1840) | 0.08 |
| 39. 37 Shore Dr. (07-169) | Orazal Trust | single family (1900) | 0.07 |
| 40. 3 State St. (82-117) | Jackson, Ronald | single family (1850) | 0.10 |
| 41. 7 State St. (82-118) | Earle, Katherine | single family (1850) | 0.08 |
| 42. 5 Summer St. (73-038) | Martinelli, Joan | single family (1857) | 0.10 |